EXHIBIT B

**Item 1.    Cover Page**

# Granite Point Capital Management, L.P.
# Firm Brochure

109 State Street
5th Floor
Boston, MA 02109
Telephone (617) 587-7500
Fax (617) 587-7501
info@granitepoint.com

www.granitepoint.com

**March 2019**

This brochure provides information about the qualifications and business practices of Granite Point Capital Management, L.P. ("Granite Point"), an investment adviser registered with the United States Securities and Exchange Commission. If you have any questions about the contents of this brochure, please contact our Chief Compliance Officer, David Bushley at (617) 587-7507 or david@granitepoint.com. The information in this brochure has not been approved or verified by the SEC or by any state securities authority. Registration with the SEC does not imply a certain level of skill or training.

Additional information about Granite Point is also available on the SEC's website at www.adviserinfo.sec.gov.

**Item 2.    Material Events and Changes**

There have been no material events or changes to our business since our last filing in December 2018.

**Item 3.     Table of Contents**

Item 4.     Advisory Business ............................................................................................ 4

Item 5.     Fees and Compensation .................................................................................... 5

Item 6.      Performance-Based Fees and Side-by-Side Management .................................. 8

Item 7.     Types of Clients............................................................................................... 9

Item 8.     Methods of Analysis, Investment Strategies, and Risk of Loss ............................. 9

Item 9.      Disciplinary Information .................................................................................. 19

Item 10.    Other Financial Industry Activities and Affiliations .............................................. 20

Item 11.    Code of Ethics, Participation or Interest in Client Transactions, and
            Personal Trading ............................................................................................. 20

Item 12.    Brokerage Practices ......................................................................................... 21

Item 13.    Review of Accounts .......................................................................................... 23

Item 14.    Client Referrals and Other Compensation.......................................................... 24

Item 15.     Custody........................................................................................................... 25

Item 16.     Investment Discretion....................................................................................... 25

Item 17.      Voting Client Securities..................................................................................... 25

Item 18.     Financial Information ........................................................................................ 26

**Item 4.          Advisory Business**

*A. General Description of Advisory Firm*.

Granite Point Capital Management, L.P., which we will refer to as ("Granite Point", "we", "us" or "our"), is a Delaware limited partnership formed by Warren Lammert in January 2004, when Granite Point began operations.  Granite Point provides discretionary investment advisory services to its Clients who are private pooled investment vehicles. Granite Point is owned by Warren Lammert, the founder and principal owner.

Granite Point and Granite Point's related person (relying adviser) Granite Point Capital, L.L.C., a Delaware limited liability company, are both investment advisers. Granite Point manages funds in various structures such as master-feeder and a Series Trust.  The Master Fund invests in the Series Trust and the Select Opportunities private equity fund.

Cassandra Powell and Phillip Dickie serve as the Directors to the Granite Point Capital Offshore Fund Ltd., a Cayman Islands exempted company (feeder fund) (formed in January 2004), as well as Granite Point Capital Offshore Opportunities Fund, Ltd. a Cayman Islands exempted company, formed in December 2017

The general partner of the investment manager (Granite Point) is GPC I, L.L.C., (also a relying adviser) a Delaware limited liability company of which Mr. Lammert also serves as the managing member.

Warren Lammert is primarily responsible for managing Granite Point's investment program on behalf of the Funds/Clients.

Since the Funds/Clients invest in futures and commodities contracts, Granite Point filed, and continues to rely on and annually reaffirm an exemption for registration with the NFA.  The CFTC is a federal regulatory agency with jurisdiction over futures trading.   The National Futures Association ("NFA") is the self-regulatory organization for the U.S. derivatives industry, including on-exchange traded futures, retail off-exchange foreign currency (forex) and OTC derivatives (swaps).

While the Granite Point Funds may trade commodity futures and/or commodity options contracts, the Funds are exempt from registration with the CFTC as a commodity pool operator ("CPO") pursuant to CFTC Rule 4.13(a)(3) and Granite Point is exempt from registration as commodity trading advisor ("CTA") under Rule 4.14.

*B. Description of Advisory Services (including any specializations)*

Granite Point's investment program entails investing Client/Fund capital directly in a broad range of securities, primarily equities via long/short strategy.

Granite Point's investment objective is to maximize returns while seeking preservation of capital by pursuing a long/short strategy focused on equities, but also including other publicly traded

corporate instruments, currency, interest rate, futures and commodity positions. From time to time certain Granite Point funds may acquire assets that Granite Point believes either lack a readily assessable market value or should be held until the resolution of a special event or circumstance (a "Special Investment"). The issuer of such an investment may be a private company or, if it is a public company, the securities may have been purchased in a private placement; investors have the opportunity to participate or not prospectively in such investments.

Granite Point will have complete flexibility with respect to the types of securities or other instruments used in pursuing its investment objective and strategy.

Granite Point formulates investment objectives, directs and manages the investment and reinvestment of Client assets, and provides reports to investors. Investment advice is provided directly to the Funds according the Fund's particular investment objectives and not individually to any Fund investor. Fund investors may not impose restrictions on the Fund's investment activities.

Our Fund investors are either high net worth individuals ("accredited investors") or institutional investors that meet the eligibility criteria as outlined in Fund offering documents.

### C. Availability of Tailored Services for Individual Clients

We have full discretionary authority with respect to investment decisions for the Funds/Clients. When we provide our services at the fund level, it is in accordance with the investment objectives and guidelines set forth in the funds' respective offering documents, and we do not provide investment advisory services tailored to specific individual investors in our Funds.

### D. Wrap Fee Programs.

This is not applicable as we do not offer any wrap fee programs.

### E. Client Assets Under Management.

As of December 31, 2018, Granite Point managed $277,555,012 of client assets, all of which is managed on a discretionary basis.

### Item 5.        Fees and Compensation

### A. Management Fees and Performance Allocation

Granite Point receives compensation from the Fund comprised of fees based on a percentage of assets under management and performance-based amounts, depending on fund performance (after calculation and accrual of management fees). The performance-based compensation is in the form of a profit allocation from the Fund to the General Partner of the Fund. The

management fee is typically paid monthly in arrears (based on net asset value) by deducting the fee from the Fund investors' capital accounts and is pro-rated for intra-year capital contributions and withdrawals. Other than Special Investments, the performance allocation is based on realized and unrealized gains (based on increase in net assets) determined as of the last business day of each year or upon a Fund investor's withdrawal of capital, subject to a high-water mark.

We charge an annual performance allocation generally between 15% - 20% which is subject to a high-water mark and a 1.5% - 2%% management fee.

### B. Payment of Fees.

The performance allocation fee is deducted from an investor's capital account as of the last business day of the year in arrears and the Management Fee is typically deducted monthly in arrears or at time of capital withdrawal.

Compensation payable to Granite Point is negotiable under certain circumstances (such as the size of an individual investment or the overall amounts allocated to us over time). Granite Point may, in its discretion, waive all or a portion of its management fees or performance-based compensation for a particular investor. An investor may pay a management fee that is higher or lower than that of another investor, based on factors such as the amount of assets managed for the investor overall.

Early Series Fund investors were offered a reduced fee structure for the first two years of their investment and this was documented via side letters with each investor.

### C. Other Fees and Expenses

The Funds pay such out-of-pocket costs and expenses as we determine to be necessary or advisable to the conduct of our business, including without limitation:

For Granite Point Capital Master Fund, LP, the Partnership bears its own operating expenses and its pro rata share of the Master Fund's expenses, including, but not limited to, investment expenses (e.g., brokerage commissions, expenses relating to short sales, expenses related to the purchase and sale of illiquid securities, clearing and settlement charges, custodial fees, bank service fees and interest expenses, consulting and other professional fees relating to particular investments); legal expenses; professional fees relating to investments; accounting expenses; auditing and tax preparation expenses; costs of printing and mailing reports and notices; entity-level taxes; fees to the Administrator, corporate licensing; regulatory expenses; organizational expenses; expenses incurred in connection with the offering and sale of the limited partnership interests and other similar expenses related to the Partnership and the Master Fund; and extraordinary expenses.  Such expenses will be shared by all of the Partners, including the General Partner; provided, however, that the General Partner may, in its discretion, specially allocate expenses to a Partner's capital account to reflect such Partner's interest in Special Investment Accounts in proportion to their respective participating percentage interest therein.

A portion or all of the organizational expenses and/or the operating expenses may be borne by the Investment Manager, in its sole discretion. Since the inception of the Partnership, the Investment Manager has decided to absorb, because of the size of the Partnership, some costs that are ordinarily paid by the Partnership, which had the effect of slightly improving the performance results of the Partnership; there is no guarantee that the Investment Manager will choose to absorb these costs in the future.

For the Series Fund and the Select Opportunities Fund, the Partnership will bear all costs and expenses related to the organization of the Partnership and the costs incurred in connection with the initial issuance of Interests, including legal and accounting fees, document production and printing costs, federal and state filing fees, and other related expenses (the "Organizational Expenses"). The Partnership's Organizational Expenses and offering expenses, to the extent the General Partner deems appropriate, may be, for accounting purposes, amortized by the Partnership for up to a 60-month period. Amortization of such expenses over a period that is up to 60 months is a divergence from GAAP, which may, under certain circumstances, result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may decide to (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes but amortize expenses for purposes of calculating the Partnership's net asset value. The Partnership will bear all costs and expenses related to its investments and its operations, including, without limitation, brokerage and other transaction costs, clearing and settlement charges, interest and commitment fees on debit balances or borrowings, borrowing charges on securities sold short, costs of any liability insurance obtained on behalf of the Partnership, custody fees, costs of any litigation or investigation involving Partnership activities, indemnification expenses, the Management Fee, consulting expenses, the fees and expenses of professionals providing services to the Partnership, including legal, audit, accounting, tax and administration, any issue or transfer taxes chargeable in connection with any securities transactions, any entity level taxes, regulatory costs, filing and license fees, research and research-related travel expenses, the costs of reporting and providing information to Limited Partners and any extraordinary expenses.

### D. Additional Compensation and Conflicts of Interest.

We are not compensated for the sale of securities or other investment products and we are not affiliated with any broker-dealers.

Granite Point sometimes approves one or more firm employees to act as representatives on the board of directors of certain companies in which the Funds invest. These firm employees are sometimes, but not always, compensated for their service on the Board. Compensation is in the form of cash compensation or equity. This represents a conflict of interest in that the employee has a fiduciary duty to two different entities – the Fund as well as the company. Granite Point has taken the position that the interests of the two entities are aligned so as to mitigate this conflict. If the company performs well, the Fund that is invested in the company will benefit from this performance. Typically, and historically, all companies have been private companies which minimizes the risk of trading on material non-public information. Any directorship requires pre-approval by our Chief Compliance Officer and annual reporting of any changes.

In situations where Granite Point votes the proxy for a company in which an employee or employees serve on the board of directors, Granite Point will ensure that the employee is not involved in the proxy voting process for that company.

Compensation received by an individual (officer or employee) of Granite Point, as it relates to services provided as a director, consultant or other advisory role to a company in which Granite Point has made an investment, that compensation will be contributed by the recipient to the fund(s) participating in the investment. The contribution shall be net of any tax impact to the recipient (officer or employee) and made as soon as practical after realization of the economic value.  To the extent possible, compensation for director services will be declined by the officer/employee so there is no contribution amount necessary.

In addition, some employees, officers, or directors of Granite Point may become founders of companies in which the funds invest (a related party transaction).  As founders, they may receive founder's shares in the company and those shares will be retained by the individual. The conflict imposed by this arrangement is similar to the conflict identified above for directors. A financial incentive exists for the founder/employee in that if the company performs well the founder's shares will increase in value.  However, any employee, officer, or director of Granite Point that founds a company in which the funds invest will not be involved in the day-to-day management of the company and will not receive a salary from the company.  His/her primary focus will remain at Granite Point.

Certain Limited Partners with specialized private investment expertise will occasionally source private investment opportunities for Funds in which they later become invested. These Limited Partners will not be charged management or performance-based fees and are typically paid for the services they provide to the Funds by Granite Point. Investment ideas brought to Granite Point in this manner are vetted in the same way as any other investment opportunity sourced internally.

An additional economic benefit is provided to these investors, above and beyond other investors, in the form of compensation as well as no fees charged on their capital balances. This conflict of interest with other investors is mitigated by our disclosure to all investors of this activity (via this Brochure) and by the alignment of interests between the Fund and the Limited Partners.  When the Funds perform well, all investors, including the compensated partners, benefit.

Our Funds utilize committees composed of independent limited partners that approve any related party transactions before, at the time of, or after any Fund investment involving a related party of Granite Point.


**Item 6.  Performance-Based Fees and Side-by-Side Management**


As noted above under "Fees and Compensation," Granite Point may receive from the Funds/Clients performance-based compensation in the form of an allocation equal to a percentage of the appreciation in the net asset value of each investor's investment, depending on fund performance.

The receipt of performance-based compensation creates a conflict of interest between Granite Point's interests in earning a profit for itself in the short term and the long-term interests of the investors. Specifically, Granite Point may have an incentive to make investments that are riskier or more speculative than would be the case if we were compensated solely based on a flat percentage of capital. We may receive increased compensation because the performance-based compensation is calculated on a basis which includes unrealized appreciation as well as realized gains, and any securities for which market quotations are not readily available will be valued by Granite Point at the value reasonably determined by us. These valuations can affect the amount of performance-based compensation received by us.

Some of Granite Point's related persons or former employee investors are not charged performance-based fees. There may be a potential conflict of interest because Granite Point and its supervised persons may have an incentive to favor Clients that are charged performance fees over those that are not charged performance fees. Granite Point addresses this potential conflict by striving to treat each Client as fairly as possible and allocating securities among Clients to not favor any one particular Client.

We retain the right to waive or reduce the Performance Allocation with respect to any investor.

## Item 7.        Types of Clients

Granite Point provides investment supervisory services to private investment funds. Investment advice is provided directly to a private fund client, subject to our direction and control, and not individually to Fund investors. Our investor base is comprised of accredited investors and institutions, including Mr. Lammert and his family members and other Principals of the Investment Manager.

Minimum Investment Requirement:

- The minimum initial investment amount for investors in our Fund's is typically $1,000,000.

While the Fund(s) offering documents generally limit initial investments to at least $1,000,000, Granite Point may waive the minimum in its discretion. Factors that may be considered in waiving such minimum are the size of an investment in the Fund and the overall amounts allocated to us for management by the investor.

## Item 8.        Methods of Analysis, Investment Strategies, and Risk of Loss

### A. *Methods of Analysis and Investment Strategies*.

Granite Point's investment objective is to maximize returns while seeking preservation of capital by pursuing a long/short strategy-focused on equities, but also including other publicly

traded corporate instruments, private companies, public company securities purchased in private investments (PIPES), currency, interest rate, futures and commodity positions. Granite Point will have complete flexibility with respect to the types of securities or other instruments used in pursuing its investment objective and strategy.

Granite Point or its affiliate seeks to identify investment opportunities through a value driven analytical framework based on fundamental research on individual securities and the examination of macro-economic conditions and risks. At the individual stock level, Granite Point seeks to find companies selling at prices which Granite Point believes do not adequately reflect their future prospects. Granite Point engages in research that draws on a range of sources that may include management, customer, supplier, competitor and distribution contacts; public information from Wall Street analysts and other research; industry consultants; analysis of income statements, cash flows, balance sheets and returns on investments; and competitive analysis and examination of the trading in related securities. The portfolio managers and analysts bring decades of investment experience and an extensive network of contacts to bear in this process. In addition to staking out core equity positions as outlined above, Granite Point will be opportunistic with respect to macro-economic developments. Futures and options in equities, currencies, interest rates and commodities may be used to control risk and to exploit profitable trends as observation and experience suggest.

As economics would suggest and our experience confirms, Wall Street research coverage of small and mid-size companies tends to be less thorough than that devoted to larger companies. Mismatches between market expectations and Granite Point's forecasts of individual company prospects drive Granite Point's process. While Granite Point believes that these opportunities present themselves among companies large and small, Granite Point expects that many such opportunities will relate to smaller company stocks.

Risk Management

We may, in our discretion, execute risk management strategies as an overlay to an investment portfolio.  We believe that doing so may be advisable from time to time in order to reduce overall exposure to certain individual securities or markets accumulated across different Funds/Clients, to maintain attractive risk/return profiles in certain investments (where no underlying hedging may be occurring) as well as to reduce exposure to certain illiquid investments held by the Fund(s).  We may hedge by making investments which we believe may closely correlate with the Fund's underlying holdings.  However, there can be no assurance that the expected correlation will in fact occur or that the selected hedging vehicle will in fact reduce the Fund's risk exposure.

Specific risk management efforts used by Granite Point are described in the Fund's governing documents and investment management agreements.

No Strategy Limitations

Granite Point will have complete flexibility with respect to the types of securities or other instruments used in pursuing its investment objective and strategy. Granite Point will invest primarily in U.S. dollar denominated securities traded on U.S. markets, but may invest its assets

in investments denominated in other currencies. Granite Point may invest all or any portion of its assets in cash or cash equivalents.

***B. Material Risks (Including Significant or Unusual Risks) Relating to Investment Strategies***.

The following is a summary of some of the material risks associated with the investment strategy employed by Granite Point on behalf of our Funds/Clients. This summary does not attempt to describe all of the risks associated with the investment strategies pursued. The Fund's offering memorandum contains a more complete description of the risks associated with an investment in the Funds.  Investing in securities involves risk of loss that the Fund investors should be prepared to bear.

***Increased Competition in Alternative Asset Investments***

There has been a marked increase in the number of, and flow of capital into, investment vehicles established in order to implement alternative asset investment strategies, including the strategies implemented by the Funds. Such increase may result in greater competition for investment opportunities or may result under certain circumstances in increased price volatility, decreased liquidity or lower returns with respect to certain positions.

***Investments in Other Funds of Funds***

We may invest in unrelated private funds (*i.e.*, "funds of funds"). Such investments will subject the Fund to the fees charged by the underlying private funds in which they invest. In addition, it may be difficult or impossible for us to conduct adequate due diligence on the underlying private funds since we are not privy to that information, and instead, we may rely on a particular fund of funds' due diligence of its own underlying funds.

Our Master fund also invests in our Series Funds in order to gain access to different investment strategies. Fund investors will only pay the fees attributable to the Fund to which they are directly invested.  Fund investors should refer to each Fund's Offering Memorandum for specific details on our master/feeder funds and applicable fees.

***"Hedging" No Assurance Against Loss***

Although the Funds may hedge certain market exposure, such hedging may provide no protection against significant losses.

We may utilize financial instruments such as currency forwards and options both for investment purposes and for risk management purposes in order to: (i) protect against possible changes in the market value of a Fund's investment portfolio resulting from fluctuations in the securities markets and changes in interest rates, (ii) protect the unrealized gains in the value of a Fund's investment portfolio, (iii) facilitate the sale of any such investments, (iv) enhance or preserve returns, spreads or gains on any investment in a Fund's portfolio, (v) hedge the interest rate or currency exchange rate on any of a Fund's liabilities or assets, (vi) protect against any increase in

the price of any securities a Fund anticipates purchasing at a later date or (vii) for any other reason that Granite Point or its affiliate deems appropriate.

### Master-Feeder Structure for the Funds

Granite Point Capital Master Fund, LP, Granite Point Select Opportunities Fund, LP, and each of the Series Funds employ a "master-feeder" structure.  This structure, in particular the existence of multiple feeder funds investing in the same master fund, presents certain unique risks to investors. When there are multiple feeder funds investing in a master fund, there is no overlapping or duplication of management fee and performance allocation. Fund investors will only pay the fees attributable to the Fund to which they are directly invested.  Fund investors should refer to each Fund's Offering Memorandum for specific details on our master/feeder funds and applicable fees.

### Equity Securities

We invest in equity securities and equity derivatives.  The value of these Financial Instruments generally will vary with the performance of the issuer and movements in the equity markets.  As a result, the Funds may suffer losses if it invests in equity instruments of issuers whose performance diverges from our expectations or if equity markets generally move in a single direction and the Fund has not hedged against such a general move. The Fund also may be exposed to risks that issuers will not fulfill contractual obligations, such as, in the case of convertible securities or private placements, delivering marketable common stock upon conversions of convertible securities and registering restricted securities for public resale.

### Convertible Securities

Convertible securities are stocks or other securities that may be converted into, or exchanged for, a specified amount of common stock of the same or a different issuer within a particular period of time at a specified price or formula. Typically, the market value of a convertible security performs like that of a debt security. A convertible security may be subject to redemption at the option of the issuer at a price established in the convertible security's governing instrument. If a convertible security held by the Fund is called for redemption, the Fund will be required to permit the issuer to redeem the security, convert it into the underlying common stock, or sell it to a third party. Any of these actions could have a material adverse effect on the Fund's performance. Convertible securities are also subject to liquidity risk based on market conditions.

### Short Sales of Securities

We may sell securities short. Selling securities short involves selling securities that the Fund does not own. To make delivery to the purchaser of those securities, the Fund may borrow securities from a third-party lender. The Fund subsequently must return the borrowed securities to the lender by delivering to the lender securities purchased in the open market. The Fund could, in theory, be exposed to an unlimited loss in the event of an unlimited increase in the market price of a borrowed security. Purchasing securities to close out the short position can itself cause the price of the securities to rise, thereby limiting profits or exacerbating losses. The risk also

exists that the securities necessary to cover a short position will not be available for purchase. Additionally, arbitrage strategies involving short sales are exposed to the risk of the loss of the hedge if the stock sold short is called by the lending broker, or the position cannot otherwise be maintained, forcing premature liquidation.

Short selling is continually the subject of regulatory scrutiny, and regulatory restrictions exist in one or more markets in which the Fund trades.

### *PIPEs*

Each Series of a Fund may invest in private investments in public equities ("PIPEs"). Most PIPE transactions involve the purchase of securities in a private offering where either (i) the closing of the private transaction is conditioned upon the effectiveness of a registration statement covering the resale of such securities or (ii) the issuer covenants at the time of the closing of the private offering to obtain an effective registration statement covering the resale of such securities within a certain period of time. As securities sold in a PIPE transaction will generally be restricted only for the period from the private sale until the issuer's registration statement with the SEC covering resale of such securities becomes effective, a Fund may pay more for such securities than for other private placement securities. If the issuer is unable to obtain an effective resale registration statement for a PIPE, the PIPE will remain restricted under U.S. securities laws (subject to the availability of some other exemption) and a Fund may be unable to recover from the issuer an amount sufficient to compensate a Fund for the loss of liquidity of such security.

### *Options*

We may buy and sell put and call options on securities and stock indices. The writer of a covered call option assumes the risk of a decline in the market price of the underlying security to a level below the purchase price of the underlying security, less the premium received on the call option. The writer of a covered call option also gives up the opportunity for gain on the underlying security above the exercise price of the call.  In addition, the writer of a call option that is not covered assumes the additional risk that it will be required to satisfy its obligation to the buyer of the call option by making an open-market purchase of the underlying securities on unfavorable terms. The buyer of a put or call option assumes the risk of losing the premium invested in the option.

There are risks associated with the sale and purchase of put options. The seller ("writer") of a put option which is covered (e.g., the writer has a short position in the underlying security) assumes the risk of an increase in the market price of the underlying security above the sales price (in establishing the short position) of the underlying security, plus the premium received, and gives up the opportunity for gain on the underlying security if the market price falls below the exercise price of the option. The buyer of a put option assumes the risk of losing its entire investment in the put option.

*Use of Derivatives*

We may use over-the-counter derivative instruments, such as forwards, options and swaps. These contracts are not traded on exchanges; rather, banks and dealers act as principals in these markets. The Fund will be subject to the risk of the failure of, or the inability or refusal to perform with respect to such contracts by, the principals with which the Fund trades. The regulatory and tax environment for derivative instruments in which the Fund may participate, directly or indirectly, is evolving and changes in the regulation, including pursuant to the Dodd Frank Wall Street Reform Act, or taxation of such instruments may have a material adverse effect on the Fund. The Fund could suffer substantial losses from its derivatives holdings.

*Investments in Emerging Markets*

Investing in emerging markets involves additional risks and special considerations not typically associated with investing in other more established economies or markets. Such risks may include (i) increased risk of nationalization or expropriation of assets or confiscatory taxation; (ii) greater social, economic and political uncertainty, including war; (iii) higher dependence on exports and the corresponding importance of international trade; (iv) greater volatility, less liquidity and smaller capitalization of markets; (v) greater volatility in currency exchange rates; (vi) greater risk of inflation; (vii) greater controls on foreign investment and limitations on realization of investments, repatriation of invested capital and on the ability to exchange local currencies for U.S. dollars; (viii) increased likelihood of governmental involvement in and control over the economy; (ix) governmental decisions to cease support of economic reform programs or to impose centrally planned economies; (x) differences in auditing and financial reporting standards which may result in the unavailability of material information about issuers; (xi)less extensive regulation of the markets; (xii) longer settlement periods for transactions and less reliable clearance and custody arrangements; (xiii) less developed corporate laws regarding fiduciary duties of officers and directors and the protection of investors; and (xiv) certain considerations regarding the maintenance of a Client's financial instruments with non-U.S. brokers and securities depositories.

Repatriation of investment income, assets and the proceeds of sales by foreign investors may require governmental registration and/or approval in some emerging countries. A Fund could be adversely affected by delays in or a refusal to grant any required governmental registration or approval for such repatriation or by withholding taxes imposed by emerging market countries on interest or dividends paid on financial instruments held by a Fund or gains from the disposition of such financial instruments.

In emerging markets, there is often less government supervision and regulation of business and industry practices, stock exchanges, over-the-counter markets, brokers, dealers, counterparties and issuers than in other more established markets. Any regulatory supervision which is in place may be subject to manipulation or control. Some emerging market countries do not have mature legal systems comparable to those of more developed countries. Moreover, the process of legal and regulatory reform may not be proceeding at the same pace as market developments, which could result in investment risk.  Legislation to safeguard the rights of private ownership may not yet be in place in certain areas, and there may be the risk of conflict among local, regional and national requirements. In certain cases, the laws and regulations governing investments in securities may

not exist or may be subject to inconsistent or arbitrary appreciation or interpretation. Both the independence of judicial systems and their immunity from economic, political or nationalistic influences remain largely untested in many countries. A Fund may also encounter difficulties in pursuing legal remedies or in obtaining and enforcing judgments in non-U.S. courts.

### Forward Contracts

We may trade forward contracts in currencies on behalf of the Fund. These forward contracts are not traded on exchanges; rather, banks and dealers act as principals in these markets. There is no limitation on the daily price movements of forward contracts traded. In its forward trading, the Fund will be subject to the risk of the failure of, or the inability or refusal to perform with respect to its forward contracts by, the counterparties with which the Fund trades.

### Futures Contracts

We may trade futures and options. Futures prices can be highly volatile. Because of the low margin deposits normally required in futures trading, a high degree of leverage is typical of a futures trading account. As a result, a relatively small price movement in a futures contract may result in substantial losses to the investor. Commodity exchanges limit fluctuations in commodity futures contract prices during a single day. During a single trading day no trades may be executed at prices beyond the "daily limit." Once the price of a futures contract for a particular commodity has increased or decreased by an amount equal to the daily limit, positions in the commodity can be neither taken nor liquidated unless Granite Point is willing to effect trades at or within the limit.

### Non-U.S. Investments

We may invest, directly or indirectly, in investment entities located in or managed from countries other than the United States. These investments may be subject to greater risk than domestic investments due to various political considerations, U.S. and foreign tax problems, currency controls, the fluctuation of currency exchange rates, the lack of, or different, regulations applicable to such investments as compared to U.S. investments and other factors.

We may invest in securities of non-U.S. issuers. Non-U.S. investments involve certain special risks, including political or economic instability; the possibility of foreign governmental actions such as expropriation, nationalization or confiscatory taxation; the imposition or modification of currency controls; the imposition of withholding taxes; and different bankruptcy laws and practice. As compared to U.S. entities, non-U.S. entities generally disclose less financial and other information publicly and are subject to less stringent and less uniform accounting, auditing and financial reporting standards.

### Currency Exchange Exposure

A Fund may invest a portion of its assets in the securities of non-U.S. issuers and other instruments denominated in non-U.S. currencies, the prices of which are determined with reference to currencies other than the U.S. dollar. A Fund, however, values its securities and other assets in U.S. dollars. To the extent unhedged, the value of a Fund's positions in non-U.S.

investments will fluctuate with U.S. dollar exchange rates as well as the price changes of the investments in the various local markets and currencies. In such cases, an increase in the value of the U.S. dollar compared to the other currencies in which a Fund makes its investments will reduce the effect of any increases and magnify the effect of any decreases in the prices of a Fund's securities in their local markets and may result in a loss to the Fund. Conversely, a decrease in the value of the U.S. dollar will have the opposite effect on a Fund's non-U.S. dollar investments.

Furthermore, a Fund may incur costs in connection with conversions between various currencies. Non-U.S. currency exchange dealers realize a profit based on the difference between the prices at which they are buying and selling various currencies. Thus, a dealer normally will offer to sell currency to a Fund at one rate, while offering a lesser rate of exchange should a Fund desire immediately to resell that currency to the dealer. A Fund conducts its currency exchange transactions either on a spot (i.e., cash) basis at the spot rate prevailing in the currency exchange market, or through entering into forward, futures or commodity options contracts to purchase or sell non-U.S. currencies. Most of a Fund's currency exchange transactions occur at the time securities are purchased and are executed through the local broker or custodian acting for a Fund.

### *Use of Leverage and Borrowing*

We may make use of leverage and borrowing in implementing investment strategies. Leverage increases both profit potential and risk of loss.

A Fund has the power to borrow funds and may do so when deemed appropriate by Granite Point or its affiliate, including to enhance a Fund's returns and satisfy redemption requests that would otherwise result in the premature liquidation of investments. Each Series of a Fund will limit its leverage exposure to 300% gross exposure, 200% net long exposure and 200% net short exposure. A Fund may borrow funds from brokers, banks and other lenders to finance its trading operations, which borrowings may be secured by assets of a Fund. The use of such leverage can, in certain circumstances, maximize the losses to which a Fund's investment portfolio may be subject. Any event that adversely affects the value of an investment would be magnified to the extent that asset or a Fund is leveraged. The cumulative effect of the use of leverage by a Fund in a market that moves adversely to a Fund's investments could result in a substantial loss to a Fund, which would be greater than if a Fund was not leveraged. Leverage may b e achieved through, among other methods, direct borrowing, purchases of securities on margin and the use of options, futures, forward contracts, repurchase and reverse repurchase agreements and swaps. The access to capital could be impaired by many factors, including market forces or regulatory changes. A Fund has unrestricted borrowing powers.

### *Volatile Markets*

The prices of securities and derivative instruments, including futures and options prices, may be volatile. Price movements of securities, forward contracts, futures contracts and other derivative contracts in which Funds may invest are influenced by, among other things: interest rates; changing supply and demand **relationships**; trade, fiscal, monetary and exchange control programs and policies of governments; and U.S. and international political and economic events and policies. In addition, governments from time to time intervene, directly and/or by regulation,

in certain markets, particularly those in currencies and interest rate related futures and options. This intervention often is intended directly to influence prices and may, together with other factors, cause all of such markets to move rapidly in the same direction because of, among other things, interest rate fluctuations. The Fund is also subject to the risk of the failure of any of the exchanges on which their positions trade or of their clearinghouses.

*Concentration*

Granite Point is not required to follow any specific concentration restrictions and may at times (individually or collectively) accumulate substantial positions in one or more securities, thereby exposing the Fund/Client to the possibility of substantial losses.

*Suspensions of Trading*

A public exchange typically has the right to suspend or limit trading in all securities that it lists. Such a suspension could render it impossible for a Fund to liquidate its positions and thereby expose it to losses. In addition, there is no guarantee that non-exchange markets will remain liquid enough for a Fund to close out positions.

*Illiquid Investments*

The Funds may invest in restricted or illiquid securities referred to herein generally as Special Investments. The Select Opportunities Fund generally will only invest in Special Investments. No withdrawals may be made by a Limited Partner from any portion of its investment in a Special Investment Account (a side pocket of the Master – Feeder Fund) until the investment is realized or deemed realized. The market prices, if any, for such securities tend to be volatile and may not be readily ascertainable, and we may not be able to sell them when it desired to do so or to realize what it perceives to be their fair value in the event of a sale. The sale of restricted and illiquid securities often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than do the sales of securities eligible for trading on national securities exchanges or in the over-the-counter markets. The Partnership may not be able to readily dispose of such illiquid investments and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time. Restricted securities may sell at a price lower than similar securities that are not subject to restrictions on resale. An investment in the Partnership is suitable only for certain sophisticated investors who do not require immediate liquidity for their investments. Each Limited Partner will elect either to participate in profits and losses attributable to future Special Investments or not participate in profits and losses attributable to Special Investments at the time of its initial capital contribution (and therefore with respect to its memorandum account) and with respect to (i) such capital contribution and (ii) subsequent capital contributions thereafter, such election may not be changed without the General Partner's written consent, which may be withheld in its sole discretion.

### *Purchasing Securities of Initial Public Offering*

From time to time a Fund may purchase securities that are part of initial public offerings. The prices of these securities may be very volatile. The issuers of these securities may be undercapitalized, have a limited operating history, and lack revenues or operating income without any prospects of achieving them in the near future. Some of these issuers may only make available a limited number of shares for trading and therefore it may be difficult for a Fund to trade these securities without unfavorably impacting their prices. In addition, investors may lack extensive knowledge of the issuers of these securities. A Fund may invest in securities that are "new issues," as defined by Rule 5130. Rule 5130 and Rule 5131 restrict certain persons from participating in "new issues." As a result, certain Limited Partners may be restricted from participating in profits and losses attributable to such investments. A Subscription Agreement will provide a mechanism for the purchase of new issues that excludes participation in such investment by any Partner that is deemed restricted.

### *Necessity for Counterparty Trading Relationships; Counterparty Risk*

A Fund expects to establish relationships to obtain financing, engage in derivative transactions and obtain prime brokerage services all of which permit a Fund to trade in any variety of markets or asset classes over time; however, there can be no assurance that a Fund will be able to maintain such relationships or establish such relationships. An inability to establish or maintain such relationships would limit a Fund's trading activities and could create losses, preclude a Fund from engaging in certain transactions, financing, derivative intermediation and prime brokerage services and prevent a Fund from trading at optimal rates and terms. Moreover, a disruption in the financing, derivative and prime brokerage services provided by any such relationships before a Fund establishes additional relationships could have a significant impact on a Fund's business due to a Fund's reliance on such counterparties.

Some of the markets in which a Fund may affect its transactions are "over-the- counter" or "inter-dealer" markets. The participants in such markets are typically not subject to credit evaluation and regulatory oversight as are members of "exchange- based" markets. This exposes a Fund to the risk that a counterparty will not settle a transaction due to a credit or liquidity problem, thus causing a Fund to suffer a loss. In addition, in the case of a default, a Fund could become subject to adverse market movements while replacement transactions are executed. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where a Fund has concentrated its transactions with a single counterparty or small group of counterparties.

Furthermore, there is a risk that any of a Fund's counterparties could become insolvent and/or the subject of insolvency proceedings. If one or more of a Fund's counterparties were to become insolvent or the subject of insolvency proceedings, there exists the risk that the recovery of a Fund's securities and other assets from a Fund's prime brokers or broker-dealers will be delayed or be of a value less than the value of the securities or assets originally entrusted to such prime broker or broker- dealer.

A Fund may use counterparties located in jurisdictions outside the United States. Such counterparties are subject to the laws and regulations in non-U.S. jurisdictions that are designed to protect their customers in the event of their insolvency.  However, the practical effect of

these laws and their application to a Fund's assets are subject to substantial limitations and uncertainties.  Because of the large number of entities and jurisdictions involved and the range of possible factual scenarios involving the insolvency of a counterparty, it is impossible to generalize about the effect of their insolvency on a Fund and its assets.

A Fund is not restricted from dealing with any particular counterparty or from concentrating any or all of its transactions with one counterparty. Moreover, Granite Point or its affiliate's internal credit function which evaluates the creditworthiness of its counterparties may prove insufficient. The ability of a Fund to transact business with any one or more counterparties, the lack of complete and "foolproof" evaluation of the financial capabilities of a Fund's counterparties and the absence of a regulated market to facilitate settlement may increase the potential for losses by a Fund.

### *Systems and Operational Risks*

A Fund depends on Granite Point to develop and implement appropriate systems for a Fund's activities.  A Fund relies heavily and daily on financial, accounting and other data processing systems to execute, clear and settle transactions and to evaluate certain securities, to monitor its portfolio and capital, and to generate risk management and other reports that are critical to oversight of a Fund's activities. In addition, a Fund relies on information systems to store sensitive information about a, Granite Point, their affiliates and the Limited Partners. Certain of a Client's and Granite Point's activities will be dependent upon systems operated by third parties, including prime brokers, the Administrator, market counterparties and other service providers, and Granite Point may not be in a position to adequately verify the risks or reliability of such third-party systems. Failures in the systems employed by Granite Point, prime brokers, the Administrator, counterparties, exchanges and similar clearance and settlement facilities and other parties could result in mistakes made in the confirmation or settlement of transactions, or in transactions not being properly booked, evaluated or accounted for. Disruptions in a Fund's operations or breach of a Fund's information systems may cause a Client to suffer, among other things, financial loss, the disruption of its business, liability to third parties, regulatory penalties or reputational damage. Any of the foregoing failures or disruptions could have a material adverse effect on a Fund and the Limited Partners' investments therein.

### *Possible Withholding Taxes on Certain Payments*

Unless a Fund enters into an agreement with the United States Treasury to perform diligence regarding its investors and reports certain information to the IRS, and meets certain other conditions, then (i) payments to a Client of dividends, interest, and certain other categories of income from sources within the United States that are made (other than such payments made with respect to certain "preexisting" obligations), and (ii) payments to a Client of gross proceeds from sales or other dispositions of property that can produce U.S.-source interest or dividends, may be subject to a 30% U.S. federal withholding tax.

### Item 9.        Disciplinary Information

Granite Point and its related persons have no disciplinary history to report.

**Item 10.        Other Financial Industry Activities and Affiliations**

Granite Point Capital, LLC., a Delaware limited liability company serves as the general partner of the Funds, and in such capacity is responsible for the operation and management of the Funds as a relying adviser.  Mr. Warren B. Lammert III is the managing member of the General Partner.

Our general partner is GPC I, LLC, a Delaware limited liability company, of which Mr. Lammert also serves as the managing member.  GPC I, LLC is also a relying adviser of Granite Point.

Granite Point and its management persons have relationships and arrangements that are material to its advisory business or its Clients with various related persons as described above. None of these relationships or arrangements creates a material conflict of interest with Clients.

**Item 11.        Code of Ethics, Participation or Interest in Client Transactions, and Personal Trading**

*A. Code of Ethics.*

Granite Point has adopted a Code of Ethics predicated on the principle that Granite Point owes a fiduciary duty to its clients. The following set of principles frames the professional and ethical conduct that Granite Point expects from its employees:

- Act with integrity, competence, diligence and in an ethical manner with the public, clients, prospective investors, employers, employees, colleagues in the investment profession, and other participants in the global capital markets;
- Adhere to the fundamental standard that the employee should not take inappropriate advantage of his or her position; Comply with privacy policies designed to protect the confidential nature of investors' non-public personal information;
- Use reasonable care and exercise independent professional judgment when conducting investment analysis, making investment recommendations, taking investment actions and engaging in other professional activities;
- Practice and encourage others to practice in a professional and ethical manner that will reflect credit on himself or herself and the profession;
- Promote the integrity of, and uphold the rules governing, capital markets;
- Maintain and improve his or her professional competence and strive to maintain and improve the competence of other investment professionals; and
- Comply with applicable provisions of the federal securities laws.

The Code of Ethics provides that Granite Point Access Persons must pre-clear all personal transactions in reportable securities, including initial public offerings or limited private offerings.

The Code of Ethics also provides that Granite Point employees are prohibited from effecting transactions on behalf of the Clients in publicly traded securities issued by companies for which Granite Point possesses material non-pubic information.

For a copy of our Code of Ethics, please contact our Chief Compliance Officer, who may be reached at (617) 587-7507.

*B. Client Transactions in Securities where Adviser has a Material Financial Interest*.

Granite Point's related person, Granite Point Capital, LLC., serves as the general partner of several pooled investment vehicles managed by Granite Point.  This general partner maintains capital accounts in each pooled investment vehicle managed by Granite Point. Warren Lammert is the manager of the general partner and owns all or substantially all of the equity interests in the general partner. Mr. Lammert also has significant investments in these pooled investment vehicles as a limited partner. There is a potential conflict of interest in this arrangement since each general partner is typically entitled to an allocation of between 15% and 20% of the net profits of each pooled investment vehicle, which could encourage Granite Point to invest more aggressively in riskier securities than in the absence of this performance allocation.

Granite Point is subject to certain conflicts of interest in advising the Funds. Some of these conflicts are summarized here, but this summary does not attempt to describe all of the conflicts of interest associated with an investment in the Funds. The confidential private placement memorandum for the Funds contain a more complete description of what we believe to be the most significant conflicts of interest associated with an investment in the Funds but is also not an exhaustive list.

*C. Investing in Securities Recommended to Clients*.

The Code of Ethics is designed to ensure that our employees conduct their personal securities transactions in such a manner as to avoid putting their own personal interests ahead of our Clients and to avoid conflicts of interest. The Code requires pre-clearance of certain personal securities transactions by Access Persons prior to execution of such transactions. Permitting Access Persons to invest in the same securities as the Funds creates a conflict of interest, including that employees might benefit from market activity by a Client. Trading by employees is regularly monitored under the Code of Ethics.

*D. Conflicts of Interest Created by Contemporaneous Trading*.

It is possible that a Granite Point employee may buy or sell securities for their own benefit that they also buy or sell for Clients.

Conflicts of interest are created when one of our employees are trading in the same security as a Fund. Client transactions will always take precedence over any Firm or employees' transactions. We have developed procedures under our Code of Ethics policies to monitor such transactions.

**Item 12. Brokerage Practices**

  *A. Factors Considered in Selecting or Recommending Broker-Dealers for Client Transactions.*

*1.*       ***Best Execution and Broker Selection***

Granite Point has a prime brokerage relationship with Credit Suisse.

Allocation of Investment Opportunities:

Granite Point intends to allocate investments between the Funds on a basis that it considers to be equitable, taking into consideration factors such as the size of a portfolio, available capital, concentration of holdings, investment objectives and guidelines, the liquidity needs of the fund and relevant tax considerations. We will attempt to allocate or rotate investment opportunities in a manner deemed fair and equitable, over time and in the aggregate, by us and in accordance with the terms of our compliance policies and procedures.

Unless a Fund has a particular restriction or separate strategy that would limit or prohibit an investment in a particular security, Granite Point generally invests Clients' assets proportionately based upon the respective net assets of each Client and the securities to be purchased or sold may be aggregated in order to obtain superior execution and/or lower brokerage expenses. Execution prices for identical securities purchased or sold on behalf of multiple Funds in any one business day may be averaged. In such instances, allocation of prices, as well as expenses incurred in the transaction, shall be made in a manner that Granite Point considers to be equally as favorable to each Client.

In selecting brokers, Granite Point seeks best execution, considering such factors as price, execution capabilities, reputation, infrastructure, reliability, financial resources, quality of research products or services and other value-added services. Granite Point makes its broker selection without any consideration of client referrals by any brokerage firm.

Some brokers used by us may also make cash payments to discharge the obligations of Granite Point to third parties. Under these arrangements we may pay commissions to such brokers which are greater than the amount another broker might charge.

We use a wide range of brokers and dealers, none of which are affiliated with Granite Point. We do not receive any share of commissions or dealer mark-ups paid by the portfolio.  Granite Point may have long-standing business relationships with some brokers selected for Clients.

Granite Point assumes no responsibility for the actions or omissions of any broker or dealer selected by us in good faith.


*2.*       ***Research and Other Soft Dollar Benefits.***

If Granite Point determines in good faith that the amount of commissions charged by a broker is reasonable in relation to the value of the brokerage, research products or services and other property, products and services provided by the broker to Clients, we may cause the Client to pay commissions to such broker in an amount greater than the amount another broker might charge for the same execution services. Arrangements under which an adviser receives products or

services from a broker in consideration for commissions or revenue are known as "soft dollar" arrangements.

We currently utilize soft dollar accounts through our prime broker, Credit Suisse, and BTIG, LLC whereby a portion of our commissions paid are allocated for research payments in accordance with the safe harbor provisions of Section 28(e) of the Exchange Act.

### 3.    *Brokerage for Client Referrals*.

Granite Point makes its broker selection without any consideration of investor referrals by any brokerage firm.

### 4.    *Directed Brokerage*.

Our duties as an investment advisor relate solely to our management of the Funds. As such, choice of broker is at our discretion as disclosed in the Fund's offering documentation and this Form ADV Part 2A brochure.

From time to time, we may direct brokerage to certain sell-side firms that provide us with industry research.  We do not pay any additional commissions to any broker-dealers in exchange for this research.  The research we receive is unsolicited.  Some broker-dealers provide us with industry specific research and if we find the research useful, we may direct a portion of our transactions to these brokers.  There are no limits or criteria for directing transactions.  We select the brokers on their ability to provide best execution in addition to the research benefits we receive.

## Item 13. Review of Accounts

### A. *Frequency and Nature of Review*.

Fund reviews are performed daily and the portfolios are monitored continuously for investment activity, performance, and various market risk factors and conditions at both the micro and macro levels. These reviews are conducted by our portfolio managers and Warren Lammert as CIO.  Our COO oversees the valuations of the Special Investments (side pockets) which are reviewed monthly or if a material event occurs at the issuer.   In addition, all Funds undergo an annual independent financial audit by Ernst and Young.

Our Fund Administrator, SS&C Technologies, has an active role in Fund oversight.  The Fund Administrator is responsible for, among other things: (i) maintaining the register of Shareholders of the Fund and generally performing all actions related to the issuance and transfer of Shares of the Fund and the safe-keeping of certificates therefore, if any; (ii) reviewing and, subject to approval by the Fund, accepting subscriptions for Shares and accepting payment therefore; (iii) computing and disseminating the Net Asset Value of the Fund's Shares in accordance with its Articles of Association and a Fund's valuation policies and procedures; (iv) performing all

administrative acts related to redemption of Shares; (v) keeping the accounts of the Funds and such financial books and records as are necessary for the proper conduct of the financial affairs, and preparing or procuring the preparation of annual financial statements of the Funds and furnishing such statements, as well as monthly reports regarding the Fund's Net Asset Value per Share, to Shareholders; (vi) communicating with Shareholders; and (vii) performing all other accounting and clerical services necessary in connection with the administration of the Funds.

Granite Point also calculates and maintains capital account reporting for investors.

### B. Periodic Reviews

Periodic account reviews are performed. See response to Item 13.A. above.

Other conditions that may trigger a review are changes in applicable laws, new investment information, and changes in a particular Fund/Client's circumstances.

### C. Content and Frequency of Regular Account Reports.

Fund investors generally will receive audited financial statements annually and a quarterly performance letter during the fiscal year and, if applicable, annual tax reporting information. Investors may receive their capital account statements upon request by submitting a fax to the Fund Administrator (SS&C) at, (860)-371-2503, Attn: Investor Services.

## Item 14. Client Referrals and Other Compensation

We currently have one solicitation arrangement in place via our relationship with our placement agent, Lyster Watson Securities, Inc. ("Lyster Watson").  See Item 14B below.

### A. Economic Benefits Received from Non-Clients for Providing Services to Clients.

We do not accept or receive any benefits (cash or non-cash) other than our advisory fees and performance-based fees in relation to our investment advisory business.

### B. Compensation to Non-Supervised Persons for Client Referrals.

Granite Point has retained Lyster Watson, a SEC and FINRA registered broker-dealer, to help make introductions to potential investors. Granite Point pays Lyster Watson per a written placement agent agreement.

The staff of the U.S. Securities and Exchange Commission released an interpretive letter, clarifying that Investment Advisers Act Rule 206(4)-3 does not apply to solicitations of investors in an investment pool such as a hedge fund.  The interpretive letter, Mayer Brown LLP (July 15, 2008), clarifies that the cash solicitation rule does not apply to a Registered Investment Adviser's

cash payment to a person "solely to compensate that person for soliciting investors or prospective investors for, or referring investors or prospective investors to, an investment pool managed by the adviser." The cash solicitation rule generally prohibits RIAs from paying third parties to solicit advisory clients without meeting certain disclosure and contractual requirements.

## Item 15. Custody

Under Rule 206(4)-2 of the Advisers Act, Granite Point is deemed to have custody of the securities and other assets of the Funds even though Granite Point does not physically hold the securities and other assets, and they are not held or registered in Granite Point's name. Rule 206(4)-2 imposes certain requirements on registered investment advisers who have actual or deemed custody of Client assets, however, Granite Point is exempt from many of the provisions of that rule because the Funds are audited in accordance with U.S. generally accepted accounting principles on an annual basis by an independent public accountant that is registered with, and subject to regular inspection by, the Public Company Accounting Oversight Board. The audited financial statements are distributed to each Fund investor. Granite Point follows the SEC guidelines for the distribution of audited financial statements to all Fund investors.

All Fund assets are physically held by qualified custodians. Any certificated securities are maintained either with qualified custodians or in accordance with SEC guidance on maintaining certificated shares of private companies.

Upon final liquidation of a fund, financial statements reflecting the final audit will be distributed to all investors.

## Item 16. Investment Discretion

Pursuant to the governing documents of each Fund, Granite Point has complete investment authority with respect to all securities owned by the Funds and there are no limitations on this authority. This authority is conveyed by Fund investors subscribing to a Fund in their subscription agreements and in each Fund's governing documents.

## Item 17. Voting Client Securities

*Policies and Procedures Relating to Our Authority to Vote Client Securities*.

Granite Point has established procedures for exercising proxy voting rights as required under Rule 206(4)-6. Granite Point's proxy voting policy is reasonably designed to ensure that proxies are voted in the best interests of Funds/Clients, after taking into account all relevant facts and circumstances at the time of the vote, and in accordance with Granite Point's fiduciary duties and applicable regulations. Granite Point does not take into account social, political or other non-investment-related goals or interests in voting or abstaining from voting a proxy.

Granite Point follows procedures designed to identify conflicts or potential conflicts that could arise between its own interests and those of the Funds/Clients. If it is determined that any such conflict or potential conflict is not material, we may vote proxies notwithstanding the conflict. If it is determined, however, that a conflict of interest or potential conflict of interest is material, the Chief Compliance Officer will work with appropriate personnel to agree upon a method to resolve such conflict before voting proxies affected by the conflict. If the Chief Compliance Officer determines that a material conflict of interest exists, we may, at its expense, engage the services of an outside proxy voting service or consultant who will provide an independent recommendation on the direction in which we should vote on the proposal. In such circumstances, the proxy voting service's or consultant's determination will be binding on Granite Point.  We may also elect to abstain from voting if it deems such abstinence in the Fund's/Client's best interests.

Investors may request a copy of our Proxy Policy, as well as relevant proxy voting records, by contacting Granite Point's Chief Compliance Officer, David Bushley at (617) 587-7507.

## Item 18. Financial Information

Granite Point is not aware of any financial commitment that impairs its ability to meet contractual and fiduciary commitments to clients and has not been the subject of a bankruptcy proceeding.