**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: CANNTRUST HOLDINGS INC. SECURITIES LITIGATION | No. 1:19-cv-06396-JPO <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> Judge J. Paul Oetken <br><br> <u>CLASS ACTION</u> |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

# TABLE OF CONTENTS

**PAGE**

I.    VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT .............. 3

II.    NATURE OF THE EXCHANGE ACT CLAIMS ............................................................ 3

    A.    CannTrust's Aggressive Expansion Plan ................................................. 5

    B.    CannTrust Was Required to Follow Strict Regulations Governing the Production and Sale of Cannabis ............................................................... 7

    C.    Defendants Knowingly Violated Health Canada Regulations to Increase Production Capacity ...................................................................... 8

    D.    Defendants Knowingly Misled Investors About The Illicit Growing and Storing Scheme and the Risks it Posed ............................................... 10

    E.    Defendants Cash-In While Unsuspecting Investors Pour Money Into CannTrust ......................................................................................... 12

    F.    Defendants' Illicit Growing and Storing Scheme—and The Risks It Posed— Are Revealed In a Series of Explosive Disclosures ............................... 13

III.    JURISDICTION AND VENUE ...................................................................... 16

IV.    PARTIES ...................................................................................................... 17

    A.    Plaintiffs ................................................................................................ 17

    B.    Defendants ............................................................................................ 17

        1.    Corporate Defendant ............................................................... 17

        2.    Individual Defendants ............................................................. 18

        3.    Director Defendants ................................................................ 19

    C.    KPMG ................................................................................................. 22

    D.    Relevant Third Parties .......................................................................... 23

V.    SUBSTANTIVE ALLEGATIONS ................................................................. 26

    A.    CannTrust Rapidly Expanded Its Growing Capacity in Light of Increased Demand for its Products ....................................................................... 26

i

1. CannTrust's Medicinal Cannabis Business ............................................. 26

2. CannTrust Tries to Capitalize on Skyrocketing Demand Following the Legalization of Recreational Cannabis in Canada and the United States ................................................................................. 26

3. Health Canada Strictly Regulated the Growing, Storing, and Sale of Medicinal and Recreational Cannabis ................................................... 28

4. CannTrust Rapidly Expanded its Production Capacity in Light of Increased Demand From Canadian and U.S. Legalization of Marijuana ................................................................................. 32

5. CannTrust Replaced its Medicinal Cannabis Management Team With Individuals With Financial Backgrounds but With Little or No Experience with Cannabis Growing, Production, or Regulation ........ 34

B. CannTrust Purposefully Violated the Cannabis Act In Order to Take Advantage of Massive Demand For Recreational Cannabis ................................ 36

1. CannTrust Began Illegally Growing and Storing Cannabis in Unlicensed Rooms ..................................................................... 37

2. Defendants Hid the Unlicensed Growing from Health Canada ............... 41

3. Defendants Themselves Directed the Illicit Growing and Storing of Cannabis in Unlicensed Rooms ............................................... 43

4. Defendants Grew Cannabis Using Illegal, Black Market Seeds In Order to Increase Production ..................................................... 48

C. CannTrust Misled Investors About Growing and Storing Cannabis in Unlicensed Rooms and Knowingly Violating Health Canada Regulations .......... 50

1. Defendants Touted Being In Compliance with Applicable Regulations ............................................................................. 52

2. From November 2018 through April 2019 Defendants Touted CannTrust's Success and Growth Due to Increased Capacity and Expansion of the Niagara Facility ............................................. 55

3. Defendants Overstated Their Audited Financial Figures, Including Revenues and the Values of Inventory and Biological Assets ................ 60

4. CannTrust Issued Financial Statements In Violation of International Accounting Standards ......................................................... 64

(a)     CannTrust's Illicit Growing and Storing Scheme Resulted in Overstated Biological Assets and Inventory ............................ 64

(b)     Defendants Recognized Revenue in Violation of International Financial Reporting Standards ................................ 67

(c)     CannTrust Lacked Effective Internal Controls During the Class Period ................................................................... 71

(d)     CannTrust Was Required to Disclose the Significant Uncertainty that the Company Could Not Continue As a Going Concern, But Failed to Do So ............................................ 73

5.     KPMG Knowingly or Recklessly Issued An Audit Report In Violation of Auditing and Accounting Standards ...................................... 75

(a)     KPMG Was Required to Follow PCAOB Standards in Conducting its Audit of CannTrust ................................................ 75

(b)     KPMG Was Responsible for Obtaining Reasonable Assurance that CannTrust's Financial Statements were Fairly Presented in Conformity with IFRS Standards ................. 76

(c)     KPMG Ignored Red Flags and Inconsistencies Related to CannTrust's Revenue Biological Assets and Inventory .............. 80

(d)     KPMG Was on Notice of CannTrust's Lack of Internal Controls and Failed to Respond With Increased Audit Procedures ................................................................... 88

(e)     KPMG Failed to Evaluate Whether CannTrust Could Continue as a Going Concern ........................................ 89

(f)     KPMG Issued a Clean Audit Report That Contained False and Misleading Statements .......................................... 90

D.     CannTrust Failed to Disclose to Investors That the Company's Success Was Attributable to the Cannabis Grown in the Unlicensed Rooms .................... 91

E.     Defendants Continued to Mislead Investors About the Illicit Growing and Storing Scheme After Health Canada Approved the Rooms for Growing Based on Defendants' Falsified Applications ........................................ 93

F.     CannTrust's Unlicensed Growing Strategy is Revealed and the Undisclosed Risks of the Illicit Strategy Materialized Causing the Company's Stock Price to Plummet .................................................... 95

1.  CannTrust Whistleblower Nick Lalonde Reported Defendants' Fraudulent Scheme to Health Canada ........................................................ 96

2.  Health Canada Conducts a Surprise Inspection Uncovering CannTrust's Illicit Growing Scheme And Sanctions the Company ......... 97

3.  CannTrust's Stock Price Continues to Plummet as the Extent of Defendants' Illicit Growing Scheme is Revealed ................................... 100

4.  CannTrust Announces a Hold on the Sale and Shipment of All Cannabis Products While Health Canada Continued its Audit ............... 100

5.  CannTrust's Stock Price Continues to Decline Following News of Several Legal Actions Filed Against the Company ............................... 101

6.  CannTrust Shares Continue to Plunge as Investors Discover that Defendants Aceto, Abramowitz and Paul Were Aware of the Illicit Growing Scheme ......................................................................... 103

7.  Health Canada Uncovers Additional Violations at the Vaughan Facility Including the Storage of Cannabis in Unlicensed Rooms ......... 106

8.  The Risk of Growing Cannabis in Unlicensed Rooms and Violating Health Canada Regulations Materializes When Health Canada Suspends CannTrust's License to Grow and Sell Cannabis ...... 109

G.  Post-Class Period Events ................................................................... 110

VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................. 112

A.  Defendants Misled Investors About Being In Compliance with Applicable Regulations ........................................................................ 113

1.  December 19, 2018 – Press Release ..................................... 113

2.  January 8, 2019 – Form 40-F (Registration Statement) ......................... 120

3.  March 1, 2019 – Registration Statement ................................. 122

4.  March 18, 2019 – Amended Registration Statement ............................ 123

5.  March 28, 2019 – Press Release and 2018 Form 40-F .......................... 125

6.  April 8, 2019 – Press Release ................................................ 128

7.  April 22, 2019 – Preliminary Prospectus ................................. 128

8.  May 3, 2019 – Prospectus Supplement ................................... 130

B.    Defendants Misled Investors Each Time They Touted Their Successful
      Increased Capacity and Expansion ................................................... 133

      1.    June 26, 2018 – Press Release ................................................ 134

      2.    July 13, 2018 – Press Release ................................................ 136

      3.    August 14, 2018 – Letter to Shareholders ............................. 137

      4.    August 14, 2018 – Press Release ........................................... 137

      5.    August 21, 2018 – Press Release ........................................... 138

      6.    August 22, 2018 – Press Release ........................................... 138

      7.    September 13, 2018 – Press Release....................................... 139

      8.    October 1, 2018 – Press Release............................................ 140

      9.    October 10, 2018 – Press Release.......................................... 141

      10.   November 14, 2018 – MD&A and 3Q 2018 Earnings Call.................... 141

      11.   December 19, 2018 – Press Release ........................................ 143

      12.   January 9, 2019 – Interview.................................................... 144

      13.   January 22, 2019 – Press Release ........................................... 145

      14.   March 28, 2019 – 2018 Form 40-F, Press Release, 2018 Q4
            Earnings Call.......................................................................... 146

C.    Defendants Continued to Mislead Investors Regarding the Increased
      Capacity After Health Canada Licensed the Previously Unlicensed
      Growing Rooms in April 2019 .......................................................... 151

      1.    April 8, 2019 – Press Release ................................................ 152

      2.    April 22, 2019 – Press Release and Preliminary Prospectus ................. 153

      3.    May 14, 2019 – MD&A, Press Release, and 1Q 2019 Earnings
            Call......................................................................................... 157

      4.    July 11, 2019 –Press Release ................................................. 161

D.    Defendants Misled Investors When They Misleadingly Reported
      Overstated Financial Figures That Included Illicitly Grown Cannabis as
      Biological Assets and Inventory and Revenue Generated Therefrom............... 162

1.      August 14, 2018 – Condensed Interim Consolidated Financial
        Statements (Unaudited)........................................................... 162

2.      November 14, 2018 – Condensed Interim Consolidated Financial
        Statements (Unaudited)........................................................... 166

3.      March 28, 2019 – Consolidated Financial Statements............................ 169

4.      May 14, 2019 – Consolidated Financial Statements............................... 172

E.      KPMG's Clean Audit Report Contained False and Misleading Statements....... 174

VII.    LOSS CAUSATION................................................................................. 176

A.      July 8, 2019 – First Partial Corrective Disclosure/Materialization of the
        Risk ............................................................................................... 178

B.      July 10, 2019 – Second Partial Corrective Disclosure/Materialization of
        the Risk ........................................................................................... 181

C.      July 11, 2019 – Third Partial Corrective Disclosure/Materialization of the
        Risk ............................................................................................... 182

D.      July 15, 2019 – Fourth Partial Corrective Disclosure/Materialization of the
        Risk ............................................................................................... 185

E.      July 23–24, 2019 – Fifth Partial Corrective Disclosure/Materialization of
        the Risk ........................................................................................... 187

F.      August 12, 2019 – Sixth Partial Corrective Disclosure/Materialization of
        the Risk ........................................................................................... 189

G.      September 17, 2019 – Final Corrective Disclosure/Materialization of the
        Risk ............................................................................................... 191

VIII.   ADDITIONAL INDICIA OF SCIENTER .................................................... 194

A.      Defendants Were Aware of the Unlicensed Growing and Staged
        Photographs Sent to Health Canada................................................... 195

B.      The Growing and Storing of Cannabis Was a Core Operation of
        CannTrust's Business......................................................................... 199

C.      Defendants Were Motivated to Grow In Unlicensed Rooms to Profit from
        Surging Demand and Establish Itself as a Cannabis Market Leader ................. 201

D.      Defendants Paul, Litwin, and Sanders Made Millions in Profits Offloading
        CannTrust Stock Through Insider Sales Transactions With Knowledge of
        the Illicit Growing Scheme and the Huge Regulatory Risks it Posed ............... 202

E.      The Timing and Circumstances of Defendants Aceto's and Paul's Departures Support a Strong Inference of Scienter ............................................ 204

F.      Defendants Aceto's, Guyatt's, and Abramowitz's SOX and Form 52-109F2 Certifications Support a Strong Inference of Scienter ............................. 207

IX.     CONTROL PERSON ALLEGATIONS.................................................................. 209

X.      CLASS ACTION ALLEGATIONS ............................................................... 210

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ................................................................. 212

XII.    NO SAFE HARBOR ................................................................................. 214

XIII.   CAUSES OF ACTION ............................................................................. 216

        COUNT I Violation of Section 10(b) of the Exchange Actand Rule 10b-5 Against CannTrust, KPMG, the Individual Defendants and the Director Defendants ................ 216

        COUNT II Violation of Section 20(a) of the Exchange Act Against Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul............................................... 218

PRAYER FOR RELIEF ......................................................................... 219

XIV.    VIOLATIONS OF SECTIONS 11, 12(a)(2) AND 15 OF THE SECURITIES ACT................................................................................................. 219

        A.      Factual Background ................................................................... 220

        B.      Summary of the May 6, 2019 Public Offering ................................. 225

XV.     JURISDICTION ................................................................................. 227

XVI.    THE SECURITIES ACT PARTIES ......................................................... 227

        A.      Lead Plaintiffs................................................................. 227

        B.      Defendants ..................................................................... 228

        C.      Relevant Third Parties..................................................... 233

XVII.   THE MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING MATERIALS ......................................................... 234

        A.      False and Misleading Statements Concerning CannTrust's Compliance with Applicable Regulations............................................. 235

B. False and Misleading Statements Concerning CannTrust's Successful Increased Capacity and Expansion ................................................................. 240

C. False and Misleading Statements Concerning CannTrust's Financial Growth and Values of Inventory and Biological Assets ..................................... 250

 1. CannTrust Issued Financial Statements In Violation of International Accounting Standards ........................................................ 253

  (a) CannTrust's Illicit Growing and Storing Scheme Resulted in Overstated Biological Assets and Inventory ........................... 254

  (b) Defendants Recognized Revenue in Violation of International Financial Reporting Standards .............................. 257

 2. KPMG Issued A Clean Audit Report That Contain False and Misleading Statements ............................................................ 261

 3. The Underwriter Defendants Failed to Perform Adequate Due Diligence ........................................................................... 262

XVIII. CLASS ALLEGATIONS ............................................................. 266

XIX. CAUSES OF ACTION ................................................................ 268

COUNT III For Violations of Section 11 of the Securities Act Against The Securities Act Defendants ................................................................. 268

COUNT IV For Violation of Section 12 (a)(2)  of the Securities Act of 1933 Against The Securities Act Defendants .......................................................... 271

COUNT V For Violation of Section 15 of the Securities Act of 1933 Against CannTrust, the Individual Securities Act Defendants, Cannamed, and Cajun .............. 273

PRAYER FOR RELIEF ........................................................................ 274

JURY DEMAND ................................................................................. 274

Court-appointed Lead Plaintiffs Granite Point Master Fund, LP and Granite Point Capital Scorpion Focused Ideas Fund ("Lead Plaintiffs" or "Granite Point"), and additional plaintiff Jose A. Silva ("Dr. Silva," and collectively with Granite Point, "Plaintiffs"), bring this action under Section 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act Claims") and separately under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act Claims") against CannTrust Holdings Inc. ("CannTrust" or the "Company"), several of its officers and directors, CannTrust's auditor, the underwriters of CannTrust's secondary public offering completed on May 6, 2019 (the "Offering"), and two holding companies owned by members of CannTrust's Board of Directors that sold shares in the Offering.

As it pertains to the Exchange Act Claims, Plaintiffs bring the Consolidated Class Action Complaint against Defendants: CannTrust; CannTrust's auditor, KPMG LLP ("KPMG"); and several of CannTrust's senior executives and directors: former Chief Executive Officer ("CEO") Peter Aceto, former Chief Financial Officer ("CFO") and current CEO Greg Guyatt, former CFO Ian Abramowitz, and former President and Chief Operating Officer ("COO") Brad Rogers (the "Individual Defendants"); and former Chairman of the Board and CEO, Eric Paul, and members of CannTrust's Board of Directors: Mark E. Dawber, Mitchell J. Sanders, John T. Kaden, Mark I. Litwin, Shawna Page, and Robert F. Marcovitch (the "Director Defendants," and together with CannTrust and the Individual Defendants, "Defendants").

As it pertains to the Securities Act Claims, Lead Plaintiffs bring the Consolidated Class Action Complaint against Defendants: CannTrust; Paul, Aceto, Guyatt, Litwin, Sanders, Marcovitch, Dawber, Page, and Kaden (collectively referred to herein as the "Individual Securities Act Defendants"); Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), Citigroup Global Markets Inc. ("Citigroup"), Credit Suisse Securities (USA) LLC ("Credit

Suisse"), Jefferies LLC ("Jefferies"), RBC Dominion Securities Inc. ("RBC"), and Canaccord Genuity LLC ("Canaccord") (collectively referred to herein as the "Underwriter Defendants"); Cannamed Financial Corp. ("Cannamed") and Cajun Capital Corp. ("Cajun," and together with Cannamed the "Selling Shareholder Defendants"); and KPMG.   CannTrust, the Individual Securities Act Defendants, the Underwriter Defendants, the Selling Shareholder Defendants and KPMG, are collectively referred to as the "Securities Act Defendants."   The Securities Act Claims solely allege strict liability and negligence causes of action, and do not sound in fraud. Accordingly, for the purpose of these Securities Act Claims, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud, intentional misconduct or deliberately reckless misconduct.

Plaintiffs' claims are brought upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by CannTrust with the Securities and Exchange Commission ("SEC") and Canada's System for Electronic Document Analysis and Retrieval ("SEDAR"); (2) reports issued by analysts covering or concerning CannTrust and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about CannTrust, its business, and the Individual Defendants; (4) an investigation conducted by Plaintiffs' attorneys, including interviews with former CannTrust employees; and (5) other publicly available information concerning CannTrust, its business, and the allegations contained herein.  Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Plaintiffs have a reasonable opportunity for discovery.

## I.     VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT

The Exchange Act Claims set forth below in Counts I and II allege violations of Sections 10(b) and (20(a) of the Securities and Exchange Act of 1934.  Plaintiffs bring the Exchange Act Claims individually and on behalf of all persons and entities who, during the period from June 26, 2018 through September 17, 2019, inclusive (the "Class Period"), purchased the publicly traded common stock of CannTrust on the New York Stock Exchange or on any U.S.-based trading platform during the Class Period and were damaged thereby (the "Exchange Act Class").[1]

## II.     NATURE OF THE EXCHANGE ACT CLAIMS

1.     The Exchange Act Claims arise from Defendants' fraudulent attempt to take advantage of surging demand in the recreational and medicinal cannabis industry caused by the Canadian government's legalization of cannabis in 2018.

2.     Defendants did so by knowingly growing and storing massive amounts of cannabis in unlicensed rooms to artificially boost the Company's production capacity.  This unlicensed growing and storing scheme was accomplished purposely—with the knowledge and consent of CEO Defendant Aceto and Chairman of the Board Defendant Paul—in direct violation of the laws and regulations set forth by the Canadian Cannabis Act and the Canadian equivalent of the U.S. Food and Drug Administration, Health Canada.

---

[1] The following are excluded from the Exchange Act Class: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of CannTrust during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (v) CannTrust's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

3.      CannTrust also intentionally falsified its license applications to Health Canada by hanging up fake walls and staging photographs to make it appear as if its cannabis growing rooms were empty when they were in fact filled with thousands of cannabis plants.

4.      Finally, CannTrust also boosted production capacity (and increased profits from surging demand) by growing cannabis using cheaper, unregulated seeds obtained on the black-market.  CannTrust then mislabeled the cannabis grown from unregulated seeds to customers as if it were regulated and approved by Health Canada.

5.      Because Health Canada was unaware of the black-market cannabis, CannTrust was able to increase its production capacity by commingling black-market and regulated cannabis and labeling it all as regulated.  By engaging in this illicit growing and storing scheme and concealing it all from Health Canada, CannTrust knowingly put the entire Company and investors' money at serious risk were the regulator to discover the scheme.

6.      Nonetheless, throughout the Class Period, Defendants consistently assured investors that CannTrust was in compliance with all Health Canada regulations and boasted that CannTrust  was in pole-position to become one of the market leading cannabis companies in the world as demonstrated by its ostensibly strong revenue growth and inventory numbers.

7.      However, little did investors know that CannTrust was in violation of numerous Health Canada regulations and that the Company's strong revenue and growth were directly attributable to the Company's illicit growing and storing of cannabis in unlicensed rooms and reliance on black-market seeds.  As a result CannTrust also issued financial statements (some audited by KPMG) that materially overstated the Company's revenues, assets, and inventories throughout the Class Period.

8.     The risk that Defendants' fraud would come crashing down eventually materialized in June 2019 when a former employee blew the whistle to Health Canada about Defendants' fraudulent practices.   Shortly thereafter, Health Canada performed a surprise inspection of CannTrust's facilities, uncovering uncontroverted evidence of the illicit growing and storing scheme.   Over the course of the next two months, the truth about CannTrust's fraudulent business practices and Defendants' knowledge and direction thereof were revealed in a series of bombshell disclosures that caused CannTrust's stock price to plunge **more than 73%**, injuring investors as nearly three-quarters of the Company's market cap disappeared.

### A.     CannTrust's Aggressive Expansion Plan

9.     CannTrust was founded in 2013 and for years made money by selling medical cannabis to its approximately 58,000 prescription-carrying customers.   However, beginning in 2017, the prospect of the legalization of recreational cannabis in Canada and an increasing number of U.S. states began to gain considerable momentum.   By April 2018, legislation was introduced and quickly passed in Canada legalizing the recreational use and sale of cannabis as of October 17, 2018.   Cannabis market commenters—and CannTrust itself—announced that they were anticipating a massive increase in demand that would come along with legalization and even predicted a nationwide shortage of recreational cannabis.   This surge in demand presented a once-in-a-lifetime opportunity for CannTrust—which already had an established medicinal cannabis operation—to establish itself as a market leader in the soon-to-be booming recreational cannabis industry.

10.     In order to take advantage of the upcoming surge in demand, CannTrust undertook an ambitious expansion plan in order to increase its production capacity. Accordingly, in March 2017, CannTrust acquired a massive 450,000-square-foot greenhouse facility in the Town of Pelham, within the regional municipality of Niagara, Ontario (the

"Niagara Facility").[2]   Prior to that, CannTrust operated entirely out of a separate facility in Vaughan, Ontario, Canada (the "Vaughan Facility").  CannTrust's plan was to make the Niagara Facility the Company's sole growing facility, while the Vaughan Facility would exclusively handle the storage, processing, packaging, and shipping of CannTrust's cannabis products.

11.   In addition to overhauling its growing and processing facilities, CannTrust also brought in a new team of executives who lacked expertise in the cannabis industry but had strong corporate finance backgrounds.  These new executives presumably would take the Company from a mid-level medicinal cannabis producer to a large, market-leading recreational cannabis brand with hundreds-of-thousands of customers and investors.

12.   Such a transformation would be required if CannTrust was to attract new investors who believed CannTrust had the expertise to become one of the top cannabis corporations in the world.  At the forefront of this corporate overhaul was the hiring of Defendant Peter Aceto—a former banking and corporate finance CEO at Tangerine Bank— in October 2018 as the Company's new CEO who replaced Defendant Paul, the Company's Chairman of the Board of Directors, who assumed a role as a "Special Advisor."

13.   Armed with a new corporate leadership team, 450,000 square feet of potential growing space in Niagara, and a streamlined storage and processing center in Vaughan, CannTrust appeared to be ideally positioned to profit from the booming demand for recreational cannabis.

14.   Nevertheless, one major hurdle existed: many of the growing rooms at the new Niagara Facility and the storage rooms at the Vaughan Facility were **not yet licensed by Health Canada** and therefore **could not be used to grow or store cannabis**.

---

[2] The Niagara Facility is sometimes also referred to as the "Pelham Facility."

**B.      CannTrust Was Required to Follow Strict Regulations Governing the Production and Sale of Cannabis**

15.      Because cannabis and cannabis-related products are consumed by human beings, the production and sale of cannabis are highly regulated.   Accordingly, along with the legalization of recreational cannabis came strict regulations governing CannTrust's growing, storage, and sale of cannabis.  Indeed, the Cannabis Act, which replaced the previous Access to Cannabis for Medicinal Purposes Regulations ("ACMPR"), set forth a thorough regulatory framework and licensing process for CannTrust to comply with, including detailed licensing requirements for each phase or activity in the cannabis industry including production, growing, importation, exportation, testing, packaging, labelling, sending, delivery, transportation, sale, possession, and disposal of cannabis for both recreational and medical purposes.

16.      Critically, CannTrust was also required to obtain **location-specific** licenses for each of the facilities and rooms in which each distinct phase or activity took place—each of which was required to comply with its own specific regulations depending on the activity for which that the room was designated (and licensed).  Obtaining a license for a specific location or room, Health Canada required, *inter alia*: (i) verification of the physical security requirements for the site; (ii) confirmation that the activities of the licensed producer correspond to those indicated on the licensed producer's license; (iii) identification of the legal source from which the licensed producer obtains its starting materials (*i.e.*, seeds and plants); and (iv) confirmation that adequate standard operating procedures (SOPs) have been established.

17.      As of the start of the Class Period, however, at least **five of the twelve growing rooms** in the Niagara Facility were **not yet fully licensed** by Health Canada.  Likewise, many of the rooms at the Company's Vaughan Facility were yet to be licensed for storage.  Nonetheless, as early as June 2018, CannTrust started illicitly storing cannabis in unlicensed rooms at the

Vaughan Facility.  And as early as October 2018, CannTrust started illicitly growing cannabis in unlicensed rooms at the Niagara Facility—in flagrant violation of Health Canada regulations. Moreover, as another way to boost production capacity, beginning in June 2018, CannTrust began to grow and sell cannabis from seeds obtained on the black-market and commingling it with regulated cannabis and labeling it all as the regulated strain and selling it to CannTrust's customers.

### C.  Defendants Knowingly Violated Health Canada Regulations to Increase Production Capacity[3]

18.     Defendants' knowledge of the illicit growing and storage scheme is not reasonably in dispute.  Following the November 2018 inspection by Health Canada of CannTrust's Niagara greenhouse growing facility, Graham Lee, CannTrust's Director of Quality and Compliance, **sent Defendants Aceto and Abramowitz— CannTrust's CEO and CFO, respectively—an email warning them:** *"***We dodged some bullets . . . [Health Canada] did not ask about RG8E/W, which are unlicensed rooms currently full of plants**."

19.     Lee explicitly listed the numerous instances of unlicensed growing and storing that was already occurring at CannTrust's facilities, with plans to expand the illicit practice in days: "**1) RG8 is not licenced but has plants in it; 2) RG9 is not licenced but we are intending to put plants in it on Monday; 3) PA2A-E are not licenced but we have moved the encapsulation equipment into them and will begin running it next week**."  This email was later **sent to Defendant Paul—CannTrust's Chairman of the Board—**who responded to the communication evidencing his knowledge of the illicit scheme.

---

[3] All emphases are added unless otherwise noted.

20.     Neither Defendants Aceto, Abramowitz nor Paul reacted as they should have: immediately intervening to stop the illicit growing and storing practice.  In fact, Defendant Aceto did exactly the opposite.  According to internal CannTrust weekly production minutes from November 2018, while discussing the fact that CannTrust had plants growing in unlicensed rooms, **Defendant Aceto instructed CannTrust employees to "continue as planned**."

21.     CannTrust then took affirmative steps to conceal the practice from Health Canada. According to former CannTrust employee and whistleblower, Nick Lalonde, senior CannTrust employees instructed him to hang fake walls in front of the unlicensed rooms so the Company could take pictures making it appear as though the room was empty when in reality it was filled to capacity with cannabis plants.  CannTrust did this **so it could submit falsified pictures to Health Canada** as part of its application for a license to grow cannabis for those very rooms.

22.     These allegations are all fully corroborated by numerous former CannTrust employees and confidential witnesses ("CWs") who confirmed that Defendants grew and stored cannabis in unlicensed rooms and engaged in other regulatory violations in order to boost production capacity and concealed it all from Health Canada.

23.     For example, one former employee, CW1, who attended Quality Control meetings where issues at the Niagara Facility were discussed, recalled that she saw plants and greenhouses being opened where the Company had not obtained the proper permitting.  The same employee confirmed that CannTrust took affirmative steps to hide the unlicensed growing from Health Canada, which included misleading Health Canada inspectors and hanging up fake walls and curtains in front of the plants in the unlicensed rooms so it appeared in photographs sent to Health Canada that the rooms were empty.  Critically, **three former employees, CW1, CW2,**

and CW6 all confirmed that Defendant Aceto knew about and directed the unlicensed growing.

24.     In fact, Defendants' knowledge of the illicit growing and storing scheme was so egregious that once Health Canada uncovered the violations, Defendants promptly admitted to the illicit practices.  Indeed, in two separate press releases issued following Health Canada's surprise inspection of the Niagara Facility in June 2019 and audit of the Vaughan Facility in July 2019, **CannTrust admitted to engaging in the practice of growing and storing cannabis in unlicensed rooms from October 2018 and June 2018 respectively** (in addition to a multitude of other regulatory violations).  Rather than provide an explanation, Defendant Aceto simply told investor investors: "**We made errors in judgement**."

25.     Likewise, in a July 8, 2019 interview with a Canadian news outlet Globe & Mail, Defendant Aceto admitted: "We constructed these rooms in accordance with all the rules and regulations; the mistake that was made by CannTrust was putting plants in these rooms before we'd actually received the approval to do so."

> **D.     Defendants Knowingly Misled Investors About The Illicit Growing and Storing Scheme and the Risks it Posed**

26.     Yet, in complete contradiction to what was happening behind CannTrust's walls, throughout the Class Period, Defendants brazenly and repeatedly assured investors that CannTrust was in compliance with all applicable regulations.  For example, Defendants repeatedly assured investors during the Class Period:

- **[CannTrust] currently holds or has applied for all necessary licences and permits to carry on the activities which it is currently conducting under applicable laws and regulations . . . .**

- **CannTrust is a Licensed Producer and distributor of medical and recreational cannabis pursuant to the provisions of the Cannabis Act (Canada) (the "Cannabis Act") and its regulations.**

- **The Company distributes its recreational cannabis products in accordance with the federal and provincial regulatory frameworks**.

27.     Likewise, Defendants boasted to investors that CannTrust was successfully ramping up its production capacity and increasing inventory, which in turn led to massive increases in revenues from surging demand.  But Defendants failed to disclose the true reason for the Company's new-found success: the illicit growing and storing strategy.

28.     For example, during the Class Period Defendants told investors:

- *CannTrust is excited and well-positioned to enter this new marketplace and has the production capacity and infrastructure . . . to immediately begin fulfilling adult consumer [i.e., recreational] use market orders on a national level.*

- *CannTrust is a front-runner in the industry and perfectly positioned to continue its exponential growth in Canada and abroad following the legislative changes set to become effective in Canada on October 17th.*

- *In the quarter ended March 31, 2019, we harvested approximately 9,424 kg of cannabis from our Niagara [F]acility, representing an increase of 96% from the fourth quarter of 2018.*

- *The total quantity of medical cannabis sold to patients during the three months ended December 31, 2018 increased to 2,017 kg, a 166% from the comparable 2017 period.  For the full year 2018, the [C]ompany sold 5,372 kg of medical cannabis, an increase of 141% from the comparable 2017 period.*

- *The increase in gross profit excluding the impact of the change in the fair value of biological assets was as a result of increased scale of operations.*

29.     However, contrary to what Defendants told investors, and as known internally among CannTrust's executives, the real reason CannTrust was "perfectly positioned" and had the "production capacity and infrastructure" to "continue its exponential growth" and the resultant "increase in gross profit" was directly attributable to their knowing violation of Health Canada regulations in order to increase production capacity and take advantage of increased demand.

30.     Moreover, Defendants' illicit growing and storage scheme also misleadingly propped up the Company's financial figures they reported to the market.  Indeed during the Class Period, CannTrust boasted about its strong balance sheet of biological assets, inventory, and revenue figures when in reality those line items were materially overstated because they included cannabis that was both grown and stored in violation of Heath Canada regulations and accordingly in violation of numerous International Financial Reporting Standards and International Accounting Standards.  Notably, because CannTrust lacked legal title to the illicitly grown cannabis, it was not able to properly recognize revenue therefrom.  Some of these misleading financial statements were also purportedly audited by CannTrust's certified public accountants, KPMG, in stark violation of relevant auditing standards.

**E.      Defendants Cash-In While Unsuspecting Investors Pour Money Into CannTrust**

31.     By the beginning on 2019 CannTrust became one of the hottest cannabis stocks in the world based on the Company's exponential growth and soaring profits—much of which was unknowingly attributable to the production and sale of unlicensed cannabis.  Indeed the Company applied to—and shortly thereafter was listed on—the New York Stock Exchange in February 2019 and became one of the most popular cannabis stocks to invest in.

32.     Shortly afterwards, the Company filed a registration statement for a secondary offering of CannTrust common stock in order to generate additional capital.  The registration statement and the supplemental prospectus filed pursuant thereto were riddled with false and misleading statements, including many of those mentioned above, regarding CannTrust's compliance with Health Canada regulations, increased production capacity and profits, and misleading consolidated financial statements supposedly audited by well-regarded member of the "big four" accounting firms, KPMG.

33.     The secondary offering closed on May 6, 2019.  All told, CannTrust generated approximately $200 million in the Offering.  Critically however, Defendants Paul and Litwin— who signed the false consolidated financial statements—and Defendant Sanders collectively reaped more than **$33 million** in personal proceeds from the Offering.

**F.      Defendants' Illicit Growing and Storing Scheme—and The Risks It Posed—
          Are Revealed In a Series of Explosive Disclosures**

34.     Eventually, CannTrust's illicit growing and storage scheme could no longer be contained.  In June 2019, Nick Lalonde, one of CannTrust's former employees, blew the whistle on CannTrust by sending an email to Health Canada detailing Defendants' fraud and stating "[i]f you look through the camera footage prior to the dates the pictures were taken and requested **you will clearly see us hanging up white poly walls to cover up thousands of plants**."  Shortly thereafter, Health Canada conducted a surprise inspection and audit of the Niagara Facility that uncovered uncontroverted evidence of Defendants' unlicensed growing operations.

35.     Then, on July 8, 2019, prior to the market opening, CannTrust issued a press release, disclosing that CannTrust had "received a compliance report from Health Canada notifying the Company that its greenhouse facility in [Niagara] is non-compliant with certain regulations" and that "[t]he non-compliant rating is based on observations by the regulator regarding the growing of cannabis in five unlicensed rooms . . . [which] took place from October 2018 to March 2019."  The press release also stated that CannTrust "accepted Health Canada's non-compliance finding and has taken actions to ensure current and future compliance."

36.     Health Canada's findings also had financial ramifications.  The press release explained: "Health Canada has placed a hold on inventory which includes approximately 5,200kg of dried cannabis that was harvested in the previously unlicensed rooms in [Niagara], until it deems that the Company is compliant with regulations" and that "CannTrust has

instituted a voluntary hold of approximately 7,500kg of dried cannabis equivalent at its Vaughan manufacturing facility that was produced in the previously unlicensed rooms."  In response to this news, CannTrust's share price fell **more than 22%**.

37.     As the explosive news of CannTrust's fraudulent scheme spread, the Canadian regulators and authorities and news outlets began to dig into the details of CannTrust's illicit growing and storage practices causing CannTrust stock to continue to plummet in a series of explosive revelations, decimating CannTrust's stock price.

38.     On July 10, 2019 the Globe and Mail newspaper issued a news report that revealed the explicit details of Mr. Lalonde's email to Health Canada, including senior CannTrust employees directing Mr. Lalonde and others to hang fake walls in front of the unlicensed rooms to hide their unlicensed growing from Health Canada.   In response, CannTrust's stock price fell over **12%**.

39.     On July 11, 2019, after the market closed, CannTrust announced that "it has implemented a voluntary hold on sale and shipment of all cannabis products as a precaution while Health Canada visits and reviews its Vaughan, Ontario manufacturing facility."  CannTrust also informed investors that it created a Special Committee "comprised of independent members of the Board of Directors" to "investigate [a compliance report] from Health Canada in its entirety."  On this news, CannTrust fell another **17%**.

40.     On July 15, 2019, after the market closed, the Financial Post published an article discussing an initial investigation by the enforcement team of the Ontario Securities Commission and the potential that Defendants' scheme could rise to the level of a "criminal offence."  The article also explained that a number of class action lawsuits had been filed against the Company

in both Canada and the United States for securities fraud violations.  As a result, CannTrust's stock price fell **10%**.

41.     Then, on July 23, 2019, multiple news reports published for the first time excerpts from the internal CannTrust emails discussed above demonstrating that CannTrust executives, including Defendants Aceto and Paul, **knew about and directed** the unlicensed growing and storage scheme.  On this news, CannTrust stock fell **over 22%.**

42.     Following these revelations of Defendants Aceto's and Paul's direct involvement with the growing in the five unlicensed rooms, on July 25, 2019, the Company issued a press release, announcing: "The investigation into the Company's non-compliance with Health Canada regulations and ancillary matters uncovered new information that has resulted in a determination by the Board to **terminate with cause** CannTrust CEO Peter Aceto."  The press release also announced that "the Board of Directors demanded the resignation of the Company's Chair Eric Paul and he complied."

43.     On August 12, 2019, prior to the market opening, CannTrust told investors that Health Canada found significant regulatory violations at the Vaughan Facility.  On that day, the Company issued a press release, stating "[a]fter trading hours on Friday, August 9, 2019, CannTrust received a report from Health Canada notifying the Company that its manufacturing facility in Vaughan, Ontario has been rated non-compliant with certain regulations."

44.     Specifically, the disclosure revealed for the first time that CannTrust "conver[ted] five rooms from operational areas to storage areas, which were used for storage since June 2018 without prior approval of Health Canada."  Again, Defendants admitted that the regulator's findings were accurate noting: "CannTrust has accepted Health Canada's findings and remedial actions are underway."  On this news, CannTrust's stock price fell another **27%**.

45.     The parade of troubling revelations ended on the last day of the Class Period—September 17, 2019.  On that day, the Company informed investors that Health Canada was suspending its licenses, preventing CannTrust from continuing to produce and sell cannabis altogether.  Of course, this also meant the Company's apparently legitimate and sustainable revenue stream would dry up.  On this news, CannTrust's stock price fell **14%**.

46.     Not long after that, on March 31, 2020, CannTrust filed for creditor protection (*i.e.*, bankruptcy) in Canada and trading was halted on the Toronto and New York Stock Exchanges.

## III.    JURISDICTION AND VENUE

47.     These claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

48.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

49.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud occurred in this Judicial District.  CannTrust's common stock traded on the NYSE in this district during the Class Period and Defendants made materially false and misleading representations to investors that were disseminated to investors in this District.

50.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

IV.    **PARTIES**

A.    **Plaintiffs**

51.    On April 16, 2020, the Court appointed Granite Point Master Fund, LP and Granite Point Capital Scorpion Focused Ideas Fund ("Granite Point") to serve as Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Located in Boston, Massachusetts, Granite Point is a hedge fund that manages approximately $177 million in assets. Granite Point purchased CannTrust securities during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.  A list of Granite Point's Class Period transactions is included in Lead Plaintiffs' certification submitted with its application to be named Lead Plaintiff.  (ECF No. 45-1).

52.    Additional Plaintiff Jose A. Silva ("Dr. Silva") purchased CannTrust securities during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.  A list of Dr. Silva's Class Period transactions is included in Dr. Silva's certification submitted with his application to be named lead plaintiff.  (ECF No. 25-1).

B.    **Defendants**

1.    **Corporate Defendant**

53.    CannTrust is incorporated in Ontario, Canada and maintains its principal executive offices at 3280 Langstaff Road, Unit 1, Vaughan, Ontario L4K 4Z8, Canada.  At the start of the Class Period, the Company's stock traded on the Toronto Stock Exchange under the symbol "TRST" and as F-Shares[4] under the symbol "CNTTF" on the OTC Pink Open Market in

---

[4] An F-share is a foreign security denominated in U.S. currency, and traded on the U.S. OTC Market based in New York.  One share of CNTTF represents ownership of one share of CannTrust common stock sold under the ticker symbol TRST in Canada.  An F-share is established in the U.S. when a broker-dealer files with the Financial Industry Regulatory

the United States.[5]   On February 25, 2019, the Company's shares began trading on the NYSE under the symbol "CTST."

## 2.   Individual Defendants

54.   Defendant Peter Aceto ("Aceto") served as the Company's Chief Executive Officer since October 1, 2018.  Prior to joining CannTrust, Defendant Aceto was President & CEO of Tangerine Bank (formerly, ING Direct); prior to that, Aceto held the positions of Chief Risk Officer, Chief of Staff and Chief Lending Officer at ING Direct in the U.S., and was Legal and General Counsel at ING Direct in Canada.  Defendant Aceto made materially false and misleading statements and material omissions in CannTrust filings with the SEC and SEDAR,[6] press releases and on public conference calls and media platforms throughout the Class Period.

55.   Defendant Greg Guyatt ("Guyatt") has served as the Company's CFO since February 19, 2019 and is CannTrust's current CEO since February 2020.  Defendant Guyatt made materially false and misleading statements and material omissions in CannTrust filings with the SEC and SEDAR.

56.   Defendant Ian Abramowitz ("Abramowitz") was the Company's CFO at the beginning of the Class Period through February 19, 2019.  As of February 19, 2019, Defendant Abramowitz serves as CannTrust's SVP of Global Investments and Partnerships.  Defendant

Authority ("FINRA") to create a U.S. ticker symbol in order to facilitate reporting trades in the U.S. in the Company's security.
[5] CNTTF shares trade on the OTC Pink Open Market which is owned and operated by the OTC Markets Group, Inc.  The OTC Markets Group is headquartered at 300 Vesey Street, 12th Floor, North End Ave, New York, NY 10282.
[6] SEDAR is the Canadian equivalent of the SEC website known as EDGAR and serves as the official website that provides access to public securities documents and information filed by issuers with the thirteen provincial and territorial securities regulatory authorities ("Canadian Securities Administrators" or "CSA").  SEDAR provides investors with real-time quantitative and qualitative information on all Canadian issuers and provides investors with transparency when choosing to invest in a Canadian company.

Abramowitz made materially false and misleading statements and material omissions in CannTrust filings with the SEC and SEDAR.

57.     Defendant Brad Rogers ("Rogers") was the Company's President and COO at the beginning of the Class Period through November 9, 2018.  Defendant Rogers made materially false and misleading statements and material omissions in CannTrust's SEDAR filings and press releases.

58.     The Individual Defendants, by virtue of their high-level positions at CannTrust, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition, as alleged herein.

### 3.     Director Defendants

59.     Eric Paul ("Paul") is a co-founder of CannTrust and was its CEO from inception until October 1, 2018, when he stepped down to assume the role of Chairman of CannTrust's Board and Special Advisor to CannTrust's management team.  He was a director of CannTrust since 2015.  Defendant Paul resides in Ontario, Canada.  Defendant Paul (i) signed the Offering Materials; (ii) certified the August 14, 2018 Financial Statements and Management's Discussion and Analysis ("MD&A"), and (iii) on behalf of the board of directors, signed each of CannTrust's financial statements issued during the Class Period, and in doing so, he adopted as his own the false statements made in those documents.  As a board member, he caused CannTrust to make the misrepresentations particularized below.  During the Class Period, Defendant Paul, through entities he owns and/or controls (including Cannamed and the Paul Family Trust) sold CannTrust shares while having actual or constructive knowledge of the

material, non-public information described herein, including over three million shares in the Offering, and over 780,000 shares in the secondary market.

60.     Mark E. Dawber ("Dawber") has been a director of CannTrust since 2017.  He resides in Ontario, Canada.   During the Class Period, Dawber was a member of the Audit Committee of CannTrust's Board of Directors.  As a board member, he adopted as his own the false statements made in each of CannTrust's annual financial statements released while he was a board member, particularized below, when such statements were signed on his behalf.  As a board member, he caused CannTrust to make the misrepresentations particularized below, including by signing the Offering Materials.  Dawber was responsible for CannTrust's financial reporting process and the quality of its financial reporting.  He was charged with the mandate of providing independent review and oversight of CannTrust's financial reporting process, the system of internal control and management of financial risks, and the audit process, including the selection, oversight and compensation of CannTrust's external auditors.

61.     Mitchell J. Sanders ("Sanders") has been a director of CannTrust since 2015.  He resides in Ontario, Canada.  As a board member, he adopted as his own the false statements made in each of CannTrust's annual financial statements released while he was a board member, particularized below, when such statements were signed on his behalf.  As a board member, Defendant Sanders caused CannTrust to make the misrepresentations particularized below, including by signing the Offering Materials.  During the Class Period, Sanders, through Cajun Capital Corporation Inc., which he controls, sold 250,000 CannTrust shares in the Offering while having actual or constructive knowledge of the material, non-public information described herein.

62.     John T. Kaden ("Kaden") has been a director of CannTrust since October 22, 2018 until October 28, 2019.   Kaden resides in New York in the United States of America. During the Class Period (as of February 14, 2019), Kaden was a member of the Audit Committee of CannTrust's Board of Directors, and was appointed to the Special Committee July 2019.   As a board member, he adopted as his own the false statements made in each of CannTrust's annual financial statements released while he was a board member, particularized below, when such statements were signed on his behalf, including by signing the Offering Materials.   As a board member, he caused CannTrust to make the misrepresentations particularized below.   Kaden was responsible for CannTrust's financial reporting process and the quality of its financial reporting. He was charged with the mandate of providing independent review and oversight of CannTrust's financial reporting process, the system of internal control and management of financial risks, and the audit process, including the selection, oversight and compensation of CannTrust's external auditors.

63.     Mark I. Litwin ("Litwin") has been a director of CannTrust since 2015.   He resides in Ontario, Canada.   Litwin, on behalf of the board of directors, signed each of CannTrust's financial statements issued during the Class Period, and in doing so, he adopted as his own the false statements made in those documents, including by signing the Offering Materials.   As a board member, he caused CannTrust to make the misrepresentations particularized below, including by signing the Offering Materials.   During the Class Period, Litwin, through entities owned and/or controlled by him and his family members (including Cannamed, Mar-Risa Holdings, Inc., Forum Financial Corporation, and York Capital Funding, Inc.) sold CannTrust shares while having actual or constructive knowledge of the material, non-

public information described herein, including approximately 1.5 million CannTrust shares in the Offering, and over 2.3 million CannTrust shares in the secondary markets.

64.     Shawna Page ("Page") has been a director of CannTrust since February 22, 2018. She resides in Ontario, Canada.  As a board member, she adopted as her own the false statements made in each of CannTrust's annual financial statements released while she was a board member, particularized below, when such statements were signed on her behalf.  As a board member, she caused CannTrust to make the misrepresentations particularized below, including by signing the Offering Materials.

65.     Robert F. Marcovitch ("Marcovitch") has been a director of CannTrust since 2017. He resides in Washington State.  During the Class Period, Marcovitch was a member of the audit committee of CannTrust's board of directors. As a board member, he signed SEC filings that contained false and misleading statements therein.

**C.     KPMG**

66.     Defendant KPMG has been engaged as CannTrust's auditor since 2018.  KPMG purportedly provided audit services to CannTrust beginning in December 2018.  CannTrust paid KMPG approximately $500,000 for professional audit services related to CannTrust's fiscal year 2018.   KPMG is a Canadian member firm of KPMG International Cooperative.   KPMG International Cooperative is based in Switzerland and is a membership-based company with member and network accounting and advisory firms operating locally in countries around the world, including the United States and Canada.  All KPMG member firms are affiliated with KPMG International.

67.     KPMG issued a Report of Independent Registered Public Accounting Firm to the shareholders and Board of Directors of CannTrust that included an audit of CannTrust's consolidated statement of financial position, as of December, 31, 2018 (the "Audit Report").

KPMG consented to the use of its Audit Report and notes on CannTrust's consolidated financial statements for the year ended December 31, 2018. The Audit Report was published in numerous documents filed by CannTrust during the Class Period including the supplemental prospectus CannTrust filed on May 3, 2019.

### D. Relevant Third Parties[7]

68. **CW1** worked at CannTrust's Niagara Facility from August 2018 until May 2019 as a Document Coordinator. CW1 was responsible for issuing paperwork for harvests, cleanliness of the facility, sanitation logs, and, as she explained, "everything that is required by Health Canada." CW1 handled those documents internally, and then her boss, Quality Supervisor Jared Epp, communicated directly with Health Canada. Epp reported to Graham Lee who in turn reported to Defendant Aceto. During her tenure, CW1 attended Quality Control meetings where issues at the Niagara Facility were discussed. Furthermore, CW1 knew at the time that CannTrust staff, such as Cam Fletcher and Nick Lalonde, removed plants from the unlicensed rooms, hung up curtains, and took framed pictures to make it look like there were no cannabis growth activities occurring in those rooms.

69. **CW2** worked at CannTrust's headquarters at its Vaughan Facility from May 2019 until July 2019 as a Compliance Manager. CW2 was responsible for oversight and audits of CannTrust's business including their adherence to Health Canada's regulatory requirements. CW2 reported directly to Andrea Kirk, VP of Quality Operations, who reported to Defendant Aceto. CW2 initially shared an office with Andrea Kirk and Graham Lee, the Director of Quality and Compliance, but then Kirk moved to another office. According to CW2, Andrea

---

[7] All Confidential Witnesses ("CWs") are referred to with female pronouns, regardless of gender, to protect their identity.

Kirk would thereafter frequently come to their shared office to have closed door meetings with Lee and CW2 present.

70.     **CW3** worked at CannTrust's headquarters at its Vaughan Facility from October 2018 until August 2019.  In October 2018, when CW3 first joined CannTrust, she worked in operational quality assurance, which involved working on the floor and overseeing enforcement of procedures.  In January 2019, CW3 transitioned into a new role that involved deviation closures.  In April 2019, CW3 was promoted to the rank of QAP (Quality Assurance Professional) at CannTrust.  In that role, CW3 worked with the product quality team and was responsible for training that team in advance of its product releases.  In February 2019, CW3 started doing the pre-review for product batches before they were released.  CW3 initially reported to Steven Khemraj, then Laura Leung, then Victoria Malov.

71.     **CW4** worked at CannTrust's Niagara Facility from May 2018 until June 2019 as a Senior Grow Technician.  CW4 was responsible for growth activities for CannTrust's cannabis plants.

72.     **CW5** worked at CannTrust's headquarters at its Vaughan Facility from June 2018 until January 2020 as a Brand Manager.  CW5 was hired by and worked for Jeff Zietlow, until Zietlow changed positions within CannTrust in December 2018. Then from December 2018 through October 2019, CW5 reported to Bernie Yeung until approximately October 2019.  As a Brand Manager, CW5 was responsible for marketing CannTrust's products.

73.     **CW6** worked at CannTrust's Niagara Facility from August 2018 to July 2019 as a Vault Inventory Supervisor.  CW6 was responsible for overseeing the vault in the Niagara Facility that stored CannTrust's products after they were harvested, dried, cured, trimmed, and finished.  CW6 reported to Chris Ash, Plant Manager.  CW6 communicated with Defendant

Aceto during the Class Period when Defendant Aceto would visit the Niagara Facility, typically once a week.  Indeed, Defendant Aceto visited the specific vault where CW6 worked.

74.     **Nick Lalonde** worked at CannTrust's Niagara Facility from June 2017 to May 2019 as head of disposal operations.  Shortly after Mr. Lalonde left CannTrust for a company outside the cannabis industry, Mr. Lalonde blew the whistle on CannTrust's illicit scheme of growing cannabis in unlicensed rooms to Health Canada.  Specifically, on June 14, 2019, Mr. Lalonde sent Health Canada officials an email outlining the wrongdoing that took place at CannTrust during the Class Period, which included informing Health Canada that CannTrust staged photographs sent to Health Canada by erecting fake walls to conceal the unlicensed growing.  When asked by The Voice, a weekly newspaper published in Pelham, Canada, why he came forward, Mr. Lalonde explained that his main motivation was to "show the country and the world that you shouldn't be scared to stand up for what's right.  And for all the amazing employees that CannTrust lied to and made do illegal activities, risking their future for minimum wage."

75.     **Health Canada**, pursuant to the Cannabis Act and the Cannabis Regulations, sets and enforces the standards required for production and sale of cannabis in Canada. Health Canada also held the sole authority to grant regulatory approval of all licenses and permits for cannabis production, as well as for any cannabis facility or growing rooms.  In addition, Health Canada conducted site inspections of licensed producers, such as CannTrust to ensure regulatory compliance.  According to Health Canada's website, "Health Canada can inspect the operations of a licensed producer at any reasonable time to confirm that the applicable legislative and regulatory requirements are being met."

## V.      SUBSTANTIVE ALLEGATIONS[8]

### A.      CannTrust Rapidly Expanded Its Growing Capacity in Light of Increased Demand for its Products

#### 1.      CannTrust's Medicinal Cannabis Business

76.      Founded in 2013 by a group of pharmacists (including Defendant Paul), CannTrust was a federally regulated, licensed producer and distributor of medical cannabis in Canada, the United States and other international markets.  CannTrust sold various dried, extract, and capsule cannabis products to its approximately 58,000 medical patients that use the Company's products to treat a variety of medical conditions.  The Company sold its medicinal products as dried flower (*i.e.*, dried plants), cannabis drops, encapsulated cannabis oil, and pre-rolled marijuana cigarettes.  CannTrust has also developed, produced and sold a broad spectrum of concentrated, water-soluble, tasteless, and odorless consumer products, including food additives, beverages, edibles, and sprays—all providing the same intended effects as the Company's more traditional cannabis products.[9]

#### 2.      CannTrust Tries to Capitalize on Skyrocketing Demand Following the Legalization of Recreational Cannabis in Canada and the United States

77.      CannTrust had been licensed to produce and sell medicinal marijuana in Canada for years prior to the start of the Class Period.  On June 12, 2014, CannTrust received its initial license from Health Canada to produce and cultivate medicinal cannabis, which the Company began doing at its facility and headquarters located in Vaughan, Ontario, Canada (the "Vaughan

---

[8] Unless otherwise noted, all references to CannTrust's business and operations refer to events that occurred during the Class Period as defined herein.

[9] During the Class Period the Company offered products under a variety of different marketing brands: liiv, Synr.g, Xscape, and Peak Leaf.  CannTrust also offered different flavors of its cannabis products to attract new cannabis users who would were unfamiliar with the practice of smoking or otherwise consuming cannabis.

Facility"). Shortly thereafter, on February 9, 2015, the Company received its license to sell medicinal cannabis from Health Canada. But even by the start of the Class Period in June 2018, CannTrust was limited to selling its products to the approximately 58,000 customers who had a prescription from a medical professional to take cannabis as a treatment for a variety of conditions.

78. However, the legalization of recreational cannabis in Canada and in certain states within the United States presented a massive opportunity for CannTrust (and the cannabis industry) to grow its customer base exponentially. Rumors of legalization in Canada had been circulating for years after an increasing number of U.S. states began to legalize recreational cannabis including California and Colorado. Indeed, as far back as 2015, Canadian Prime Minister Justin Trudeau promised that he would legalize and regulate cannabis for recreational use in Canada. But, in 2017 the prospect of legal recreational cannabis in Canada became a reality. Specifically, on April 13, 2017, the Canadian government issued an official press release introducing legislation to legalize and regulate the use of recreational cannabis in Canada.

79. On June 26, 2018 (the first day of the Class Period) CannTrust issued a press release entitled "**CannTrust Positioned for Rapid Growth as Canada's Cannabis Act Receives Royal Assent**" that boasted to investors about CannTrust's position in the industry and ability to meet the production capacity needed to serve the soon-to-be booming recreational market: "*CannTrust is excited and well-positioned to enter this new marketplace and has the production capacity and infrastructure together with standardized products with precise label claims indicating the exact dosage, to immediately begin fulfilling adult consumer [i.e., recreational] use market orders on a national level*."

80.     On October 17, 2018, the sale of cannabis for adult recreational use in Canada was legalized.  According to the Wall Street Journal, "Canada became the largest country to legalize the recreational use of marijuana . . . , a potentially watershed moment for a nascent cannabis industry that is banking on showing the drug can be safely regulated."  André Gagnon, a spokesman for Health Canada, was quoted by the New York Times as stating that October 17, 2018 "marked the end of nearly a century of criminal prohibition of cannabis and the launch of an entirely new regulated industry in our country."

### 3.     Health Canada Strictly Regulated the Growing, Storing, and Sale of Medicinal and Recreational Cannabis

81.     Along with the legalization of recreational cannabis came strict regulations imposed by the Canadian government, which had significant implications for CannTrust's plans to seize on surging demand and become a cannabis market leader.  Indeed, during the Class Period, CannTrust and other cannabis companies all operated under a strictly regulated environment governed by various laws, regulations, and standards primarily administered by Health Canada—the Canadian equivalent of the FDA.

82.     The regulatory framework that gave Health Canada its authority over CannTrust was the federal *Cannabis Act* and the regulations promulgated thereunder (the "Cannabis Act"). The Cannabis Act went into effect on October 17, 2018—the same day as the legalization of Cannabis in Canada.[10]

---

[10] The Cannabis Act replaced the old cannabis regulatory regime under the ACMPR standards, which had previously replaced the *Marijuana for Medical Purposes Regulations* ("MMPR") as of August 24, 2016. The Cannabis Act also replaced the *Controlled Drugs and Substances Act (Canada)* ("CDSA"), and both the ACMPR and CDSA were repealed the same day. However, like the Cannabis Act the previous ACMPR and CDSA regulations also imposed strict activity and location licensing requirements.

83.     The Cannabis Act set forth a thorough regulatory framework and licensing scheme for Cannabis manufacturing companies such as CannTrust. The Cannabis Act contained detailed regulations and licensing requirements for each phase or activity in the cannabis industry including production, importation, exportation, testing, packaging, labelling, sending, delivery, transportation, sale, possession, and disposal of cannabis for both recreational and medical purposes. Accordingly, CannTrust was required to obtain activity-specific licenses for **each phase** of the Company's cannabis operations (such as cultivation, testing, processing, and sale of cannabis).

84.     Critically, CannTrust was also required to obtain **location-specific** licenses for each of the facilities and rooms in which the distinct phase or activity took place—each of which was required to comply with its own specific regulations depending on the activity for which that room was designated (and licensed). Under these strict regulations, CannTrust was required to obtain specific licenses for any new room or facilities—such as the Niagara Facility and each room therein—depending on what that room was being used for (*i.e.*, growing, storing, testing, packaging, *etc.*).

85.     Indeed, for each room within each facility, Health Canada required, *inter alia*: (i) verification of the physical security requirements for the site; (ii) confirmation that the activities of the licensed producer correspond to those indicated on the licensed producer's license; (iii) identification of the legal source from which the licensed producer obtains their starting materials (*i.e.*, seeds and plants); and (iv) confirmation that adequate standard operating procedures (SOPs) have been established.

86.     However, because of the legalization of cannabis in the Fall of 2018 and the resulting surge in cannabis production and applications for licenses, Health Canada allowed

cannabis producers to apply for licenses through an online portal known as the Cannabis Tracking and Licensing System ("CTLS").[11]   As the Financial Post explained, "[a]s the number of licensed producers increased in the lead-up to legalization, Health Canada introduced an online portal called the [CTLS] where producers would submit any kind of amendment request through an online application form, which would then be reviewed by the department."

87.   Critically, the license application process **required the producer to submit** an evidence package containing detailed visual evidence of the facilities compliance.  For example, when applying for standard processing, standard cultivation, and sale for medical purposes with possession licenses, the license producer must send to Health Canada an evidence package with: (i) "Guided video tour of entire site (including both indoor and outdoor areas), highlighting all security features of the site perimeter, operations areas (including all grow areas) and storage areas.  All devices must correspond to their location as indicated on the site plan (including all floor plans)"; (ii) "Photographic overview of each side of the defined site perimeter"; (3) "Visual recording device footage that includes the front, back and sides of the defined site perimeter (*e.g.*, east, west, south and north walls).  Complete coverage may be best demonstrated by displaying multiple visual recording device feeds that capture an individual walking around the perimeter"; and (iv) "Footage from all visual recording devices in each operations areas (including the entry and exit points of the grow areas) and all storage areas."  Additionally, the

---

[11]   The Cannabis Act also allowed for Health Canada to conduct ad hoc, unscheduled site inspections of cannabis producers such as CannTrust to ensure compliance.  According to Health Canada's website, "Health Canada can inspect the operations of a licensed producer at any reasonable time to confirm that the applicable legislative and regulatory requirements are being met."  In the event that Health Canada's inspections uncovered violations, Health Canada could then issue the licensed producer a compliance report, informing the company of the violations and requiring corrective measures to be taken.

videos and images must "[c]apture the entirety of the areas identified (*i.e.*, no blind spots and/or obstructed views)."

88.    It was well-known to all cannabis growers, producers, and sellers that failure to comply with these regulations would result in Health Canada seeking significant penalties against non-compliant producers, including the suspension and revocation of the producer's license to grow and sell cannabis in Canada.  Indeed, CannTrust acknowledged that there would be serious adverse consequences to its business if it was found to be non-compliant with Health Canada regulations.  In its Form 40-F for the year ended December 31, 2018 ("2018 Form 40-F"): "**A significant failure of the Company's site security measures and other facility requirements, including any failure to comply with regulatory requirements, could have an impact on its ability to continue operating under its Cannabis Licences or its prospects of renewing its Cannabis Licences, and could also result in a suspension or revocation of the Cannabis Licences**."

89.    Moreover, Defendants were well aware of the severe ramifications of buying seeds on the black market and failing to comply with other applicable regulations.  Indeed, Health Canada put all Canadian licensed producers on notice that if they fail to comply with the regulations, they *will* lose their licenses.  For instance, Ascent Industries Corporation ("Ascent") deviated from applicable regulations by failing to meet its record keeping and other compliance requirements.  On September 26, 2018, Health Canada partially suspended Ascent's producer's and dealer's licenses.

90.    Similarly, Bonify Medical Cannabis ("Bonify") procured illegal cannabis from the black market and possessed, distributed, and sold product purchased from that illegal source.  On February 4, 2019, Health Canada suspended its sales license and demanded Bonify to

"immediately suspend sales of all cannabis for both medical and nonmedical purposes." CannTrust therefore knew that if it failed to comply with applicable regulations that it would suffer the same fate as its peers.

        **4.**      **CannTrust Rapidly Expanded its Production Capacity in Light of Increased Demand From Canadian and U.S. Legalization of Marijuana**

91.     As expected, almost immediately following legalization, demand for recreational cannabis skyrocketed—causing an imminent nationwide supply shortage of cannabis in Canada. According to a November 7, 2018 New York Times article, "Canada is running low on legal pot three weeks after sales of recreational marijuana were authorized."

92.     Similarly, in November 2018, MarketWatch published an article explaining that "[a]fter more than a month of legal recreational marijuana sales in Canada, provinces say stores are still having trouble procuring enough pot from producers that have built large valuations on promises of selling tons of the drug."

93.     Prior to and during the time when cannabis was legalized, CannTrust began a massive undertaking to expand its growing capacity in order to capitalize on the outsized demand for recreational cannabis thereby establishing itself as a market leader in the cannabis industry.

94.     However, in order to accomplish this goal, CannTrust had to expand dramatically its growing capacity in a relatively short period of time. Accordingly, in March 2017, CannTrust acquired real estate assets and related equipment of a 450,000-square-foot greenhouse facility in the Town of Pelham, Ontario within the regional municipality of Niagara, Ontario (the "Niagara Facility").[12]

---

[12] The Company acquired the facility through its wholly owned subsidiary, Elmcliffe Investments Inc. Specifically, Elmcliffe Investments is a wholly owned subsidiary of CannTrust Inc., and CannTrust Inc. is a wholly owned subsidiary of CannTrust Holdings, Inc.

95.     CannTrust's plan was to operate the Niagara Facility as the Company's sole growing facility and convert the formerly all-purpose Vaughan Facility to serve as the Company's processing facility (*i.e.*, growing no longer occurred there).  During the Class Period, the Company thus grew all its cannabis in its Niagara Facility and then shipped the harvested product to its Vaughan Facility for processing, extraction, manufacturing, packaging, and order fulfillment.

96.     However, before growing cannabis in the newly acquired Niagara Facility in accordance with Health Canada's stringent requirements, the Company had to bring it into compliance with applicable regulations.  Since CannTrust wanted to begin production in the new facility as soon as possible, and converting the entire 450,000-square-foot facility all at once would have taken a long time, the Company chose to split the redevelopment of the facility into three phases.  Splitting the conversion into three phases would allow the Company to begin producing cannabis in part of the facility while the Company worked to convert the rest of the facility into compliance with Health Canada regulations.

97.     Specifically, Phase 1 of the development of the Niagara Facility involved converting 250,000 square feet of the 450,000-square-foot facility into compliance with Health Canada regulations.[13]  Phase 2—the phase most germane to this action—involved bringing the other 200,000 square feet into compliance with applicable regulations.  When completed with Phases 1 and 2, the Niagara Facility would consist of a total of twelve grow rooms with the

---

[13] CannTrust received its Health Canada cultivation license for Phase 1 in October 2017 and its sales license in February 2018—allowing the Company to legally grow and sell cannabis, but only for medicinal purposes until the use of recreational cannabis was legalized.

capacity to produce an estimated 50,000 kilograms of cannabis per year.[14]   However, as discussed above, in order to reach that growing capacity, CannTrust had to receive permits and licenses from Health Canada for each of the rooms in the Niagara Facility.

98.     As of the start of the Class Period, five of the twelve growing rooms in the Niagara Facility—those rooms that were part of Phase 2 of the expansion—were not yet fully licensed by Health Canada.   Specifically, the five rooms that were last to get licensed were rooms RG8, RG9, RG10, RG11, and RG12.   Accordingly, CannTrust was not permitted to grow cannabis in those five rooms for any purpose.

99.     As discussed below, CannTrust did not receive those licenses from Health Canada until April 2019.   Nonetheless, CannTrust started illicitly growing cannabis in those rooms by October 2018—in flagrant violation of Health Canada regulations—so Defendants could begin reaping the profits from the almost unrelenting demand for recreational cannabis.

> ### 5.     CannTrust Replaced its Medicinal Cannabis Management Team With Individuals With Financial Backgrounds but With Little or No Experience with Cannabis Growing, Production, or Regulation

100.     During the same time, in response to concerns over an inability to meet increased demand, CannTrust replaced the Company's senior management with individuals with finance backgrounds who had the corporate financial knowledge to take CannTrust from a medicinal cannabis producer to a trusted market-leader in the recreational and medicinal cannabis space. Accordingly, on October 1, 2018, CannTrust announced that Defendant Paul, CannTrust's co-founder and leader, had stepped down from his role as CEO, and has transitioned to Chairman of

---

[14] In January 2019, the Company received the necessary permits from Health Canada to develop an additional 390,000-square-foot expansion of the facility known as Phase 3.  However, Phase 3 was never completed as a result of Health Canada's suspension of CannTrust's cannabis production and selling licenses for growing and storing cannabis in unlicensed rooms in direct violation of the Cannabis Act.

the Board and "Special Advisor" to CannTrust's management team.  Defendant Aceto, a former CEO and President at Tangerine Bank, replaced Defendant Paul as CEO effective immediately.

101.    Because of his extensive background in corporate finance, Defendant Aceto was appointed with one goal in mind—to maximize capacity and take advantage of the limitless demand facing the cannabis industry at the time.  Indeed, as the Financial Post reported, Defendant "Aceto was brought in to lead CannTrust in a climate where licensed producers were under pressure to scale-up production because of a nationwide supply shortage."

102.    Shortly thereafter, in November 2018, CannTrust continued to re-vamp its management team and announced the departures of the Company's long-time president, Defendant Rogers, who is credited with growing CannTrust from 20 to nearly 500 employees at the time of his departure, as well as Michael Ravensdale, CannTrust's SVP of Quality and Production Management.[15]

103.    However, this transition meant that the Company was at that time being run by corporate finance rather than medicinal cannabis executives.  Indeed, according to several CannTrust employees that spoke to the Financial Post, the change in leadership resulted in the Company being run by "a group of 'young, inexperienced growers calling the shots.'"  The article further explained that those same CannTrust employees recalled that at that time the Company became "disorganized and chaotic" and that this change in management "was the beginning of a major shift in the [C]ompany's workplace culture, one that saw a drive towards increased productivity 'at all costs.'"  The Company would soon find out that attention to detail, and ensuring adherence to regulations in a highly regulated industry like recreational cannabis

---

[15] As discussed below, on February 19, 2019, CannTrust also replaced their Chief Financial Officer Defendant Abramowitz, with Defendant Guyatt who had no prior cannabis experience.

was as critical, if not more critical, to CannTrust's success than simply driving increased productivity at all costs.

**B.      CannTrust Purposefully Violated the Cannabis Act In Order to Take Advantage of Massive Demand For Recreational Cannabis**

104.    Leading up to Canada's legalization of cannabis in October 2018 (and the surge in demand it created), CannTrust—led by its newly-appointed CEO Defendant Aceto and new "Special Advisor" Defendant Paul—began implementing an expansion and growing strategy that would allow CannTrust to profit from the dramatic increase in demand.  The key to this expansion and growing strategy was to increase the Company's growing capacity—and its profits—by growing massive amounts of cannabis in illegal, unlicensed rooms at the Niagara Facility and hiding it from Health Canada.

105.    Similarly, and at that same time, when Defendants ran out of licensed space to store the excess cannabis grown in the unlicensed rooms, they chose to store the overflow in similarly unlicensed rooms in the Company's Vaughan Facility.  Simultaneously, Defendants were committing a number of other regulatory violations including the use of cheaper, black-market cannabis seeds in order to maximize profits and then selling that cannabis with false labeling stating that the cannabis came from an approved cannabis strain.

106.    Critically, in addition to knowingly violating Health Canada's strict regulations, Defendants also repeatedly concealed this fact from investors despite profiting handsomely themselves by selling considerable amounts of stock and raising approximately $200 million of cash in the Offering—all prior to Defendants' illicit scheme becoming public.

107.    By engaging in this illicit practice, Defendants put the entire Company (and investors' money) at risk.  Indeed, were Health Canada to uncover CannTrust's illicit growing strategy and suspend or terminate the Company's license to grow and sell marijuana from those

unlicensed rooms or even altogether, the foreseeably result would be the end of the Company's apparently legitimate and sustainable revenue stream.

### 1.      CannTrust Began Illegally Growing and Storing Cannabis in Unlicensed Rooms

108.    Defendants' fraudulent concealment of their illegal growing strategy is straightforward.  At the time that recreational cannabis became legal in Canada, CannTrust's Niagara Facility was the Company's only growing facility.  The Company's other facility, the Vaughan Facility, was repurposed into solely an extraction, manufacturing, and packaging facility (*i.e.*, where the raw cannabis grown at the Niagara facility was sent to be packaged and shipped to customers).  The Niagara Facility consisted of twelve grow rooms total.  However, by October 2018, CannTrust was unable to utilize the Niagara Facility at full capacity because only seven of the twelve rooms had the proper Health Canada license to allow the growing of cannabis at that time.

109.    Five of the grow rooms—RG8, RG9, RG10, RG11, and RG12—did not have the proper Health Canada licenses, and therefore CannTrust was prohibited from growing cannabis inside them.  But, for Defendants, the fact remained that they were not producing enough cannabis to keep up with demand.  Growing in those rooms would allow Defendants to sell more cannabis and vastly increase their profits.  So they did.

110.    From October 2018 through March 2019, Defendants grew cannabis in those five unlicensed rooms within their Niagara Facility—in direct violation of Health Canada regulations.  This foreseeably put the Company's ability to continue selling recreational and medicinal cannabis in serious jeopardy, which in turn put the Company's revenue stream at risk.[16]

---

[16] As discussed in Section V.F.2, *infra*, Defendants eventually admitted to this illicit growing practice.  In their July 8, 2019 press release the Company stated: "[g]rowing in unlicensed rooms

111.    Defendants' carried out their unlicensed growing scheme, in part, by instructing their employees, including whistleblower Nick Lalonde, to conceal the unlicensed rooms and the plants therein by staging photographs sent to Health Canada to make it appear as though the unlicensed rooms were empty when they were not.  As discussed below, Mr. Lalonde detailed CannTrust's wrongdoing in an email he sent to Health Canada, which explained that CannTrust was growing thousands of plants in unlicensed growing rooms at the Niagara Facility.

112.    Mr. Lalonde's description of Defendants' illicit growing scheme is corroborated by numerous CannTrust employees who observed the growing of cannabis plants in unlicensed rooms.  For example, CW1 confirmed that she knew about the plants in the unlicensed rooms during the Class Period.  CW2 also recalled that during the Class Period, Defendants were growing cannabis in unlicensed rooms.  According to CW4, the illegal growing started at the same time that Defendant Aceto took over as CEO.  Similarly, CW2 explained that there were discussions in Vaughan about the illegal growing activities in the Niagara Facility "way before" May 2019.

113.    Critically, as a result of increased cannabis production caused by growing in the unlicensed rooms, Defendants began to ship more and more cannabis to the Company's Vaughan Facility for storage.  However, like the Niagara Facility, not all of the storage rooms in Defendants' Vaughan Facility were licensed.  But that did not stop Defendants.  Defendants went

---

took place from October 2018 to March 2019 during which time CannTrust had pending applications for these rooms with Health Canada."  This unlicensed growing ultimately led to CannTrust receiving a compliance report from Health Canada, and as the July 8, 2019 press release indicated, the "non-compliant rating is based on observations by the regulator regarding the growing of cannabis in five unlicensed rooms. . ."

ahead anyway and chose to store the excess unlicensed grown cannabis inside unlicensed storage rooms in the Vaughan Facility.[17]

114.    Multiple former CannTrust employees corroborated that the overflow cannabis that was grown in the unlicensed Niagara Facility rooms were later stored in the unlicensed Vaughan Facility rooms.  For instance, CW3 recalled that some cannabis being stored in the Vaughan Facility that had been highlighted in the violations by Health Canada was the same cannabis grown in the rooms in the Niagara Facility without proper permitting.  CW3 explained that CannTrust transferred the product in bulk from its Niagara Facility to its Vaughan Facility, and that there was so much product being sent from the Niagara Facility that CannTrust did not have the capacity in the licensed rooms so CannTrust used the unlicensed rooms to store the excess product.  CW3 further explained that she knew this because she worked in these rooms to do her quality checks and observed the excess product being stored there.

115.    CW2 similarly recalled that CannTrust was doing the same thing in Vaughan as it was in Niagara by storing product in unlicensed rooms.  CW2 stated that CannTrust had opened up extra areas in the Vaughan Facility that had also not received the proper permitting from Health Canada, and those areas were referred to internally as "the new warehouse."

116.    CW2 explained that CannTrust had decided to use the warehouse in the Vaughan Facility because it needed it for all the product coming from Niagara, and that CannTrust knew it was waiting for the licenses to come through from Health Canada but they said "screw it, we are

---

[17] As with the illicit growing in unlicensed rooms, Defendants also eventually admitted to the illicit practice of storing cannabis in unlicensed rooms at the Vaughan Facility.  Specifically, the Company's  August 12, 2019 press release noted that Health Canada has uncovered "[t]he conversion of five rooms from operational areas to storage areas, which were used for storage since June 2018 without prior approval of Health Canada and that "CannTrust has accepted Health Canada's findings and remedial actions are underway."

just going to use them."  CW2 also recounted an example of a room that was supposed to be for packaging but CannTrust was using it for storage of excess dry cannabis.  CW2 further recalled that CannTrust Director of Distribution Luca Rea told CannTrust employees "don't tell anybody . . . we do not have anywhere to put anything."

117.   In fact, according to several former CannTrust employees—whose accounts of the unlicensed growing strategy were published in a July 24, 2019 Financial Post article—**photographic evidence of cannabis being grown in one of the unlicensed rooms (and Defendant Aceto's undeniable knowledge of that fact) actually appeared in a CannTrust promotional video that was published on CannTrust's YouTube account on February 27, 2019**.  Specifically, according to the Financial Post news article, five former CannTrust employees confirmed to the Financial Post that the Company's February 27, 2019 YouTube video shows Defendant Aceto standing outside grow room RG8—one of the five unlicensed rooms—while it was still unlicensed yet **filled with cannabis plants**.

118.   According to the former employees, several of them knew the video depicted unlicensed growing in RG8 because "[t]hree of those employees worked in the room as grow technicians between October 2018 and April 2019" during the time when RG8 was unlicensed.  And two of those employees "saw the video being filmed in early 2019."  The following image is a screen shot from the February 27, 2019 YouTube video of the specific scene described by the former employees of Defendant Aceto (pictured on the left, with the green hairnet) standing in front of the unlicensed RG8 growing room with cannabis plants inside RG8 in the background:



### 2.    Defendants Hid the Unlicensed Growing from Health Canada

119.    As explained above, Health Canada required producers who sought license approval to submit an evidence package consisting of, *inter alia*, photographs of each grow room in each facility.  However, CannTrust could not easily submit photographs of the yet to be licensed rooms at the Niagara Facility because, at the time, **Defendants had already put thousands of cannabis plants in those rooms in violation of Health Canada regulations**. CannTrust was nonetheless required to send photographs of the rooms as part of the evidence package in order to obtain licenses.  Thus, Defendants took it upon themselves to hide the illicit growing strategy.

120.    In order to conceal the plants in the unlicensed rooms, CannTrust management (at the direction of Defendants Aceto and Paul) told CannTrust employees to hang fake walls in front of the thousands of plants in the unlicensed rooms so when photographs of the rooms were

taken, it would appear as though the rooms were empty.  Indeed, as whistleblower Mr. Lalonde explained in an email he wrote to Health Canada detailing Defendants' wrongdoing, he  had been asked by his supervisors to hang white poly walls so that the unlicensed rooms would appear empty in photographs the Company submitted to Health Canada.  In fact, Mr. Lalonde even suggested to Health Canada how to confirm that the Company engaged in this illicit practice telling Health Canada: "If you look through the camera footage prior to the dates the pictures were taken and requested you will clearly see us hanging up white poly walls to cover up thousands of plants."  Furthermore, according to Mr. Lalonde, CannTrust employees were also "moving tables with hundreds of plants on them out of the camera view, just to snap a picture of the room with nothing in it."

121.    Other former CannTrust employees confirm Mr. Lalonde's contentions.  For example, CW1 also recalled that CannTrust hung up curtains to to make it look like there were not cannabis growth activities in those rooms.  CW1 confirmed that she knew at the time that CannTrust staff removed the plants from the unlicensed rooms, hung up curtains, and took framed pictures to make it look like there were no growth activities occurring in those rooms.

122.    Likewise, with respect to the cannabis being stored in unlicensed rooms in the Vaughan Facility, CW2 recalled that when she questioned Director of Distribution Luca Rea about how they were going explain to Health Canada that they were using a room to store excess dry cannabis contrary to the room's permitted use, Luca Rea's response to CW2 was to "just put some bins in front of it" so the regulators would not ask about it.  Indeed, CW2 explained that the purpose of putting storage containers in front of the doors of the rooms was to "deter" Health Canada from wanting to enter those unlicensed storage rooms.

### 3. Defendants Themselves Directed the Illicit Growing and Storing of Cannabis in Unlicensed Rooms

123. Defendant Aceto personally directed the illicit growing strategy at CannTrust notwithstanding the serious risk it was putting CannTrust (and investors' money) in. Indeed, CannTrust executives indisputably knew that the Company was growing cannabis in five unlicensed rooms from the beginning of the Class Period. To be sure, the decision to engage in the illegal growing strategy came directly from the Company's top executives, namely Defendant Aceto.

124. According to a BNN Bloomberg news article which obtained internal CannTrust emails, on November 14, 2018—the same day as the conference call discussing the earnings result for the third quarter of 2018 ("3Q 2018 Earnings Call")—the Company held a weekly production meeting, which was attended by at least seven CannTrust employees, including three vice-presidents and Graham Lee, the Company's Director of Quality and Compliance. The purpose of the meeting was to provide updates on developments at RG9, one of five unlicensed rooms at the Company's Niagara Facility. During the meeting, senior CannTrust staff confirmed that RG9 was not licensed by Health Canada and that further work in the room "needs [to] be run up the chain before anything is planted in there."

125. According to the internal emails, at the production meeting held the next week on November 21, 2018, the meeting minutes stated that RG9 remained unlicensed but Lee—who attended each of the production meetings—stated he **spoke to Defendant Aceto about the unlicensed room and was instructed to "continue as planned."** Defendant Aceto and Lee's "plan[]" was to begin planting cannabis in the unlicensed rooms despite knowing that they were not yet approved by Health Canada.

126.    The emails continued to detail that, a week later, at the November 28, 2018 weekly production meeting, the minutes similarly stated that CannTrust employees had submitted an application to Health Canada for the RG9 license and were still waiting for approval from the federal regulator.   Yet, the minutes went on to state that CannTrust still decided to plant a huge quantity of cannabis in RG9 that day noting: "**Still moving forward with planting today – 3 lots.**"   One lot is approximately 1,000 cannabis plants, which can produce as much as 1,000 kilograms (or 2,200 pounds) of marijuana,  Thus, **Defendants planted approximately 3,000 plants in RG9 without a license, enough to produce 3,000 kilograms (or 6,600 pounds) of cannabis.**

127.    In addition to weekly production meetings, the unlicensed rooms were also discussed in Quality Control Meetings.   For example, CW1 recalled that at the Quality Control meetings, which were held weekly in Niagara, and attended by Epp, Scott Rolph, Emily Tarrant, Emily Mclinchey, and others, issues at the Niagara Facility were discussed.   Specifically, CW1 explained that at these meetings, they discussed the Niagara Facility "not being up to par," documents not being filled out properly, cleanliness issues along with other quality issues.   CW1 further explained that they openly discussed the unlicensed grow rooms, RG8-12, and referred to them by their numbers.

128.    Indeed, CW1 recalled that they openly discussed making sure those rooms were clean before the plants were put in but CW1 explained that she refused to partake in documenting the related cleaning logs because the rooms were unlicensed.   According to CW1, because she "pushed back" by saying that it was "above her pay grade," those logs were handled by someone else.   CW1 recalled that Rolph and Mclinchey also pushed back on the unlicensed rooms.

129.    Notably, CW1 explained that Tarrant took the notes for the minutes at those Quality Control Meetings and that all documents and minutes "went to corporate" in Vaughan. CW1 stated that the minutes sent to corporate reflected discussions of RG8-RG12, and CW1 confirmed that those discussions that were reflected in the minutes included references to the unlicensed rooms.

130.    Defendants' knowledge of the illicit growing strategy and direct participation in the fraud on investors was further confirmed in another article detailing their brazen and risky scheme.   A July 23, 2019 Globe & Mail article revealed that—based on internal CannTrust emails that the news organization obtained—"[b]oth the chairman and the chief executive officer of CannTrust Holdings Inc. were informed that the [C]ompany was growing cannabis in unlicensed rooms about seven months before Health Canada uncovered the regulatory breach."

131.    Indeed, according to internal CannTrust emails sent directly to Defendants Aceto and Abramowitz and was forwarded on the same day to Defendant Paul in November 2018, Graham Lee, CannTrust's Director of Quality and Compliance expressed relief that Defendants "**dodged some bullets**" because Health Canada did not find out about Defendants' growing in the unlicensed rooms during an in-person, on-site inspection.   The emails confirmed that CannTrust executives—including Defendants Aceto, Paul and Abramowitz—were aware that this unlicensed growing was occurring in multiple rooms, as well as the fact that doing so posed a significant risk and exposed the Company to potential liability.   The article revealed the explosive contents of the email:

> In an e-mail dated Nov. 16, 2018, Graham Lee, CannTrust's [D]irector of [Q]uality and [C]ompliance, informed [Defendant] Aceto and other top executives about a Health Canada inspection that had just been completed. It had revealed several compliance breaches but missed the plants growing in unlicensed rooms.

45

**"We dodged some bullets," Mr. Lee wrote.  "[Health Canada] did not ask about RG8E/W, which are unlicensed rooms currently full of plants."**

The e-mail outlines a number of "current risks," including **plants growing in unlicensed rooms, the storage of cannabis in unlicensed rooms and** the "large number of lost bottles [of cannabis] we have not reported."

"Although serious, on their own, each of these can be talked through with [Health Canada]. The concern is that together they will paint a picture with the regulator of a company not in control.  We have dodged observations for items 1 and 6 despite having [Health Canada] in the building," Mr. Lee wrote.

**Along with [Defendant] Aceto, the e-mail was sent to [Defendant] Ian Abramowitz, a CannTrust executive who was chief financial officer at the time**, and Ilana Platt, the [C]ompany's vice-president of innovation and regulatory affairs.

**\*\*\***

The November e-mail was sent shortly after a targeted inspection of CannTrust's Pelham [F]acility by Health Canada, which turned up several regulatory breaches, including poor paperwork, missing personnel and an incorrect protocol for releasing batches of cannabis, according to Mr. Lee's e-mail.

"The fallout from this inspection will be major observations, and possibly a 'critical' one.  I am not ruling out a censure letter of some sort.  That said, in the past I have had success explaining away these types of observations to [Health Canada], and they have dialed down the rhetoric. Practically, this may lead to increased inspections and more scrutiny, but hopefully will have no other immediate material [e]ffect," Mr. Lee wrote.

"That said, if that's all that happens, we got very lucky here.  **There are several points of exposure in our business we need to consider.  I would not be surprised if [Health Canada] visits [the] Vaughan [Facility] in the near future and that could compound [Health Canada's] concerns,"** he added.

**Mr. Lee outlined a number of risks, referring to room numbers in the facility: "1) RG8 is not licenced but has plants in it; 2) RG9 is not licenced but we are intending to put plants in it on Monday; 3) PA2A-E are not licenced but we have moved the encapsulation equipment into them and will begin running it next week."**

46

**Mr. Lee said CannTrust was storing product in unlicensed rooms at both its Pelham and Vaughan facilities.**

"We have a large number of lost bottles we have not reported.  I suspect due to bad counting rather than diversion [into the black market]," Mr. Lee added.  "I will continue working to eliminate our exposure on all these items, but they remain a liability.  Please advise of any actions you would like me to take."

132.    Former CannTrust employees further corroborated the internal emails in which Defendant Aceto directed employees to grow in unlicensed rooms and conceal the illicit growing from Health Canada.  For example, CW1 recalled that Defendant Aceto and the executives in Vaughan "dictated" what they did at the facility level and corporate level, such as Graham Lee, "mandated all aspects of the business" including growth, and how they set-up the greenhouses.

133.    Similarly, CW6 recalled that the decision to grow in the unlicensed rooms came from Defendants Aceto and Abramowitz.  According to CW6, Defendant Aceto visited the Niagara Facility typically once a week.  CW6 also stated that Defendant Abramowitz and Defendant Guyatt also visited the Niagara Facility.

134.    Likewise, former CannTrust employees also recounted that other CannTrust executives had knowledge of the Company's unlicensed growing as well.  For instance, CW2 recalled that both Andrea Kirk, VP of Quality Operations, and Lee knew about the unlicensed growing and that **Lee had told the executives and the board of directors that if Health Canada found out about the rooms, "there was going to be a lot of issues."**  Yet, while CW2 stated that Kirk and Lee knew about the unlicensed rooms in the Niagara Facility, the decision to go ahead with growing in those rooms was made by Defendants Aceto and Paul.  CW2 was privy to this information because she sat in the same office as Lee, and Kirk would frequently come to their shared office to have a lot of closed door meetings.

135.    Additionally, with respect to storing the excess unlicensed-grown cannabis in the unlicensed storage rooms in the Vaughan Facility, CW2 recalled that the decision to store in the warehouse was made by Kirk with Defendant Aceto's and the Board's blessing.  CW2 explained that those decisions were made in an Upper Management meeting attended by Defendant Aceto, Defendant Abramowitz, Defendant Paul, Kirk, Lee, and others.   These Upper Management meetings were scheduled monthly and held in the boardroom in Vaughan.   CW2 further explained that Kirk instructed her to audit the unlicensed rooms or "new warehouse."  Yet, after CW2 audited the warehouse and wrote up her findings and detailed the problems, she was told that the warehouse was going to be used anyway.  Additionally, CW2 explained that Defendant Paul and Graham met regularly, and that Defendant Paul was on site regularly.

### 4.    Defendants Grew Cannabis Using Illegal, Black Market Seeds In Order to Increase Production

136.    In addition to growing and storing cannabis in unlicensed rooms, as far back as June 2018, CannTrust was growing cannabis from black-market cannabis seeds and then relabeling and selling the cannabis as a different, Health Canada- approved strain.  In doing so, CannTrust was able to significantly bolster its production capacity because the black market seeds were not part of the regulated (and then highly in-demand) purchase and sale of seeds from cannabis strains approved by Health Canada.   Therefore, CannTrust could use the cannabis grown from the black market seeds to supplement its production capacity from legitimate health Canada-approved seeds.

137.    Indeed, according to a September 6, 2019 BNN Bloomberg article—which disclosed information from four sources and internal CannTrust documents—senior CannTrust staff working at the Niagara Facility brought cannabis seeds from the black market into

production rooms and that some of that illicitly-grown marijuana was sold in the legal market. The article goes on to note:

> Cannabis plants from at least two strains that originated from the black market-sourced seeds entered production rooms where they were fully grown to flower, packaged and sold into the recreational market, according to the sources. In total, more than one thousand cannabis plants that originated from the illicit seeds were grown at CannTrust's cultivation facility, the documents show.

138.    According to the internal documents cited in the article, in an effort to conceal the use of the black market cannabis seeds from regulators, CannTrust employees changed the names of as many as twenty strains to names which the Company was already licensed to sell in the medicinal and recreational markets.

139.    The article went on to quote one of the sources who stated: "I can guarantee you they would harvest [plants that originated from black market seeds], trim them and send them out . . . Guaranteed, they went to the legal market. I can tell you 100 per cent they did."

140.    According to three of the sources cited in the article, the use of black market seeds ramped up shortly after CannTrust president Brad Rogers and head of production, Michael Ravensdale, left the Company in October 2018.

141.    However, according to other former employees, Defendants' use of black market seeds to bolster CannTrust's production capacity began as early as June 2018. Specifically, CW5 stated that three of the strains that she was responsible for selling were "cultivated illegally" and came from seeds not approved by Health Canada. According to CW5, specifically "Blueberry Kush" and "Gold Kush" were two of the strains that were cultivated illegally. She went on to say that at CannTrust, the Blueberry Kush and Gold Kush strains were "snuck in" to their operations and grown at mass. According to CW5, CannTrust then sold them without the proper permitting and one was even an award winning strain.

142.     CW5 went on to say that CannTrust did not go through the proper Health Canada channels to have those strains become a part of the Company's "assortment."   According to CW5, the Blueberry and Gold Kush were some of the most potent strains sold by CannTrust.

143.     CW5 confirmed that she knows that Gold Kush was being grown by CannTrust before the Cannabis Act had even passed and specifically that it was launched about a week before she joined the Company in June 2018.

### C.     CannTrust Misled Investors About Growing and Storing Cannabis in Unlicensed Rooms and Knowingly Violating Health Canada Regulations

144.     Despite the magnitude of the scheme to defraud that CannTrust was perpetrating, throughout the Class Period, Defendants repeatedly concealed the truth about the illicit growing and storing schemes at the Niagara and Vaughan Facilities from investors.

145.     During the Class Period, Defendants consistently told investors that CannTrust was in compliance with applicable Health Canada regulations despite knowing they were illicitly growing and storing cannabis in unlicensed rooms.  In doing so, Defendants also concealed the risk of being caught by Health Canada for growing and storing cannabis in unlicensed rooms and having to put holds on their inventory, being banned from producing any more cannabis, and losing their license to sell cannabis which in turn put the Company's only revenue stream at risk.

146.     Likewise, prior to the Niagara Facility receiving the necessary licenses and permits to legally grow cannabis in each of its rooms (which they eventually received in April 2019), Defendants repeatedly told investors that CannTrust was in a position to materially expand its growing capacity with the upcoming approval of the unlicensed growing rooms at the Niagara Facility.

147.     But Defendants concealed the fact that they had already been growing in the unlicensed rooms despite not having the necessary licenses and permits.  This undisclosed fact

rendered their statements about increased capacity and attributing their success to increased capacity materially misleading because the true reason for the increased capacity was the illicitly grown cannabis.  As such, Defendants also concealed the risk of being caught by Health Canada for growing and storing cannabis in unlicensed rooms and having to put holds on their inventory, being banned from producing any more cannabis, and losing their license to sell cannabis and thereby risking the complete loss of their only revenue stream.

148.    After the Niagara Facility received the necessary licenses and permits to grow in each of its rooms in April 2019, Defendants continued to tout to investors that they were now fully licensed and in position to capitalize on the increased growing capacity.  However, as before, Defendants failed to disclose that they had already been growing in unlicensed rooms prior to ever receiving the necessary licenses and permits which was the true reason for the Company's increased cannabis production.  As with the above, Defendants also concealed the continued and on-going risk of Health Canada uncovering the illicit growing and storing strategy and having to put holds on their inventory, being banned from producing any more cannabis, and losing their license to sell cannabis which in turn put the Company's only revenue stream at risk.

149.    Finally, as a result of their illicit growing strategy, Defendants reported materially overstated inventory, biological assets and profitability figures because they falsely included the cannabis that was grown and stored in unlicensed rooms and sold thereafter in those financial figures.   Included in those falsely issued financial statements was the Company's 2018 consolidated financial statements which were purportedly audited by Defendant KPMG who knowingly or recklessly issued a clean audit report which contained misleading financial figures and misstatements about KPMG's audit.

1.     **Defendants Touted Being In Compliance with Applicable Regulations**

150.    During the Class Period, Defendants also blatantly misled investors about CannTrust's compliance with Health Canada regulations.  Yet at the same time those statements were made, Defendants knew that the Company was growing and storing cannabis in unlicensed rooms—in direct violation of Health Canada regulations.

151.    For example, on January 8, 2019, CannTrust filed with the SEC a Form 40-F registration statement pursuant to Section 12 of the Exchange Act (the "January 8, 2019 Form 40-F), which was signed by Defendant Abramowitz.  Filed with the January 8, 2019 Form 40-F were 130 exhibits.  The January 8, 2019 Form 40-F, through those exhibits, touted that CannTrust was complying with all applicable regulations:

> The Company's operations are subject to various laws, regulations and guidelines relating to the manufacture, management, transportation, storage and disposal of medical cannabis as well as laws and regulations relating to health and safety, the conduct of operations and the protection of the environment.  To the knowledge of management, other than the requirement that the Company make routine corrections that may be required by Health Canada from time to time, ***the Company is currently in compliance with all such laws***.

152.    Similarly, the January 8, 2019 Form 40-F stated:

> Health Canada conducts ad hoc, unscheduled site inspections of Licensed Producers.  CannTrust Opco has experienced these inspections at its Vaughan Facility on a monthly basis.  CannTrust Opco has responded to and complied with all requests from Health Canada within the time frames indicated in such requests.  ***As of the date hereof, there are no outstanding inspection issues with Health Canada beyond day- to- day adjustments that may occur in order to ensure ongoing compliance***.

153.    The January 8, 2019 Form 40-F further stated that "[t]he Company believes that it currently holds or has applied for all necessary licences and permits to carry on the activities which it is ***currently conducting under applicable laws and regulations,*** and also ***believes that it is complying in all material respects with the terms of such licences and permits***."

154.    Likewise, on March 28, 2019, CannTrust filed its 2018 Form 40-F, which was signed by Defendant Guyatt and accompanied by certifications pursuant to the Sarbanes-Oxley Act ("SOX") Sections 302 and 906 signed by Defendants Aceto and Guyatt.  Notably, CannTrust touted to investors in the 2018 Form 40-F that the "***Company believes that it currently holds or has applied for all necessary licences and permits to carry on the activities which it is currently conducting under applicable laws and regulations, and also believes that it is complying in all material respects with the terms of such licences and permits***."

155.    The 2018 Form 40-F further stated "[t]he Company distributes its recreational cannabis products in accordance with the federal and provincial regulatory frameworks" and continued that "any expansion of the Niagara Facility is subject to Health Canada regulatory approvals."  And despite knowing that once Health Canada discovered the growing in the five unlicensed rooms that they would lose approval to continue operations and not meet demand, Defendants stated, "[t]he delay or denial of such approvals may have a material adverse impact on the business of the Company and may result in the Company not meeting anticipated or future demand when it arises."

156.    Likewise, despite knowing the consequences of Health Canada finding out that they were growing in rooms prior to receiving the proper licenses, Defendants continued to tout in both the 2018 Form 40-F and the March 28, 2019 Form 6-K, with respect to increasing production in their Niagara Facility, that the "***Company is positioned to receive all necessary regulatory approvals to support this planned growth.***"

157.    Defendants continued to conceal the truth during the March 28, 2019 conference call discussing the earnings result for the fourth quarter of 2018 ("4Q 2018 Earnings Call") when asked directly about the outstanding licenses in the Company's Phase 2 expansion plan.  Indeed,

Defendant Aceto blatantly misled investors when explaining that Defendants were still waiting on Health Canada approval on the final rooms of Phase 2, while reassuring investors that CannTrust planted in the licensed rooms and will plant in the remaining rooms, but only once they receive the proper licenses.

158.     Specifically, during the 4Q 2018 Earnings Call, Defendant Aceto explicitly stated in a back-and-forth with an analyst that Defendants had planted in licensed rooms, while omitting that they had also planted in unlicensed rooms:

> **Analyst:**   Okay, got it. And last question here is, so you mentioned that construction of Phase 2 is now complete, but could you talk a bit more about where are you in ramping up the growing and planting of the Phase 2? And what licensing, if any, is still outstanding for the Phase 2 part?

> **Defendant Aceto:**  Yes. So the construction is complete on Phase 2, and we await final license.  So we have a broad license which we make amendments to, which has created sort of efficiency in our process with Health Canada.  ***But there still remains our last few rooms that we await Health Canada approval from, and we will continue to wait for that.***  Their turnaround times have been generally reasonable. ***So the last rooms, we await final licensing for.***

> **Analyst:**  And the rest have been planted, I assume?

> **Defendant Aceto:**  ***Correct. Anything that's been licensed has been planted***.

159.     Additionally, on April 8, 2019, CannTrust issued a press release that quoted Defendant Aceto touting CannTrust's ability to always "meet and exceed regulatory standards":

> ***We have always been confident that our processes meet and exceed regulatory standards, and we now have further validation of this from our regulators*** . . . . With this approval, CannTrust is set to meet its plan to reach 50,000kg of annualized capacity at the perpetual harvest greenhouse and continue providing award-winning products in a cost-effective manner.

160.     Defendants' statements and material omissions affirming CannTrust's compliance with all applicable regulations were false and misleading because contrary to Defendants' statements CannTrust was purposefully violating Health Canada regulations in order to increase

production capacity and capitalize on increasing demand.  Among other regulatory violations, CannTrust: (1) illicitly grew cannabis in unlicensed rooms at the Niagara Facility; (2) illicitly stored cannabis in unlicensed rooms at the Vaughan Facility; and (3) grew and sold marijuana from unlicensed, black-market seeds.  Defendants knowingly engaged in these activities but failed to disclose the practices to investors despite knowing that were Health Canada to uncover the practices, CannTrust would have its licenses to grow and sell marijuana suspended or revoked which in turn put the Company's only revenue stream at risk.

> **2.** **From November 2018 through April 2019 Defendants Touted CannTrust's Success and Growth Due to Increased Capacity and Expansion of the Niagara Facility**

161.    Throughout the Class Period, Defendants repeatedly touted CannTrust's success and growth to investors, and attributed that success and growth to the increased capacity and expansion of the Niagara Facility.  In doing so, Defendants led investors to believe that the Company was in position to meet the surge in demand for cannabis and become a market leader in recreational and medicinal cannabis sales.  Accordingly, Defendants reassured investors that they had taken certain steps and implemented the regulatory requirements required to do so.

162.    However, unbeknownst to investors, Defendants were growing cannabis in five unlicensed rooms within their Niagara Facility from October 2018 through March 2019 and then storing that excess cannabis in unlicensed rooms at the Vaughan Facility.  Thus, even if the CannTrust's expansion plans and success were literally true, Defendants concealed from investors that the real reason CannTrust's capacity was increasing was because the Company was engaging in an illicit, unlicensed growing strategy in order to take advantage of the surging demand despite attributing the Company's success and growth to other factors.  Moreover, Defendants failed to disclose the practices to investors despite knowing that were Health Canada

to uncover the practices, CannTrust would have its licenses to grow and sell marijuana suspended or revoked which in turn put the Company's only revenue stream at risk.

163.    For example, on June 26, 2018—the first day of the Class Period—Defendants touted: "CannTrust is excited and well-positioned to enter this new marketplace and has the production capacity and infrastructure together with standardized products with precise label claims indicating the exact dosage, to immediately begin fulfilling adult consumer use market orders on a national level."

164.    Similarly, on August 14, 2018, CannTrust issued a press release, touting that "[o]perating a facility of this scale, CannTrust is well-positioned to meet the increased Canadian and global demand for cannabis."

165.    On October 1, 2018, CannTrust issued a press release, announcing the appointment of Defendant Aceto as CEO and boasting, "CannTrust is a front-runner in the industry and perfectly positioned to continue its exponential growth in Canada and abroad following the legislative changes set to become effective in Canada on October 17th."

166.    Likewise, on November 14, 2018, Defendants issued a MD&A based on information available to management as of November 13, 2018, which was filed with SEDAR that same day touting the Company's ability to meet surging demand: "***With the completion of all phases of the Niagara expansion, the Company will have the ability to supply a substantial share of the increased demand*** arising from international markets."

167.    Similarly, in a December 19, 2018 press release, Defendant Aceto continued to reassure investors that the Company had no issues meeting demand by using its other greenhouses: "***The use of other greenhouses and outdoor crop production are both viable***

***options that can help us meet our production targets***.  If developments change our production

targets, we plan to communicate that with investors."

168.    Analysts were encouraged by Defendants' ability to leverage and profit from the

surge in demand of recreational cannabis.  For example, on December 21, 2018, ROTH Capital

Partners ("ROTH Capital") initiated a "Buy" rating on CannTrust and reported, "[o]ngoing

production expansion allows recreational focus around own brands and potential for new alcohol

beverage, food, and cosmetics partnerships."

169.    However, Defendants' statements were false and misleading because the true

reason CannTrust had "***the ability to supply a substantial share of the increased demand***" and

"***meet [its] production targets***" was not because of any "***alternatives to increase capacity***" or the

"***completion of all phases of the Niagara expansion***" but because the Company was, at the time

these statements were made, knowingly engaging in an illicit growing strategy in direct violation

of Health Canada regulations in order to increase its cannabis production capacity.

170.    Indeed, as set forth in Section V.B, *supra*, Defendants Aceto, Paul, and

Abramowitz knew that CannTrust was growing cannabis in five unlicensed rooms at the Niagara

Facility and that CannTrust purposefully concealed that fact from Health Canada by ordering

Company employees to hang up fake walls and stage photographs to make it appear as though

the unlicensed rooms were empty.

171.    Defendants continued to make similar false and misleading statements concealing

the Company's illicit growing strategy right up until the time the Company actually received its

license.  For example, in an interview with Global Edmonton News Morning on January 9, 2019,

Defendant Aceto again touted that "***every single week that goes by, we're getting new records in***

*terms of what we're getting out and so it is getting better all the time, and I think you can expect that improvement to continue.*"

172.    Analysts continued to believe that CannTrust was well positioned to profit from increased demand, establishing the Company a major player in the cannabis industry.   For instance, on January 22, 2019, Canaccord Genuity Capital Markets ("Canaccord") opined, after discussing the Company's Phases 2 and 3, that "[w]e continue to believe CannTrust is generating strong momentum and market share gains within the segment, as we estimate the [C]ompany is capturing more than a third of all new medical patients registered with Health Canada."

173.    Furthermore, within CannTrust's 2018 Form 40-F, which was filed on March 28, 2019, Defendants touted that "*[t]he redeveloped [Niagara] Facility provides the Company with increased production capacity to meet growing market demand.*"

174.    The 2018 Form 40-F also misleadingly boasted to investors about the remarkable increased revenue, biological assets, and inventory the Company had achieved, omitting, of course, the illicit scheme underlying this apparent growth, and thereby painting an artificially inflated picture of the Company's financial health, as reflected on its balance sheet and income statement:

- *For the three months ended December 31, 2018, harvested production was 4,816 kg, a 712% increase from the 593 kg in the comparable 2017 period.*

- 2018 Fourth Quarter Highlights . . . *Sold 3,407 kg of dried Cannabis and dried Cannabis equivalent* at an average net price of $4.75 per gram.

- Gross profit/(loss) for the three and twelve months ended December 31, 2018 was a loss of $8,282 and profit of $36,493, respectively, compared to a gross profit of $11,036 and $23,980 in the comparable prior year periods . . . . *The increase in gross profit in 2018 compared to 2017 was principally due to the increase in sales.*

- Excluding the impact of the change in the fair value of biological assets, gross profit for the three and twelve months ended December 31, 2018 was $5,677 and

$25,955, respectively, compared to a gross profit of $2,406 and $13,018 in the comparable prior year periods. ***The increase in gross profit excluding the impact of the change in the fair value of biological assets was as a result of increased scale of operations.***

- ***Record annual revenue of $45,645, a 132% increase from 2017*** . . . . 2018 Fourth Quarter Highlights . . . ***Record quarterly revenues of $16,166***, a 28% increase from third quarter of 2018.

175.   On March 28, 2019, Defendants also issued a press release attached to a Form 6-K signed by Defendant Guyatt and dated that same day, which also boasted about the Company's success while omitting that the primary reason for the success came from the Company's unlicensed growing.  For example, in the March 28, 2019 press release, Defendant Aceto touted that the "***CannTrust team has delivered remarkable growth in the fourth quarter of 2018***" and that "***CannTrust remained in a strong financial position***."  Moreover, in connection with detailing the specific revenue increases, the press release continued to explain that the "***increase in revenue was attributable to increased sales volumes primarily due to the continued growth in the Company's medical patient base and sales derived from the recreational market in Canada***."

176.   Defendants' positive statements about the Company's strong financial position, ability to meet the high demand for cannabis, and the expansion of the Niagara Facility continued to leave analysts and the Company's investors in the dark with respect to Defendants' illicit practice of growing and storing cannabis in unlicensed rooms and the serious consequences or risks the practice posed if Health Canada found out.

177.   For example, a report by ROTH Capital on March 29, 2019, which issued a "Buy" rating on CannTrust stock, relied on Defendants' assurances that CannTrust was not yet growing in the remaining rooms in the Niagara Facility's Phase 2, and that once Defendants obtained approval from Health Canada, they would be operating at improved capacities.

Specifically, the report stated, "[t]he Company expects gross margins to improve by the second half of this year due to potential price increases and production efficiency improvements now that the Phase 2 build is soon to be fully licensed."  Likewise, that same day, Canaccord issued an analyst report noting that "CannTrust has yet to fully ramp-up production within its recently expanded [Niagara Facility]."  On April 1, 2019, Jefferies similarly reported that CannTrust's "facility [was] not yet at full operations."

> ### 3.   Defendants Overstated Their Audited Financial Figures, Including Revenues and the Values of Inventory and Biological Assets

178.   Throughout the Class Period, Defendants routinely touted their positive financial figures, including their values of inventory and biological assets.  However, what Defendants did not disclose to investors was that those values **included revenue, inventory, and biological assets that were being grown in the five unlicensed rooms**.  Moreover, Defendants failed to disclose the practices to investors despite knowing that were Health Canada to uncover the practices, CannTrust would have its licenses to grow and sell marijuana suspended or revoked, which in turn would put the Company's only revenue stream at risk as well as the Company's biological assets and inventory, which could be seized or ordered to be destroyed.

179.   The fact that CannTrust's inventory and biological assets were overstated during the Class Period cannot be disputed.  Indeed, on August 1, 2019, the Company disclosed that the value of impacted inventory and biological assets from the five unlicensed rooms totaled approximately $51 million.   The Company also explained that the impacted inventory represented approximately 53% of the Company's total inventory and the impacted biological assets represented approximately 30% of the Company's total biological assets.   Later, on October 14, 2019, CannTrust explained that to effectuate the Company's remediation efforts, "CannTrust's Board of Directors has determined that it is necessary to destroy approximately

$12 million of biological assets and approximately $65 million worth of inventory that was not authorized by CannTrust's licence."

180.    On March 28, 2019, CannTrust released its Consolidated Financial Statements for period ended December 31, 2018 ("2018 Consolidated Financial Statements"), which was signed by Director Defendants Paul and Litwin.  The 4Q 2018 Consolidated Financial Statements were audited by Defendant.

# CannTrust Holdings Inc.
Consolidated Statements of Financial Position
As at December 31
(in Canadian dollars)

| | Notes | 2018 | 2017 |
|---|---|---|---|
| **Assets** | | | |
| **Current** | | | |
| Cash | | $ 9,022,821 $ | 17,961,043 |
| Short term investments | 7 | 63,023,908 | 201,538 |
| Harmonized sales tax recoverable | | 1,492,110 | 2,636,710 |
| Inventory | 8 | 35,389,490 | 10,959,022 |
| Biological assets | 8 | 10,502,579 | 9,843,690 |
| Accounts receivable | | 6,151,604 | 160,383 |
| Prepaid expenses | | 2,859,039 | 2,465,506 |
| **Total current assets** | | 128,441,551 | 44,227,892 |
| Investments | 18 | 10,661,932 | 156,073 |
| Restricted cash | 7 | 100,000 | 100,765 |
| Property and equipment | 9 | 62,208,905 | 33,963,685 |
| Financial assets | 11 | 901,350 | - |
| **Total Assets** | | 202,313,738 | 78,448,415 |
| **Liabilities** | | | |
| **Current** | | | |
| Accounts payable and accrued liabilities | | 12,806,458 | 6,579,997 |
| Current portion of promissory note | 6 | 200,000 | 200,000 |
| Current portion of mortgage | 12 | 3,790,610 | - |
| **Total current liabilities** | | 16,797,068 | 6,779,997 |
| Promissory note | 6 | 600,000 | 800,000 |
| Mortgage | 12 | 9,457,876 | - |
| Deferred tax | 19 | 1,433,000 | - |
| **Total Liabilities** | | 28,287,944 | 7,579,997 |
| **Shareholders' Equity** | | | |
| Share capital | 13 | 207,061,423 | 104,824,215 |
| Share-based payment reserve | | 8,714,188 | 2,272,302 |
| Warrants reserve | 15 | 11,393,687 | 3,361,789 |
| Deficit | | (53,143,504) | (39,589,888) |
| **Total Shareholders' Equity** | | 174,025,794 | 70,868,418 |
| **Total Liabilities and Shareholders' Equity** | | $ 202,313,738 $ | 78,448,415 |

Commitments (Note 16)

The accompanying notes are an integral part of the consolidated financial statements.

_(signed) "Eric Paul"_    Director        _(signed) "Mark Litwin"_    Director

**CannTrust Holdings Inc.**
Consolidated Statements of Net (Loss) Income and Comprehensive (Loss) Income
For the Years Ended December 31
(in Canadian dollars)

| | Notes | 2018 | 2017 |
|---|---|---|---|
| | | | (Restated) (Note 5) |
| Gross revenue | 22 | $ 48,390,103 | $ 20,697,764 |
| Excise duty | | (2,744,960) | - |
| **Net revenue** | | 45,645,143 | 20,697,764 |
| Cost of goods sold | 5 | 19,690,162 | 7,680,234 |
| **Gross profit, before changes in fair value of biological assets** | 5 | 25,954,981 | 13,017,530 |
| Fair value changes in biological assets included in inventory sold | 5 | 17,301,866 | 8,929,308 |
| Unrealized gain on changes in fair value of biological assets | 5,8 | (27,840,156) | (19,891,851) |
| **Gross profit** | | 36,493,271 | 23,980,073 |
| **Expenses** | | | |
| Amortization | 9 | 2,169,281 | 964,396 |
| General and administrative | 17 | 9,014,467 | 3,636,808 |
| Marketing and promotion | | 7,274,454 | 198,858 |
| Salaries and benefits | | 9,823,942 | 3,853,314 |
| Selling and shipping costs | | 8,971,434 | 3,803,056 |
| Share based compensation | 14 | 8,056,451 | 2,310,678 |
| **Operating expenses** | | 45,310,029 | 14,767,110 |
| **(Loss) income from operations** | | (8,816,758) | 9,212,963 |
| Mortgage interest expense | | (478,169) | (260,203) |
| Interest income | | 790,123 | - |
| Accretion expense | 12 | (208,842) | (233,716) |
| Transaction costs | 6 | - | (204,282) |
| Other (loss) income | 18 | (2,033,700) | 143,060 |
| (Loss) on equity accounted investment | 18 | (385,110) | (147,056) |
| Impairment loss on assets | 10 | (988,160) | - |
| Loss on revaluation of derivative liability | | - | (1,625,336) |
| **(Loss) income before income taxes** | | (12,120,616) | 6,885,430 |
| Deferred income tax expense | 19 | 1,433,000 | - |
| **Net (loss) income and comprehensive (loss) income** | | $ (13,553,616) | $ 6,885,430 |
| **Weighted average number of common shares - basic** | | 99,282,045 | 76,876,971 |
| **Weighted average number of common shares - diluted** | | 99,282,045 | 80,526,105 |
| **Earnings (loss) per share - basic** | 13 | (0.14) | 0.09 |
| **Earnings (loss) per share - diluted** | 13 | (0.14) | 0.09 |

181.    However, these figures were false and misleading and were materially overstated because they included inventory, biological assets, and revenues derived therefrom in violation of applicable Health Canada regulations and International Financial Reporting Standards ("IFRS") standards.   Critically, CannTrust routinely issued inflated biological asset, inventory, and revenue figures in its financial statements throughout the Class Period.   Moreover, as

63

discussed below, CannTrust's Class Period financial statements violated numerous well established accounting rules that CannTrust claimed it followed.

### 4. CannTrust Issued Financial Statements In Violation of International Accounting Standards

182. International Financial Reporting Standards ("IFRS") represent the set of accounting principles that domestic public companies in Canada are required to employ for purposes of preparing financial statements.[18] IFRS are generally accepted around the globe and at least 100 countries have adopted IFRS. *See* SEC Release No. 33-8879. For example, the SEC allows "foreign private issuers in their filings with the Commission [to prepare] financial statements . . . in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB")." (*Id.*) IFRS are comparable to U.S. generally accepted accounting principles ("GAAP") and the SEC has supported efforts to converge the standards. (*Id.*).

183. According to CannTrust's 2017 and 2018 annual reports, the Company reported and prepared its financial statements in accordance with the IFRS.[19]

### (a) CannTrust's Illicit Growing and Storing Scheme Resulted in Overstated Biological Assets and Inventory

184. During the Class Period, CannTrust consistently overstated its biological assets and inventory according to IFRS. CannTrust's inventory and biological assets were critical assets on the Company's balance sheet and to investors because they represented approximately 40% of total current assets and more than 80% when excluding short-term investments.

---

[18] https://www.ifrs.org/use-around-the-world/use-of-ifrs-standards-by-jurisdiction/canada/
[19] IFRS include International Accounting Standards ("IAS") that were issued by the International Accounting Standards Committee.

|  | Notes | 2018 | 2017 |
|---|---|---|---|
| **Assets** | | | |
| **Current** | | | |
| Cash | | $ 9,022,821 $ | 17,961,043 |
| Short term investments | 7 | 63,023,908 | 201,538 |
| Harmonized sales tax recoverable | | 1,492,110 | 2,636,710 |
| Inventory | 8 | 35,389,490 | 10,959,022 |
| Biological assets | 8 | 10,502,579 | 9,843,690 |
| Accounts receivable | | 6,151,604 | 160,383 |
| Prepaid expenses | | 2,859,039 | 2,465,506 |
| **Total current assets** | | 128,441,551 | 44,227,892 |

185.    According to CannTrust's SEC and SEDAR filings, biological assets represented pre-harvest seeds and plants and were reported at fair value less costs to sell at time of harvest. Biological assets were then transferred to inventory when the cannabis plants were harvested. Inventory included harvested finished goods, cannabis in process, extracts, accessories and packing supplies, and was valued at the lower of cost and net realizable value.

186.    CannTrust claimed that it valued biological assets and inventory in accordance with IAS Rule 41, which covers "Agriculture that applied to Biological Assets," and IAS 2 and IAS 41.3, which apply to "Inventories that applied to post-harvest products."  However, as discussed above, CannTrust grew and stored cannabis in unlicensed facilities and from black-market seeds that were then improperly recorded as biological assets and inventory for multiple reasons.

187.    First, CannTrust did not have control, including legal ownership, of the biological assets, which is a required condition for asset measurement under IAS 41.10-11.  Under IAS 41, legal ownership requires that the asset is acquired or produced by legitimate means.  Here, CannTrust did not have legal ownership or control over the cannabis grown and stored in unlicensed rooms because it was not produced by legitimate means.  Likewise, the cannabis grown from black-market seeds was unquestionably not acquired by legitimate means.

188.     Second, CannTrust's valuation of biological assets is necessarily overstated because the Company could not and did not accurately account for the **fair market value** of unlicensed cannabis or cannabis grown from black-market seeds.   As mentioned above, CannTrust's biological assets represented "pre-harvest seeds and plants . . . [are] reported at fair value."

189.     However, CannTrust did not and could not demonstrate or report any evidence that a market participant would have been willing to pay the same price for an unlicensed product as a licensed product **as is required to accurately assess fair market value under IAS 41.8**.[20]   For example, CannTrust could not have identified quoted market prices for unlicensed cannabis products as required by IAS 41.30 because no such market prices for unlicensed or black-market products existed.   Consequently, CannTrust did not have the ability to reliably measure the fair value of those biological assets.

190.     Moreover, IFRS 13 – Fair Value Measurement, states that in determining fair value, a market participant would be expected to use the asset in its highest and best use taking into account the use of the asset that is physically possible, **legally permissible**, and financially feasible.   *See* IFRS 13.28.[21]   Yet, CannTrust still reported increased biological assets during the Class Period even though it did not and could not accurately account for the fair value of illicitly grown cannabis.   Accordingly, CannTrust violated IFRS in reporting biological assets at the level that they did during the Class Period.

---

[20] "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  *See* IFRS 13 Fair Value Measurement.

[21] *See also*, IFRS 13.28(b), "[a] use that is legally permissible takes into account any legal restrictions on the use of the asset that market participants would take into account when pricing the asset."

191.    Further, CannTrust did not and could not report inventory that was unlicensed (such as cannabis sold in violation of Health Canada regulations) under IAS 2.7 because the cannabis could not be sold in the ordinary course of business.  Under IAS 2.7, net realizable value is the net amount that an entity expects to realize from the sale of inventory in the ordinary course of business.  The net realizable value of inventory decreases when, for example, inventory is damaged or market prices decline.  Here, such products have a net realizable **value of zero** because illicitly grown products cannot be sold in the ordinary course of business as they were grown in violation of Health Canada regulations.  Consequently, CannTrust vastly overstated the value of inventory during the Class Period.

192.    CannTrust overstated a material portion of the Company's biological assets and inventory during the Class Period.  As discussed above, following Health Canada's discovery of the illicit growing and storing scheme, CannTrust was forced to place the sale of impacted inventory on hold (*i.e.*, it was unable to sell the inventory).  Ultimately, CannTrust estimated that the reported value of the impacted inventory and biological assets was $51 million as of June 30, 2019.  As described above, this inventory was later destroyed. As of March 31, 2019, the Company's total inventory and biological assets totaled approximately $77.6 million.  Thus, the Company's fraudulent scheme imperiled at least 65% of the reported value of biological assets and inventory.  Yet, CannTrust concealed this information from investors.

### (b)    Defendants Recognized Revenue in Violation of International Financial Reporting Standards

193.    In addition to overstating inventory and biological assets, Defendants also overstated its revenue.  Indeed, as discussed below, under relevant IFRS standards, CannTrust was permitted to recognize revenue only for products for which the Company **held valid legal title**.  And because CannTrust generated revenue from cannabis that it grew, stored and sold

through illegitimate means, it improperly recognized revenue from any cannabis that was grown or stored in unlicensed rooms or were from black-market seeds.

194.    However, because CannTrust grew and stored cannabis in unlicensed, unregulated rooms and from black-market seeds, CannTrust did not possess legal title and control over the illicitly grown cannabis because it was non-conforming with Health Canada regulations.   Nor could CannTrust transfer legal title and control to its customers because it did not have it to begin with.   Accordingly, any illicitly grown cannabis that was transferred or sold to CannTrust's customers was subject to immediate return and refund.

195.    According to CannTrust's SEC and SEDAR filings, the Company "[r]evenue is recognized when **control of the goods has transferred to the purchaser** and the collectability is reasonably assured.   **This is generally when goods have been delivered, which is also when the performance obligations have been fulfilled under the terms of the related sales contract**."   Like all of its financial information, CannTrust represented to investors that its revenue recognition policy was consistent with IFRS—including the IFRS rules governing revenue recognition, IFRS rule15.31-32.

196.    However, because CannTrust did not have a valid license to produce all of its cannabis (and specifically the illicitly grown cannabis), CannTrust was unable to legitimately transfer **control** of the cannabis to its customers.   For accounting purposes (and according to CannTrust's auditor KPMG's IFRS Handbook), **control refers to the right to use, consume, and sell the asset**.   *See* KPMG Revenue – IFRS 15 Handbook, p.114 (hereafter the "KPMG Guide").   The following diagram summarizes the analysis of the transfer of control according to the KPMG Guide, p.149, IFRS 15.38.



197.    In addition to not having legal title to pass, CannTrust also could not establish a second, separate condition for revenue recognition—**that collectability was reasonably assured**, even if the customer had already paid for it—for the simple reason that CannTrust was faced with the very real prospect that customers would demand a refund if the unlicensed **or** black market nature of the product was revealed.  In other words, customers could demand a refund because they were not buying the same product that CannTrust was representing and warranted that it was selling. [22]

198.    In such circumstances where an entity cannot conclude that a **legally enforceable** contract exists (either because the entity does not have legal title or collectability cannot be reasonably assured) CannTrust was **required to defer the revenue on sales of such products because the customer payments received constitute a deposit liability**.  *See* IFRS 15.16 and 15.B20; KPMG Guide, pp.15, 241. [23]

---

[22] To be sure, these exact events occurred after Health Canada discovered CannTrust's illicit growing and storing scheme. For example, on August 19, 2019, the Ontario Cannabis Store (OCS) determined that all of its inventory of CannTrust product constituted Non-Conforming Products and would be returned. The value of OCS's inventory at that time was C$2.9 million. This return was substantial despite the fact that it was from a single customer.   Indeed, CannTrust's total revenue for the quarter ended March 31, 2019 was C$16.9 million.  Thus, this customer return accounted for approximately 17% of CannTrust's total quarterly revenue.

[23] *See also*, KPMG Guide § 1.1, "A contract with a customer is in the scope of the standard when the contract is legally enforceable and certain criteria are met. If the criteria are not met, then the contract does not exist for the purpose of applying the general model of the standard, and any consideration received from the customer is generally recognised as a deposit (liability)."



**Revenue recognition may be deferred for a significant period**

If an entity cannot conclude that a legally enforceable contract exists, then it may be difficult to evaluate when all or substantially all of the promised consideration has been received and is non-refundable. In some cases, an entity may have a deposit liability recognised for a significant period of time before it can conclude that a contract exists in the model or that the criteria for recognising the consideration as revenue are met.

KPMG Guide, p.15

199.   Critically however, CannTrust's financial statements, did not reflect any accounting for deferred revenue as of either December 31, 2018 or March 31, 2019 or at any other time during the Class Period:

## CannTrust Holdings Inc.
### Condensed Interim Consolidated Statements of Financial Position
(in Canadian dollars)

|  | Notes | March 31, 2019 | December 31, 2018 |
|---|---|---|---|
| **Current** |  |  |  |
| Accounts payable and accrued liabilities |  | 11,327,922 | 12,806,458 |
| Current portion of promissory note |  | 200,000 | 200,000 |
| Current portion of mortgage | 10 | 13,210,731 | 3,790,610 |
| **Total current liabilities** |  | 24,738,653 | 16,797,068 |
|  |  |  |  |
| Promissory note |  | 400,000 | 600,000 |
| Mortgage | 10 | - | 9,457,876 |
| Lease liability | 3 | 1,785,059 | - |
| Deferred tax | 17 | 7,430,000 | 1,433,000 |
| **Total Liabilities** |  | 34,353,712 | 28,287,944 |

200.   Furthermore, under IFRS Rule 15.110 CannTrust was required to disclose sufficient information to enable investors who rely on its financial statements to understand the nature, amount, timing, **and uncertainty** of revenue and cash flows arising from contracts with customers.   During the Class Period, CannTrust failed to disclose the existence of any uncertainty surrounding the Company's revenues and cash flows despite knowing that—as discussed above—there was significant uncertainty surrounding revenue generated from illicitly grown and sold cannabis.

201.    That Defendants did not disclose any such uncertainty is not surprising. Defendants knew that if Health Canada were to discover the illicit unlicensed growing and storing scheme and use of black market seeds, there was an extremely high probability that CannTrust's customers would return the non-conforming cannabis because, like CannTrust, the customer would no longer have or be able to pass legal title of an unregulated and non-conforming product.   However, CannTrust obviously did not disclose the existence of such regulatory uncertainty because in doing so they would have to simultaneously disclose that the reason for deferring such revenue was because of the uncertainty associated with CannTrust's fraudulent illicit growing and storing scheme and use of black-market seeds.

202.    Accordingly, CannTrust overstated its revenue because it recognized revenue from illicitly grown and black-market cannabis that was not recognizable under the relevant IFRS and KPMG accounting standards set forth above.

### (c)    CannTrust Lacked Effective Internal Controls During the Class Period

203.    Under IFRS, CannTrust was required to have disclosure controls and procedures ("DC&P") to provide reasonable assurance that material information relating to the Company was made known to senior management, including the CEO (*i.e.*, Defendant Aceto and former CEO Defendant Paul) and CFO (*i.e.*, Defendant Guyatt and former CFO Defendant Abramowitz).   Accordingly, Internal Controls over Financial Reporting ("ICFR") was required to be designed by management, under the supervision of the CEO and CFO, so that investors could be assured that financial statements were prepared and reported in accordance with IFRS. Effective DC&P also required CannTrust's financial information be recorded, processed, summarized, and reported within the time periods specified under the Securities Act, Exchange Act, and the rules and regulations promulgated thereunder.

204.    Despite these requirements, CannTrust acknowledged in its 2018 Form 40-F that a deficiency in internal controls existed as of December 31, 2018.  However, while the Company disclosed these past internal control issues, it immediately reassured investors that "as of December 31, 2018, and [the Company] **has since implemented new mitigating controls and procedures**."  Specifically, CannTrust disclosed:

> As of December 31, 2018, the Company had limited accounting personnel with expertise to assist in the effective preparation of financial statements and related note disclosures.  In particular, the Company did not have sufficient resources with appropriate knowledge of IFRS to allow for an independent review in complex areas of financial reporting with respect to non-routine transactions, resulting in a reasonable likelihood that a material misstatement to the consolidated financial statements may not be prevented or detected on a timely basis.  As a result of the non-routine transaction assessment, management concluded that the DC&P and ICFR were not effective as of December 31, 2018, and has since implemented new mitigating controls and procedures.

205.    In reality, however, CannTrust's internal controls were significantly out of compliance with relevant ICFR standards both before and after this disclosure.

206.    First, CannTrust failed to address the deficiencies in its "control environment" as required by their own auditor KPMG's Internal Control over Financial Reporting Guide ("KPMG ICFR Guide").  One of the requirements for an adequate internal controls and control environment is an adequate "tone at the top" of the organization.

207.    For example, the first principle of the control environment required that the organization demonstrates a commitment to integrity and ethical values.  CannTrust, however, knowingly violated Health Canada regulations by engaging in the unlicensed growing and storing of cannabis, the acquisition of black-market seeds, and the mislabeling of cannabis grown from the black market seeds—all with the knowledge of CannTrust's CEO and Chairman of the

Board.  Such behavior by CannTrust's leadership demonstrates a significant lack of effective internal controls.

208.    Second, CannTrust failed to address obvious deficiencies in its Risk Assessment process.  For example, according to the KPMG ICFR Guide, a compliant entity is expected to have controls in place to mitigate the risk of noncompliance with laws and regulations that have a direct impact on the financial statements.  During the Class Period, CannTrust either failed to appropriately design effective control activities or failed to monitor whether such control activities operated effectively as demonstrated by the fact that the Company engaged in a far-ranging illicit scheme of growing and storing of cannabis in unlicensed rooms and growing and selling cannabis from black-market seeds for months.

209.    Based on these observations, CannTrust lacked sufficient internal controls during the Class Period.

> **(d)** **CannTrust Was Required to Disclose the Significant Uncertainty that the Company Could Not Continue As a Going Concern, But Failed to Do So**

210.    According to CannTrust's SEC and SEDAR filings, the Company prepared its financial statements on a going concern basis.  Going concern is an accounting principle under IAS Rule 1 that allows the readers of financial statements to assume that the company will continue on long enough to carry out its objectives and commitments.  In other words, the lack of disclosure regarding the uncertainties about the Company's going concern indicates to investors that the Company's accountants believe that the Company will not liquidate in the near future.

211.    At the time CannTrust prepared its financial statements, CannTrust was required to periodically perform an assessment of material uncertainties that cast doubt on its ability to continue as a going concern under IAS 1 – Presentation of Financial Statements, 1.25.  This

assessment of material uncertainties was required to consider all information regarding the foreseeable future, including at least the next twelve months. *See* IAS 1.26.

212.    Here, the uncertainty caused by Health Canada uncovering CannTrust's growing and storing cannabis in unlicensed rooms and using black-market seeds—and revoking the Company's license as a result—cast significant doubt on CannTrust's ability to operate as a going concern—the Company would not be able to operate at all were its licenses suspended or revoked.

213.    Indeed, after Health Canada uncovered CannTrust's actions, CannTrust was forced to stop the sale of inventory, stop the sale of new products, and continuously failed to meet financial statement filing deadlines since.  Following the end of the Class Period, on March 31, 2020, CannTrust effectively admitted that there was substantial doubt regarding its ability to continue as a going concern:

> Despite the efforts by CannTrust's management and Board of Directors to preserve the Company's cash liquidity while seeking to restore the Company to operations and resolve the multiple litigations and other contingent claims facing the Company, the Company's future remains uncertain.

214.    However, under the applicable regulations, the conditions for disclosing the uncertainty regarding the Company's status as a going concern existed beginning in June 2018 through the end of the Class Period while CannTrust operated under the substantial risk that the Company's licenses could be suspended or revoked.  Thus, while significant risks to CannTrust's ability to operate as a going concern existed, the Company's financial statements in 2018 and 2019 failed to identify any such uncertainties caused by the operation of its business in direct violation of Health Canada regulations.

**5.      KPMG Knowingly or Recklessly Issued An Audit Report In Violation of Auditing and Accounting Standards**

      **(a)      KPMG Was Required to Follow PCAOB Standards in Conducting its Audit of CannTrust**

215.   When it performed its audit of CannTrust, KPMG was required to comply with auditing standards issued by the Public Company Accounting Oversight Board ("PCAOB"). Indeed, KPMG's Audit Report confirmed that the auditor had audited the 2018 Annual Financial Statements "**in accordance with the standards of the PCAOB.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud**."

216.   As described herein, KPMG knowingly and/or recklessly violated applicable audit standards and thereby provided clean audit opinions that allowed CannTrust to perpetrate its fraud with respect to its financial statements.  As a result, KPMG's Audit Report contained false and misleading statements therein.

217.   An independent auditor's role has been described as that of a "public watchdog," established in part to improve the reliability of financial statements, enhance the credibility of those financial statements, and allow investors to invest in companies with confidence that an independent auditor has verified the company's financial statements.

218.   To oversee independent auditors, the Sarbanes-Oxley Act of 2002 established the PCAOB.  The PCAOB is responsible for establishing professional audit standards applicable to audits of publicly-traded companies, including CannTrust.  PCAOB Standards set the minimum level of ethical, performance and quality that auditors are expected to achieve.  PCAOB Standards are referred to herein as "AS."

219.    Since 2004, the PCAOB has required that foreign issuer auditors register with the PCAOB.  The introduction of this requirement by the PCAOB had the effect of compelling the "big four" accounting firms, including KPMG, to provide greater oversight and control over their respective foreign issuer auditors in order to protect the credibility and independence of the big four accounting firms.  The consequence of this new PCAOB requirement was a heightened oversight and agency relationship by and among those KPMG affiliated entities.

> **(b)      KPMG Was Responsible for Obtaining Reasonable Assurance that CannTrust's Financial Statements were Fairly Presented in Conformity with IFRS Standards**

220.    The objective of a financial statement audit under PCAOB standards is the expression of an opinion on the fairness with which the financial statements present, in all material respects, the financial position, results of operations, and the cash flows, in conformity with generally accepted accounting principles, here IFRS.  *See* AS 1001, *Responsibilities and Functions of the Independent Auditor*, AS 1001.01.  However, as discussed below, KPMG simply did not perform its obligations as an independent auditor as required by PCAOB Standards.  Had it done so, KPMG would have discovered that CannTrust was materially overstating its revenue, biological assets, and inventory figures by including the proceeds of cannabis grow and stored in unlicensed rooms and cannabis sourced from black-market seeds.

221.    These misstatements had pervasive impacts on CannTrust's financial statements. Specifically, the overstatement of the value of inventory and biological assets resulted in corresponding overstatements of current and total assets, as well as Shareholders' Equity. Similarly, the overstatement of revenue resulted in corresponding overstatements of gross profit and earnings metrics including earnings per share and Adjusted EBITDA.  In essence, CannTrust's fraud caused virtually all measures in its financial statements to be misleading.

222.    KPMG had a responsibility to plan and perform its audit in order to obtain reasonable assurance about whether CannTrust's financial statements were free of material misstatement whether caused by error or fraud.  *See* AS 1001.02.  PCAOB standards state that "reasonable assurance" means a "high level" of assurance.  *See* AS 1015, *Due Professional Care in the Performance of Work,* 1015.10.

223.    KPMG was also required to identify and assess the *risks* of material misstatement. *See* AS 2110, *Identifying and Assessing Risks of Material Misstatement*.  For example, KPMG was obligated to perform risk assessment procedures that were "sufficient to provide a reasonable basis for identifying and assessing" the risks of material misstatement affecting CannTrust's financial statements, whether due to error or fraud.  *See* AS 2110.04 and AS 2110.74.   In order to satisfy these requirements, KPMG was required to obtain a sufficient understanding of CannTrust, its business environment, and its internal controls over financial reporting.  *See* AS 2110.05.  Matters that KPMG was required to investigate and understand included:

(a)    Relevant industry, regulatory, and other external factors affecting CannTrust.  Obtaining an understanding of relevant industry, regulatory, and other external factors encompasses industry factors, including the competitive environment and technological developments; the regulatory environment, including the applicable financial reporting framework and the legal and political environment; and external factors, including general economic conditions. *See* AS 1101, AS 2110, AS 2110.09 and AS 2301;

(b)    The nature of the Company, including the organizational structure, management personnel, key personnel, key supplier and customer relationships, significant investments, joint ventures and the Company's operating characteristics, including its size and complexity; *See* AS 2110.10; and

(c)    The Company's objectives and strategies and those related business risks that might reasonably be expected to result in risks of material misstatement.  Examples of situations in which business risks might result in material misstatement of the financial statements include industry developments, **expansion of the business, current and prospective financing requirements**

**and regulatory requirements (including increased legal exposure)**. *See* AS 2110.15.

224.    Through these procedures, KPMG was expected to obtain an understanding of CannTrust's business processes to ensure that no misstatements related to these matters existed. *See* AS 2110.31. For instance, business processes are the activities designed to "**[e]nsure compliance with laws and regulations relevant to the financial statements**." *See* AS 2110.30. Similarly, KPMG's audit planning should have evaluated the laws and regulations and regulatory matters important to CannTrust's financial statements. *See* AS 2101, *Audit Planning*, AS 2101.07.

225.    After obtaining an appropriate understanding of CannTrust's business and identifying applicable risks of material misstatement, regulatory risks, and legal risks, PCAOB standards required KPMG to "design and implement audit responses that address the [assessed] risks of material misstatement" and reduce "audit risk to an appropriately low level." *See* AS 1101.03, AS 2301, *The Auditor's Responses to the Risks of Material Misstatement,* AS 2301.03. In simple terms, an "audit response" is the procedure, work process, or action the auditor performs to adequately address any identified risks of material misstatement so that the auditor can accurately assess whether or not a material misstatement exists. *See* AS 2301.04, AS 2301.05, AS 2301.08-10.

226.    Audit responses recognized by PCAOB Standards to address risks of material misstatement include: (1) "[r]esponses that have an overall effect on how the audit is conducted" (*e.g.*, evaluating the company's "selection and application of significant accounting principles" and "[p]roviding the extent of supervision that is appropriate for the circumstances, including, in particular, the assessed risks of material misstatement" (*see* AS 2301.04 and AS 2301.05.) and

(2) "responses involving the nature, timing and extent of audit procedures to be performed." *See* AS 2301.04.

227.     For significant risks, including the risk that revenue was overstated (as it was with CannTrust), KPMG was required to "perform substantive procedures, including tests of details, that are specifically responsive to the assessed risks." *See* AS 2301.11.  KPMG was also required to "plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis" for its audit opinion. *See* AS 1105, *Audit Evidence*, 1105.04.  In this regard, PCAOB Standards state that as the risk of material misstatement increases, "the amount of evidence that the auditor should obtain also increases.  For example, more evidence is needed to respond to significant risks."  This is a requirement because it assures that the auditor has a reasonable basis for its opinion where a significant risk of material misstatement exists. *See* AS 1105.05.

228.     Under PCAOB Standards, fraud is an intentional act that results in a material misstatement in financial statements that are the subject of an audit. *See* AS 2401.05, *Consideration of Fraud in a Financial Statement Audit*.  For purposes of its audits, KPMG was required to exercise "professional skepticism," which is defined as an attitude that includes a questioning mind and a critical assessment of the audit evidence. *See* AS 2401.13.  Specifically, "professional skepticism is described as follows:

> [P]rofessional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

### (c)      KPMG Ignored Red Flags and Inconsistencies Related to CannTrust's Revenue Biological Assets and Inventory

229.    By any objective measure, revenue, inventory, and biological assets were significant accounts for CannTrust's financial statements.  For example, these accounts had large balances that grew significantly in a year-over-year basis, were highly susceptible to misstatement, and had increased activity.  *See* AS 2110.60.  In particular, KPMG should have presumed a fraud risk existed related to improper revenue recognition by CannTrust:

> *Presumption of Fraud Risk Involving Improper Revenue Recognition.* The auditor should presume that there is a fraud risk involving improper revenue recognition and evaluate which types of revenue, revenue transactions, or assertions may give rise to such risks.

*See* AS 2110.68.

230.    Yet, rather than presume there is a fraud risk regarding improper revenue recognition, KPMG simply rubber-stamped CannTrust's financial statements while ignoring massive red flags and inconsistencies.  Under these circumstances, KPMG's practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious.

231.    As an initial matter, KPMG appears to have failed to perform any required analytical procedures.  Analytical procedures are an important part of the audit process that evaluate the correlation or financial relationships between financial and non-financial information.  *See* AS 2305, *Analytical Procedures*, AS 2305.02.  Analytical procedures are effective tests for misstatements that would not be apparent from an examination of more detailed evidence (*e.g.*, simply evaluating invoices and cash receipts for the sale of cannabis would not effectively detect whether CannTrust was licensed to sell the cannabis).  *See* AS 2305.12.

232.    Here, given the spike in CannTrust's cannabis production, KPMG should have performed analytical procedures to identify the underlying financial relationship between

CannTrust's increased cannabis production and financial results. *See* AS 2110.46.a. Such analytical procedures would have enabled KPMG to identify specific risks relevant to the audit, including unusual transactions and events that warrant investigation. AS 2110.46.b. Analytical procedures were particularly relevant to CannTrust's reporting of revenue:

> In applying analytical procedures as risk assessment procedures, the auditor should perform analytical procedures relating to revenue with the objective of identifying unusual or unexpected relationships involving revenue accounts that might indicate a material misstatement, including material misstatement due to fraud. *See* AS 2110.47.

233.    CannTrust's unlicensed production of cannabis began in October 2018. Unsurprisingly, the next quarter CannTrust experienced an immediate and unprecedented growth in volume in grams of cannabis sold. The following chart summarizes this growth over the five quarters leading up to March 31, 2019:



234.    The growth in grams of cannabis fueled a comparable level of growth in reported revenue. Such growth would not have been possible without the unlicensed use of CannTrust's growing facilities:



235.     This spike had pervasive and material impacts on CannTrust's financial statements.  A basic analytical procedure that KPMG should have performed was to compare cannabis production with revenue.  In doing so, KPMG would have identified that CannTrust's cannabis volume tripled in Q4 2018 as compared to the three earlier quarters in 2018.  Consequently, the total grams of cannabis sold by CannTrust in Q4 2018 constituted 50% of total grams sold during 2018 and was therefore clearly inconsistent with its licensed level of cannabis production.

236.     Confronted with these circumstances and its knowledge of CannTrust's business, KPMG should have pursued audit evidence to investigate this inconsistency and to corroborate that CannTrust was in fact licensed for the related magnitude of production.  For example, KPMG should have performed procedures including inquiry of operating personnel unrelated to the financial reporting process to address the risk of fraud.  *See* AS 2110.57.  Rather than approach these circumstances with the "questioning mind" required under AS 2110.53, instead, KPMG simply failed to probe the reason for the changes reported by CannTrust in its financial statements.

237.    PCAOB rule AS 1105.29 required KPMG to perform additional audit procedures in light of these inconsistencies:

> If audit evidence obtained from one source is inconsistent with that obtained from another, or if the auditor has doubts about the reliability of information to be used as audit evidence, the auditor should perform the audit procedures necessary to resolve the matter and should determine the effect, if any, on other aspects of the audit.

238.    KPMG ignored the inconsistent audit evidence regarding CannTrust's clearly evident failure to limit its production to what it was licensed to grow and sell, and should have applied audit procedures to respond to this inconsistent audit evidence, understand the limits of those licenses and the resulting impact on the Company's financial results.  Indeed, CannTrust's periodic filings with SEDAR and the SEC set forth the importance of its business licenses in operating the Vaughan and Niagara facilities.

239.    For example, CannTrust's Form 40-F explained "[a] significant failure of the Company's site security measures and other facility requirements, including any failure to comply with regulatory requirements, could have an impact on its ability to continue operating under its Cannabis Licences or its prospects of renewing its Cannabis Licences, and could also result in a suspension or revocation of the Cannabis Licences."

240.    Accordingly, because of the licenses' importance, KPMG was required to consider such information in performing its audit.  *See* AS 2701, *Other Information in Documents Containing Audited Financial Statements*, AS 2701.04.    This data served to emphasize what was already clear from the Company's financial statement disclosures: the operation of CannTrust's facilities required licensure and CannTrust's rights to the related assets were dependent on CannTrust's compliance with applicable laws and regulations in order to maintain those business licenses.

241.    Likewise, under PCAOB Standards, KPMG was required to consider laws and regulations that had a direct and material effect on the determination of CannTrust's financial statement amounts.  *See* AS 2405.05.  This requirement is consistent with other applicable standards that required KPMG to understand laws and regulations relevant to CannTrust's financial statements.  AS 2110.30-31.

242.    PCAOB Standards provide an example of compliance with laws and regulations that have a direct and material effect on the determination of financial statement amounts.  An example of a circumstance where the auditors must investigate and ensure compliance with relevant laws and regulations includes where "applicable laws and regulations may affect the amount of revenue accrued."  *See* AS 2405.05.  This scenario is wholly consistent with the circumstances confronted by KPMG when performing the audit of CannTrust.  That is, KPMG was obligated to assess how much cannabis CannTrust was licensed to sell and thereby ask the question whether revenue fairly presented based on the price at which CannTrust reportedly sold the cannabis.

243.    Specifically, KPMG was responsible for assessing how CannTrust's compliance with laws and regulations impacted financial statement assertions made by CannTrust:

> [T]he auditor considers such laws or regulations from the perspective of their known relation to audit objectives derived from **financial statements assertions** rather than from the perspective of legality per se.  The auditor's responsibility to detect and report misstatements resulting from illegal acts having a direct and material effect on the determination of financial statement amounts is the same as that for misstatements caused by error or fraud as described in AS 1001, *Responsibilities and Functions of the Independent Auditor*; AS 2405.05.

244.    Under PCAOB auditing standards (*see* AS 1105.11), CannTrust's financial statements reflected assertions made by management classified into the following five categories:

| No. | Assertion | Definition |
|---|---|---|
| 1 | Existence or occurrence | Assets or liabilities of the company exist at a given date, and recorded transactions have occurred during a given period. |
| 2 | Completeness | All transactions and accounts that should be presented in the financial statements are so included. |
| 3 | Valuation or allocation | Asset, liability, equity, revenue, and expense components have been included in the financial statements at appropriate amounts. |
| 4 | Rights and obligations | The company holds or controls rights to the assets, and liabilities are obligations of the company at a given date. |
| 5 | Presentation and disclosure | The components of the financial statements are properly classified, described, and disclosed. |

245.    KPMG was required to perform substantive audit procedures for each relevant assertion of each significant account and disclosure.   *See* AS 2301.36.   In other words, CannTrust's reported revenue, inventory and biological assets reflected management's assertion that the Company possessed the *rights* to such amounts.   Thus, KPMG was required to obtain relevant and reliable evidence to audit whether CannTrust's assertions, including those about *valuation* and *rights* to its revenue, biological assets, and inventory supported the amounts the Company reported in its financial statements.   AS 1105.02, AS 1105.07-08.

246.    As discussed in Section V.C.4, *supra*, KPMG failed to adequately determine that CannTrust's revenue, biological assets, and inventory were adequately *valued* at the appropriate amounts.   Indeed, CannTrust violated IFRS in presenting materially overstated revenue, biological assets, and inventory in its consolidated financial statements, as well as all of the consequential effects on earnings measures and liquidity.   Yet, KPMG's audit failed to identify any of the accounting violations.   KPMG's failures constitute an extreme departure from the standards of ordinary care.

247.    KPMG also failed to assess whether or not CannTrust held or controlled the rights to its biological assets and inventory.   The need for KPMG to carry out testing of CannTrust's

assertion that it had adequate *rights* to its cannabis was heightened by the fact that CannTrust was both: (1) subject to "new accounting, statutory, or regulatory requirements" under the Cannabis Act; and (2) experiencing "[r]apid growth or unusual profitability, especially compared to that of other companies in the same industry."  Both of these items are specifically listed by the PCAOB standards as risk factors (*i.e.*, red flags) of fraudulent financial reporting.  *See* AS 2401.A.2.a.  Yet, KPMG performed no such assessment, allowing CannTrust's fraud to be perpetrated.

248.    Further, under PCAOB rules, "it is ordinarily necessary for the independent auditor to be present at the time of [the inventory] count."  *See* AS 2510, *Auditing Inventories*, AS 2510.09.  Thus, at least for purposes of inventory testing, KPMG would have been physically present at CannTrust's facilities, including at or around the December 31, 2018, when such a count was performed.  As discussed above, CannTrust's inventory was materially overstated because it included cannabis grown and stored in unlicensed rooms and was sourced from black-market seeds.  Yet, KPMG reported no such overstatement of inventory.

249.    Moreover, given the above evidence demonstrating that CannTrust violated Health Canada regulations, KPMG was presented with the illegal act under PCAOB Standards. *See* AS 2405, *Illegal Acts by Client,* 2405.02.  Generally, the further removed an illegal act is from the events and transactions reflected in the financial statements, the less likely the auditor is to become aware of the act or recognize its possible illegality.  *See* AS 2405.04.  Here, however, Defendants' violations of Health Canada regulations are **directly related to the events and transactions reflected in the financial statements** because the Company's illicit growing and storing scheme resulted in overstated financial statements.

250.     Presented with audit evidence that a possible illegal act occurred, KPMG should have applied audit procedures to detect whether an illegal act had occurred.   AS 2405.07. Specifically, KPMG should have reviewed relevant regulatory filings to, and communications with, Health Canada and other information to understand the extent CannTrust was authorized to produce and grow cannabis at the levels of revenue and assets it was reporting.  *See e.g.*, AS 1105, AS 2101, AS 2110, AS 2301, AS 2401 and AS 2405.09 (including any "[i]nvestigation by a governmental agency," and "[v]iolations of laws or regulations cited in reports of examinations by regulatory agencies that have been made available to the auditor").   If no such communications had occurred, KPMG should have consulted CannTrust's counsel to understand whether CannTrust could legitimately operate outside of its business licenses.  *See* AS 2405.08. Yet, it appears KPMG engaged in no such inquiry.

251.     Furthermore, the evaluation of an illegal act such as CannTrust's operation without a business license should have caused KPMG to consider the indirect impact on the financial statements, such as the payment of fines and penalties.   KPMG was required to consider such contingencies for purposes of CannTrust's 2018 financial statements.   *See* AS 2405.13-14.

252.     Ultimately, KPMG should have ensured that CannTrust's financial statements disclosed the potential effects of the illegal act on its operations:

> The auditor should evaluate the adequacy of disclosure in the financial statements of the potential effects of an illegal act on the entity's operations.  **If material revenue or earnings are derived from transactions involving illegal acts**, or if **illegal acts create significant unusual risks associated with material revenue or earnings**, such as loss of a significant business relationship, **that information should be considered for disclosure**.  *See* AS 2405.15.

253.     Despite these rules and requirements, KPMG's audit knowingly and/or recklessly failed to detect CannTrust's material misstatements of revenue, inventory, and biological assets.

As a result, KPMG issued an Audit Report with materially false and misleading statements and that aided CannTrust in the fraud being perpetrated.

>           **(d)     KPMG Was on Notice of CannTrust's Lack of Internal
>                     Controls and Failed to Respond With Increased Audit
>                     Procedures**

254.    As discussed in Section V.C.4.c, *supra*, KPMG was on notice that CannTrust acknowledged in its 2018 Form 40-F that deficiency in internal controls existed as of December 31, 2018.   Knowing this, KPMG was under a heighted responsibility to assess CannTrust's financial statements and assertions as the Company's independent auditor.

255.    An auditor's understanding of internal controls over financial reporting includes evaluating the design of controls that are relevant to the audit and determining whether the controls have been implemented.   Effective internal controls mitigate fraud risk.   *See* AS 2110.72.   Conversely, ineffective controls increase the risk of fraud.   *See, e.g.*, AS 2405.07, ("circumstances [for fraud] exist, for example, [where there is] the absence of controls, ineffective controls, or the ability of management to override controls-that provide an opportunity for a fraud to be perpetrated").[24]

256.    Here, CannTrust's internal controls were woefully inadequate because the Company conceded that it "had limited accounting personnel with expertise to assist in the effective preparation of financial statements and related note disclosures."   Consequently, KPMG knew that a reasonable possibility existed that the CannTrust's financial statements were inaccurate or overstated.

---

[24] Even if KPMG asserts that CannTrust's misstatement of revenue was attributable to management override of internal controls, KPMG was still required to have considered this risk. *See* AS 2110.69.

257.    Thus, KPMG should have been responsive to the increased risk by augmenting its audit procedures to detect improper revenue recognition.   KPMG should have considered the types of misstatements that could have arisen and obtained more persuasive evidence to assure that no such misstatements existed.   *See* AS 2301.09.   Specifically, KPMG should have changed the nature, timing, and extent of its audit procedures to address the risk that revenue, inventory, and biological assets were misstated.   *See* AS 2301.14.   Audit procedures were relevant to evaluate whether significant transactions (*e.g.*, the Q4 2018 spike in revenue) were unusual for reasons related to the nature of the transactions, here revenue from unlicensed and illicit growing and storing of cannabis.   *See* AS 2301.15.

### (e)    KPMG Failed to Evaluate Whether CannTrust Could Continue as a Going Concern

258.    In addition to the above, KPMG was also obligated to evaluate CannTrust's ability to continue as a going concern.   AS 2415, *Consideration of an Entity's Ability to Continue as a Going Concern*, AS 2415.02.   That is, if CannTrust's businesses were suspended or revoked, was there substantial doubt about its ability to continue to operate as a going concern? As discussed in Section V.C.4.d, *supra*, such doubt regarding CannTrust's ability to operate as a going concern existed at the time KPMG performed its audit of the Company.   Specifically, under PCAOB standards, the need to significantly revise operations, and external matters that may jeopardize an entity's ability to operate are recognized conditions that may indicate such substantial doubt exists.   *See* AS 2415.06.

259.    When an auditor identifies substantial doubt about an entity's ability to continue as a going concern, the auditor is required to pursue evidence from management to mitigate the circumstances causing the substantial doubt.   *See* AS 2415.07.   If the auditor is unable to overcome this substantial doubt, the audit report should include an explanatory paragraph to that

effect.  *See* AS 2415.12.  Moreover, because CannTrust itself failed to provide disclosure with respect to its ability to continue as a going concern, a departure from IFRS existed.  KPMG's audit report failed to follow this standard by not addressing CannTrust's departure from IFRS or providing an explanatory paragraph to address the substantial doubt about CannTrust's ability to continue as a going concern.

> **(f)      KPMG Issued a Clean Audit Report That Contained False and Misleading Statements**

260.    In addition to the false and misleading revenue, biological assets, and inventory figures set forth in CannTrust's KPMG audited consolidated financial statements filed on March 28, 2019, KPMG made numerous false and misleading statements in its Audit Report.

261.    Specifically, KPMG's Audit Report misleadingly told investors that KPMG audited the March 28, 2019 Consolidated Financial Statements and that "***the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018***."

262.    KPMG's Audit Report claimed that the auditor had audited the 2018 Annual Financial Statements "***in accordance with the standards of the PCAOB.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud***."

263.    In addition the Audit Report misleadingly reassured investors that "***the audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks.  Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements***."

264.    The Audit Report continued "***the audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements*" and "*[KPMG] believe[d] that the audit provide[d] a reasonable basis for [its] opinion***."

265.    Finally, the Audit Report stated "***the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018, and the financial performance and its cash flows for the year then ended, in conformity with [IFRS]***."

266.    Each of these statements were false and misleading because, as discussed in Sections V.C.5.a-c, *supra*, KPMG's audit of CannTrust violated numerous PCAOB auditing standards and CannTrust's financial statements violated applicable accounting standards. KPMG's clean audit opinion reinforced the credibility of CannTrust's financial statements and allowed CannTrust to perpetrate its fraud.   Indeed, contrary to these statements and the representations, KPMG did not conduct its audit in accordance with PCAOB standards; as described herein, the financial statements referred to in these statements contained material errors and omissions in violation of IFRS; and KPMG lacked a reasonable basis for its opinion that the financial statements referred to in these statements were fairly presented in accordance with IFRS.

**D.    CannTrust Failed to Disclose to Investors That the Company's Success Was Attributable to the Cannabis Grown in the Unlicensed Rooms**

267.    Propped up by the increased production and capacity of cannabis from the unlicensed rooms, in early 2019, CannTrust began to distinguish itself as a powerful market leader in the medicinal and recreational cannabis sector.   On February 13, 2019, CannTrust announced that it was hiring a new CFO, Defendant Guyatt, who had previous experience, as a

CPA at Deloitte & Touche, as an investment banker at UBS, and as a senior finance member of Sears Canada, running the financial aspects of a larger company. And effective, February 19, 2019, Defendant Guyatt became the Company's CFO, replacing Defendant Abramowitz, who remained with the Company but transitioned to a role as SVP of Global Investments and Partnerships.

268. Shortly thereafter, CannTrust took another step towards becoming a cannabis powerhouse by applying to be listed on the pre-eminent stock exchange in the world, the NYSE. The application was granted, and on February 25, 2019, common shares began trading on the NYSE under the ticker symbol "CTST." The Company explained that its shares would continue to be listed on the TSE under the ticker symbol "TRST" and that shareholders that purchased common shares on the OTC Pink Open Market could now trade their shares on the NYSE.

269. After being listed on the NYSE, Defendants decided to cash in while the Company's ongoing illicit growing strategy was still a secret to CannTrust's regulators and investors. Accordingly, on March 18, 2019, CannTrust issued a press release announcing that the Company "filed a (final) short form base shelf prospectus (the 'Shelf Prospectus') with the securities commissions in each of the provinces of Canada, except Québec, and a corresponding shelf registration statement on Form F-10 (the 'Registration Statement') with the [SEC] under the U.S./Canada Multijurisdictional Disclosure System ('MJDS')." The Shelf Prospectus and Registration statement allowed CannTrust to offer up to $200 million worth of common shares.

270. The Registration Statement and Prospectus issued in connection with the Offering were riddled with misleading statements falsely inducing investors to invest in CannTrust's booming cannabis business. For example, the Prospectus misleadingly touted CannTrust's explosive growth and profitability while failing to disclose that the real reason for CannTrust's

success was directly attributable to the Company's illicit practice of growing and storing cannabis in unlicensed rooms and use of cheaper black market seeds to boost production numbers stating, *inter alia*: "***Our rapidly growing patient base has increased organically at a rate we believe is faster than any other licensed producer, experiencing a 57% growth from 2017 to 2018***."  The Prospectus continued:  "Gross profit/(loss) for the three and twelve months ended December 31, 2018 was a loss of $8,282 and profit of $36,493, respectively, compared to a gross profit of $11,036 and $23,980 in the comparable prior year periods. . . . ***The increase in gross profit in 2018 compared to 2017 was principally due to the increase in sales.***"

     **E.**     **Defendants Continued to Mislead Investors About the Illicit Growing and Storing Scheme After Health Canada Approved the Rooms for Growing Based on Defendants' Falsified Applications**

271.    On April 8, 2019, CannTrust announced that its Niagara Facility became fully licensed by Health Canada.  However, Defendants continued to mislead investors regarding the increased capacity after Health Canada licensed the unlicensed growing rooms.  Indeed, Defendants failed to tell investors that they had already been growing thousands of plants in those rooms since at least October 2018—notwithstanding the fact that they knew the rooms were not licensed.  Specifically, CannTrust's press release, which was attached to a Form 6-K signed by Defendant Guyatt and dated that same day, announced that CannTrust "is pleased to announce that its cultivation and processing permit under Health Canada Cannabis Regulations was amended to include the final 20% of its Phase 2 expansion.  ***The entire 450,000 sq. ft. of its perpetual harvest greenhouse in [Niagara], is now fully licensed.***"

272.    Likewise, in the MD&A that CannTrust issued on May 14, 2019 and based on information available to CannTrust management as of May 13, 2019 ("May 14, 2019 MD&A"), the Company reiterated that the Niagara Facility "***was fully licensed as of April 2019.***"

273.    The May 14, 2019 MD&A also explained that "[t]he redeveloped Perpetual Harvest Facility provides the Company with increased production capacity to meet growing market demand."

274.    As the Class Period continued, Defendants continued to mislead investors about the Company's growing, production, and sale of cannabis that was grown in unlicensed rooms. For instance, in its May 14, 2019 press release, attached to a Form 6-K signed by Defendant Guyatt, the Company continued to tout "*exceptional operational growth in the first quarter [of 2019], with harvested production of over 9,400kg*," which is the quarter prior to receiving the license approvals from Health Canada for the remaining rooms in the Niagara Facility.  The press release further touted the increased harvested production, yet omitted that growing in unlicensed grow rooms attributed to such production: "*Harvested production increased by more than 400% to over 9,400kg, versus the first quarter of 2018, and 96% over the fourth quarter of 2018*."

275.    However, Defendants' statements continued to mislead investors by falsely attributing the Company's success to legitimate means while failing to disclose that the real reason was because of the illicit growing and storing scheme and reliance on black market seeds to increase production capacity.

276.    Analysts continued to believe that CannTrust was succeeding by legitimate means, and had not the slightest clue of the catastrophic risks that the Company faced from Health Canada should the regulator uncover the Company's unlicensed growing practices. Furthermore, analysts continued to report on the recently completed Phase 2, optimistic that such completion would allow Defendants to operate at full capacity and improve harvest numbers.

277.    For example, on May 14, 2019, Jefferies issued a "Buy" rating for CannTrust and reported: "The near term outlook for CannTrust also appears strong.  With kg harvested doubling in the [first quarter], and the Phase 2 expansion fully operational and planted, expect a 50,000kg/y run rate by Q3, contributing significantly to the top line.  This leverage will contribute to gross margin improvements."  The next day, ROTH Capital maintained a "Buy" rating and similarly reported that "[w]ith the completion of the Phase 2 expansion, [CannTrust] is ramping the production capacity to further penetrate supply constrained recreational markets through its LIIV and Xscape brands.  We forecast a meaningful increase in revenues in 2H19, with continuing strong medical and increasing recreational sales."

**F.     CannTrust's Unlicensed Growing Strategy is Revealed and the Undisclosed Risks of the Illicit Strategy Materialized Causing the Company's Stock Price to Plummet**

278.    As discussed above, from October 2018 to March 2019—the months that CannTrust was growing cannabis in five unlicensed rooms—CannTrust concealed the five unlicensed grow rooms (and the thousands of plants therein) from Health Canada.  To do so, CannTrust management directed lower level employees, many of which were making close to minimum wage, to work late hours and hang fake walls to make it appear as though the unlicensed rooms were empty.

279.    However, in June 2019, one of those employees, Nick Lalonde,[25] blew the whistle on CannTrust and its practice of concealing the unlicensed rooms from regulators.  These explosive revelations caused a chain of events that would result in not only the precipitous decline of the Company's stock price, but Health Canada suspending CannTrust's licenses to

---

[25] Mr. Lalonde worked for CannTrust from June 2017 to May 2019, and served as head of disposal operations at the Niagara Facility.

grow and sell cannabis altogether and, ultimately, the Company filing for the Canadian equivalent of bankruptcy.

### 1. CannTrust Whistleblower Nick Lalonde Reported Defendants' Fraudulent Scheme to Health Canada

280.    On June 14, 2019, Mr. Lalonde sent Health Canada officials an email outlining the wrongdoing that took place at CannTrust beginning in October 2018.  In the email, Mr. Lalonde told Health Canada that he had been asked by his supervisors to hang the white poly walls so that the unlicensed greenhouse rooms would appear empty in photos the Company submitted to the regulator in order to have the rooms licensed for growing.  Mr. Lalonde further asked Health Canada to investigate and even suggested exactly how Health Canada could uncover the illicit scheme.  In his letter, Mr. Lalonde detailed to Health Canada, "[i]f you look through the camera footage prior to the dates the pictures were taken and requested **you will clearly see us hanging up white poly walls to cover up thousands of plants**."

281.    Indeed, in an interview Mr. Lalonde had with the Globe and Mail on July 10, 2019, Mr. Lalonde elaborated that in the Fall of 2018 (before November), employees were asked to stay late to set up fake walls to hide "several thousand" plants from view, in order to take photographs that had been required by Health Canada as part of routine licensing requirements. Mr. Lalonde explained to the Globe and Mail, "**Health Canada requested pictures of the ranges [greenhouse rooms] in order to give the licence and the permit; they wanted to see pictures of the range complete and functioning correctly with no plants in it, because it's not a licensed room at the time.**"  Mr. Lalonde continued, "**We're hanging these poly walls, these white poly walls . . . moving tables with hundreds of plants on them out of the camera view, just to snap a picture of the room with nothing in it.**"

282.    Mr. Lalonde also explained to the Financial Post in a July 11, 2019 article that when he asked why they were hanging the walls, he was told that they were for "before and after photos."  Mr. Lalonde further told the Financial Post that: "If I wouldn't have sent that email, CannTrust would've still been going along, day-to-day, like nothing happened," and "Health Canada would have no knowledge of it.  Nobody would have any knowledge of this going on."

### 2.    Health Canada Conducts a Surprise Inspection Uncovering CannTrust's Illicit Growing Scheme And Sanctions the Company

283.    Several days after Health Canada received Mr. Lalonde's email, on June 17, 2019, Health Canada conducted a surprise inspection and audit of the Niagara Facility that uncovered uncontroverted evidence of Defendants unlicensed growing operations.

284.    Following the surprise inspection, Health Canada issued CannTrust a compliance report detailing the regulators damning findings.  On July 8, 2019, prior to the market opening, CannTrust issued a press release, disclosing that CannTrust had "received a compliance report from Health Canada notifying the Company that its greenhouse facility in Pelham, Ontario is non-compliant with certain regulations" and that the Company "accepted Health Canada's non-compliance finding and has taken actions to ensure current and future compliance."

285.    The press release went on to confirm that from October 2018 to March 2019, Defendants had been growing cannabis in five unlicensed rooms and misled Health Canada inspectors during their audit in June of the Niagara Facility:

> The non-compliant rating is based on observations by the regulator regarding the growing of cannabis in five unlicensed rooms and inaccurate information provided to the regulator by CannTrust employees.  Growing in unlicensed rooms took place from October 2018 to March 2019 during which time CannTrust had pending applications for these rooms with Health Canada.

286.    Although these rooms were eventually issued licenses in April 2019, Defendants further explained that "Health Canada has placed a hold on inventory which includes

approximately 5,200kg of dried cannabis that was harvested in the previously unlicensed rooms in [Niagara], until it deems that the Company is compliant with regulations."  Defendants also told investors that "CannTrust has instituted a voluntary hold of approximately 7,500kg of dried cannabis equivalent at its Vaughan manufacturing facility that was produced in the previously unlicensed rooms."  CannTrust further announced that "[d]ue to the product on hold, some CannTrust customers and patients will experience temporary product shortages."

287.    Notably, within that same press release, Defendant Aceto conceded that with respect to their communications with Health Canada about growing in five unlicensed rooms, "[w]e made errors in judgment."

288.    In response to this news, CannTrust's share price fell $1.11, or **more than 22%**, to close at $3.83 per share on July 8, 2019 from $4.94 per share on July 5, 2019, on **unusually heavy trading volume**.

289.    Analysts and the media were shocked by this news and directly linked CannTrust's stock decline to its disclosure of the compliance issues.  For example, on July 8, 2019, Canaccord reported that "a breach of Hea[l]th Canada regulations is an unfortunate setback for CannTrust and will likely materially impact Q3/19 results."  Jefferies also issued a report that same day that explained that "today's update was the last thing [CannTrust] needed," and that "[n]ear term, there will undoubtedly be a financial impact" and "[l]ong term, it impacts credibility."  The report further noted that "[t]he fact the [C]ompany never spotted this, or indeed still doesn't know how it happened, is a concern."

290.    Similarly, ROTH Capital issued a report that same day linking the drop in share price to Defendants' announcement: "CTST shares are down ~20% to $3.87 while investors weigh the ramifications of cannabis production in unlicensed rooms and the pending inventory

concerns in the near term."   The analyst report further expressed concern over Defendants' misrepresentations that they made to Health Canada, stating, "we are concerned with the non-compliance rating and that Health Canada felt [CannTrust] employees misled regulators during the June audit."

291.   Likewise, news outlet Globe and Mail published an article on July 8, 2019, explaining that "CannTrust Holdings Inc. shares plunged more than 20 per cent on Monday, after the NYSE-listed cannabis grower disclosed that Health Canada discovered unlicensed growing activity at the [C]ompany's main greenhouse in Ontario and put a sales freeze on 5,200 kilograms of CannTrust's inventory, pending further investigation."   Indeed, the article quoted Defendant Aceto admitting:   "We constructed these rooms in accordance with all the rules and regulations; the mistake that was made by CannTrust was putting plants in these rooms before we'd actually received the approval to do so."

292.   ROTH Capital issued another report the next day on July 9, 2019 and downgraded the Company's stock to Neutral, further explaining that "CannTrust has taken a huge credibility hit from the issued Hea[l]th Canada non-compliance rating audit report," and opining that CannTrust demonstrated "a flagrant lack of compliance surrounding cultivating cannabis in five unlicensed rooms over a five month timeframe."   The report further found that "[w]ith a number of cannabis brands currently competing for market share, we believe this will materially slow CTST's likelihood of becoming a top-tier cannabis producer over the next year."

293.   However, the revelation of the unlicensed growing rooms was just the tip of the iceberg.   Investors were still unaware of the extent of Company's regulatory violations, Defendants' direct knowledge and participation in the scheme, and what penalties Health Canada would impose on CannTrust as more and more was uncovered by the regulator.   Indeed, some

analysts expressed concern that there might still be further measures or actions by Health Canada or other authorities as a result of Defendants' non-compliance.  As ROTH Capital explained on July 8, 2019, "It is still unclear if this is a temporary hold (with CTST able to sell inventory once cannabis quality from unlicensed rooms is verified), or if Health Canada will require more drastic measures such as destroying the crop grown in the unlicensed rooms."

### 3. CannTrust's Stock Price Continues to Plummet as the Extent of Defendants' Illicit Growing Scheme is Revealed

294.    On July 10, 2019, the Globe and Mail published an explosive article detailing whistleblower Nick Lalonde's email to Health Canada, further revealing details about Defendants' fraudulent conduct.  As explained above, the Globe and Mail article for the first time revealed the explicit details of Mr. Lalonde's email, such as Defendants requiring CannTrust employees to hang fake walls in front of the unlicensed rooms to hide their unregulated growing from Health Canada.

295.    In response to this news CannTrust's stock price fell over **12%** from $3.60 per share on July 9, 2019 to $3.16 per share on July 10, 2019, again on unusually heavy trading volume.

296.    Analysts responded to the revelation in turn.  For example, on July 11, 2019, Canaccord reduced its rating of CannTrust stock to Hold, in light of recent "allegations that employees of CannTrust may have knowingly deceived Health Canada to grow cannabis in rooms which had yet to be licensed."

### 4. CannTrust Announces a Hold on the Sale and Shipment of All Cannabis Products While Health Canada Continued its Audit

297.    On July 11, 2019, CannTrust announced that "it has implemented a voluntary hold on sale and shipment of all cannabis products as a precaution *while Health Canada visits and reviews its Vaughan, Ontario manufacturing facility*."  Critically, despite the fact

Defendants knew at the time that the Company had also been storing excess cannabis from the Niagara Facility in unlicensed rooms at the Vaughan Facility, they once again failed to disclose to investors that they had illicitly stored cannabis there, and accordingly, that there was a considerable risk that Health Canada would uncover the illicit storage during its review of the Vaughan Facility.  Defendants' failure to disclose this information rendered their statement regarding the review of the Vaughan Facility false and misleading.

298.    CannTrust also informed investors that it created a Special Committee "comprised of independent members of the Board of Directors" to "investigate th[e] matter in its entirety." Specifically, per a later press release, "the Special Committee was appointed by the Board of Directors to investigate a compliance report from Health Canada notifying the Company that its greenhouse facility in Pelham, Ontario is non-compliant with certain regulations."

299.    Moreover, the Special Committee had a "broad mandate to, among other things, investigate the Company's non-compliance with Health Canada regulations and ancillary matters, to make recommendations to the Board of Directors regarding any actions to be taken by CannTrust as a result of the investigation, and to assess any impact on the Company's bio assets, inventory, sales and revenue."  At the time, the Special Committee met with its legal counsel, McCarthy Tétrault LLP, several times.

300.    As a result of this news, CannTrust's stock price fell over **17%** from $3.11 per share on July 11, 2019 to $2.58 per share on July 12, 2019, on unusually high trading volume.

###     5.    CannTrust's Stock Price Continues to Decline Following News of Several Legal Actions Filed Against the Company

301.    Then, on July 15, 2019, after the close of trading, the Financial Post published an article entitled "OSC complaint, class-action lawsuits could add to CannTrust's woes," which detailed the various legal actions CannTrust was facing as a result of the illicit growing scheme

and the negative impact they could have on the Company.  Specifically, the article discussed an initial investigation by the enforcement team of the Ontario Securities Commission ("OSC") revealed the possibility that Defendants' actions concerning the growing in the five unlicensed rooms could rise to the level of a "criminal offence."  The article also explained that a number of class action lawsuits had been filed against the Company in both Canada and the United States for securities fraud violations.

302.    As a result, on July 16, 2019, CannTrust's stock price fell over **10%**, from $3.06 per share on July 15, 2019 to $2.75 per share on July 16, 2019, on unusually high trading volume.

303.    Analysts continued to be uncertain about the full impact that Defendants' fraudulent conduct would have on the Company going forward.  For example, on July 15, 2019, ROTH Capital issued a report that placed CannTrust shares "Under Review" and reported: "The biggest unknown is the response by Health Canada, as the federal regulator has the power to potentially suspend or revoke CTST's license.  Additional legal actions may come about pending further investigations of violating The Cannabis Act.  At this time, the impact of these matters on CTST's financial results are unknown."

304.    Likewise, Jefferies reported on July 15, 2019 that "[f]or a company that we had found to be well set up to succeed, we have been disappointed by execution and a lack of catalysts." The report further stated:  "As more details emerge, it becomes less likely that Health Canada will provide a swift resolution to the situation, with a number of cases likely to be put to CannTrust for violation of the Cannabis Act, or potentially worse.  There are also question marks over whether management had been aware of such schemes during its $200m equity offering."

6. **CannTrust Shares Continue to Plunge as Investors Discover that Defendants Aceto, Abramowitz and Paul Were Aware of the Illicit Growing Scheme**

305.     Then, between July 23, 2019 and July 24, 2019, multiple news reports revealed for the first time that CannTrust executives, including Defendants Aceto, Abramowitz and Paul, knew of the unlicensed growing.  On July 23, 2019 Globe & Mail published an article revealing that—based on internal CannTrust emails obtained by the news organization—"**[b]oth the chairman and the chief executive officer of CannTrust Holdings Inc. were informed that the [C]ompany was growing cannabis in unlicensed rooms about seven months before Health Canada uncovered the regulatory breach.**"  As explained in further detail above, the article explained that the internal emails "show chairman Eric Paul and CEO Peter Aceto were made aware that cannabis was being cultivated in rooms at a growing facility in Southern Ontario that had yet to be licensed by the federal regulator, and that Mr. Paul counselled staff on how to respond."

306.     Similarly, on July 24, 2019, BNN Bloomberg published an article that—according to internal Company documents obtained by BNN Bloomberg—disclosed that Defendant "Aceto told senior company officials to 'continue as planned' and plant cannabis in an unlicensed room in mid-November."  In reviewing internal weekly production meeting minutes, the article set forth a detailed timeline of when senior CannTrust executives—including Defendant Aceto and Paul—knew of the illegal growing.

307.     On this news, CannTrust stock fell **over 22%** from $2.62 per share on July 23, 2019 to $2.04 per share on July 24, 2019, on unusually high trading volume.

308.     The financial media attributed the stock drop directly to the new information about Defendants' explicit knowledge of the illicit unlicensed growing rooms.  For example, Global News reported on July 24, 2019 that "CannTrust Holdings Corp. shares have plummeted

further after a media report alleging that the cannabis company's chief executive and chairman of the board were aware of pot cultivation in rooms without government approval months before Health Canada discovered the illicit activity."

309.    Following these revelations of Defendant Aceto's and Paul's direct involvement with the growing in the five unlicensed rooms, on July 25, 2019, the Company issued a press release, announcing: "The investigation into the Company's non-compliance with Health Canada regulations and ancillary matters uncovered new information that has resulted in a determination by the Board to **terminate with cause** CannTrust CEO Peter Aceto."  The press release also announced that "the Board of Directors demanded the resignation of the Company's Chair Eric Paul and he complied."    The Company named the Special Committee Chair, Defendant Marcovitch, as interim CEO.

310.    Shortly thereafter, on August 1, 2019, the OSC initiated an investigation into CannTrust surrounding the five unlicensed rooms.  The investigation was being handled by the OSC's Joint Serious Offences Team ("JSOT"), and was understood to be pursuing the matter as a "quasi-criminal" case, a type of proceeding that has the potential to lead to jail time depending on what charges are uncovered, brought, and successfully prosecuted.

311.    The same day, the Company issued a press release on August 1, 2019, that estimated the value of impacted inventory and biological assets from the five unlicensed rooms at approximately $51 million as of June 30, 2019.[26]  The August 1, 2019 press release further announced that CannTrust "will likely miss its filing deadline . . . of August 14, 2019 to file an

---

[26] As the Company announced in an August 15, 2019 press release, that "impacted inventory represents approximately 53% of the Company's total inventory as at June 30, 2019 and the impacted biological assets represent approximately 30% of the Company's total biological assets as at June 30, 2019."

interim financial report for the three and six month periods ended June 30, 2019, an interim management's discussion and analysis for the corresponding period and certifications of interim filings."  The likely missed filing deadline was due to the uncertainty of the Health Canada investigation related to revenue and asset valuation.

312.    As time passed, the fallout from Defendants' fraudulent concealment of the unlicensed growing rooms continued to materialize.  On August 9, 2019, CannTrust issued a press release, attached to a Form 6-K dated that same day, announcing that, effective the day prior, "the Company's independent auditor, [KPMG], . . . is withdrawing its report dated March 27, 2019 on the Company's consolidated financial statements as at and for the year ended December 31, 2018 and its interim report to the Audit Committee dated May 13, 2019 on the unaudited condensed interim consolidated financial statements as at and for the three month period ended March 31, 2019 (collectively, the 'KPMG Reports'), and therefore, the KPMG Reports should no longer be relied upon."

313.    Additionally, in light of the "significant uncertainty with respect to the potential impact of pending Health Canada decisions on the valuation of the Company's inventory and biological assets and revenue recognition," "CannTrust cautions against any reliance on its consolidated financial statements as at December 31, 2018 and interim consolidated financial statements as at and for the three month period ended March 31, 2019."

314.    KPMG's decision to withdraw its reports were directly linked to the Special Committee's adverse findings, as well as the Company's own comments cautioning the public from relying on prior financial reports.  Specifically, with respect to why KPMG withdrew its reports, the press release explained:

> KPMG's decision was prompted by the Company's caution against reliance on its financial statements for the year ended December 31, 2018 and for the three

months ended March 31, 2019, as well as the recent sharing with KPMG of newly uncovered information from the Special Committee's investigation, including information that led to senior leadership changes announced on July 25, 2019. KPMG was not aware of the information recently shared by the Company when it issued the KPMG Reports and had relied upon representations made by individuals who are no longer at the Company

**7.  Health Canada Uncovers Additional Violations at the Vaughan Facility Including the Storage of Cannabis in Unlicensed Rooms**

315.    In addition to previously reprimanding CannTrust for growing in unlicensed rooms in its Niagara Facility, Health Canada soon discovered that CannTrust had been storing cannabis in unlicensed rooms in its Vaughan Facility following its review of the facility in July 2019.   Indeed, on August 12, 2019, CannTrust told investors that Health Canada found significant regulatory violations at the Vaughan facility.   On that day, the Company issued a press release, stating "[a]fter trading hours on Friday, August 9, 2019, CannTrust received a report from Health Canada notifying the Company that its manufacturing facility in Vaughan, Ontario has been rated non-compliant with certain regulations."   Health Canada found the following violations:

1.  The conversion of five rooms from operational areas to storage areas, which were used for storage since June 2018 without prior approval of Health Canada;

2.  The construction of two new areas without prior approval of Health Canada, one of which was used to store cannabis since November 2018;

3.  Insufficient security controls at the manufacturing facility;

4.  Inadequate quality assurance investigations and controls;

5.  Standard operating procedures that did not [] meet the requirements under regulations; and

6.  Documents or information that were not retained in a manner to enable Health Canada to complete its audit in a timely manner.

316.    These findings were "based on observations made during an inspection completed during the period July 10-16, 2019."  Again, Defendants admitted that the regulator's findings were accurate noting: "CannTrust has accepted Health Canada's findings and remedial actions are underway."

317.    As explained above, Defendants' need to store cannabis in the unlicensed rooms was a result of their growing in the unlicensed rooms in the Niagara Facility.  As discussed above, CW3 recalled that some cannabis being stored in the Vaughan Facility was the same cannabis grown in the unlicensed rooms in the Niagara Facility.  CW3 explained that there was so much product being sent from the Niagara Facility that CannTrust did not have the capacity in the licensed rooms so CannTrust used the unlicensed rooms to store the excess product.

318.    Defendants had thus concealed not only that they had stored the excess illegally grown cannabis in unlicensed rooms, but also that if Health Canada discovers the unlicensed store rooms, then CannTrust would suffer further ramifications.  Accordingly, the risk that Health Canada would discover that CannTrust was storing its excess inventory in unlicensed rooms fully materialized causing CannTrust's stock price to plummet.

319.    On this news CannTrust's stock price fell approximately **30%** from a closing price of $3.17 per share on Friday, August 9, 2019 to a closing price of $2.32 on Monday, August 12, 2019.

320.    Analysts attributed the additional regulatory violations related to the use of unlicensed rooms at CannTrust's Vaughan Facility as the cause of the stock drop.  For example, on August 19, 2019, Jefferies reported that despite CannTrust's shares experiencing a gain as a possible result of a certain cannabis ETF rebalancing (*i.e.*, allocating a larger portion of the overall ETF to CannTrust shares), "[t]hese gains were all but lost though after CannTrust

announced on Monday morning that it has received a report from Health Canada informing it that its manufacturing facility in Vaughan, Ontario was non-compliant with certain regulations, which is in addition to the non-compliance finding for its Pelham facility previously."

321.     As more news about CannTrust's non-compliance was disclosed, the Company's customers, including the provincial entities in charge of wholesale distribution began to return the illicitly grown cannabis that CannTrust sold to them because the cannabis was non-conforming.   For example, on August 19, 2019, the CannTrust filed a Form 6-K and press release disclosing that the Ontario Cannabis Store, the Crown corporation in charge of wholesale distribution of cannabis products in Ontario, notified the Company that certain products sold were non-conforming (C$2.9 million) and would be returned.

322.     Then, on September 6, 2019, numerous news reports were released revealing CannTrust's use of black-market seeds and mislabeling of cannabis from those seeds as a regulated and approved strain.   For example, on that day, BNN Bloomberg published an article entitled "Black market pot entered CannTrust facility, flowed into legal market last year: Sources"   According to the article, internal CannTrust documents obtained by BNN Bloomberg showed that CannTrust tried to conceal the black-market cannabis seeds from Health Canada and that some CannTrust employees changed the names of the black market cannabis strains to those which the Company was licensed to sell in the legal medical and recreational markets.   The article went on to note "[a]dding cannabis seeds obtained through the black market would have allowed CannTrust to significantly bolster its production at a time when it had overcommitted itself with supply contracts with provinces and other licensed marijuana producers."

**8.    The Risk of Growing Cannabis in Unlicensed Rooms and Violating Health Canada Regulations Materializes When Health Canada Suspends CannTrust's License to Grow and Sell Cannabis**

323.    The foreseeable risk associated with Defendants' illicit growing and storing scheme fully materialized on September 17, 2019 when the Company informed investors that Health Canada was suspending its license, preventing CannTrust from continuing to sell cannabis altogether.

324.    On that day, CannTrust published a press release, attached to a Form 6-K dated September 18, 2019, that "it received late this morning a Notice of Licence Suspension . . . under section 64(1) of the Cannabis Act (Canada)," which "states that **Health Canada has suspended CannTrust's authority to produce . . . and to sell cannabis**."

325.    The press release continued: "As such, the Notice constitutes a partial suspension of the Company's licence for standard cultivation and a full suspension of its licences for standard processing, medical sales, cannabis drugs and research issued under the Cannabis regulations."  Also, "[d]uring the suspension, CannTrust may not propagate new lots or batches of cannabis or engage in the sale or distribution of cannabis."  The Notice cited "the Company's previous non-compliance with certain requirements of the Cannabis Act (Canada) and the regulation made thereunder (the 'Cannabis regulations') in respect of the matters that the Company has been discussing with Health Canada."

326.    On this news, CannTrust's stock price fell **14%** from a closing price of $1.50 per share on September 16, 2019 to a closing price of $1.29 on September 17, 2019, on unusually high trading volume.

327.    Analysts acknowledged that the suspension was a result of Defendants' illicit growing in the five unlicensed rooms at the Niagara facility and the other regulatory violations.

For example, on September 18, 2019, ROTH Capital reported that "[t]he recent announcement stems from the previous non-compliance of CTST growing cannabis in five unlicensed rooms."

### G.    Post-Class Period Events

328.    On October 14, 2019, CannTrust issued a press release, attached to a Form 6-K dated that same day, announcing its purported success in its remediation efforts.  Critically, part of the Company's remediation efforts involved destroying a significant amount of biological assets and inventory that related to their illegal growing in the five unlicensed rooms.  Specifically, the press release explained:

> In order to implement these measures, CannTrust's Board of Directors has determined that it is **necessary to destroy approximately $12 million of biological assets and approximately $65 million worth of inventory that was not authorized by CannTrust's licence**.  The exact amount of material destroyed will be validated and verified once the destruction is complete.  The inventory being destroyed includes product that was returned by patients, distributors, and retailers.  **Given the status of its licenses, the Company is unable to process the material being destroyed or sell it to other licensed producers.**  The destruction process will allow the Company to free up much needed capacity to both implement remediation measures and store material that has been grown and processed in accordance with the Company's license since April 5, 2019.

329.    Similarly, in an October 24, 2019 press release, attached to a Form 6-K dated that same day, CannTrust explained that it "will also take steps to recover all cannabis from distributors and retailers that has not already been sold to end consumers or returned to CannTrust."  Within that same press release, interim CEO Defendant Marcovitch reiterated that as a result of the Special Committee's findings, "CannTrust has taken swift action to begin addressing the factors that led to its non-compliance, including several involuntary departures from the Company's leadership team"—referring mainly to Defendant Aceto being terminated for cause.

330.   On November 26, 2019, the Company announced that "the Toronto Stock Exchange ('TSX') has advised the Company that it intends to review CannTrust's eligibility for continued listing of the Company's common shares on the TSX, pursuant to Part VII of the *TSX Company Manual*."  The TSX indicated the reason for the review related to Company being in arrears for satisfying certain disclosure requirements, namely the preparation and filing of the Company's restated audited financial statements for the year ended December 31, 2018, its restated interim financial statements for the first quarter of 2019, and its interim financial statements for the second and third quarters of 2019, together with the related management's discussion and analysis ("MD&A") for the corresponding periods."

331.   Then, on December 10, 2019, the Company announced that it received written notification on December 9, 2019 from the NYSE that "CannTrust is no longer in compliance with the NYSE's continued listing standard rules because the per share trading price of the Company's common shares has fallen below the NYSE's share price rule," *i.e.*, "[a]s of December 9, 2019, the 30 trading-day average closing price of the Company's common shares was" less than $1.00 per share.

332.   Finally, on March 31, 2020—similar to bankruptcy protection in the United States—CannTrust applied for and obtained an order from the Ontario Superior Court of Justice granting protection under the *Companies' Creditors Arrangement Act*, c. C-36, as amended, a Canadian federal law allowing insolvent corporations that owe their creditors in excess of $5 million to restructure their business and financial affairs.  In a press release issued by the Company on March 31, 2020, it indicated that it seeks to address "the multiple putative class actions and other litigation brought against CannTrust in several jurisdictions, seeking to resolve all of the claims and contingent claims against the Company in a single forum."

333.    CannTrust informed investors in its March 31, 2020 press release that trading in CannTrust's common shares on the TSX and NYSE had been halted.  CannTrust common stock was ultimately delisted from the NYSE on April 27, 2020.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

334.    Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or maintained the price of CannTrust's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

335.    Throughout the Class Period, Defendants made a series of misrepresentations concerning the Niagara and Vaughan Facilities in which they concealed from investors that they grew and stored cannabis in rooms prior to receiving the proper licenses in addition to committing several other regulatory violations including the growth and sale of cannabis from black-market seeds.

336.    Because Defendants failed to disclose that they grew and stored cannabis in unlicensed rooms from June 2018 through March 2019 in violation of applicable rules and regulations, and that this illicit practice subjected CannTrust to significant regulatory risks, Defendants misled investors each time Defendants touted: (1) that CannTrust was in compliance with applicable regulations; (2) CannTrust's success and growth due to increases in capacity and expansion of the Niagara Facility; (3) the Company's continued successful expansion after Health Canada licensed the five unlicensed rooms in April 2019; and (4) reported certain overstated financial figures as a result of counting illicitly grown cannabis toward their reported inventory and biological assets.

A.     **Defendants Misled Investors About Being In Compliance with Applicable Regulations**

337.    During the Class Period, Defendants consistently told investors that the Company was in compliance with Health Canada regulations when in fact the Company knew that it was growing and storing cannabis in unlicensed rooms, and growing and selling cannabis from black-market seeds in direct violation of Health Canada regulations.   Moreover, if Health Canada found CannTrust to be in violation of its regulations, it posed significant regulatory risks that would negatively impact CannTrust's continuing ability to operate including, *inter alia*, the loss or suspension of CannTrust's license to grow and sell cannabis.

338.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because they failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

1.     **December 19, 2018 – Press Release**

339.    On December 19, 2018, CannTrust issued a press release, which was filed with SEDAR that same day, updating investors on Phases 2 and 2 of the Niagara Facility expansion. In the December 19, 2018 press release, CannTrust told investors that "*[t]he fully-permitted Phase II expansion remains on course to bring the Company's capacity to 50,000 kg per year. CannTrust expects first harvest from the expansion in Q1/19.  Construction of the final range should be complete in January 2019*."

340.    The statements above regarding CannTrust's compliance with regulations as well as CannTrust's representations that it was a licensed or permitted producer and distributer were materially false and misleading when made because: (i) starting in October 2018, CannTrust began illegally growing cannabis in unlicensed rooms at the Niagara Facility; (ii) since June 2018, CannTrust was illegally storing dried cannabis in unlicensed rooms in the Vaughan facility; (iii) by June 2018, CannTrust was using illegal "black market" seeds to grow over one thousand cannabis plants without approval from Health Canada; (iv) CannTrust's product packaging mislabeled "black market" seed cannabis as one of the licensed strain names, in violation of the Cannabis Act; and (v) CannTrust distributed and sold cannabis to consumers without a proper permit.   Accordingly, CannTrust was not operating in compliance with regulations and did not have a license to produce, store, and sell certain of its products.

341.    For example, multiple former CannTrust employees corroborated that Defendants were growing in unlicensed rooms during the Class Period.   According to former CannTrust employees, including whistleblower Nick Lalonde, Defendants knew or were reckless in not knowing that the Company was growing cannabis in five unlicensed rooms in the Niagara Facility from the beginning of the Class Period—in violation of Health Canada regulations.   For example, Mr. Lalonde, who served as head of disposal operations at the Niagara Facility, recounted that CannTrust was growing in unlicensed rooms and intentionally concealed that fact from both Health Canada and investors.   In fact, Mr. Lalonde detailed CannTrust's wrongdoing to Health Canada in an email, which included divulging that CannTrust was growing thousands of plants in unlicensed rooms and concealed the illicit growing scheme from Health Canada.

342.    Similarly, CW1, who attended Quality Control meetings where issues in the facility were discussed, recalled that she saw plants and greenhouses being opened where the

Company had not obtained the proper permitting.  CW4 likewise stated that the illegal growing started at the same time that Defendant Aceto took over as CEO, which happened in October 2018.

343.    Indeed, Defendants admitted to doing so after receiving a compliance report from Health Canada on July 8, 2019.  For instance, CannTrust issued a press release that same day, explaining that the "non-compliant rating is based on observations by the regulator regarding the growing of cannabis in five unlicensed rooms and inaccurate information provided to the regulator by CannTrust employees," and that the "[g]rowing in unlicensed rooms took place from October 2018 to March 2019 during which time CannTrust had pending applications for these rooms with Health Canada."  Notably, the press release further stated that "CannTrust has accepted Health Canada's non-compliance finding," and Defendant Aceto conceded that with respect to Defendants' communications with Health Canada about growing in five unlicensed rooms, "[w]e made errors in judgement."

344.    In addition, not only did CannTrust grow cannabis in five unlicensed rooms from October 2018 through March 2019, but the Individual Defendants either knew or were reckless in not knowing that it was occurring.  Critically, the decision to do so was given by CannTrust executives—including Defendant Aceto.  For example, as explained in Section V.B, according to internal CannTrust minutes from weekly production meetings held on November 21, 2018 and November 28, 2018, CannTrust executives explicitly discussed growing in unlicensed rooms and stated that Defendant Aceto was informed of the same and that Defendant Aceto instructed them to "continue as planned."  Former CannTrust employees, such as whistleblower Mr. Lalonde, CW1, CW6, and CW2, corroborated that certain Individual Defendants knew about and directed the unlicensed growing.

345.    Moreover, in addition to weekly production meetings, the unlicensed rooms were also discussed in Quality Control Meetings.  For example, CW1 recalled that at the Quality Control meetings, which were held weekly in Niagara, and attended by Epp, Scott Rolph, Emily Tarrant, Emily Mclinchey, and others, issues at the Niagara Facility were discussed. Specifically, CW1 explained that at these meetings, they discussed the Niagara Facility "not being up to par," documents not being filled out properly, cleanliness issues along with other quality issues.  CW1 further explained that they openly discussed the unlicensed grow rooms, RG8-12, and referred to them by their numbers.

346.    Indeed, CW1 recalled that they openly discussed making sure those rooms were clean before the plants were put in but CW1 explained that she refused to partake in documenting the related cleaning logs because the rooms were unlicensed.  According to CW1, because she "pushed back" by saying that it was "above her pay grade," those logs were handled by someone else.  CW1 recalled that Rolph and Mclinchey also pushed back on the unlicensed rooms.

347.    Notably, CW1 explained that Tarrant took the notes for the minutes at those Quality Control Meetings and that all documents and minutes "went to corporate" in Vaughan. CW1 stated that the minutes sent to corporate reflected discussions of RG8-RG12, and CW1 confirmed that those discussions that were reflected in the minutes included references to the unlicensed rooms.

348.    In addition, as explained in Section V.B, according to Mr. Lalonde and CW1, CannTrust took affirmative steps to hide the unlicensed growing from Health Canada, which included misleading Health Canada inspectors and hanging up fake walls and curtains in front of

the plants in the unlicensed rooms so it appeared in photographs sent to Health Canada that the rooms were empty.

349.    CannTrust executives—including Defendant Aceto—acknowledged that very fact in an email exchange on November 16, 2018.   Subsequent to a Health Canada inspection, Graham Lee, CannTrust's director of quality and compliance, sent Defendant Aceto an email explaining, "[w]e dodged some bullets," and "[Health Canada] did not ask about RG8E/W, which are unlicensed rooms currently full of plants."   Critically, the email further explicitly mentioned that Defendants had plants in unlicensed rooms: "1) RG8 is not licenced but has plants in it; 2) RG9 is not licenced but we are intending to put plants in it on Monday; 3) PA2A-E are not licenced but we have moved the encapsulation equipment into them and will begin running it next week."   Defendant Paul was then forwarded this email and responded to this email later that same day on November 16, 2018.

350.    Moreover, in addition to growing cannabis in unlicensed rooms in their Niagara Facility, Defendants also stored cannabis in unlicensed rooms in their Vaughan Facility. Defendants ran out of space to store the excess cannabis that Defendants had grown in the unlicensed rooms, and thus chose to store the overflow from the unlicensed rooms in Niagara in other unlicensed rooms at the Company's Vaughan Facility.

351.    Health Canada reprimanded CannTrust for this very practice in August 2019. Specifically, CannTrust announced on August 12, 2019 that Health Canada issued Defendants a report on August 12, 2019 that outlined violations found in the Vaughan Facility.   These violations included, *inter alia*, "[t]he conversion of five rooms from operational areas to storage areas, which were used for storage since June 2018 without prior approval of Health Canada";

and "[t]he construction of two new areas without prior approval of Health Canada, one of which was used to store cannabis since November 2018."

352.    Multiple former CannTrust employees corroborate that much of the overflow cannabis that was grown in the unlicensed Niagara Facility rooms were stored in the unlicensed Vaughan Facility rooms.  For instance, CW3 recalled that some cannabis being stored in the Vaughan Facility was the same cannabis grown in the unlicensed rooms and that there was so much product being sent from the Niagara Facility that CannTrust did not have the capacity in the licensed rooms so CannTrust used the unlicensed rooms to store the excess product.

353.    CW2 similarly recalled that CannTrust had opened up extra areas in the Vaughan Facility to use as storage because it needed it for all the product coming from the Niagara Facility, and that CannTrust knew it was waiting for the licenses to come through from Health Canada but they said "screw it, we are just going to use them."  Additionally, CW2 recalled that there was product coming from the Niagara Facility, and CW2 recounted an example of a room that was supposed to be for packaging but CannTrust was using it for storage of excess dry cannabis.  CW2 further recalled that CannTrust Director of Distribution Luca Rea told CannTrust employees "don't tell anybody . . . we do not have anywhere to put anything."

354.    Finally, as set forth in Section V.B.4, according to former CannTrust employees and internal CannTrust documents, CannTrust obtained and used illegal seeds from the black-market to create additional strains of cannabis and to increase production and then mislabeled the cannabis grown from those seeds as approved and regulated strains.

355.    For example, according to CW5, three of the strains that she was responsible for selling were "cultivated illegally" and came from seeds that were not approved by Health Canada.  CW5 also stated that CannTrust did not go through the proper Health Canada channels

to have those strains become a part of the Company's "assortment."  Specifically, CW5 recalled that "Blueberry Kush" and "Gold Kush" were two of the strains that were cultivated illegally.

356.    CW5 recalled that CannTrust had been growing Gold Kush as early as June 2018. CW5 further explained that at CannTrust, the Blueberry and Gold strains were "snuck in" to their operations and grown at mass.  CW5 stated that CannTrust then sold them without the proper permitting.

357.    Moreover, BNN Bloomberg published an article on September 6, 2019 stating that—according to internal CannTrust documents and four sources directly familiar with the matter—"[s]enior operating staff working at [CannTrust's] Pelham, Ont[ario] facility late last year brought cannabis seeds from the black market into production rooms, leading to some illicitly-grown pot flowing into the legal market."  The documents obtained by BNN Bloomberg "suggest that, in an apparent effort to conceal the black market cannabis seeds from regulatory inspections and other staff members, some CannTrust employees changed the names of as many as 20 strains to those which the [C]ompany was licensed to sell in the legal medical and recreational markets."

358.    The article's sources also explained that "[c]annabis plants from at least two strains that originated from the black market-sourced seeds entered production rooms where they were fully grown to flower, packaged and sold into the recreational market."  The documents indicated that "more than one thousand cannabis plants that originated from the illicit seeds were grown at CannTrust's cultivation facility."  The sources further informed BNN Bloomberg that "[a]dding cannabis seeds obtained through the black market would have allowed CannTrust to significantly bolster its production at a time when it had overcommitted itself with supply contracts with provinces and other licensed marijuana producers."

359.    In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 2.    January 8, 2019 – Form 40-F (Registration Statement)

360.    On January 8, 2019, CannTrust filed with the SEC a Form 40-F registration statement pursuant to Section 12 of the Exchange Act (the "January 8, 2019 Form 40-F), which was signed by Defendant Abramowitz.   Filed with the January 8, 2019 Form 40-F were 130 exhibits.   The January 8, 2019 Form 40-F, through those exhibits, touted that CannTrust was complying with all applicable regulations:

> The Company's operations are subject to various laws, regulations and guidelines relating to the manufacture, management, transportation, storage and disposal of medical cannabis as well as laws and regulations relating to health and safety, the conduct of operations and the protection of the environment.   To the knowledge of management, other than the requirement that the Company make routine corrections that may be required by Health Canada from time to time, ***the Company is currently in compliance with all such laws***.

361.    Similarly, the January 8, 2019 Form 40-F stated:

> Health Canada conducts ad hoc, unscheduled site inspections of Licensed Producers. CannTrust Opco has experienced these inspections at its Vaughan Facility on a monthly basis.   CannTrust Opco has responded to and complied with all requests from Health Canada within the time frames indicated in such requests.   ***As of the date hereof, there are no outstanding inspection issues with Health Canada beyond day- to- day adjustments that may occur in order to ensure ongoing compliance.***

362.    The January 8, 2019 Form 40-F further stated that "[t]he Company believes that it currently holds or has applied for all necessary licences and permits to carry on the activities

which it is ***currently conducting under applicable laws and regulations,*** and also ***believes that it is complying in all material respects with the terms of such licences and permits***."

363.    The January 8, 2019 Form 40-F also purported to warn that "***[t]he failure of the Company to obtain and maintain the applicable licenses and amendments thereto would have a material adverse impact upon the Company.***"

364.    Defendants' statements concerning being in compliance with all applicable regulations and the Company's purported risk factors *should* it fail to comply with applicable regulations were materially false and misleading for the same reasons set forth in paragraphs 340-358.

365.    In addition, even if Defendants' purported risk factor was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.  Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

366.    Moreover, Defendants' purported warning was materially false and misleading because it was misleading for Defendants to issue a warning that failing to "obtain and maintain applicable licenses" *would* adversely impact CannTrust when Defendants already knew, or were reckless in not knowing, that CannTrust was already failing to comply with applicable licenses.

367.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts,

which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

**3.      March 1, 2019 – Registration Statement**

368.     On March 1, 2019, CannTrust filed a Registration Statement on Form 10-F with the SEC for a proposed offering of securities (the "Registration Statement").  The Registration Statement was signed by Defendants Aceto, Guyatt, Dawber, Paul, Sanders, Kaden, Page, Litwin, and Marcovitch.

369.     The Registration Statement touted that the Company was not violating any regulations at the time the statement was made: "***The Company believes that, as of the date of this Prospectus, it is in material compliance with all laws and regulations***."

370.     The Registration Statement further stated:

*Any delays or complications in obtaining regulatory approvals, as well as failure to obtain any regulatory approvals, may have a material adverse effect on the business of the Company and result in additional costs.*

*Achievement of the Company's business objectives is contingent, in part, upon compliance with regulatory requirements enacted by governmental authorities and obtaining all regulatory approvals, where necessary for the sale of its product.*  The Company may not be able to accurately predict the impact of the compliance regime Health Canada is implementing for the Canadian medical and recreational cannabis industry.  Similarly, the Company may not be able to accurately predict the time required to secure all appropriate regulatory approvals for its product, or the extent of testing and documentation that may be required by governmental authorities.  ***The impact of Health Canada's compliance regime, any delays in obtaining, or failure to obtain, regulatory approvals may significantly delay or impact the development of markets, products and sales initiatives and could have a material adverse effect on the business, results of operations and financial condition of the Company.***

371.     Defendants' statements that the Company was *"in material compliance with all laws and regulations"* and concerning the Company's purported risk factors should it fail to comply with applicable regulations were materially false and misleading for the same reasons set forth in paragraphs 340-358.

372.     In addition, even if Defendants' purported warnings were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.  Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

373.     Moreover, Defendants' purported warnings were materially false and misleading because it was misleading for Defendants to issue a warning that CannTrust *may* or *could* face the risk of adverse consequences if Defendants fail to comply with applicable regulations when Defendants already knew, or were reckless in not knowing, that CannTrust was already failing to comply with applicable regulations and had already faced the risk of having its licenses suspended from Health Canada.

374.     To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

### 4.      March 18, 2019 – Amended Registration Statement

375.     On March 18, 2019, the Company filed with the SEC an amendment to the Registration Statement on Form F-10/A (the "Amended Registration Statement").  The Amended Registration Statement was signed by Defendants Aceto, Guyatt, Dawber, Paul, Sanders, Kaden, Page, Litwin, and Marcovitch.  On March 19, 2019, the SEC declared the Amended Registration Statement effective.

376.     Like the Registration Statement, the Amended Registration Statement similarly touted that "*[t]he Company believes that, as of the date of this Prospectus, it is in material compliance with all laws and regulations summarized below*" and stated:

> *Any delays or complications in obtaining regulatory approvals, as well as failure to obtain any regulatory approvals, may have a material adverse effect on the business of the Company and result in additional costs.*
>
> *Achievement of the Company's business objectives is contingent, in part, upon compliance with regulatory requirements enacted by governmental authorities and obtaining all regulatory approvals, where necessary for the sale of its product.* The Company may not be able to accurately predict the impact of the compliance regime Health Canada is implementing for the Canadian medical and recreational cannabis industry.  Similarly, the Company may not be able to accurately predict the time required to secure all appropriate regulatory approvals for its product, or the extent of testing and documentation that may be required by governmental authorities. *The impact of Health Canada's compliance regime, any delays in obtaining, or failure to obtain, regulatory approvals may significantly delay or impact the development of markets, products and sales initiatives and could have a material adverse effect on the business, results of operations and financial condition of the Company.*

377.     The Amended Registration Statement also purported to warn that "any expansion of the Niagara Facility is subject to Health Canada regulatory approvals. *The delay or denial of such approvals may have a material adverse impact on the business of the Company and may result in the Company not meeting anticipated or future demand when it arises.*"

378.     The Amended Registration Statement also stated: "*The Company is required to obtain and maintain certain permits, licenses or other approvals from regulatory agencies* in countries and markets outside of Canada in which it operates, or to which it exports, in order to produce or export to, and sell its medical products in, these countries, including, in the case of certain countries, the ability to demonstrate compliance with Good Manufacturing Practices ("GMP"). *There can be no assurance that the Company will be able to comply with these standards.*"

379.    Defendants' statements that the Company was *"in material compliance with all laws and regulations"* and concerning the Company's purported risk factors should it fail to comply with applicable regulations were materially false and misleading for the same reasons set forth in paragraphs 340-358.

380.    In addition, even if Defendants' purported warnings were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.  Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

381.    Moreover, Defendants' purported warnings were materially false and misleading because it was misleading for Defendants to issue a warning that CannTrust *may* or *could* face the risk of adverse consequences if Defendants fail to comply with applicable regulations when Defendants already knew, or were reckless in not knowing, that CannTrust was already failing to comply with applicable regulations and had already faced the risk of having its licenses suspended from Health Canada.

382.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

**5.    March 28, 2019 – Press Release and 2018 Form 40-F**

383.    On March 28, 2019, CannTrust issued a press release, attached to a Form 6-K signed by Defendant Guyatt and dated that same day, announcing its financial results for the

fourth quarter of 2018.  The March 28, 2019 press release explained to investors the Company's "expect[ation] to increase production capacity to 50,000kg on an annualized basis," and notably, that the "*Company is positioned to receive all necessary regulatory approvals to support this planned growth.*"

384.    Also on March 28, 2019, CannTrust filed with the SEC its 2018 Form 40-F, which was signed by Defendant Guyatt and accompanied by certifications signed by Defendants Aceto and Guyatt, in which Defendants represented: "*As of the date hereof, there are no outstanding inspection issues with Health Canada beyond day-to-day adjustments that may occur in order to ensure ongoing compliance.*"

385.    Notably, the 2018 Form 40-F touted that the "*Company believes that it currently holds or has applied for all necessary licences and permits to carry on the activities which it is currently conducting under applicable laws and regulations, and also believes that it is complying in all material respects with the terms of such licences and permits.*"

386.    The 2018 Form 40-F further stated that "*[f]ailure to comply with regulations may result in additional costs for corrective measures, penalties or restrictions on the Company's operations.*"

387.    The 2018 Form 40-F further stated that "*any expansion of the Niagara Facility is subject to Health Canada regulatory approvals.*"   Furthermore, despite knowing that once Health Canada discovered the growing in the five unlicensed rooms, they would lose approval to continue operations and not meet demand, Defendants stated, "*[t]he delay or denial of such approvals may have a material adverse impact on the business of the Company and may result in the Company not meeting anticipated or future demand when it arises*."

388.    Similarly, the 2018 Form 40-F touted that "*[t]he Company distributes its recreational cannabis products in accordance with the federal and provincial regulatory frameworks.*"

389.    Defendants' statements concerning complying with Health Canada regulations were materially false and misleading for the same reasons set forth in paragraphs 340-358.

390.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

391.    Moreover, Defendants' purported warnings were materially false and misleading because it was misleading for Defendants to issue a warning that CannTrust *may* face the risk of adverse consequences if Defendants fail to comply with applicable regulations when Defendants already knew, or were reckless in not knowing, that CannTrust was already failing to comply with applicable regulations and had already faced the risk of having its licenses suspended from Health Canada.

392.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

### 6.   April 8, 2019 – Press Release

393.   On April 8, 2019, within CannTrust's press release, which was attached to a Form 6-K signed by Defendant Guyatt and dated that same day, announcing that its Pelham Facility became fully licensed, Defendant Aceto touted CannTrust's ability to always "meet and exceed regulatory standards":

> *We have always been confident that our processes meet and exceed regulatory standards, and we now have further validation of this from our regulators* . . . . With this approval, CannTrust is set to meet its plan to reach 50,000kg of annualized capacity at the perpetual harvest greenhouse and continue providing award-winning products in a cost-effective manner.

394.   Defendant Aceto's statement that "[w]e have always been confident that our processes meet and exceed regulatory standards, and we now have further validation of this from our regulators," was materially false and misleading for the same reasons set forth in paragraphs 340-358.

### 7.   April 22, 2019 – Preliminary Prospectus

395.   On April 22, 2019, CannTrust filed a Preliminary Prospectus Supplement (the "Preliminary Prospectus") with the SEC, which preliminarily announced offering an aggregate of $200 million of common shares but did not set an offering price.

396.   The Preliminary Prospectus touted: "*The Company believes that, as of the date of this Prospectus, it is in material compliance with all laws and regulations.*"

397.   The Preliminary Prospectus further touted that "[w]ith [The Company's] increased production capability, we believe revenue will increase significantly in 2019 compared to the 2018 full year results, with revenue growth accelerating throughout the year starting in the second quarter of 2019.  *We are positioned to receive all necessary regulatory approvals to support this planned growth*."

398.    The Preliminary Prospectus also stated that "[w]e operate only in countries where

cannabis is legal and *abide by applicable federal, state and provincial laws.*"

399.    Furthermore, the Preliminary Prospectus stated:

*Any delays or complications in obtaining regulatory approvals, as well as failure to obtain any regulatory approvals, may have a material adverse effect on the business of the Company and result in additional costs.*

*Achievement of the Company business objectives is contingent, in part, upon compliance with regulatory requirements enacted by governmental authorities and obtaining all regulatory approvals, where necessary for the sale of its product.*  The Company may not be able to accurately predict the impact of the compliance regime Health Canada is implementing for the Canadian medical and recreational cannabis industry.  Similarly, the Company may not be able to accurately predict the time required to secure all appropriate regulatory approvals for its product, or the extent of testing and documentation that may be required by governmental authorities.  *The impact of Health Canada's compliance regime, any delays in obtaining, or failure to obtain, regulatory approvals may significantly delay or impact the development of markets, products and sales initiatives and could have a material adverse effect on the business, results of operations and financial condition of the Company.*

400.    The Preliminary Prospectus further stated:

*A significant failure of our site security measures and other facility requirements, including any failure to comply with regulatory requirements, could have an impact on our ability to continue operating under the Cannabis Licences or our prospects of renewing the Cannabis Licences, and could also result in a suspension or revocation of the Cannabis Licences.*  As we currently produce our cannabis products only at the Niagara Facility *any event impacting our ability to continue production there, or requiring us to delay production, would prevent us from continuing to operate our business* until operations at the Niagara Facility could be resumed, or until we were able to commence production at another facility.

401.    Moreover, the Preliminary Prospectus stated that "any expansion of the Niagara

Facility is subject to Health Canada regulatory approvals.  *The delay or denial of such approvals*

*may have a material adverse impact on our business and may result in us not meeting*

*anticipated or future demand when it arises*."

402.    Defendants' statements that the Company was "in material compliance with all

laws and regulations," that "[w]e are positioned to receive all necessary regulatory approvals,"

that "[we] abide by applicable federal, state and provincial laws," and concerning the Company's purported risk factors should it fail to comply with applicable regulations were materially false and misleading for the same reasons set forth in paragraphs 340-358.

403.   In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

404.   Moreover, Defendants' purported warnings were materially false and misleading because it was misleading for Defendants to issue a warning that CannTrust *may* or *could* face the risk of adverse consequences if Defendants fail to comply with applicable regulations when Defendants already knew, or were reckless in not knowing, that CannTrust was already failing to comply with applicable regulations and had already faced the risk of having its licenses suspended from Health Canada.

405.   To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

### 8.   May 3, 2019 – Prospectus Supplement

406.   On May 3, 2019, CannTrust filed a Prospectus Supplement (the "Prospectus Supplement"), announcing its offering of 36,363,636 shares of common stock, which includes

the Cannamed and Cajun offering of 5,454,545 shares of common stock, at an offering price of $5.50 per share.

407.    The Prospectus Supplement touted that "[w]ith [The Company's] increased production capability, we believe revenue will increase significantly in 2019 compared to the 2018 full year results, with revenue growth accelerating throughout the year starting in the second quarter of 2019. *We are positioned to receive all necessary regulatory approvals to support this planned growth.*"

408.    The Prospectus Supplement also stated that "*[f]ailure to comply with regulations may result in additional costs for corrective measures, penalties or restrictions on our operations.*"

409.    The Prospectus Supplement further stated that "any expansion of the Niagara Facility is subject to Health Canada regulatory approvals. *The delay or denial of such approvals may have a material adverse impact on our business and may result in us not meeting anticipated or future demand when it arises.*"

410.    The Prospectus Supplement also touted that "[w]e operate only in countries where cannabis is legal and *abide by applicable federal, state and provincial laws.*"

411.    The Prospectus Supplement also purported to warn:

> *Any delays or complications in obtaining regulatory approvals, as well as failure to obtain any regulatory approvals, may have a material adverse effect on the business of the Company and result in additional costs.*
>
> *Achievement of the Company business objectives is contingent, in part, upon compliance with regulatory requirements enacted by governmental authorities and obtaining all regulatory approvals, where necessary for the sale of its product.* The Company may not be able to accurately predict the impact of the compliance regime Health Canada is implementing for the Canadian medical and recreational cannabis industry. Similarly, the Company may not be able to accurately predict the time required to secure all appropriate regulatory approvals for its product, or the extent of testing and documentation that may be required by governmental authorities. *The impact of Health*

*Canada's compliance regime, any delays in obtaining, or failure to obtain, regulatory approvals may significantly delay or impact the development of markets, products and sales initiatives and could have a material adverse effect on the business, results of operations and financial condition of the Company.*

412.    Similarly, the Prospectus Supplement stated:

*A significant failure of our site security measures and other facility requirements, including any failure to comply with regulatory requirements, could have an impact on our ability to continue operating under the Cannabis Licences or our prospects of renewing the Cannabis Licences, and could also result in a suspension or revocation of the Cannabis Licences.* As we currently produce our cannabis products only at the Niagara Facility *any event impacting our ability to continue production there, or requiring us to delay production, would prevent us from continuing to operate our business* until operations at the Niagara Facility could be resumed, or until we were able to commence production at another facility.

413.    Defendants' statements that "[w]e are positioned to receive all necessary regulatory approvals to support this planned growth," that "[we] abide by applicable federal, state and provincial laws," and concerning their purported risk warnings were materially false and misleading for the same reasons set forth in paragraphs 340-358.

414.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.  Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

415.    Moreover, Defendants' purported warnings were materially false and misleading because it was misleading for Defendants to issue a warning that CannTrust *may* or *could* face the risk of adverse consequences if Defendants fail to comply with applicable regulations when Defendants already knew, or were reckless in not knowing, that CannTrust was already failing to

comply with applicable regulations and had already faced the risk of having its licenses suspended from Health Canada.

416.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

**B.    Defendants Misled Investors Each Time They Touted Their Successful Increased Capacity and Expansion**

417.    During the Class Period, Defendants also repeatedly touted CannTrust's success and growth to investors, and attributed that success and growth to the increased capacity and expansion of the Niagara Facility.  In doing so, Defendants led investors to believe that the Company was in position to meet the surge in demand and become a market leader in recreational and medicinal cannabis sales.  However, Defendants failed to disclose the material fact that the real reason the Company was in position to meet increased demand was because of the increased production capacity from growing and storing of cannabis in unlicensed rooms and use of black-market seeds.

418.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.  Specifically, Defendants failed to disclose that they were obtaining seeds from the black market, and after October 2018, were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 1.   June 26, 2018 – Press Release

419.   On June 26, 2018, CannTrust issued a press release applauding the granting of Royal Assent to Bill C-45, *the Cannabis Act*.  The press release further explained, "[w]ith Royal Assent received, the legislation legalizing cannabis for adult consumer use has now passed its final official step, and retail sales are to commence on October 17, 2018, as announced by Canada's federal government."

420.   In light of the upcoming legalization of recreational cannabis in Canada, Defendant Rogers touted: "***CannTrust is excited and well-positioned to enter this new marketplace and has the production capacity and infrastructure together with standardized products with precise label claims indicating the exact dosage, to immediately begin fulfilling adult consumer use market orders on a national level.***"

421.   Similarly, the June 26, 2018 press release quoted Defendant Rogers: "[w]hile the federal government has recently announced the commencement date for adult consumer use, CannTrust has been working towards this date for a very long time.  ***We are well positioned for this rapid growth with our new product offerings, infrastructure, research and development and staffing.***"

422.   Defendants' statements above were materially false and misleading because as far back as June 2018, Defendants had been skirting Health Canada regulations to attempt to keep up with actual and anticipated demand for cannabis.  Defendants at every turn tried to increase growing capacity and supply of their cannabis to get ready for the upcoming legalization of recreational cannabis in October 2018.

423.   For example, set forth in Section V.B.4, according to former CannTrust employees and internal CannTrust documents, CannTrust obtained and used illegal seeds from the black-market to create additional strains of cannabis and to increase production.

424.     According to CW5, three of the strains that she was responsible for selling were "cultivated illegally" and came from seeds that were not approved by Health Canada.  CW5 also stated that CannTrust did not go through the proper Health Canada channels to have those strains become a part of the Company's "assortment."   Specifically, CW5 recalled that "Blueberry Kush" and "Gold Kush" were two of the strains that were cultivated illegally.

425.     CW5 recalled that CannTrust had been growing Gold Kush as early as June 2018.  CW5 further explained that at CannTrust, the Blueberry and Gold strains were "snuck in" to their operations and grown at mass.  CW5 stated that CannTrust then sold them without the proper permitting.

426.     Moreover, BNN Bloomberg published an article on September 6, 2019 stating that—according to internal CannTrust documents and four sources directly familiar with the matter—"[s]enior operating staff working at [CannTrust's] Pelham, Ont[ario] facility late last year brought cannabis seeds from the black market into production rooms, leading to some illicitly-grown pot flowing into the legal market."  The documents obtained by BNN Bloomberg "suggest that, in an apparent effort to conceal the black market cannabis seeds from regulatory inspections and other staff members, some CannTrust employees changed the names of as many as 20 strains to those which the Company was licensed to sell in the legal medical and recreational markets."

427.     The article's sources also explained that "[c]annabis plants from at least two strains that originated from the black market-sourced seeds entered production rooms where they were fully grown to flower, packaged and sold into the recreational market."  The documents indicated that "more than one thousand cannabis plants that originated from the illicit seeds were grown at CannTrust's cultivation facility."  The sources further informed BNN Bloomberg that

"[a]dding cannabis seeds obtained through the black market would have allowed CannTrust to significantly bolster its production at a time when it had overcommitted itself with supply contracts with provinces and other licensed marijuana producers."

428.   Additionally, as set forth in Section V.B.1-3, in light of Defendants' increased production of cannabis grown from illegal seeds, Defendants then stored their illegally grown cannabis in unlicensed rooms within their Vaughan Facility since at least June 2018.  Indeed, Defendants were later reprimanded by Health Canada for the conversion of five rooms from operational areas to storage areas, which were used for storage since June 2018 without prior approval of Health Canada.

429.   In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.  Specifically, Defendants failed to disclose that they were obtaining seeds from the black market, and in light of this direct violation of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 2.      July 13, 2018 – Press Release

430.   On July 13, 2018, CannTrust issued a press release, which was filed with SEDAR on July 16, 2018.  Within the July 13, 2018 press release, Defendant Rogers stated that "[t]his is just the beginning for CannTrust!  *We are now a trusted, primary supplier in British Columbia, Alberta and Manitoba, thanks to our unparalleled product quality, value, innovations and proven expertise*."

431.   Defendant Rogers' above statement was materially false and misleading for the same reasons set forth in paragraphs 417-418 and 422-428.

432.   Additionally, as of June 2018, CannTrust was growing cannabis from black-market seeds and then mislabeling the cannabis as an approved and regulated strain.

Accordingly, Defendant Rogers' statement boasting about being a *"trusted, primary supplier"* and having "*unparalleled product quality, value, innovations* and proven expertise" was false and misleading because CannTrust was not a trusted supplier and did not provide unparalleled product quality and value when their product was, in reality, mislabeled and sold its customers a different product that the Company was advertising.

### 3.    August 14, 2018 – Letter to Shareholders

433.    On August 14, 2018, CannTrust filed with SEDAR a letter to the shareholders from Defendant Paul that touted the Company's financial success.  For example, the letter stated that "*[w]e continue to experience dynamic growth in all areas of the Company as we execute our business plan aimed at being a market leader and innovator in the development of products and services* to better serve our patients and physicians."

434.    Defendant Paul's above statement was materially false and misleading for the same reasons set forth in paragraphs 417-418, 422-428, and 432.

435.    In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.  Specifically, Defendants failed to disclose that they were obtaining seeds from the black market, and in light of this direct violation of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 4.    August 14, 2018 – Press Release

436.    On August 14, 2018, CannTrust issued a press release, which was filed with SEDAR that same day.  Within the August 14, 2018 press release, Defendant Rogers touted that "*[o]perating a facility of this scale, CannTrust is well-positioned to meet the increased Canadian and global demand for cannabis*."

437.   Defendant Rogers' above statement was materially false and misleading for the same reasons set forth in paragraphs 417-418, 422-428, and 432.

438.   In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.  Specifically, Defendants failed to disclose that they were obtaining seeds from the black market, and in light of this direct violation of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 5.   August 21, 2018 – Press Release

439.   On August 21, 2018, CannTrust issued a press release, which was filed with SEDAR that same day, announcing that the Company "has signed an agreement with the Ontario Cannabis Retail Corporation (OCRC), operating as the Ontario Cannabis Store (OCS), to supply a broad range of adult-use products from all three of the Company's new recreational cannabis brands – liiv, Xscape and Synr.g."  Within the August 21, 2018 press release, Defendant Rogers stated that "*[o]ur top-of-the-line greenhouse facility, processing operations and distribution network*, all based in Ontario, *ideally position us to grow rapidly to meet the demand* within the province and across the country."

440.   Defendant Rogers' above statement was materially false and misleading for the same reasons set forth in paragraphs 417-418, 422-428, and 432.

### 6.   August 22, 2018 – Press Release

441.   On August 22, 2018, CannTrust issued a press release, which was filed with SEDAR that same day, introducing three new recreational cannabis brands.  The August 22, 2018 press release stated that "[t]hese three new brands were cultivated by Canada's first pharmacist-operated and licensed producer, CannTrust.  With four years as a trusted provider of

cannabis, ***CannTrust brings its high quality, trusted and standardized products to the liiv, Synr.g and Xscape brands to provide products that are of the highest quality*** and best flavor."

442.    The August 22, 2018 press release further explained, "***[w]hen developing a new strain, CannTrust's expert cultivation team plants hundreds of seeds, monitoring the plants from seedling through to full flower and selecting only the varieties with high terpene levels and the right amount of THC and CBD as the mother plant for all future products.***"

443.    Defendants' statements above were materially false and misleading for the same reasons set forth in paragraphs 417-418, 422-428, and 432.  Indeed, at that time liiv, Synr.g and Xscape represented CannTrust's only three brands of cannabis.  Accordingly, the cannabis sold under those brand names included cannabis that was grown and stored in unlicensed rooms as well as cannabis that was grown and sold from black-market seeds and then sold under these brand names rendering Defendants statements boasting about providing products of the highest quality" and "developing a new strain" were false and misleading.

444.    In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.  Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 7.    September 13, 2018 – Press Release

445.    On September 13, 2018, CannTrust issued a press release, which was filed with SEDAR that same day, announcing "***supply agreements with Nova Scotia, New Brunswick, Prince Edward Island and Newfoundland. . . and has a long-term strategy to be a market***

*share leader in the Canadian recreational space.*"   The September 13, 2018 press release further touted, "*[b]eginning October 17, Canadians from coast-to-coast will have access to CannTrust's quality, standardized cannabis products grown in the [C]ompany's Niagara, Ontario perpetual harvest facility, which is setting new industry standards for product excellence and cost effectiveness.*"

446.   Defendants' above statements were materially false and misleading for the same reasons set forth in paragraphs 417-418, 422-428, and 432.

447.   In addition, the supply agreements CannTrust was touting were based on the sale of illicitly grown and stored cannabis and/or from the use of black-market seeds.  Accordingly, such supply agreements were based on false information and conveyed cannabis for which CannTrust lacked legal title and, as set forth in Section V.C.4 was not entitled to transfer.

### 8.   October 1, 2018 – Press Release

448.   On October 1, 2018, CannTrust issued a press release, which was filed with SEDAR that same day, announcing the appointment of Defendant Aceto as CEO.  Within the October 1, 2018 press release, Defendants touted, "*CannTrust is a front-runner in the industry and perfectly positioned to continue its exponential growth in Canada and abroad following the legislative changes set to become effective in Canada on October 17th*."

449.   Defendants' above statement was materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, and 432.

450.   In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of

these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 9.    October 10, 2018 – Press Release

451.    On October 10, 2018, CannTrust issued a press release, which was filed with SEDAR that same day, introducing a fourth recreational brand, Peak Leaf.  The October 10, 2018 press release explained, "*[w]hen developing a new strain, CannTrust's expert cultivation team plants hundreds of seeds, monitoring the plants from seedling through to full flower* and selecting only the varieties with terpene levels and the right amount of THC and CBD as the mother plant for all future products."

452.    Defendants' above statement was materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, 432, and 443.

453.    In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 10.    November 14, 2018 – MD&A and 3Q 2018 Earnings Call

454.    On November 14, 2018, Defendants issued a MD&A based on information available to CannTrust management as of November 13, 2018, which was filed with SEDAR that same day.  Filed with the November 14, 2018 MD&A were Form 52-109F2 Certifications of Interim Filings signed by Defendants Aceto and Abramowitz, which indicated that they "reviewed the interim financial report and interim MD&A (together, the 'interim filings')," and

that "having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings."

455.    The November 14, 2018 MD&A stated that "[t]he Company received its Health Canada Sales License for the Perpetual Harvest Facility in February 2018" and the "***planned Phase 2 expansion at the Perpetual Harvest Facility is progressing as planned and is nearing completion***."

456.    The November 14, 2018 MD&A further stated: "***With the completion of all phases of the Niagara expansion, the Company will have the ability to supply a substantial share of the increased demand arising from international markets.***"

457.    Also on November 14, 2018, Defendants held a conference call discussing the earnings results for the third quarter of 2018 ("3Q 2018 Earnings Call").  During the 3Q 2018 Earnings Call, with respect to the increased demand for cannabis created by the legalization of recreational cannabis in Canada, Defendant Aceto explained to investors that "***we have taken steps to add some additional laboratory partners to try and manage that***" and are "certainly very optimistic about the way our products have been received and ***our ability to deliver***."

458.    Defendants' statements that the Niagara Facility's Phase 2 expansion was "progressing as planned and [] nearing completion," that the "Company will have the ability to supply a substantial share of the increased demand" once Phase 2 was complete, and that Defendants were optimistic about their "ability to deliver" and implementing steps and plans to meet demand for their cannabis products, including by "add[ing] some additional laboratory

partners," were materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, and 432.

459.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

460.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

### 11.    December 19, 2018 – Press Release

461.    On December 19, 2018, CannTrust issued a press release, which was filed with SEDAR that same day, updating investors on the Company's newly built 35,000 sq. ft. greenhouse facility adjacent to its current greenhouse in Pelham.   The press release further explained that, "*[g]iven the very high demand for the Company's medical and recreational products, CannTrust had been considering many alternatives to increase capacity beyond the Phase III expansion*, prior to the enactment of this bylaw."   To that end, in that press release, Defendant Aceto proceeded to reassure investors that the Company had no issues meeting demand by using its other greenhouses: "*The use of other greenhouses and outdoor crop production are both viable options that can help us meet our production targets*.   If developments change our production targets, we plan to communicate that with investors."

143

462.    Defendants' above statement was materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, and 432.

463.    In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 12.    January 9, 2019 – Interview

464.    In an interview with Global Edmonton News Morning on January 9, 2019, Defendant Aceto touted to investors that despite Health Canada's extensive regulatory requirements, the Company was setting new production records every week.   For example, Defendant Aceto explained that "demand was way beyond what any of us have imagined, so we're all certainly at CannTrust we're working very, very hard to optimize our processes; we've had a lot of rules and regulations that we have to comply with."   Defendant Aceto continued to tout that "***every single week that goes by, we're getting new records in terms of what we're getting out and so it is getting better all the time, and I think you can expect that improvement to continue.***"

465.    Defendant Aceto's statement that "every single week that goes by, we're getting new records in terms of what we're getting out and so it is getting better all the time, and I think you can expect that improvement to continue" was materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, and 432.

466.    In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

467.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

### 13.    January 22, 2019 – Press Release

468.    On January 22, 2019, CannTrust issued a press release, which was filed with SEDAR that same day, that similarly touted that "*[t]he fully-permitted Phase II expansion remains on course to bring the Company's capacity to 50,000 kg per year.  CannTrust expects first harvest from the Phase II expansion in Q1/19.  Construction of the final range should be complete by the end of January 2019.*"

469.    Defendants' statements that "[t]he fully-permitted Phase II expansion remains on course to bring the Company's capacity to 50,000 kg per year," that "CannTrust expects first harvest from the Phase II expansion in Q1/19," and that "[c]onstruction of the final range should be complete by the end of January 2019," were materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, and 432.

470.    In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their

statement misleading. Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

471. To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

> **14. March 28, 2019 – 2018 Form 40-F, Press Release, 2018 Q4 Earnings Call**

472. On March 28, 2019, CannTrust filed with the SEC its 2018 Form 40-F, which was signed by Defendant Guyatt and accompanied by certifications signed by Defendants Aceto and Guyatt, in which Defendants stated: The 2018 Form 40-F further stated "*[w]ith the completion of all phases of the Niagara expansion, the Company believes it ha[s] the ability to supply a substantial share of the increased demand arising from international markets*."

473. The 2018 Form 40-F further stated: "*The redeveloped Perpetual Harvest Facility provides the Company with increased production capacity to meet growing market demand.*"

474. The 2018 Form 40-F further stated: "At December 31, 2018, it is expected the Company's *biological assets will yield, net of waste, approximately 13,926,974 grams (December 31, 2017- 1,911,972 grams) of biological produce, with net selling prices ranging from $2.92 to $12.00 per gram*."

475.     The 2018 Form 40-F further stated: "As at [sic] December 31, 2018, the Company *held 4,471,032 grams of dry cannabis (December 31, 2017 – 626,935) and 6,887,849 grams of extracts (December 31, 2017 – 977,186)*."

476.     The 2018 Form 40-F further stated: "For the three months ended December 31, 2018, *harvested production was 4,816 kg, a 712% increase from the 593 kg in the comparable 2017 period*."

477.     The 2018 Form 40-F further stated: "2018 Full Year Highlights . . . *Sold 7,251 kg of dried Cannabis and dried Cannabis equivalent* at an average net price of $6.29 per gram."

478.     The 2018 Form 40-F further stated: "2018 Fourth Quarter Highlights . . . *Sold 3,407 kg of dried Cannabis and dried Cannabis equivalent* at an average net price of $4.75 per gram."

479.     The 2018 Form 40-F also falsely represented that CannTrust's revenue was increasing, and that the increase was due to organic customer growth and sales: "Revenue for the quarter ended December 31, 2018 was $16,166 compared to $6,983 for the comparable 2017 period, an increase of 132%.   Revenue for the year ended December 31, 2018 was $45,645 compared to $20,698 in the comparable 2017 period, an increase of 121%.   *The increase in revenue in the quarter and year ended December 31, 2018 was primarily attributable to increased sales volume due to the growth in the Company's medical patient base from approximately 37,000 at December 31, 2017 to 58,000 as at December 31, 2018, as well as sales derived from the Company's new domestic and international wholesale revenue streams, which includes sales to the provinces related to the legalization of the adult-use recreational market.*"

480.     The 2018 Form 40-F further stated: "*The total quantity of medical cannabis sold to patients during the three months ended December 31, 2018 increased to 2,017 kg, a 166% from the comparable 2017 period.  For the full year 2018, the [C]ompany sold 5,372 kg of medical cannabis, an increase of 141% from the comparable 2017 period.*"

481.     The 2018 Form 40-F further stated: "Cost of goods sold during the three and twelve months ended December 31, 2018 were $10,489 and $19,690, respectively, compared to $4,577 and $7,680 in the comparable prior year periods.  Costs of goods sold includes pre-harvest production, post-harvest production and processing costs of cannabis, packaging, testing and inventory purchased from third parties.  *Costs of goods sold during the three and twelve months ended December 31, 2018 increased compared to the comparable 2017 periods due to increases in sales quantities and the associated increase in the scale of production activities.*"

482.     The 2018 Form 40-F further stated: "Gross profit/(loss) for the three and twelve months ended December 31, 2018 was a loss of $8,282 and profit of $36,493, respectively, compared a gross profit of $11,036 and $23,980 in the comparable prior year periods . . . . *The increase in gross profit in 2018 compared to 2017 was principally due to the increase in sales.*"

483.     The 2018 Form 40-F further stated: "Excluding the impact of the change in the fair value of biological assets, gross profit for the three and twelve months ended December 31, 2018 was $5,677 and $25,955, respectively, compared to a gross profit of $2,406 and $13,018 in the comparable prior year periods.  *The increase in gross profit excluding the impact of the change in the fair value of biological assets was as a result of increased scale of operations.*"

484.     The 2018 Form 40-F further stated: "[2018 Full Year Highlights:] *Record annual revenue of $45,645, a 132% increase from 2017* . . . . 2018 Fourth Quarter Highlights . . . *Record quarterly revenues of $16,166*, a 28% increase from third quarter of 2018."

485.     Furthermore, on March 28, 2019, CannTrust issued a press release, attached to a Form 6-K signed by Defendant Guyatt and dated that same day, announcing its financial results for the fourth quarter of 2018.  Without ever mentioning that the Company was growing in five unlicensed rooms which attributed to CannTrust's growth, Defendant Aceto touted within the March 28, 2019 press release that the "***CannTrust team has delivered remarkable growth in the fourth quarter of 2018***."

486.     Likewise the press release touted: "[n]et revenue for the fourth quarter of 2018 increased to $16.2 million from $7.0 million in the fourth quarter of 2017," and continued to explain that the "***increase in revenue was attributable to increased sales volumes primarily due to the continued growth in the Company's medical patient base and sales derived from the recreational market in Canada.***"

487.     Defendants' statements within the 2018 Form 40-F and March 28, 2019 press release concerning the Company's ability to increase growing capacity, and the misattributions for the Company's successful revenue, assets and inventory growth were materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, and 432.

488.     The 2018 Form 40-F similarly represented that CannTrust would increase its production and profitability once the Phase 2 expansion was complete, stating: "The Company owns and operates an approximately 450,000 square foot perpetual harvest facility in the Niagara region (the "Perpetual Harvest Facility"), which is ***expected to have an annual capacity of approximately 50,000 kilograms***.  The planned Phase 3 expansion is expected to increase the annual capacity of the Perpetual Harvest Facility to 100,000 kilograms upon its completion."

489.     The 2018 Form 40-F further stated: "***Profitability is expected to improve following the full realization of the increased operational capacity of the Phase 2 expansion***.

149

As the Phase 2 expansion contributes to positive operating leverage, the Company is targeting a return to profitability."

490.    The 2018 Form 40-F further stated: "***The Phase II expansion remains on course to bring the Company's capacity to 50,000 kg per year.***"

491.    Defendant Aceto further told investors in the March 28, 2019 press release: "***We expect the trajectory of revenue growth to continue in 2019 as we bring additional capacity online through our Phase 2 expansion.***"

492.    During the 4Q 2018 Earnings Call, Defendant Aceto explained, "***[w]e have completed the construction of our Phase 2 perpetual harvest greenhouse facility in Pelham, which should bring our capacity to 50,000 kilograms on an annualized basis.***"

493.    Similarly, with respect to an analyst's question of "what proportion of full capacity did you achieve by the end of fourth quarter," Defendant Aceto stated during the 4Q 2018 Earnings Call:

> I don't know, that's a challenging question to ask.  Just our -- ***when we get our final rooms licensed in Phase 2, we'll be at 50,000 kilograms annualized, but we brought room systematically online as we've continued to build Phase 2.***  So I think that number has changed.  And ***actually Phase 2, for much of the case, the output that we sold in Q4 did not primarily come from plants grown in Phase 2.***

494.    The 2018 Form 40-F further represented that "CannTrust Opco has an extensive genetic strain bank and ***currently produces approximately eight core strains***.  The strains have been optimized for greenhouse horticultural practices."

495.    Defendants' above statements were materially false and misleading for the reasons set forth in paragraphs 340-358, 417-418, 422-428, 432, and 443.

496.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their

statements misleading.  Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

497.     To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

**C.     Defendants Continued to Mislead Investors Regarding the Increased Capacity After Health Canada Licensed the Previously Unlicensed Growing Rooms in April 2019**

498.     In early April 2019, CannTrust announced that its Niagara Facility became fully licensed by Health Canada.  Yet, although newly recognized by Health Canada as rooms that Defendants could properly grow cannabis in, nothing changed for CannTrust because prior to receiving the licenses in April 2019, Defendants had already been growing in those rooms since October 2018.  Yet, each time that Defendants touted that they received the licenses and that as a result they had increased capacity to produce cannabis, Defendants failed to disclose the fact that CannTrust's increased capacity was attributable to the Company's illicit growing and storing scheme.

499.     In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.  Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of

these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 1.    April 8, 2019 – Press Release

500.    Specifically, on April 8, 2019, CannTrust issued a press release, which was attached to a Form 6-K signed by Defendant Guyatt and dated that same day, announcing that CannTrust "is pleased to announce that its cultivation and processing permit under Health Canada Cannabis Regulations was amended to include the final 20% of its Phase 2 expansion. ***The entire 450,000 sq. ft. of its perpetual harvest greenhouse in Pelham, Ontario, is now fully licensed***."

501.    Defendants' statements above were materially false and misleading for the reasons set forth in paragraphs 340-358, 417-418, 422-428, and 432.

502.    Additionally, Defendants' statement that "[t]he entire 450,000 sq. ft. of its perpetual harvest greenhouse in Pelham, Ontario, is now fully licensed" was materially false and misleading because even though Health Canada eventually approved licenses for the final rooms in Defendants' Phase 2 redevelopment in April 2019, Defendants misled investors each time Defendants touted that they received licenses for those rooms and that capacity to grow cannabis would increase since Defendants failed to disclose that they had already been using unlicensed rooms to grow and store cannabis and were relying on cannabis from black-market seeds long before Health Canada approved licenses for them and that engaging in these practices put the Company's ability to continue operating at serious risk were Health Canada to discover the illicit growing and storing scheme.

503.    In addition, even if Defendants' statement was literally true, it was false and misleading by omission because Defendants failed to disclose material facts, rendering their statement misleading.   Specifically, Defendants failed to disclose that they were growing

cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### 2.   April 22, 2019 – Press Release and Preliminary Prospectus

504.   On April 22, 2019, CannTrust issued a press release, attached to a Form 6-K signed by Defendant Guyatt and dated that same day, announcing the preliminary operational and financial results for the quarter ended March 31, 2019.  The April 22, 2019 press release discussed its recently acquired licenses for the Niagara Facility, with no mention that the Company had already been growing in those rooms:

> *In April 2019, CannTrust's cultivation and processing permit under Health Canada Cannabis Regulations was amended to include the final 20% of its Phase 2 expansion, which is now fully licensed.  With the Phase 2 expansion, the Company expects full production to be achieved by the end of the second quarter of 2019 at an annualized rate of 50,000kg per year*.

505.   The April 22, 2019 press release that announced the preliminary operational and financial results for the quarter ended March 31, 2019, quoted Defendant Aceto:

> *These preliminary results represent the excellent efforts the CannTrust team has made in increasing output at our Niagara perpetual harvest greenhouse*.  We are quickly approaching our stated capacity of 50,000kg per year from our Phase 2 expansion.  *Our 96% sequential increase in production over the prior quarter* will enable us to service both our rapidly growing base of medical patients and the high demand in the recreational market for our award-winning products and brands.

506.   Also on April 22, 2019, the Company filed with the SEC its Preliminary Prospectus, which similarly stated:

> In the quarter ended March 31, 2019, we harvested approximately 9,424 kg of cannabis from our Niagara Facility, representing an increase of 96% from the fourth quarter of 2018.  *In April 2019, our cultivation and processing permit under Health Canada Cannabis Regulations was amended to include the final 20% of our Phase 2 expansion, which is now fully licensed.  With the Phase 2*

*expansion, we expect full production to be achieved by the end of the second quarter of 2019 at an annualized rate of 50,000 kg per year*.

507.    The Preliminary Prospectus likewise touted that "*[t]he completed Phase 2 expansion of the Niagara Facility is expected to increase production capacity to 50,000 kg on an annualized basis.*"

508.    The Preliminary Prospectus further touted, "*[w]ith the completion of all phases of the Niagara expansion, we believe we have the ability to supply a substantial share of the increased demand arising from international markets*."

509.    Furthermore, the Preliminary Prospectus explained that "[t]he Company's approximately 450,000 square foot perpetual harvest facility in Niagara (the "Niagara Facility"), *has an annual capacity of approximately 50,000 kilograms, as of April 2019* and, through its planned expansion, the Company is targeting annual capacity of 100,000 kilograms by 2020."

510.    Likewise, the Preliminary Prospectus stated "[t]he Phase 2 expansion at the Niagara Facility was substantially completed during the first quarter of 2019 and *Health Canada approved the amendment of our cultivation and processing permit to include the final 20% of the Phase 2 expansion on April 8, 2019*."

511.    The Preliminary Prospectus also touted "[w]*e are also making strategic investments into our capacity to prepare for expected increases in demand for our products.*"

512.    The Preliminary Prospectus also stated that "[t]he Company believes that the efficiency of its operating model, *including its production capacity* and research and development, *makes the Company one of the few licensed producers with a clear, identifiable path to growth and profitability*."

513.   The Preliminary Prospectus also touted CannTrust's increased production and growth, stating "we *harvested approximately 9,424 kg of cannabis from our Niagara [F]acility, representing an increase of 96% from the fourth quarter of 2018*."

514.   The Preliminary Prospectus also stated: "*For the year ended December 31, 2018, harvested production was 16,212 kg, a 471% increase from the 2,839 kg in the prior year period. For the three months ended December 31, 2018, harvested production was 4,816 kg, a 712% increase from the 593 kg in the comparable 2017 period*. *The increase in the fair value of biological assets recorded during the period was due to the ramp up of production at the Niagara Facility,* partially offset by the impact of valuation assumptions such as the average revenue per gram and the stage of the plants as of the reporting date.  While the total number of plants in production increased significantly year over year, as at December 31, 2018 the average stage of the plants in the grow cycle combined with lower expected revenue per gram as a result of the recreational market resulted in the limited increase in the value of biological assets."

515.   The Preliminary Prospectus further stated: "*As of December 31, 2018, the Company supplied more than 10,000 finished units of its products per day for its medical and adult-use recreational market*.""*Our rapidly growing patient base has increased organically at a rate we believe is faster than any other licensed producer, experiencing a 57% growth from 2017 to 2018.* We believe that we have supported this growth through our commitment to patients' access to cannabis."

516.   The Preliminary Prospectus further stated: "*Net revenue is expected to be approximately $17 million, an increase of 116% as compared to $7.8 million for the quarter ended March 31, 201[9].  The estimated increase in revenue is primarily due to a 68% increase in medical patients combined with the contributions from the Canadian adult-use recreational*

***market, which was legalized in October of 2018***.  This estimated revenue represents an increase of approximately 5% as compared to $16.2 million for the quarter ended December 31, 2018, primarily due to a 16% increase in medical patients."

517.   The Preliminary Prospectus also stated: "***The Phase 2 expansion at the Niagara Facility was substantially completed during the first quarter of 2019*** and Health Canada approved the amendment of our cultivation and processing permit to include the final 20% of the Phase 2 expansion on April 8, 2019."

518.   The Preliminary Prospectus further stated: "***With the Phase 2 expansion, we expect full production to be achieved by the end of the second quarter of 2019 at an annualized rate of 50,000 kg per year***."

519.   The Preliminary Prospectus stated: "***The completed Phase 2 expansion of the Niagara Facility is expected to increase production capacity to 50,000 kg on an annualized basis.  With this increased production capability, we believe revenue will increase significantly in 2019 compared to the 2018 full year results, with revenue growth accelerating throughout the year starting in the second quarter of 2019.  We are positioned to receive all necessary regulatory approvals to support this planned growth***.  In addition, having obtained all necessary permits from the Town of Pelham for the construction of its Phase 3 expansion, we continue to expect our Niagara Facility capacity to reach 100,000 kg on an annualized basis in the second half of 2020."

520.   Defendants' statements concerning "making strategic investments into our capacity," "production capacity," and purported reasons why CannTrust was successfully able to meet increased demand of cannabis and grow its revenues and financial figures were materially

false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, 432, 498, and 502.

521.    The same or substantially similar statements as in paragraphs 506-519 were also set forth in the Company's May 3, 2019 prospectus supplement.

522.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

523.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

### 3.    May 14, 2019 – MD&A, Press Release, and 1Q 2019 Earnings Call

524.    On May 14, 2019, CannTrust issued a MD&A based on information available to CannTrust management as of May 13, 2019 ("May 14, 2019 MD&A"), which was filed with the SEC as an attachment to a Form 6-K signed by Defendant Guyatt that same day.   Filed with the May 14, 2019 MD&A were Form 52-109F2 Certifications of Interim Filings signed by Defendants Aceto and Guyatt, which indicated that they "reviewed the interim financial report and interim MD&A (together, the 'interim filings')," and that "having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading

in light of the circumstances under which it was made, with respect to the period covered by the interim filings."

525.    Within the May 14, 2019 MD&A, CannTrust touted that "[t]he Phase 2 expansion at the Perpetual Harvest Facility was substantially completed during the first quarter of 2019, and is *as of the date of this MD&A, fully licensed by Health Canada*" and similarly that "[t]he 200,000 square foot Phase 2 expansion at the Perpetual Harvest Facility was substantially completed in the first quarter of 2019 and *was fully licensed as of April 2019*."

526.    The May 14, 2019 MD&A also explained that "*[w]ith the completion of all phases of the Niagara expansion, the Company believes it has the ability to supply a substantial share of the increased demand arising from international markets*" and that "*[t]he redeveloped Perpetual Harvest Facility provides the Company with increased production capacity to meet growing market demand*."

527.    The May 14, 2019 MD&A reported a "gain of $26 million" in the fair value of biological assets, which it attributed in part to "*the ramp up of production at the Perpetual Harvest Facility following approval from Health Canada of the final rooms from Phase 2, and an increase in the average stage of the plants in the grow cycle combined with higher expected revenue per gram as a result of the selling price increases in the medical and recreational markets.*"

528.    On May 14, 2019, CannTrust issued a press release, attached to a Form 6-K signed by Defendant Guyatt and dated that same day, announcing its financial results for the first quarter of 2019, which ended March 31, 2019—the quarter prior to receiving the license approvals from Health Canada on its growing rooms in its Pelham Facility.  Filed with the May 14, 2019 Form 6-K were Form 52-109F2 Certifications of Interim Filings signed by Defendants

Aceto and Guyatt, which indicated that they "reviewed the interim financial report and interim MD&A (together, the 'interim filings')," and that "having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings."

529.    Defendant Aceto stated within the May 14, 2019 press release that "*[t]he CannTrust team delivered exceptional operational growth in the first quarter, with harvested production of over 9,400kg.  This is a 96% increase in production over the prior quarter and reflects the impact of the investments made into our facilities, as well as process improvements to increase throughput.*"

530.    The May 14, 2019 press release further touted the increased harvested production, yet omitted that growing in illegal grow rooms attributed to such production: "*Harvested production increased by more than 400% to over 9,400kg, versus the first quarter of 2018, and 96% over the fourth quarter of 2018*."

531.    The May 14, 2019 press release also reiterated that the "entire 450,000 sq. ft. of the Perpetual Harvest Facility in Pelham, Ontario, *is now fully licensed and planted*," and similarly explained that "*[t]he Company has received all necessary regulatory approvals for the Phase 2 expansion, which is now fully operational and planted*."

532.    On May 14, 2019, Defendants also held a conference call discussing the earnings results for the first quarter of 2019 ("1Q 2019 Earnings Call").  During the 1Q 2019 Earnings Call, Defendant Aceto explained to investors that "*[i]n April, we received Health Canada approval for the remaining 20% of our Phase II greenhouse*" and "*[w]e expect that production*

*will continue to increase to the full promised annualized capacity of 50,000 kilograms in the third quarter of this year*."

533.   During the 1Q 2019 Earnings Call, Defendant Aceto further told investors that "*I think with phase II being completed, being fully licensed, where we're very close to being at full production capacity at the 50,000 kilograms, we [will] certainly be in a better position to meet all of the stakeholder needs.*"

534.   During the 1Q 2019 Earnings Call, Defendant Aceto touted that "*[t]his increased production is the result of our investment into people, training and facilities, and our company wide dedication to producing the highest quality cannabis in the market, today*."

535.   Defendants' statements within the May 14, 2019 MD&A and May 14, 2019 press release and during the 1Q 2019 Earnings Call concerning the Niagara Facility being "fully licensed as of April 2019," the completion of Phase 2 bringing the Company an "increased production capacity to meet growing market demand," and other similar statements were materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, 432, 498, and 502.

536.   In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

537.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

### 4.    July 11, 2019 –Press Release

538.    On July 11, 2019, CannTrust issued a press release, which was filed that same day with the SEC as an attachment to a Form 6-K signed by Defedant Guyatt, announcing that it created a Special Committee "comprised of independent members of the Board of Directors" "to investigate [a compliance report from Health Canada] in its entirety."  CannTrust also informed investors that "it has implemented a voluntary hold on sale and shipment of all cannabis products as a precaution *while Health Canada visits and reviews its Vaughan, Ontario manufacturing facility*."

539.    Defendants' statement above was false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, 432, 498, and 502.  In addition, taken together with the fact that the Company had just recently been the subject of a surprise inspection that uncovered violations of unlicensed *growing* at the Niagara Facility, Defendants omitted the material risk that "Health Canada['s] visit[] and review[] of its Vaughan, Ontario manufacturing facility" was likely to uncover similar violations of unlicensed *storing* of cannabis, much of which was the same cannabis that was grown in the unlicensed rooms in the Niagara Facility. Accordingly, Defendants knew, but failed to disclose that there was a considerable risk that Health Canada would uncover the Company's illicit storage practice during its review of the Vaughan Facility and increased risk that the Health Canada would suspend or revoke CannTrust's licenses to grow and sell cannabis.

540.     In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.  Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### D.     Defendants Misled Investors When They Misleadingly Reported Overstated Financial Figures That Included Illicitly Grown Cannabis as Biological Assets and Inventory and Revenue Generated Therefrom

541.     During the Class Period, Defendants consistently reported that CannTrust was maintaining a strong financial position.  In particular, Defendants touted, *inter alia*, the values of the Company's revenue, income, inventory, and biological assets which misleadingly included: (1) cannabis grown from illegally obtained seeds from June 2018 onwards; (2) the value of cannabis that was stored in unlicensed rooms from June 2018 onwards; and (3) the value of cannabis that was grown in unlicensed rooms from October 2018 onwards.  Defendants engaged in each of these practices in direct violation of Health Canada rules and regulations and accordingly violated IFRS, IAS, and PCAOB Standards because they recognized revenue and accounted for assets and inventory from cannabis for which they lacked title because it was obtained through illegitimate means, among other accounting violations.

### 1.     August 14, 2018 – Condensed Interim Consolidated Financial Statements (Unaudited)

542.     On August 14, 2018, CannTrust filed with SEDAR its condensed interim consolidated financial statements for the three months and six months ended June 30, 2018 and

June 30, 2017 ("August 14, 2018 Consolidated Financial Statements"), which was signed by Defendants Paul and Litwin.

543.    The August 14, 2018 Consolidated Financial Statements, as well as the Company's MD&A filed that same day, contained a materially false and misleading balance sheet and income statement:

## CannTrust Holdings Inc.
Condensed Interim Consolidated Statements of Financial Position
(in Canadian dollars)

| | | June 30, 2018 | December 31, 2017 |
|---|---|---|---|
| | | (Unaudited) | (Audited) |
| **Assets** | | | |
| **Current** | | | |
| Cash | $ | 11,728,174 $ | 17,961,043 |
| Short term investments (Note 6) | | 87,976,562 | 201,538 |
| Harmonized sales tax recoverable | | 4,103,059 | 2,636,710 |
| Inventory (Note 7) | | 25,651,950 | 10,959,022 |
| Biological assets (Note 7) | | 22,182,880 | 9,843,690 |
| Accounts receivable | | 503,939 | 160,383 |
| Prepaids | | 2,048,778 | 2,465,506 |
| **Total current assets** | | 154,195,342 | 44,227,892 |
| | | | |
| Investments (Note 17) | | 174,673 | 156,073 |
| Restricted cash (Note 6) | | 150,765 | 100,765 |
| Property and equipment (Note 8) | | 48,860,635 | 33,963,685 |
| Intangible assets (Note 9) | | 326,275 | - |
| Financial assets (Note 10) | | 1,896,840 | - |
| | | | |
| **Total Assets** | | 205,604,530 | 78,448,415 |
| | | | |
| **Liabilities** | | | |
| **Current** | | | |
| Accounts payable and accrued liabilities | | 6,553,206 | 6,579,997 |
| Current portion of promissory note (Note 5) | | 200,000 | 200,000 |
| Current portion of mortgage (Note 11) | | 38,895 | - |
| **Total current liabilities** | | 6,792,101 | 6,779,997 |
| | | | |
| Promissory note (Note 5) | | 600,000 | 800,000 |
| Mortgage (Note 11) | | 9,478,549 | - |
| Deferred tax (Note 18) | | 4,289,290 | - |
| **Total Liabilities** | | 21,159,940 | 7,579,997 |
| | | | |
| **Shareholders' Equity** | | | |
| Share capital (Note 12) | | 193,935,293 | 104,824,215 |
| Share-based payment reserve (Note 13) | | 6,609,311 | 2,272,302 |
| Warrants reserve (Note 14) | | 11,653,284 | 3,361,789 |
| Retained Earnings (Deficit) | | (27,753,298) | (39,589,888) |
| **Total Shareholders' Equity** | | 184,444,590 | 70,868,418 |
| **Total Liabilities and Shareholders' Equity** | $ | 205,604,530 $ | 78,448,415 |

Commitments (Note 15)
Subsequent Events (Note 22)

The accompanying notes are an integral part of the condensed interim consolidated financial statements.

(signed) "Eric Paul"          Director          (signed) "Mark Litwin"          Director

**CannTrust Holdings Inc.**
Condensed Interim Consolidated Statements of Net Income (Loss) and Comprehensive Income (Loss)
For the Three Months and Six Months Ended June 30, 2018 and June 30, 2017
(in Canadian dollars) (unaudited)

| | Three months ended | | Six months ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2018 | June 30, 2017 | June 30, 2018 | June 30, 2017 |
| Revenue (Note 21) | $ 9,050,239 | $ 4,541,378 | $ 16,890,086 | $ 7,574,623 |
| Cost of goods sold | 4,085,159 | 1,040,963 | 8,051,578 | 1,791,452 |
| Amortization expensed to cost of sales (Note 8) | 377,064 | 224,131 | 623,092 | 444,148 |
| Gross profit, before the unrealized gain on changes in fair value of biological assets | 4,588,016 | 3,276,284 | 8,215,416 | 5,339,023 |
| Fair value changes in biological assets included in inventory sold | 8,754,109 | 3,024,249 | 14,285,936 | 5,315,296 |
| Unrealized gain on changes in fair value of biological assets (Note 7) | (15,350,984) | (3,747,495) | (38,515,005) | (7,765,701) |
| Gross profit | 11,184,891 | 3,999,530 | 32,444,485 | 7,789,428 |
| Expenses | | | | |
| Amortization (Note 8) | 688,338 | 332,765 | 1,571,743 | 513,678 |
| General and administrative | 1,003,121 | 351,091 | 1,772,870 | 586,058 |
| Loss on Equity Accounted Investment (Note 17) | 43,080 | 48,773 | 86,174 | 74,726 |
| Management fees (Note 16) | 80,000 | 35,000 | 160,000 | 235,000 |
| Marketing and promotion | 631,741 | 125,083 | 898,189 | 223,247 |
| Professional fees | 321,583 | 204,679 | 751,132 | 420,287 |
| Rent and facilities | 491,600 | 117,653 | 1,078,641 | 141,542 |
| Salaries and benefits | 1,865,473 | 909,645 | 3,448,662 | 1,649,663 |
| Selling and shipping costs | 2,111,169 | 659,755 | 3,581,886 | 1,238,540 |
| Share based compensation (Note 13) | 1,343,298 | 355,864 | 4,973,874 | 552,369 |
| Expenses before Financing Activities and Transaction Costs | 8,579,403 | 3,140,308 | 18,323,171 | 5,635,110 |
| Income from Operations before Financing Activities and Transaction Costs | 2,605,488 | 859,222 | 14,121,314 | 2,154,318 |
| Interest expense | (119,632) | (62,947) | (191,454) | (158,242) |
| Accretion expense (Note 11) | (52,250) | (90,246) | (83,619) | (179,694) |
| Transaction costs (Note 5) | - | - | - | (204,282) |
| Other income  (Note 10) | 1,960,589 | - | 1,990,064 | - |
| Gain (Loss) on revaluation of derivative liability | - | 48,835 | - | (1,635,140) |
| Income (loss) before income taxes | 4,394,195 | 754,864 | 15,836,305 | (23,040) |
| Deferred income tax expense (Note 18) | (4,289,290) | - | (4,289,290) | - |
| Net Income (Loss) and Comprehensive Income (Loss) | $ 104,905 | $ 754,864 | $ 11,547,015 | $ (23,040) |
| Weighted average number of common shares - basic | 95,708,683 | 71,362,575 | 93,825,315 | 70,129,251 |
| Weighted average number of common shares - diluted | 98,911,671 | 72,457,234 | 97,028,302 | 70,129,251 |
| Earnings (loss) per share - basic (Note 12) | $ 0.00 | $ 0.01 | $ 0.12 | $ (0.00) |
| Earnings (loss) per share - diluted (Note 12) | $ 0.00 | $ 0.01 | $ 0.12 | $ (0.00) |

544.    In addition to the reasons set forth in paragraphs 417-418, 422-428, 432, 498, and 541 CannTrust's figures were false and misleading and Defendants' statements concerning the then-current financial condition of the Company were materially false and misleading because as far back as June 2018, CannTrust stored cannabis in unlicensed rooms in its Vaughan Facility and had been obtaining and using seeds from the black market to grow, harvest, and sell cannabis.  The financial figures above, such as revenue, biological assets, and inventory are thus false and misleading because Defendants failed to disclose that they included the revenue, biological assets, and inventory from cannabis that was stored in unlicensed rooms and grown

from illegal seeds.  Indeed, as set forth in Section V.C, CannTrust violated numerous IFRS and IAS accounting standards when it accounted for biological assets and inventory for which it lacked legal title as a result of the illicit cannabis being grown and stored in direct violation of Health Canada regulations.  Likewise, CannTrust improperly recognized revenue for which it lacked legal title to transfer and was subject to a deposit liability and should have properly been accounted for as deferred revenue.

545.    Additionally, because seeds are counted as part of the Company's biological assets, the above figures concerning biological assets were artificially inflated because they also consisted of illegal seeds.

### 2.    November 14, 2018 – Condensed Interim Consolidated Financial Statements (Unaudited)

546.    On November 14, 2018, CannTrust filed with SEDAR its condensed interim consolidated financial statements for the three months and nine months ended September 30, 2018 and September 30, 2017 ("November 14, 2018 Consolidated Financial Statements"), which was signed by Defendants Paul and Litwin.

547.    The November 14, 2018 Consolidated Financial Statements, as well as the Company's MD&A filed that same day, contained a materially false and misleading balance sheet and income statement:

# CannTrust Holdings Inc.

Condensed Interim Consolidated Statements of Financial Position
As at September 30, 2018 and December 31, 2017
(in Canadian dollars)

| | Notes | September 30, 2018 (Unaudited) | December 31, 2017 (Audited) |
|---|---|---|---|
| **Assets** | | | |
| **Current** | | | |
| Cash | | $ 5,421,155 | $ 17,961,043 |
| Short term investments | 7 | 80,896,438 | 201,538 |
| Harmonized sales tax recoverable | | 5,318,765 | 2,636,710 |
| Inventory | 8 | 42,244,976 | 10,959,022 |
| Biological assets | 8 | 16,222,928 | 9,843,690 |
| Accounts receivable | | 2,047,935 | 160,383 |
| Prepaids | | 1,755,482 | 2,465,506 |
| **Total current assets** | | 153,907,679 | 44,227,892 |
| | | | |
| Investments | 18 | 1,101,199 | 156,073 |
| Restricted cash | 7 | 150,765 | 100,765 |
| Property and equipment | 9 | 53,310,257 | 33,963,685 |
| Intangible assets | 10 | 657,434 | - |
| Financial assets | 11 | 1,896,840 | - |
| **Total Assets** | | 211,024,174 | 78,448,415 |
| | | | |
| **Liabilities** | | | |
| **Current** | | | |
| Accounts payable and accrued liabilities | | 8,472,030 | 6,579,997 |
| Current portion of promissory note | 6 | 200,000 | 200,000 |
| Current portion of mortgage | 12 | 39,743 | - |
| **Total current liabilities** | | 8,711,773 | 6,779,997 |
| | | | |
| Promissory note | 6 | 600,000 | 800,000 |
| Mortgage | 12 | 9,468,324 | - |
| Deferred tax | 19 | 4,758,104 | - |
| **Total Liabilities** | | 23,538,201 | 7,579,997 |
| | | | |
| **Shareholders' Equity** | | | |
| Share capital | 13 | 195,779,143 | 104,824,215 |
| Share-based payment reserve | | 7,346,685 | 2,272,302 |
| Warrants reserve | 15 | 11,479,381 | 3,361,789 |
| Deficit | | (27,119,236) | (39,589,888) |
| **Total Shareholders' Equity** | | 187,485,973 | 70,868,418 |
| **Total Liabilities and Shareholders' Equity** | | $ 211,024,174 | $ 78,448,415 |

The accompanying notes are an integral part of the condensed interim consolidated financial statements.


(signed) "Eric Paul"_____   Director      (signed) "Mark Litwin"_____   Director

CannTrust Holdings Inc.
Condensed Interim Consolidated Statements of Net Income and Comprehensive Income
For the Three Months and Nine Months ended September 30, 2018 and September 30, 2017
(in Canadian dollars) (unaudited)

| | Notes | Three months ended | | Nine months ended | |
| --- | --- | --- | --- | --- | --- |
| | | September 30, 2018 | September 30, 2017 | September 30, 2018 | September 30, 2017 |
| | | | (Restated) (Note 5) | | (Restated) (Note 5) |
| Revenue | 22 | $ 12,588,727 | $ 6,140,224 | $ 29,478,813 | $ 13,714,847 |
| Cost of goods sold | 5 | 3,869,655 | 1,171,352 | 9,201,201 | 3,103,235 |
| Gross profit, before the unrealized gain on changes in fair value of biological assets | 5 | 8,719,072 | 4,968,872 | 20,277,612 | 10,611,612 |
| Fair value changes in biological assets included in inventory sold | 5 | 5,222,601 | 4,597,289 | 17,218,074 | 7,935,943 |
| Unrealized gain on changes in fair value of biological assets | 5,8 | (9,044,160) | (4,985,223) | (41,716,084) | (10,268,825) |
| Gross profit | | 12,540,631 | 5,356,806 | 44,775,622 | 12,944,494 |
| Expenses | | | | | |
| Amortization | 9 | 1,171,798 | 464,045 | 2,534,047 | 977,723 |
| General and administrative | | 1,242,415 | 469,225 | 3,015,285 | 1,055,283 |
| Loss on Equity Accounted Investment | 18 | 109,179 | 26,926 | 195,353 | 101,652 |
| Management fees | 17 | 80,000 | 63,548 | 240,000 | 298,548 |
| Marketing and promotion | | 1,614,789 | 130,391 | 2,512,978 | 353,638 |
| Professional fees | | 300,094 | 410,453 | 1,061,226 | 830,740 |
| Rent and facilities | | 172,200 | 85,356 | 1,250,841 | 226,898 |
| Salaries and benefits | | 2,587,081 | 929,073 | 6,035,743 | 2,376,996 |
| Selling and shipping costs | | 2,703,428 | 1,186,089 | 6,285,314 | 2,424,629 |
| Share based compensation | 14 | 1,514,268 | 908,223 | 6,488,142 | 1,460,592 |
| Expenses before Financing Activities and Transaction Costs | | 11,495,252 | 4,673,329 | 29,608,929 | 10,106,699 |
| Income from Operations before Financing Activities, Transaction Costs and Other Income | | 1,045,379 | 683,477 | 15,166,693 | 2,837,795 |
| Interest expense | | (143,429) | (62,332) | (334,883) | (220,574) |
| Accretion expense | 12 | (62,643) | (54,022) | (146,262) | (233,716) |
| Transaction costs | 6 | - | - | - | (204,282) |
| Other income | 11 | 50,747 | 78,382 | 2,040,811 | 78,382 |
| Gain (Loss) on revaluation of derivative liability | | - | 9,804 | - | (1,625,336) |
| Income before income taxes | | 890,054 | 655,309 | 16,726,359 | 632,269 |
| Deferred income tax expense | 19 | (468,814) | - | (4,758,104) | - |
| Net Income and Comprehensive Income | | $ 421,240 | $ 655,309 | $ 11,968,255 | $ 632,269 |
| Weighted average number of common shares - basic | | 104,054,171 | 78,701,498 | 97,630,021 | 72,997,008 |
| Weighted average number of common shares - diluted | | 108,160,500 | 81,155,187 | 101,736,361 | 75,450,697 |
| Earnings per share - basic | 13 | $ 0.00 | $ 0.01 | $ 0.12 | $ 0.01 |
| Earnings per share - diluted | 13 | $ 0.00 | $ 0.01 | $ 0.12 | $ 0.01 |

548.   Defendants' statements concerning the then-current financial condition of CannTrust were materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, 432, 498, 502, 541, and 544-545.

549.   In addition, Defendants' statements concerning the values of the Company's revenue, biological assets, and inventories were materially false and misleading because Defendants did not disclose to investors that those values included, inventory and biological assets and revenues that were derived from the sale of cannabis that was grown and stored in unlicensed rooms and from black-market seeds.

550.    Indeed, the Company ultimately disclosed on August 1, 2019 that the value of impacted inventory and biological assets from the five unlicensed rooms totaled approximately $51 million.   The Company also explained on August 16, 2019 that the impacted inventory represented approximately 53% of the Company's total inventory and the impacted biological assets represented approximately 30% of the Company's total biological assets.   Later, on October 14, 2019, CannTrust explained that to effectuate the Company's remediation efforts, "CannTrust's Board of Directors has determined that it is necessary to destroy approximately $12 million of biological assets and approximately $65 million worth of inventory that was not authorized by CannTrust's licence."

### 3.    March 28, 2019 – Consolidated Financial Statements

551.    On March 28, 2019, CannTrust filed with the SEC on Form 40-F and with SEDAR its consolidated financial statements for the year ended December 31, 2018 and December 31, 2017 ("March 28, 2019 Consolidated Financial Statements"), which was signed by Defendants Paul and Litwin.

552.    The March 28, 2019 Consolidated Financial Statements also included a Report of Independent Registered Public Accounting Firm signed by KPMG (the "Audit Report").  Addressing the shareholders, the Audit Report explained that KPMG audited the March 28, 2019 Consolidated Financial Statements and stated that "the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018."

553.    The March 28, 2019 Consolidated Financial Statements, as well as the Company's MD&A filed that same day, contained a materially false and misleading balance sheet and income statement:

# CannTrust Holdings Inc.
Consolidated Statements of Financial Position
As at December 31
(in Canadian dollars)

| | Notes | 2018 | 2017 |
|---|---|---|---|
| **Assets** | | | |
| | | | |
| **Current** | | | |
| Cash | | $ 9,022,821 | $ 17,961,043 |
| Short term investments | 7 | 63,023,908 | 201,538 |
| Harmonized sales tax recoverable | | 1,492,110 | 2,636,710 |
| Inventory | 8 | 35,389,490 | 10,959,022 |
| Biological assets | 8 | 10,502,579 | 9,843,690 |
| Accounts receivable | | 6,151,604 | 160,383 |
| Prepaid expenses | | 2,859,039 | 2,465,506 |
| **Total current assets** | | 128,441,551 | 44,227,892 |
| | | | |
| Investments | 18 | 10,661,932 | 156,073 |
| Restricted cash | 7 | 100,000 | 100,765 |
| Property and equipment | 9 | 62,208,905 | 33,963,685 |
| Financial assets | 11 | 901,350 | - |
| **Total Assets** | | 202,313,738 | 78,448,415 |
| | | | |
| **Liabilities** | | | |
| | | | |
| **Current** | | | |
| Accounts payable and accrued liabilities | | 12,806,458 | 6,579,997 |
| Current portion of promissory note | 6 | 200,000 | 200,000 |
| Current portion of mortgage | 12 | 3,790,610 | - |
| **Total current liabilities** | | 16,797,068 | 6,779,997 |
| | | | |
| Promissory note | 6 | 600,000 | 800,000 |
| Mortgage | 12 | 9,457,876 | - |
| Deferred tax | 19 | 1,433,000 | - |
| **Total Liabilities** | | 28,287,944 | 7,579,997 |
| | | | |
| **Shareholders' Equity** | | | |
| Share capital | 13 | 207,061,423 | 104,824,215 |
| Share-based payment reserve | | 8,714,188 | 2,272,302 |
| Warrants reserve | 15 | 11,393,687 | 3,361,789 |
| Deficit | | (53,143,504) | (39,589,888) |
| **Total Shareholders' Equity** | | 174,025,794 | 70,868,418 |
| **Total Liabilities and Shareholders' Equity** | | $ 202,313,738 | $ 78,448,415 |

Commitments (Note 16)

The accompanying notes are an integral part of the consolidated financial statements.


_(signed) "Eric Paul"_____     Director          _(signed) "Mark Litwin"_____     Director

## CannTrust Holdings Inc.
Consolidated Statements of Net (Loss) Income and Comprehensive (Loss) Income
For the Years Ended December 31
(in Canadian dollars)

| | Notes | | 2018 | 2017 |
|---|---|---|---|---|
| | | | | (Restated) |
| | | | | (Note 5) |
| Gross revenue | 22 | $ | 48,390,103 $ | 20,697,764 |
| Excise duty | | | (2,744,960) | - |
| **Net revenue** | | | 45,645,143 | 20,697,764 |
| Cost of goods sold | 5 | | 19,690,162 | 7,680,234 |
| **Gross profit, before changes in fair value of biological assets** | 5 | | **25,954,981** | 13,017,530 |
| Fair value changes in biological assets included in inventory sold | 5 | | 17,301,866 | 8,929,308 |
| Unrealized gain on changes in fair value of biological assets | 5,8 | | (27,840,156) | (19,891,851) |
| **Gross profit** | | | 36,493,271 | 23,980,073 |
| **Expenses** | | | | |
| Amortization | 9 | | 2,169,281 | 964,396 |
| General and administrative | 17 | | 9,014,467 | 3,636,808 |
| Marketing and promotion | | | 7,274,454 | 198,858 |
| Salaries and benefits | | | 9,823,942 | 3,853,314 |
| Selling and shipping costs | | | 8,971,434 | 3,803,056 |
| Share based compensation | 14 | | 8,056,451 | 2,310,678 |
| **Operating expenses** | | | 45,310,029 | 14,767,110 |
| **(Loss) income from operations** | | | (8,816,758) | 9,212,963 |
| Mortgage interest expense | | | (478,169) | (260,203) |
| Interest income | | | 790,123 | - |
| Accretion expense | 12 | | (208,842) | (233,716) |
| Transaction costs | 6 | | - | (204,282) |
| Other (loss) income | 18 | | (2,033,700) | 143,060 |
| (Loss) on equity accounted investment | 18 | | (385,110) | (147,056) |
| Impairment loss on assets | 10 | | (988,160) | - |
| Loss on revaluation of derivative liability | | | - | (1,625,336) |
| **(Loss) income before income taxes** | | | (12,120,616) | 6,885,430 |
| Deferred income tax expense | 19 | | 1,433,000 | - |
| **Net (loss) income and comprehensive (loss) income** | | $ | (13,553,616) $ | 6,885,430 |
| **Weighted average number of common shares - basic** | | | 99,282,045 | 76,876,971 |
| **Weighted average number of common shares - diluted** | | | 99,282,045 | 80,526,105 |
| **Earnings (loss) per share - basic** | 13 | | (0.14) | 0.09 |
| **Earnings (loss) per share - diluted** | 13 | | (0.14) | 0.09 |

554. Defendants' statements concerning the then-current financial condition of CannTrust were materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, 432, 498, 502, 541, 544-545, and 550.

### 4.      May 14, 2019 – Consolidated Financial Statements

555.      On May 14, 2019, CannTrust filed with SEDAR its consolidated financial statements for the three months ended March 31, 2019 and March 31, 2018 ("May 14, 2019 Consolidated Financial Statements"), which was signed by Defendants Paul and Litwin.

556.      The May 14, 2019 Consolidated Financial Statements, as well as the Company's MD&A filed that same day, contained a materially false and misleading balance sheet and income statement:

## CannTrust Holdings Inc.
Condensed Interim Consolidated Statements of Financial Position
(in Canadian dollars)

| | Notes | March 31, 2019 | December 31, 2018 |
|---|---|---|---|
| Assets | | (Unaudited) | (Audited) |
| **Current** | | | |
| Cash | $ | 3,203,741 $ | 9,022,821 |
| Short term investments | 6 | 39,543,366 | 63,023,908 |
| Harmonized sales tax recoverable | | 718,026 | 1,492,110 |
| Inventory | 7 | 55,813,185 | 35,389,490 |
| Biological assets | 7 | 21,802,426 | 10,502,579 |
| Accounts receivable | | 3,430,523 | 6,151,604 |
| Prepaid expenses | | 14,999,144 | 2,859,039 |
| **Total current assets** | | 139,510,411 | 128,441,551 |
| | | | |
| Investments | 16 | 11,912,719 | 10,661,932 |
| Restricted cash | 6 | 100,000 | 100,000 |
| Property and equipment | 8 | 70,504,503 | 62,208,905 |
| Right-of-Use assets | 3,8 | 1,603,571 | - |
| Financial assets | 9 | 901,350 | 901,350 |
| **Total Assets** | | 224,532,554 | 202,313,738 |
| | | | |
| **Liabilities** | | | |
| **Current** | | | |
| Accounts payable and accrued liabilities | | 11,327,922 | 12,806,458 |
| Current portion of promissory note | | 200,000 | 200,000 |
| Current portion of mortgage | 10 | 13,210,731 | 3,790,610 |
| **Total current liabilities** | | 24,738,653 | 16,797,068 |
| | | | |
| Promissory note | | 400,000 | 600,000 |
| Mortgage | 10 | - | 9,457,876 |
| Lease liability | 3 | 1,785,059 | - |
| Deferred tax | 17 | 7,430,000 | 1,433,000 |
| **Total Liabilities** | | 34,353,712 | 28,287,944 |
| | | | |
| **Shareholders' Equity** | | | |
| Share capital | 11 | 207,185,559 | 207,061,423 |
| Share-based payment reserve | | 12,083,189 | 8,714,188 |
| Warrants reserve | 13 | 11,381,930 | 11,393,687 |
| Deficit | | (40,471,836) | (53,143,504) |
| **Total Shareholders' Equity** | | 190,178,842 | 174,025,794 |
| **Total Liabilities and Shareholders' Equity** | $ | 224,532,554 $ | 202,313,738 |

Commitments (Note 14)

Subsequent events (Note 20)

The accompanying notes are an integral part of the condensed interim consolidated financial statements.

| (signed) "Eric Paul" | Director | (signed) "Mark Litwin" | Director |
|---|---|---|---|

**CannTrust Holdings Inc.**
Condensed Interim Consolidated Statements of Net Income and Comprehensive Income
For the Three Months Ended March 31, 2019 and March 31, 2018
(in Canadian dollars) (unaudited)

| | Notes | March 31, 2019 | March 31, 2018 |
|---|---|---|---|
| | | | (Restated) |
| | | | (Note 5) |
| Gross revenue | | $ 18,813,801 | $ 7,839,847 |
| Excise duty | | (1,960,725) | - |
| **Net revenue** | 19 | 16,853,076 | 7,839,847 |
| Cost of goods sold | | 9,142,532 | 2,877,048 |
| **Gross profit, before changes in fair value of biological assets** | | 7,710,544 | 4,962,799 |
| Fair value changes in biological assets included in inventory sold | | 6,654,488 | 4,444,258 |
| Unrealized gain on changes in fair value of biological assets | 7 | (32,640,849) | (20,494,625) |
| **Gross profit** | | 33,696,905 | 21,013,166 |
| **Expenses** | | | |
| Amortization | 8 | 532,054 | 636,977 |
| General and administrative | 15 | 4,754,259 | 1,866,339 |
| Marketing and promotion | | 1,932,654 | 266,448 |
| Salaries and benefits | | 3,404,923 | 1,583,189 |
| Selling and shipping costs | | 2,194,915 | 1,470,717 |
| Share based compensation | 12 | 3,406,090 | 3,630,576 |
| **Operating expenses** | | 16,224,895 | 9,454,246 |
| **Income from operations** | | 17,472,010 | 11,558,920 |
| Interest expense | | (219,396) | (71,822) |
| Interest income | | 262,442 | - |
| Accretion expense | 10 | (62,516) | (31,369) |
| Other income | | 1,518,276 | 29,475 |
| Loss on equity accounted investment | 16 | (122,839) | (43,094) |
| **Income before income taxes** | | 18,847,977 | 11,442,110 |
| Deferred income tax expense | 17 | 6,044,517 | - |
| **Net income and comprehensive income** | | $ 12,803,460 | $ 11,442,110 |
| **Weighted average number of common shares - basic** | | 105,627,315 | 91,921,020 |
| **Weighted average number of common shares - diluted** | | 108,230,636 | 95,674,356 |
| **Earnings per share - basic** | 11 | 0.12 | 0.12 |
| **Earnings per share - diluted** | 11 | 0.12 | 0.12 |

557. Defendants' statements concerning the then-current financial condition of CannTrust were materially false and misleading for the same reasons set forth in paragraphs 340-358, 417-418, 422-428, 432, 498, 502, 541, 544-545, and 550.

**E.    KPMG's Clean Audit Report Contained False and Misleading Statements**

558. In addition to the false and misleading revenue, biological assets, and inventory figures KPMG certified and consented to as set forth in CannTrust's audited consolidated

financial statements filed on March 28, 2019, KPMG also made numerous false and misleading statements in its Audit Report.

559.    Specifically, KPMG's Audit Report misleadingly told investors that KPMG audited the March 27, 2019 Consolidated Financial Statements and that "***the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018***."

560.    KPMG's Audit Report claimed that the auditor had audited the 2018 Annual Financial Statements "***in accordance with the standards of the PCAOB.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.***"

561.    In addition, the Audit Report misleadingly reassured investors that "***the audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks.  Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements***."

562.    The Audit Report continued "***the audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements,***" and "***[KPMG] believe[d] that the audit provide[d] a reasonable basis for [its] opinion.***"

563.    Finally, the Audit Report stated "***the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018,***

*and the financial performance and its cash flows for the year then ended, in conformity with*
*IFRS*."

564.     Each of these statements were false and misleading because, as discussed in Sections V.C.4-5, KPMG's audit of CannTrust violated numerous PCAOB auditing standards and CannTrust's financial statements violated applicable accounting standards.  KPMG's clean audit opinion reinforced the credibility of CannTrust's financial statements and allowed CannTrust to perpetrate its fraud.  Indeed, contrary to these statements and the representations: KPMG did not conduct its audits in accordance with PCAOB standards; as described herein, the financial statements referred to in these statements contained material errors and omissions in violation of IFRS; and KPMG lacked a reasonable basis for its opinion that the financial statements referred to in these statements were fairly presented in accordance with IFRS.

## VII.    LOSS CAUSATION

565.     During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated or artificially maintained the price of CannTrust's common stock and operated as a fraud or deceit on Class Period purchasers of CannTrust common stock by failing to disclose and misrepresenting Defendants' non-compliance with applicable regulations and illicit business practices implemented to increase growing capacity in order to take advantage of surging demand, *i.e.*, the growing and storing of cannabis in unlicensed rooms, and other regulatory violations from June 2018 through March 2019.

566.     Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased CannTrust common stock at artificially inflated prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiffs and other Class members would not have purchased CannTrust stock at the artificially inflated prices at which it traded during the Class Period.

567.    The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between July 8, 2019 and September 17, 2019.  During this corrective disclosure period, CannTrust's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited CannTrust's stock price.  It was not until the final partial corrective disclosure and/or materialization of concealed risk on September 17, 2019 that the full truth and extent of Defendants' misrepresentations was known to the market and/or fully materialized such that there was no longer any artificial inflation in CannTrust's stock price attributable to the fraud.

568.    The declines in CannTrust's stock price during the corrective disclosure period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of undisclosed risks concealed by the Defendants' material misrepresentations or omissions.

569.    As a result of their purchases of CannTrust common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused CannTrust common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $13.48 per share on March 19, 2019.

570.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of CannTrust's business practices, compliance with applicable regulations, and its ability to meet the high demand for cannabis.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of CannTrust common stock fell significantly.  These declines removed the inflation from the price of CannTrust

common stock, causing real economic loss to investors who had purchased CannTrust common stock during the Class Period.

A.  **July 8, 2019 – First Partial Corrective Disclosure/Materialization of the Risk**

571.  On July 8, 2019, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized in connection with CannTrust's announcement that it received a compliance report from Health Canada.  On that date, Defendants disclosed that CannTrust had "received a compliance report from Health Canada notifying the Company that its greenhouse facility in Pelham, Ontario is noncompliant with certain regulations" and that the Company "accepted Health Canada's non-compliance finding and has taken actions to ensure current and future compliance."

572.  CannTrust disclosed that it had been growing cannabis in five unlicensed rooms in its Niagara Facility from October 2018 through March 2019 and misled Health Canada inspectors during their audit in June 2019 of the Niagara Facility.  Specifically, the press release stated:

> The non-compliant rating is based on observations by the regulator regarding the growing of cannabis in five unlicensed rooms and inaccurate information provided to the regulator by CannTrust employees.  Growing in unlicensed rooms took place from October 2018 to March 2019 during which time CannTrust had pending applications for these rooms with Health Canada.

573.  Additionally, within that same press release, CannTrust disclosed that "Health Canada has placed a hold on inventory which includes approximately 5,200kg of dried cannabis that was harvested in the previously unlicensed rooms in Pelham, until it deems that the Company is compliant with regulations," and that "CannTrust has instituted a voluntary hold of approximately 7,500kg of dried cannabis equivalent at its Vaughan manufacturing facility that was produced in the previously unlicensed rooms."  CannTrust further announced that "[d]ue to

the product on hold, some CannTrust customers and patients will experience temporary product shortages."

574.    Moreover, in light of the truth that began to reveal itself to the public, Defendant Aceto conceded within that same press release that with respect to Defendants' communications with Health Canada about growing in five unlicensed rooms, "[w]e made errors in judgement." Additionally, in an interview later that day by the Globe and Mail of Defendant Aceto on July 8, 2019, Defendant Aceto similarly admitted: "We constructed these rooms in accordance with all the rules and regulations; the mistake that was made by CannTrust was putting plants in these rooms before we'd actually received the approval to do so."

575.    The July 8, 2019 disclosures that Defendants received a compliance report from Health Canada and that much of their inventory was thus placed on hold, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Defendants' growing of cannabis in unlicensed rooms in their Niagara Facility from October 2018 through March 2019.

576.    Moreover, the July 8, 2019 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's illicit business practices, including the Company's ability to meet the high demand for cannabis by legitimate means and the Company's compliance with applicable regulations.

577.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, CannTrust's stock price

fell over *22%* from $4.94 per share on July 5, 2019, to $3.83 per share at close on July 8, 2019, on unusually heavy trading volume.

578.    Surprised by this news, analysts and the media linked the stock drop directly to the disclosures.  For example, ROTH Capital issued a report on July 8, 2019 linking the drastic drop in share price to Defendants' announcement: "CTST shares are down ~20% to $3.87 while investors weigh the ramifications of cannabis production in unlicensed rooms and the pending inventory concerns in the near term."  The analyst report further expressed concern over Defendants' misrepresentations that they made to Health Canada, stating, "we are concerned with the non-compliance rating and that Health Canada felt [CannTrust] employees misled regulators during the June audit."  Canaccord similarly reported that same day that "a breach of Hea[l]th Canada regulations is an unfortunate setback for CannTrust and will likely materially impact Q3/19 results."

579.    Likewise, news outlet Globe and Mail published an article on July 8, 2019, explaining that "CannTrust Holdings Inc. shares plunged more than 20 per cent on Monday, after the NYSE-listed cannabis grower disclosed that Health Canada discovered unlicensed growing activity at the [C]ompany's main greenhouse in Ontario and put a sales freeze on 5,200 kilograms of CannTrust's inventory, pending further investigation."  The next day, on July 9, 2019, ROTH Capital issued another report and downgraded the Company's stock to Neutral, further explaining that "CannTrust has taken a huge credibility hit from the issued Hea[l]th Canada non-compliance rating audit report," and opining that CannTrust demonstrated "a flagrant lack of compliance surrounding cultivating cannabis in five unlicensed rooms over a five month timeframe."

580.    However, despite these partial disclosures of adverse news which removed some of the artificial inflation in CannTrust's stock price, its stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded that Defendants actively attempted to cover up their unlicensed growing by putting up fake walls, the directive to grow in unlicensed rooms was known and given by CannTrust executives—including Individual Defendants—and that Defendants were storing the excess inventory in unlicensed rooms in their Vaughan Facility and that, as such, faced a high likelihood of getting the Company's license suspended.  Indeed, acknowledging that it was not yet known that Defendants had a direct role in the unlicensed growing and cover up, Jefferies explained in a July 8, 2019 analyst report that "[t]he fact the [C]ompany never spotted this, or indeed still doesn't know how it happened, is a concern."

**B.    July 10, 2019 – Second Partial Corrective Disclosure/Materialization of the Risk**

581.    On July 10, 2019, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized in connection with an explosive article that Globe and Mail published detailing whistleblower Nick Lalonde's email to Health Canada, further revealing the gory details about Defendants' fraudulent conduct to investors.  On that date, the public learned for the first time the explicit details of Mr. Lalonde's email, such as Defendants requiring CannTrust employees to hang fake walls in front of the unlicensed rooms to hide their unregulated growing from Health Canada inspections.

582.    The July 10, 2019 disclosure that Defendants took affirmative steps to hide their unlicensed growing from Health Canada, was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Defendants'

growing of cannabis in unlicensed rooms in their Niagara Facility from October 2018 through March 2019, as well as Defendants' attempts to hide their violations from Health Canada.

583.    Moreover, the July 10, 2019 disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  This disclosure partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's illicit business practices, including the Company's ability to meet the high demand for cannabis by legitimate means and the Company's compliance with applicable regulations.

584.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, CannTrust's stock price fell over *12%* from $3.60 per share on July 9, 2019 to $3.16 per share on July 10, 2019, on unusually heavy trading volume.

585.    However, despite this partial disclosure of adverse news which removed some of the artificial inflation in CannTrust's stock price, its stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded that the directive to grow in unlicensed rooms was known and given by CannTrust executives— including the Individual Defendants—and that Defendants were storing the excess inventory in unlicensed rooms in their Vaughan Facility and that, as such, faced a high likelihood of getting the Company's license suspended.

    **C.    July 11, 2019 – Third Partial Corrective Disclosure/Materialization of the Risk**

586.    On July 11, 2019, after the close of trading, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during

the Class Period were partially revealed and/or partially materialized in connection with CannTrust's announcement that "it has implemented a voluntary hold on sale and shipment of all cannabis products as a precaution *while Health Canada visits and reviews its Vaughan, Ontario manufacturing facility*."  CannTrust further informed investors on that date that it created a special committee "comprised of independent members of the Board of Directors" to "investigate this matter in its entirety"—referring to the unlicensed growing.

587.    The July 11, 2019 disclosures that Defendants implemented a voluntary hold on sale and shipment of all cannabis products and that the Company created a Special Committee to investigate Defendants' wrongdoing were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Defendants' growing of cannabis in unlicensed rooms in their Niagara Facility from October 2018 through March 2019, as well as Defendants' decision to ship the cannabis grown in those unlicensed rooms to their Vaughan Facility for storage.

588.    Moreover, the July 11, 2019 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's illicit business practices, including the Company's ability to meet the high demand for cannabis by legitimate means and the Company's compliance with applicable regulations.  Defendants' statement that the Company "has implemented a voluntary hold on sale and shipment of all cannabis products as a precaution while Health Canada visits and reviews its Vaughan, Ontario manufacturing facility" was additionally false and misleading because Defendants failed to disclose that they engaged in the illicit practice of storing cannabis

in unlicensed rooms at the Vaughan Facility and that there was a considerable risk Health Canada would uncover the practice (especially given the recent findings of unlicensed growing at the Niagara Facility), increasing the risk of CannTrust losing its license to grow or sell cannabis.

589.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, CannTrust's stock price fell over *17%* from $3.11 per share on July 11, 2019 to $2.58 per share on July 12, 2019, on unusually high trading volume.

590.    The media linked the July 12, 2019 stock price drop directly to Defendants' disclosures.  For example, on July 12, 2019, Barrons.com reported that "CannTrust Holdings said Friday morning it has halted all cannabis sales and shipments while Health Canada reviews its processing plant in Vaughan, Ontario.  Now its shares are tanking."  Similarly, that same day, Bloomberg News reported that "CannTrust said Thursday night that it[] put a voluntary hold on the sale and shipment of all its medical and recreational products" and that CannTrust stock "tumbled . . . Friday after the Canadian pot company halted all sales and shipments of its products."

591.    However, despite these partial disclosures of adverse news which removed some of the artificial inflation in CannTrust's stock price, its stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded that the directive to grow in unlicensed rooms was known and given by CannTrust executives— including Individual Defendants—and that Defendants were storing the excess inventory in unlicensed rooms in their Vaughan Facility and that, as such, faced a high likelihood of getting the Company's license suspended.

**D.     July 15, 2019 – Fourth Partial Corrective Disclosure/Materialization of the Risk**

592.    On July 15, 2019, after the close of trading, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized in connection with an article published by the Financial Post discussing a recently filed action against CannTrust, which alleged CannTrust breached section 130 of the Ontario Securities Act which outlines liability for misrepresentation in offerings.  On that date, the article revealed for the first time the possibility that Defendants' actions concerning the growing in the five unlicensed rooms could rise to the level of a "criminal offence."

593.    The July 15, 2019 disclosure that Defendants' actions concerning the growing in the five unlicensed rooms could rise to the level of a criminal offence was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Defendants' growing of cannabis in unlicensed rooms in their Niagara Facility from October 2018 through March 2019.

594.    Moreover, the July 15, 2019 disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  This disclosure partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's illicit business practices, including the Company's ability to meet the high demand for cannabis by legitimate means and the Company's compliance with applicable regulations.

595.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, CannTrust's stock price fell

over **10%** from $3.06 per share on July 15, 2019 to $2.75 per share on July 16, 2019, on unusually high trading volume.

596.     However, despite these partial disclosures of adverse news which removed some of the artificial inflation in CannTrust's stock price, its stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded that the directive to grow in unlicensed rooms was known and given by CannTrust executives— the including Individual Defendants—and that Defendants were storing the excess inventory in unlicensed rooms in their Vaughan Facility and that, as such, faced a high likelihood of getting the Company's license suspended.

597.     Indeed, analysts were still uncertain about the full impact that Defendants' fraudulent conduct would have on the Company going forward.  For example, on July 15, 2019, ROTH Capital issued a report that placed CannTrust shares "Under Review" and reported: "The biggest unknown is the response by Health Canada, as the federal regulator has the power to potentially suspend or revoke CTST's license.  Additional legal actions may come about pending further investigations of violating The Cannabis Act.  At this time, the impact of these matters on CTST's financial results [is] unknown."  Likewise, Jefferies reported on July 15, 2019 that "[f]or a company that we had found to be well set up to succeed, we have been disappointed by execution and a lack of catalysts."  The report further stated: "As more details emerge, it becomes less likely that Health Canada will provide a swift resolution to the situation, with a number of cases likely to be put to CannTrust for violation of the Cannabis Act, or potentially worse.  There are also question marks over whether management had been aware of such schemes during its $200m equity offering."

E. **July 23–24, 2019 – Fifth Partial Corrective Disclosure/Materialization of the Risk**

598. On July 23, 2019, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized in connection with an article published by the Globe and Mail revealing new information about Defendants' role in the unlicensed growing. On that date, the article revealed that—based on internal CannTrust emails obtained by the news organization—"[b]oth the chairman and the chief executive officer of CannTrust Holdings Inc. were informed that the [C]ompany was growing cannabis in unlicensed rooms about seven months before Health Canada uncovered the regulatory breach." The article further disclosed that the internal emails "show chairman Eric Paul and CEO Peter Aceto were made aware that cannabis was being cultivated in rooms at a growing facility in Southern Ontario that had yet to be licensed by the federal regulator, and that Mr. Paul counselled staff on how to respond."

599. Additionally, on July 24, 2019, further new facts were revealed by the media about Defendants' role in the unlicensed growing. On that day, BNN Bloomberg published an article that—according to internal Company documents obtained by BNN Bloomberg— disclosed that Defendant "Aceto told senior company officials to 'continue as planned' and plant cannabis in an unlicensed room in mid-November." In reviewing internal weekly production meetings minutes, BNN Bloomberg created a timeline of when senior CannTrust executives— including Defendant Aceto—knew of the illegal growing.

600. The July 23–24, 2019 disclosures that certain Individual Defendants knew about and directed the growing of cannabis in unlicensed rooms were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Defendants' growing of cannabis in unlicensed rooms in their Niagara Facility from October

2018 through March 2019, as well as certain Individual Defendants' direct and personal involvement with the unlicensed growing by directing it and allowing it to continue.

601.    Moreover, the July 23–24, 2019 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's illicit business practices, including the Company's ability to meet the high demand for cannabis by legitimate means and the Company's compliance with applicable regulations.

602.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, CannTrust's stock price fell over *22%* from $2.62 per share on July 23, 2019 to $2.04 per share on July 24, 2019, on unusually high trading volume.

603.    The media attributed the stock drop directly to the new information about Defendants' explicit knowledge of the illicit activity in unlicensed growing rooms.  For example, Global News reported on July 24, 2019 that "CannTrust Holdings Corp. shares have plummeted further after a media report alleging that the cannabis company's chief executive and chairman of the board were aware of pot cultivation in rooms without government approval months before Health Canada discovered the illicit activity."  Similarly, the Canadian Press (CNP) reported that same day that "CannTrust Holdings Corp. shares took a nearly 22 per cent dive on Wednesday after a media report alleged that the cannabis company's chief executive and chairman of the board were aware of pot cultivation in rooms without government approval months before Health Canada discovered the illicit activity."  That same day, Bloomberg News also reported

that "[t]he [C]ompany's shares plunged 22% to C$2.68 in Toronto on the Globe and Mail report which cited internal emails showing Chairman Eric Paul and Chief Executive Officer Peter Aceto were informed the [C]ompany was growing pot in unlicensed rooms about seven months before Health Canada raised the issue."

604.    However, despite these partial disclosures of adverse news which removed some of the artificial inflation in CannTrust's stock price, its stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded that Defendants were storing the excess inventory in unlicensed rooms in their Vaughan Facility and that, as such, faced a high likelihood of getting the Company's license suspended.

**F.    August 12, 2019 – Sixth Partial Corrective Disclosure/Materialization of the Risk**

605.    On August 12, 2019, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized in connection with CannTrust's announcement that Health Canada found significant regulatory violations at a second cannabis facility.  On that date, the Company disclosed that "[a]fter trading hours on Friday, August 9, 2019, CannTrust received a report from Health Canada notifying the Company that its [Vaughan Facility] has been rated non-compliant with certain regulations."  The Company further disclosed that Health Canada found the following violations:

    (a)    The conversion of five rooms from operational areas to storage areas, which were used for storage since June 2018 without prior approval of Health Canada;

    (b)    The construction of two new areas without prior approval of Health Canada, one of which was used to store cannabis since November 2018;

    (c)    Insufficient security controls at the manufacturing facility;

    (d)    Inadequate quality assurance investigations and controls;

> (e)     Standard operating procedures that did not [] meet the requirements under regulations; and
>
> (f)     Documents or information that were not retained in a manner to enable Health Canada to complete its audit in a timely manner.

606.    Defendants explained that these findings were "based on observations made during an inspection completed during the period July 10-16, 2019."  Notably, Defendants admitted that the regulator's findings were accurate, noting: "CannTrust has accepted Health Canada's findings and remedial actions are underway."

607.    The August 12, 2019 disclosure that Health Canada found significant regulatory violations at the Company's Vaughan Facility was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Defendants' growing of cannabis in unlicensed rooms in their Niagara Facility from October 2018 through March 2019, as well as Defendants' decision to ship cannabis grown in those unlicensed rooms to their Vaughan Facility.

608.    Moreover, the August 12, 2019 disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  This disclosure partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's illicit business practices, including the Company's ability to meet the high demand for cannabis by legitimate means and the Company's compliance with applicable regulations.

609.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, CannTrust's stock price fell

approximately *30%* from a closing price of $3.17 per share on Friday, August 9, 2019 to a closing price of $2.32 on Monday, August 12, 2019, on unusually high trading volume.

610.    Analysts directly attributed the additional regulatory violations related to the use of unlicensed rooms at CannTrust's Vaughan Facility as the cause of the stock drop.   For example, on August 19, 2019, Jefferies reported that despite CannTrust's shares experiencing a gain as a possible result of a certain ETF rebalancing, "[t]hese gains were all but lost though after CannTrust announced on Monday morning that it has received a report from Health Canada informing it that its manufacturing facility in Vaughan, Ontario was non-compliant with certain regulations, which is in addition to the non-compliance finding for its Pelham facility previously."

### G.    September 17, 2019 – Final Corrective Disclosure/Materialization of the Risk

611.    On September 17, 2019, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized when the Company informed investors that Health Canada had suspended its license, preventing CannTrust from continuing to sell cannabis altogether.   On that date, CannTrust disclosed that "it received late this morning a Notice of Licence Suspension  . . . under section 64(1) of the Cannabis Act (Canada)," which "states that Health Canada has suspended CannTrust's authority to produce cannabis, other than cultivating and harvesting, and to sell cannabis."

612.    The press release continued: "As such, the Notice constitutes a partial suspension of the Company's licence for standard cultivation and a full suspension of its licences for standard processing, medical sales, cannabis drugs and research issued under the Cannabis regulations."   Also, "[d]uring the suspension, CannTrust may not propagate new lots or batches of cannabis or engage in the sale or distribution of cannabis."   The Notice cited "the Company's

previous non-compliance with certain requirements of the Cannabis Act (Canada) and the regulation made thereunder (the "Cannabis regulations") in respect of the matters that the Company has been discussing with Health Canada."

613.    The September 17, 2019 disclosure that Health Canada had suspended the Company's license, preventing CannTrust from continuing to sell cannabis altogether was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Defendants' growing of cannabis in unlicensed rooms in their Niagara Facility from October 2018 through March 2019, their attempts to hide their violations from Health Canada, their decision to ship the cannabis grown in those unlicensed rooms to their Vaughan Facility, and certain of the Individual Defendants' direct and personal involvement with the unlicensed growing by directing it and allowing it to continue.

614.    Moreover, the September 17, 2019 disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  This disclosure revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's illicit business practices, including the Company's ability to meet the high demand for cannabis by legitimate means and the Company's compliance with applicable regulations.

615.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, CannTrust's stock price fell *14%* from a closing price of $1.50 per share on September 16, 2019 to a closing price of $1.29 on September 17, 2019, on unusually high trading volume.

616.    Analysts acknowledged that the suspension was a result of Defendants' illicit growing in the five unlicensed rooms at the Niagara Facility.  For example, on September 18,

2019, ROTH Capital reported that "[t]he recent announcement stems from the previous non-compliance of CTST growing cannabis in five unlicensed rooms."

617.   Each decline in the price of CannTrust common stock, as detailed above, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in CannTrust common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

618.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of CannTrust common stock and the subsequent significant decline in the value of CannTrust common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

619.   The market for CannTrust common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 2,400,959 trades during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, CannTrust's common stock traded at artificially inflated prices.  Plaintiffs and other Class members purchased CannTrust common stock relying upon the integrity of the market relating to CannTrust common stock and suffered economic losses as a result thereof.

620.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Defendants' misrepresentations artificially inflating CannTrust's stock price and the subsequent significant decline in the value of CannTrust common stock when the

truth was revealed on July 8, 2019, July 10, 2019, July 11, 2019, July 15, 2019, July 23–24, 2019, August 12, 2019, and September 17, 2019.

621.    The declines in CannTrust's common stock price on July 8, 2019, July 10, 2019, July 12, 2019, July 16, 2019, July 24, 2019, August 12, 2019, and September 17, 2019 were the direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market.  The timing and magnitude of CannTrust's stock price decline evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

622.    Indeed, on the same day that CannTrust's common stock share price closed down 14%, the Standard & Poor's 500 Index and Dow Jones Industrial Index increased 0.26% and 0.13%, respectively.  Moreover, there was no news about CannTrust, other than the disclosures in the July 8, 2019 press release, July 10, 2019 Globe and Mail article, July 11, 2019 press release, July 15, 2019 Financial Post article, July 23–24, 2019 Globe and Mail and BNN Bloomberg articles, August 12, 2019 press release, and September 17, 2019 press release that could fully explain the Company's stock price declines on July 8, 2019, July 10, 2019, July 12, 2019, July 16, 2019, July 24, 2019, August 12, 2019, and September 17, 2019.

## VIII.   ADDITIONAL INDICIA OF SCIENTER

623.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over CannTrust's and the Individual Defendants' materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section VI were materially false or misleading when

made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the numerous allegations above setting forth Defendants' knowledge of the illicit growing and storing scheme alleged above, Defendants' scienter is further evidenced by the following facts.

A.   **Defendants Were Aware of the Unlicensed Growing and Staged Photographs Sent to Health Canada**

624.   Defendants took affirmative steps to hide from Health Canada the fact that they were growing in unlicensed rooms, and internal CannTrust communications unequivocally revealed the Individual Defendants' knowledge of the unlicensed growing.  For instance, according to whistleblower Nick Lalonde, he and other co-workers were instructed by CannTrust managers, such as the greenhouse operations manager, to hang fake white poly walls in front of the unlicensed rooms and move tables with hundreds of plants on them out of camera view so that when a photograph was taken, the cannabis in the unlicensed rooms would not be seen.

625.   As explained above, Health Canada required CannTrust, when applying for licenses, to submit an evidence package via the CTLS consisting of video footage and photographs of virtually every inch its Niagara Facility, including every single growing room within that facility.

626.   Yet, in order to grow additional cannabis in violation of the regulations, Defendants staged and sent photographs—with fake walls blocking the cannabis in the unlicensed rooms—to Health Canada as part of its evidence package.  As Mr. Lalonde informed Health Canada when he blew the whistle on Defendants' scheme, "[i]f you look through the camera footage prior to the dates the pictures were taken and requested you will clearly see us hanging up white poly walls to cover up thousands of plants."

627.    Other former CannTrust employees further explained that Defendant Aceto had even participated in a promotional video in front of one of the unlicensed rooms while plants could clearly be seen in the room in the background.

628.    Additionally, internal CannTrust emails sent to the Individual Defendants expressed a sigh of relief after an inspection of the Niagara Facility in which Health Canada did not uncover the unlicensed growing.  Specifically, those internal CannTrust emails as well as meeting minutes further demonstrate that the Individual Defendants were aware that CannTrust was growing in five unlicensed rooms from October 2018 through March 2019.

629.    For example, as explained above, Defendants Aceto, Abramowitz, and Paul received an email on November 16, 2018 from CannTrust's Director of Quality and Compliance, Graham Lee, explicitly stating that "RG8 is not licenced but has plants in it," "RG9 is not licenced but we are intending to put plants in it on Monday," and "PA2A-E are not licenced but we have moved the encapsulation equipment into them and will begin running it next week."

630.    Critically, in light of Health Canada having just completed an inspection and not finding that Defendants were growing in unlicensed rooms, the email further stated, "[w]e dodged some bullets," and "[Health Canada] did not ask about RG8E/W, which are unlicensed rooms currently full of plants."  Defendant Paul was then forwarded this email and responded to it later that same day on November 16, 2018.

631.    Further exposing Defendants' knowledge of the illicit growing scheme of CannTrust were internal minutes from weekly production meetings held during the weeks of November 21, 2018 and November 28, 2018, which were attended by CannTrust vice presidents, Graham Lee, as well as others.  According to the minutes from these meetings, CannTrust executives discussed growing in the unlicensed rooms.  Notably, the minutes also stated that

Graham Lee spoke to Defendant Aceto about the unlicensed room and was instructed to "continue as planned."

632.   In addition to weekly production meetings, the unlicensed rooms were also discussed in Quality Control Meetings.  For example, CW1 recalled that at the Quality Control meetings, which were held weekly in Niagara, and attended by Epp, Scott Rolph, Emily Tarrant, Emily Mclinchey, and others, issues at the Niagara Facility were discussed.  Specifically, CW1 explained that at these meetings, they discussed the Niagara Facility "not being up to par," documents not being filled out properly, cleanliness issues along with other quality issues.  CW1 further explained that they openly discussed the unlicensed grow rooms, RG8-12, and referred to them by their numbers.

633.   Indeed, CW1 recalled that they openly discussed making sure those rooms were clean before the plants were put in but CW1 explained that she refused to partake in documenting the related cleaning logs because the rooms were unlicensed.  According to CW1, because she "pushed back" by saying that it was "above her pay grade," those logs were handled by someone else.  CW1 recalled that Rolph and Mclinchey also pushed back on the unlicensed rooms.

634.   Notably, CW1 explained that Tarrant took the notes for the minutes at those Quality Control Meetings and that all documents and minutes "went to corporate" in Vaughan.  CW1 stated that the minutes sent to corporate reflected discussions of RG8-RG12, and CW1 confirmed that those discussions that were reflected in the minutes included references to the unlicensed rooms.

635.   Former CannTrust employees corroborated that Defendant Aceto directed employees to grow in unlicensed rooms and conceal the growing from Health Canada.  For

example, CW1 explained that Defendant Aceto knew everything that was occurring at the Niagara Facility because of the way the hierarchy of CannTrust worked, Defendant Aceto and the executives in Vaughan "dictated" what they did at the facility level and corporate "mandated all aspects of the business" including growth, and how they set-up the greenhouses.

636.    Likewise, former CannTrust employees recounted that other CannTrust executives also had knowledge of the Company's unlicensed growing.   For instance, CW2 recalled that both Andrea Kirk, VP of Quality Operations, and Lee knew about the unlicensed growing and that Lee had told the executives and the board that if Health Canada found out about the rooms, "there was going to be a lot of issues."  Yet, while CW2 stated that Kirk and Lee knew about the unlicensed rooms in the Niagara Facility, the decision to go ahead with growing in those rooms was made by Defendants Aceto and Paul.   CW2 was privy to this information because she sat in the same office as Lee, and Kirk would frequently come to their shared office to have closed door meetings.

637.    Additionally, with respect to storing the excess illicitly grown cannabis in the unlicensed storage rooms in the Vaughan Facility, CW2 recalled that the decision to store in the warehouse was made by Kirk with Defendant Aceto's and the Board's blessing at an Upper Management meeting.   CW2 further explained that Kirk instructed her to audit the warehouse. Yet, after CW2 audited the warehouse and wrote up her findings and detailed the problems, she was told that the warehouse was going to be used anyway.

638.    Defendants nonetheless touted in their 2018 Form 40-F that the Company "believes that it is complying in all material respects with the terms of such licences and permits," and warned of what could happen if the Company did not comply with all regulations, while at the time those statements were made, CannTrust was already not in compliance.

Similarly, throughout the Class Period, Defendants discussed the Phase 2 expansion and either waiting for Health Canada to approve the final rooms or parading the fact that they eventually received approval for the final rooms.

639.    But importantly, Defendants failed to disclose to investors that the Company had been growing in those rooms long before ever receiving the proper licenses to do so.  These Class Period statements, and numerous others like them, indicated that Defendants either knew about the growing of cannabis in the five unlicensed rooms from October 2018 through March 2019 and failed to disclose this conduct, or were reckless in failing to ascertain this information before making these statements to investors.

**B.    The Growing and Storing of Cannabis Was a Core Operation of CannTrust's Business**

640.    The Individual Defendants' knowledge that CannTrust was growing and storing in unlicensed rooms from October 2018 through March 2019 and storing excess cannabis in unlicensed rooms at their Vaughan Facility since June 2018 can be inferred because these facts were critical to CannTrust's core operations.

641.    Indeed, the Niagara and Vaughan Facilities were the only two facilities CannTrust operated in Canada during the Class Period.  Notably, during the Class Period, CannTrust grew 100% of its cannabis at the Niagara Facility, which consisted of a total of twelve growing rooms, and then processed that cannabis in the Vaughan Facility.

642.    Thus, the continued operation of the Niagara and Vaughan facilities was crucial to CannTrust's ongoing operation.  Indeed, if either of the facilities (or rooms within the facilities) had their licenses revoked, the Company would no longer be able to continue producing and selling its only product and the Company's cannabis operations would grind to a halt.  Accordingly, complying with all Health Canada regulations was important to CannTrust's

ongoing ability to sell medicinal and recreational cannabis.  Defendants conceded as much within their 2018 Form 40-F when they stated that "[f]ailure to comply with regulations may result in additional costs for corrective measures, penalties or restrictions on the Company's operations" and "[t]he delay or denial of such approvals may have a material adverse impact on the business of the Company and may result in the Company not meeting anticipated or future demand when it arises."

643.    In fact, CannTrust's Director of Quality and Compliance, Graham Lee, called attention to the risks the Company's illicit growing strategy created "several points of exposure" to CannTrust's business.  Specifically, on November 16, 2018, Lee emailed Defendants Aceto, Abramowitz and Paul, and another high-level employee, explicitly informing them that "[t]here are several points of exposure in our business we need to consider," and continuing to outline such risks, referring to the growing of cannabis in unlicensed rooms in the Niagara Facility: "1) RG8 is not licenced but has plants in it; 2) RG9 is not licenced but we are intending to put plants in it on Monday; 3) PA2A-E are not licenced but we have moved the encapsulation equipment into them and will begin running it next week."

644.    The Individual Defendants also had a direct role in communicating with Health Canada about the Company's facilities, and therefore either had knowledge about the facilities' operations or were reckless in not knowing.  For instance, as CW1 recalled, Defendant Aceto "was strongly involved" with communicating with Health Canada, along with Cam Fletcher, and Graham Lee, and CW1's boss, Jared Epp.  Furthermore, according to CW4, CannTrust executives visited the Niagara Facility "pretty often" from the Company's headquarters in Vaughan.

645.    Moreover, the Niagara and Vaughan Facilities and their expansion plans were discussed by Defendants during virtually every earnings call and mentioned in frequent press releases.  Defendants consistently talked about the pending license approvals on the remaining grow rooms in the Phase 2 redevelopment (*i.e.*, the five unlicensed rooms at issue), and once approved by Health Canada in April 2019, Defendants consistently touted that they were fully licensed.

646.    Therefore, the knowledge that CannTrust was growing in five unlicensed rooms from October 2018 through March 2019 can be imputed to the Individual Defendants.

**C.    Defendants Were Motivated to Grow In Unlicensed Rooms to Profit from Surging Demand and Establish Itself as a Cannabis Market Leader**

647.    The Individual Defendants were highly motivated to grow and store in unlicensed rooms during the Class Period and conceal that fact from Health Canada and investors in order to take advantage of unprecedented and skyrocketing demand.  In the wake of Canada legalizing the use of adult recreational cannabis on October 17, 2018, Canada experienced a nationwide supply shortage of cannabis, which extended to CannTrust.  This presented a once in a lifetime opportunity for CannTrust—who already had a head start as a result of their established medicinal cannabis business—to establish itself as one of the market-leading cannabis producers, provided however, that the Company could provide the volume of cannabis needed to fill the void in demand for cannabis that existed.  In order to accomplish this goal, CannTrust started growing thousands of cannabis plants in unlicensed rooms and concealed this fact from Health Canada and investors.

648.    Specifically, the Niagara Facility consisted of twelve growing rooms, five of which were not licensed for growing cannabis until April 2019.  But Defendants needed to increase capacity earlier than April 2019 when the rooms became licensed.  As such, in October

2018, Defendants seized the illegal opportunity and began growing cannabis in the five remaining rooms in the Niagara Facility despite not yet having the proper licenses.

649.     Then, once Defendants began growing cannabis in the five unlicensed rooms, Defendants were further motivated to conceal that fact from the public.  As mentioned above, if Health Canada learned that Defendants were growing in unlicensed rooms in violation of applicable regulations, CannTrust faced severe risks of being restricted from selling cannabis grown in those rooms, or worse, a suspension of the Company's licenses altogether.  Thus, Defendants were motivated to hide this fact from Health Canada by staging photographs sent to Health Canada as part of Defendants' applications, as well as omit this crucial fact from their publicly disseminated statements to investors and analysts.

**D.     Defendants Paul, Litwin, and Sanders Made Millions in Profits Offloading CannTrust Stock Through Insider Sales Transactions With Knowledge of the Illicit Growing Scheme and the Huge Regulatory Risks it Posed**

650.     During the Class Period, Defendants Paul, Litwin, and Sanders made huge profits off the inflated share price of CannTrust securities.  For example, according to Defendant Paul's Class Period trading records, he sold off more than three million shares of CannTrust stock during the Class Period, while being aware of the illicit growing and storing scheme, resulting in a personal profit to him of over $16.5 million.

651.     Critically during the Class Period, as discussed in Section V.B, *supra*, Defendant Paul knew that CannTrust was violating Heath Canada regulations and that were the regulator to uncover the Company's unlicensed growing scheme and suspend or withdraw CannTrust's licenses, it would materially impact the Company's ability to do business and cause its share price to plummet.  Thus, in anticipation of the public eventually learning the truth about Defendants' scheme, Defendant Paul took advantage of the artificially inflated stock price and sold before the illicit growing and storing scheme was disclosed to the public.

652.    Similarly, Defendant Litwin, along with Defendant Paul, sought to and did profit from the artificially inflated stock price during the Class Period.  In particular, Defendants Litwin and Paul controlled a holding company, Cannamed Financial Corp., which reaped massive proceeds from trading CannTrust stock at highly suspicious times during the Class Period. Defendant Paul owned 50% of Cannamed through The Paul Family Trust, in which included Defendant Paul as the sole trustee and with his two children as beneficiaries.  The remaining shares were owned by a mix of entities owned by Defendant Litwin, Defendant Litwin's father, Fred Litwin, and Defendant Litwin's sister, Risa Litwin.[27]

653.    Trading records indicate that on the same day that Defendant Paul received an email outlining various risks associated with growing and storing cannabis in unlicensed rooms, Cannamed, which was controlled by Defendants Paul and Litwin, sold CannTrust stock. Specifically, on November 16, 2018, Defendant Paul received, and responded to, an email that also included Graham Lee and Defendant Aceto that explicitly stated that CannTrust was growing in unlicensed rooms and further laid out other concealed risks, such as storing cannabis in unlicensed rooms.  That same day, Cannamed sold 110,000 shares and raked in approximately $1 million.  Moreover, subsequent to its November 16, 2018 trades, Cannamed sold additional CannTrust shares from November 20, 2018 through December 12, 2018, realizing more than C$5 million in additional proceeds.

---

[27] Specifically, other than Defendant Paul's 50% share of Cannamed, the remaining shareholders of Cannamed included: York Capital Funding Inc. – 21%; Forum Financial Corporation – 15%; Mar-Risa Holdings Inc. – 10.25%; and, Sutton Management Limited – 3.75%. York Capital Funding Inc. is beneficially owned 78.3% by Mar-Risa Holdings Inc., 9.8% by Mark Litwin and 9.8% by Risa Litwin. Mar- Risa Holdings Inc. is beneficially owned by the Litwin (1996) Trust, whose beneficiaries are Mark Litwin and Risa Litwin. Sutton Management Limited is owned 50% each by Mark Litwin and Risa Litwin.

654.    Defendant Litwin also traded CannTrust stock through means other than Cannamed.  For instance, through York Capital Funding Inc. and Mar-Risa Holdings Inc., Defendant Litwin sold an additional 1,964,410 shares of CannTrust during the Class Period for a total of at least $14.5 million.

655.    Moreover, Defendants Paul and Litwin, through Cannamed, sold approximately $33 million worth of CannTrust shares in connection with the Offering—again reaping massive proceeds prior to the public learning the truth about Defendants' unlicensed growing and storing of cannabis throughout the Class Period.

656.    Likewise, Defendant Sanders, through Cajun Capital Corporation, sold 250,000 shares of CannTrust stock during the Class Period for total proceeds of more than $1.3 million.

657.    The suspicious timing and magnitude of Defendants Paul's, Litwin's, and Sanders' Class Period trades therefore support a strong inference of scienter.

**E.    The Timing and Circumstances of Defendants Aceto's and Paul's Departures Support a Strong Inference of Scienter**

658.    The timing and circumstances of the forced departures of Defendants Aceto and Paul, key executives during the Class Period, also support a strong inference of scienter. Moreover, that these forced departures came from the recommendation of the special committee investigating the Company's wrongdoing and are temporally connected to disclosures of the Company's fraud further support that strong inference.

659.    After Health Canada issued its compliance report to CannTrust for growing in five unlicensed rooms and for misleading Health Canada inspectors, CannTrust created a special committee "comprised of independent members of the Board of Directors" to "investigate th[e] matter in its entirety."

660.    Specifically, "the Special Committee was appointed by the Board of Directors to investigate a compliance report from Health Canada notifying the Company that its greenhouse facility in Pelham, Ontario is non-compliant with certain regulations."  Moreover, the Special Committee had a "broad mandate to, among other things, investigate the Company's non-compliance with Health Canada regulations and ancillary matters, to make recommendations to the Board of Directors regarding any actions to be taken by CannTrust as a result of the investigation, and to assess any impact on the Company's bio assets, inventory, sales and revenue."

661.    The results of the Special Committee's investigation were devastating for Defendants Aceto and Paul, who as CEO and Chairman, respectively, were Company leaders and played a significant role in the actions the Company had taken throughout the Class Period. On July 25, 2019, the Company announced that as a result of the Special Committee's investigation, the Company fired Defendant Aceto and demanded Defendant Paul's resignation.

662.    The Company press release issued that day specifically explained that "[t]he investigation into the Company's non-compliance with Health Canada regulations and ancillary matters uncovered new information that has resulted in a determination by the Board to *terminate with cause* CannTrust CEO Peter Aceto."  The press release further announced that "the Board of Directors demanded the resignation of the Company's Chair Eric Paul and he complied."

663.    Additionally, the announcements of Defendant Aceto's firing and Defendant Paul's forced resignation came immediately after CannTrust's stock fell over 22% as a result of the public learning for the first time about internal CannTrust documents that revealed that

Defendants Aceto and Paul and other CannTrust executives not only knew about the unlicensed growing, but directed the Company to continue the unlicensed growing.

664.    For example, on July 23, 2019, the Globe and Mail reported that, according to internal CannTrust emails, "[b]oth the chairman and the chief executive officer of CannTrust Holdings Inc. were informed that the [C]ompany was growing cannabis in unlicensed rooms about seven months before Health Canada uncovered the regulatory breach."  The article further stated that the internal emails "show chairman Eric Paul and CEO Peter Aceto were made aware that cannabis was being cultivated in rooms at a growing facility in Southern Ontario that had yet to be licensed by the federal regulator, and that Mr. Paul counselled staff on how to respond."

665.    Similarly, the next day, on July 24, 2019,  BNN Bloomberg published an article that, according to internal Company documents, revealed that Defendant "Aceto told senior company officials to 'continue as planned' and plant cannabis in an unlicensed room in mid-November."  These revelations and disclosures caused CannTrust's stock to drop over 22% on July 24, 2019.

666.    Then, the very next day, on July 25, 2019, the Company announced that based on the investigation conducted by the Special Committee, Defendant Aceto had been fired and Defendant Paul had been forced to resign.

667.    Therefore, the fact that the Special Committee's investigation resulted in Defendant Aceto being fired and Defendant Paul being forced to resign, and the fact that this occurred immediately after the public learned for the first time that both Defendant Aceto and Defendant Paul had knowledge and a direct role in the unlicensed growing and concealment of the same support a strong inference of scienter.

F.      **Defendants Aceto's, Guyatt's, and Abramowitz's SOX and Form 52-109F2 Certifications Support a Strong Inference of Scienter**

668.    Finally, accompanying Defendants' 2018 Form 40-F, which contained materially false and misleading statements, Defendants Aceto and Guyatt executed certifications pursuant to the Sarbanes-Oxley Act ("SOX") Section 302 attesting to the Company's disclosure controls, internal controls, and the accuracy and veracity of the statements within the 2018 Form 40-F. The certifications stated that Defendants Aceto and Guyatt were "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the issuer's disclosure controls and procedures." The SOX Section 302 certifications further stated that Defendants Aceto and Guyatt "evaluat[ed] [] internal control over financial reporting," and that "th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report." Defendants Aceto and Guyatt also executed certifications pursuant to SOX Section 906, which accompanied the 2018 Form 40-F, attesting to the accuracy of the Company's financial reporting.

669.    In addition, accompanying the MD&A filed with SEDAR on November 14, 2018, which contained materially false and misleading statements, Defendants Aceto and Abramowitz executed Form 52-109F2 Certifications of Interim Filings, which indicated that they "reviewed the interim financial report and interim MD&A (together, the 'interim filings')," and that "having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings."

670.    The Form 52-109F2 certifications also stated that Defendants Aceto and Abramowitz were "responsible for establishing and maintaining disclosure controls and procedures (DC&P) and internal control over financial reporting (ICFR)."  Similarly, Defendants Aceto and Guyatt executed Form 52-109F2 Certifications of Interim Filings accompanying the MD&A, Form 6-K, and press release filed with the SEC on May 14, 2019, which contained similar language to the certifications filed with the November 14, 2018 MD&A.

671.    By signing these certifications, Defendants Aceto, Guyatt, and Abramowitz certified that the Company's internal controls over financial reporting and disclosure controls and procedures were effective, evidencing their access (and purported review of) CannTrust's financial data as well as the materially false and misleading statements set forth above.

672.    Contrary to Defendants Aceto's, Guyatt's, and Abramowitz's representations, throughout the Class Period, CannTrust suffered from severe internal control deficiencies and deficient disclosure controls and procedures, as evidenced by the fact that, as alleged herein, Defendants' growing of cannabis in five unlicensed rooms and scheme to prevent Health Canada from learning of that were accomplished with the approval and at the direction of CannTrust management, and Defendants' scheme rendered Defendants' public statements materially false and misleading.

673.    Had Defendants Aceto, Guyatt, and Abramowitz actually conducted the assessments and evaluations required, they would have discovered CannTrust's unlicensed growing and the misrepresentations and omissions contained within their public statements. Accordingly, Defendants Aceto, Guyatt, and Abramowitz, knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

## IX.    CONTROL PERSON ALLEGATIONS

674.    Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul, by virtue of their high-level positions at CannTrust, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

675.    Defendants Aceto, Guyatt, Abramowitz, and Rogers, as senior executive officers of CannTrust, and Defendant Paul as Chairman of the Board of Directors of CannTrust—a publicly held company whose common stock was traded on the NYSE, the TSX, and prior to February 25, 2019, the OTC Market, and governed by the federal securities laws—each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of CannTrust's publicly-traded common stock would be based on accurate information.  Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul each violated these requirements and obligations during the Class Period.

676.    Defendants Aceto, Guyatt, Abramowitz, and Rogers, because of their positions of control and authority as senior executive officers of CannTrust, and Defendant Paul, as Chairman of the Board of Directors of CannTrust, were able to and did control the content of CannTrust's SEC and SEDAR filings, press releases, and other public statements issued by or on behalf of CannTrust during the Class Period.  Each would have been provided with copies of the statements made in the SEC and SEDAR filings at issue in this action before they were issued to

the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul are responsible for the accuracy of the public statements alleged herein.

677. Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of CannTrust common stock by disseminating materially false and misleading information, and concealing and omitting material adverse facts. The scheme deceived the investing public regarding CannTrust's business, operations, and management and execution of customer contracts, and the intrinsic value of CannTrust's common stock and options, and caused Plaintiffs and members of the Class to purchase CannTrust common stock and options at artificially inflated prices.

## X.     CLASS ACTION ALLEGATIONS

678. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who, during the period from June 26, 2018 through September 17, 2019, inclusive (the "Class Period"), purchased the publicly traded common stock of CannTrust Holdings Inc. ("CannTrust" or the "Company") on the New York Stock Exchange or on any U.S.-based trading platform during the Class Period and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of CannTrust during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (v) CannTrust's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

679.    The members of the Class are so numerous that joinder of all members is impracticable.  According to its quarterly and annual reports filed with the SEC, during the Class Period, CannTrust had approximately 136,563,951 shares of common stock outstanding and was actively traded on the NYSE under the ticker symbol "CTST," and, prior to February 25, 2019, on the OTC Market under the ticker symbol "CNTTF."  While the exact number of Class members is unknown to Plaintiffs at this time, and such number can only be ascertained through appropriate discovery, Plaintiffs believe that the proposed Class has thousands of members and is widely dispersed geographically.  Record owners and other members of the Class may be identified from records maintained by CannTrust and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

680.    Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

681.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in class and securities litigation.

682.    Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(g)    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(h)     Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(i)      Whether, and to what extent, the market price of CannTrust common stock and exchange-traded options on such common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(j)      Whether Defendants acted with the requisite level of scienter;

(k)     Whether the Individual Defendants were controlling persons of CannTrust; and

(l)      Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

683.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

684.   To the extent that Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)     Plaintiffs and other members of the Class purchased CannTrust's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)     CannTrust stock met the requirements for listing and were listed and actively traded on the NYSE, TSX, and prior to February 25, 2019, the OTC Market, which are highly efficient and automated markets;

(g)     as a regulated issuer, CannTrust filed periodic public reports with SEDAR, the SEC, the NYSE, and the TSX;

(h)     CannTrust regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)     CannTrust was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Bank of America Global Research, Jefferies, ROTH Capital, and Canaccord, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

685.    As a result of the foregoing, the market for CannTrust's securities promptly digested current information regarding CannTrust from publicly available sources and reflected such information in CannTrust's securities price(s).  Under these circumstances, all persons and

entities who purchased or otherwise acquired CannTrust's securities during the Class Period suffered similar injuries through their purchase of CannTrust at artificially inflated prices and thus, the presumption of reliance applies.

686.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of CannTrust's common stock.

687.    Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of CannTrust's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

688.    To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to CannTrust's business, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII.   NO SAFE HARBOR

689.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading.   First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions.   Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.   Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

690.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent

and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

691.    In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement."   15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

692.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.   To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.  As detailed herein, Defendants failed to disclose to the market that CannTrust was growing cannabis in five unlicensed rooms from October 2018 through March 2019.

693.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of CannTrust who knew that the statement was false when made.

## XIII.   CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against
CannTrust, KPMG, the Individual Defendants and the Director Defendants**

694.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

695.   This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against CannTrust, KPMG, the Individual Defendants and the Director Defendants.

696.   As alleged herein, throughout the Class Period, CannTrust, KPMG, the Individual Defendants and the Director Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   CannTrust, KPMG, the Individual Defendants and the Director Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of CannTrust common stock; and (iii) cause Plaintiffs and members of the Class to purchase CannTrust common stock and exchange-traded options on such common stock at artificially inflated prices.

697.   The Individual Defendants, Director Defendants and KPMG were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared,

approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

698.    KPMG issued a clean Audit Report which contained false and misleading statements and financial figures and in doing so aided CannTrust in perpetrating its fraud on investors.  KPMG's practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious.

699.    As set forth above, CannTrust, KPMG, the Individual Defendants and the Director Defendants, made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased CannTrust common stock and exchange traded options on such common stock during the Class Period.

700.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for CannTrust common stock and exchange traded options on such common stock, Plaintiffs and other members of the Class purchased CannTrust common stock and options at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased CannTrust common stock and options at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of CannTrust common stock declined precipitously and Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases of CannTrust common stock and options at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

701.     By virtue of the foregoing, CannTrust, KPMG, the Individual Defendants and the Director Defendants, are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul

702.     Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

703.     This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul.

704.     Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul had control over CannTrust and made the materially false and misleading statements and omissions on behalf of CannTrust within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive leadership positions, positions as directors of CannTrust, and share ownership, as alleged above, Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend, were false and misleading.  Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

705.     In particular, Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore,

are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

706.    By reason of such wrongful conduct, Defendants Aceto, Guyatt, Abramowitz, Rogers, and Paul are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Defendants Aceto's, Guyatt's, Abramowitz's, Rogers', and Paul's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiffs as the Exchange Act Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel for the Exchange Act Class;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Exchange Act Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding Plaintiffs and the Exchange Act Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XIV.   VIOLATIONS OF SECTIONS 11, 12(a)(2) AND 15 OF THE SECURITIES ACT

707.    The claims set forth below in Counts III, IV and V allege violations of Sections 11, 12(a)(2) and 15 of the Securities Act.  Lead Plaintiffs bring these claims individually and on behalf of the ("Securities Act Class"), consisting of all persons and entities who purchased or

otherwise acquired CannTrust common stock pursuant and traceable to the Offering Materials issued in connection with the secondary public offering, completed on or about May 6, 2019 (the "Offering").[28]   The Securities Act Claims solely allege strict liability and negligence causes of action, and do not sound in fraud.   Accordingly, for the purpose of these Securities Act Claims, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud, intentional misconduct, or deliberately reckless misconduct.   Lead Plaintiffs therefore expressly do not incorporate by reference any allegations contained in Sections I-XIII, *supra*.

### A.   Factual Background

708.   Founded in 2013 by a group of pharmacists (including Defendant Paul), CannTrust was a federally regulated, licensed producer and distributor of medical cannabis in Canada, the United States and other international markets.   On June 12, 2014, CannTrust received its initial license from Health Canada to produce and cultivate medicinal cannabis, which the Company began doing at its facility and headquarters located in Vaughan, Ontario, Canada (the "Vaughan Facility").   Shortly thereafter, on February 9, 2015, the Company received its license to sell medicinal cannabis from Health Canada.

709.   On April 13, 2017, the prospect of legal recreational cannabis in Canada became a reality when the Canadian government issued an official press release introducing legislation to legalize and regulate the use of recreational cannabis in Canada.   In order to prepare for the

---

[28] The following are excluded from the Securities Act Class: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of CannTrust during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (v) CannTrust's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

increased demand and dramatically expand its growing capacity from legalization, in March 2017, CannTrust acquired real estate assets and related equipment of a 450,000-square-foot greenhouse facility in the Town of Pelham, Ontario within the regional municipality of Niagara, Ontario (the "Niagara Facility"). On October 17, 2018, the sale of cannabis for adult recreational use in Canada was legalized, the largest country to do so at the time.

710.    Along with the legalization came strict regulations imposed by the Canadian government, which had significant implications for CannTrust's plans to seize on surging demand and become a cannabis market leader. Indeed, during the Class Period, CannTrust and other cannabis companies all operated under a strictly regulated environment governed by various laws, regulations, and standards primarily administered by Health Canada—the Canadian equivalent of the FDA.

711.    The regulatory framework that gave Health Canada its authority over CannTrust was the federal *Cannabis Act* and the regulations promulgated thereunder (the "Cannabis Act"). The Cannabis Act went into effect on October 17, 2018—the same day as the legalization of Cannabis in Canada.

712.    The Cannabis Act set forth a thorough regulatory framework and licensing scheme for Cannabis manufacturing companies, such as CannTrust, for each phase or activity in the Cannabis industry including production, importation, exportation, testing, packaging, labelling, sending, delivery, transportation, sale, possession, and disposal of cannabis for both recreational and medical purposes. Accordingly, CannTrust was required to obtain activity-specific licenses for each phase of the Company's cannabis operations (such as cultivation, testing, processing, and sale of cannabis).

713. Critically, CannTrust was also required to obtain **location-specific** licenses for each of the facilities and rooms in which the distinct phase or activity took place—each of which was required to comply with its own specific regulations depending on the activity for which that the room was designated (and licensed). Under these strict regulations, CannTrust was required to obtain specific licenses for any new room or facilities—such as the Niagara Facility and each room therein—depending on what that room was being used for (*i.e.*, growing, storing, testing, packaging, *etc.*).

714. Indeed, for each room within each facility, Health Canada required, *inter alia*: (i) verification of the physical security requirements for the site; (ii) confirmation that the activities of the licensed producer correspond to those indicated on the licensed producer's license; (iii) identification of the legal source from which the licensed producer obtains their starting materials (*i.e.*, seeds and plants); and (iv) confirmation that adequate standard operating procedures (SOPs) have been established.

715. CannTrust's plan was to operate the Niagara Facility as the Company's sole growing facility and convert the formerly all-purpose Vaughan Facility to serve as the Company's processing facility (*i.e.*, growing no longer occurred there). The Company thus grew all its cannabis in its Niagara Facility and then shipped the harvested product to its Vaughan Facility for processing, extraction, manufacturing, packaging, and order fulfillment.

716. However, to begin growing cannabis in the newly acquired Niagara Facility, the Company had to bring it into compliance with applicable regulations. Since CannTrust wanted to begin production in the new facility as soon as possible, and converting the entire 450,000-square-foot facility all at once would have taken a long time, the Company split the redevelopment of the facility into three phases to allow the Company to begin producing

cannabis in part of the facility while the Company worked to convert the rest of the facility into compliance with Health Canada regulations.

717.    Specifically, Phase 1 of the development of the Niagara Facility involved converting 250,000 square feet of the 450,000-square-foot facility into compliance with Health Canada regulations.[29]  Phase 2—the phase most germane to this action—involved bringing the other 200,000 square feet into compliance with applicable regulations.  When completed with Phases 1 and 2 the Niagara Facility would consist of twelve grow rooms with the growing capacity to produce an estimated 50,000 kilograms of cannabis per year.[30]  However, as discussed above, in order to reach that growing capacity, CannTrust had to receive permits and licenses from Health Canada for each of the rooms in the Niagara Facility.

718.    As of June 2018, five of the twelve growing rooms in the Niagara Facility—those rooms that were part of Phase 2 of the expansion—were not yet fully licensed by Health Canada.  Accordingly, CannTrust was not permitted to grow cannabis in those five rooms for any purpose.  Those licenses were not issued by Health Canada until April 2019.

719.    Nonetheless, CannTrust started growing cannabis in unlicensed rooms at the Niagara Facility.  Specifically, from October 2018 through March 2019, Defendants grew cannabis in five unlicensed rooms within their Niagara Facility—in direct violation of Health Canada regulations.

---

[29] CannTrust received its Health Canada cultivation license for Phase 1 in October 2017 and its sales license in February 2018—allowing the Company to legally grow and sell cannabis, but only for medicinal purposes until the use of recreational cannabis was legalized.

[30] In January 2019, the Company received the necessary permits from Health Canada to develop an additional 390,000-square-foot expansion of the facility known as Phase 3.  However, Phase 3 was never completed as a result of Health Canada's suspension of CannTrust's cannabis production and selling licenses for growing and storing cannabis in unlicensed rooms in direct violation of the Cannabis Act.

720.    Numerous CannTrust employees observed the growing of cannabis plants in unlicensed rooms.  For example, CW1 confirmed that, during the Class Period, she knew about the plants in the unlicensed rooms.  According to CW4 the unlicensed growing started in October 2018.

721.    As a result of increased cannabis production caused by growing in the unlicensed rooms, Defendants began to ship more and more cannabis to the Company's Vaughan Facility for storage.  However, like the Niagara Facility, not all of the storage rooms in Defendants' Vaughan Facility were licensed.  Defendants stored the excess unlicensed grown cannabis inside unlicensed storage rooms in the Vaughan Facility.

722.    Former CannTrust employees corroborated that the overflow cannabis that was grown in the unlicensed Niagara Facility rooms were later stored in the unlicensed Vaughan Facility rooms.  CW3 explained that CannTrust transferred the product in bulk from its Niagara Facility to its Vaughan Facility, and that there was so much product being sent from the Niagara Facility that CannTrust did not have the capacity in the licensed rooms so CannTrust used the unlicensed rooms to store the excess product.  CW3 further explained that she knew this because she worked in these rooms to do her quality checks and observed the excess product being stored there.

723.    CannTrust employees hung fake walls in front of the thousands of plants in the unlicensed rooms.  As a result, when photographs were taken of the rooms, they appeared empty. Ultimately, CannTrust, starting in October 2018, planted approximately 3,000 plants in unlicensed room RG9, enough to produce 3,000 kilograms (or 6,600 pounds) of cannabis.

724.    In addition to growing and storing cannabis in unlicensed rooms, as far back as June 2018, CannTrust was growing cannabis from black-market cannabis seeds and then

relabeling the cannabis as a different strain approved by Health Canada and selling it.  In doing so, CannTrust was able to significantly bolster its production capacity because the black market seeds were not part of the regulated (and then highly in-demand) purchase and sale of seeds from cannabis strains that were approved by Health Canada.  Therefore, CannTrust could use the cannabis grown from the black market seeds to supplement its production capacity from legitimate health Canada approved seeds.

725.    Indeed, according to a September 6, 2019 BNN Bloomberg—which disclosed information from four sources and internal CannTrust documents—senior CannTrust staff working at the Niagara Facility brought cannabis seeds from the black market in late 2018 into production rooms and that some of that illicitly-grown marijuana was sold in the legal market. The article goes on to note:

> Cannabis plants from at least two strains that originated from the black market-sourced seeds entered production rooms where they were fully grown to flower, packaged and sold into the recreational market, according to the sources.  In total, more than one thousand cannabis plants that originated from the illicit seeds were grown at CannTrust's cultivation facility, the documents show.

726.    According to three of the sources cited in the article, the use of black-market seeds ramped up in October 2018.  However, other former employees stated that CannTrust used black-market seeds to bolster its production capacity and stated that the practice began as early as June 2018.

727.    Ultimately, CannTrust's violations were revealed to the market and the risks associated with the Company's practice of growing and storing cannabis in unlicensed rooms and from black-market seeds materialized, causing CannTrust's stock to plummet in value.

### B.    Summary of the May 6, 2019 Public Offering

728.    On March 1, 2019, CannTrust filed a Registration Statement on Form 10-F with the U.S. Securities and Exchange Commission (the "SEC") for a proposed offering of securities,

which was subsequently amended on March 18, 2019 (collectively, the "Registration Statement").  The Registration Statement was signed by Defendants Aceto, Guyatt, Dawber, Paul, Sanders, Kaden, Page, Litwin, and Marcovitch (defined below).  On March 19, 2019, the SEC declared the Registration Statement effective.

729.   On April 22, 2019, CannTrust filed a Preliminary Prospectus Supplement ("Preliminary Prospectus") with the SEC, which preliminarily announced offering an aggregate of $200 million of common shares but did not set an offering price.  On May 3, 2019, CannTrust filed a Prospectus Supplement (collectively, with the preliminary prospectus, the "Prospectus"), announcing its offering of 36,363,636 shares of common stock at an offering price of $5.50 per share.  In addition, the Prospectus stated that the Selling Shareholder Defendants were offering 5,454,545 shares of common stock at the same $5.50 offering price.

730.   In the Prospectus, CannTrust incorporated, by reference, the following documents as part of its offering materials: (a) the annual information form of CannTrust for the fiscal year ended December 31, 2018, dated March 28, 2019 (the "2018 Form 40-F"); (b) the Company's audited consolidated financial statement for the years ended December 31, 2018, and 2017, together with the independent auditor's reports thereon and the notes thereto (the "2018 Financial Statements"); (c) CannTrust's management's discussion and analysis for the year ended December 31, 2018 (the "2018 MD&A"); and (d) the management information circular of CannTrust dated April 12, 2018 ("Management Information Circular") in connection with the annual meeting of shareholders held on May 22, 2018.  These materials, along with the Registration Statement and Prospectus are collectively referred to herein as the "Offering Materials."

731.     On May 6, 2019, CannTrust completed the Offering, selling 36,363,636 common shares for total gross proceeds of approximately $199 million.   Cannamed and Cajun sold 6,272,727 common shares, including the exercised underwriter option, in the Offering.   The Defendant Underwriters (defined below) exercised their full option to purchase additional shares which maximized the amount of cash received by CannTrust and the Selling Shareholders in the Offering.

## XV.   JURISDICTION

732.     These claims arise under Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

733.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

734.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act.   Substantial acts related to the Offering occurred in this Judicial District.   CannTrust's common stock traded on the NYSE in this district during the Class Period and Defendants made materially false and misleading representations to investors that were disseminated to investors in this District.

735.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

## XVI.   THE SECURITIES ACT PARTIES

### A.     Lead Plaintiffs

736.     On April 16, 2020, the Court appointed Granite Point Master Fund, LP and Granite Point Capital Scorpion Focused Ideas Fund ("Granite Point") to serve as Lead Plaintiffs

pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Granite Point is a hedge fund that manages approximately $177 million in assets.  Granite Point is located in Boston, Massachusetts.  As set forth in Lead Plaintiffs' certification submitted with their application to be named Lead Plaintiff (ECF No. 45-1), Granite Point purchased CannTrust securities pursuant to and/or traceable to the Offering Materials at artificially inflated prices and has been damaged thereby.  Specifically, Granite Point purchased shares on May 3, 2018 at $5.89 per share.[31]  Lead Plaintiffs' May 3, 2019 trades settled on May 6, 2019, the day the Offering closed.

**B.    Defendants**

737.    CannTrust is incorporated in Ontario, Canada and maintains its principal executive offices at 3280 Langstaff Road, Unit 1, Vaughan, Ontario L4K 4Z8, Canada.  At the start of the Class Period the Company's stock traded on the Toronto Stock Exchange under the symbol "TRST" and as F-Shares under the symbol "CNTTF" on the OTC Pink Open Market in the United States.  CannTrust completed its initial public offering on March 9, 2018 and on February 25, 2019, the Company's shares began trading on the NYSE under the symbol "CTST."  CannTrust touts itself as "a leader in the Canadian cannabis industry" whose mission is

---

[31] Lead Plaintiffs' trades were not at the exact offering price of $5.50 because the Offering was offered at a non-fixed basis.  According to CannTrust's prospectus supplement filed May 3, 2019, "[t]he [s]ecurities may be sold from time to time in one or more transactions at a fixed price or prices **or at non-fixed prices**.  If offered on a non-fixed price basis, the [s]ecurities may be offered at market prices prevailing at the time of sale, at prices determined by reference to the prevailing price of a specified security in a specified market or at prices to be negotiated with purchasers, in which case the compensation payable to an underwriter, dealer or agent in connection with any such sale will be decreased by the amount, if any, by which the aggregate price paid for securities by the purchasers is less than the gross proceeds paid by the underwriter, deal or agent to the Company.  **The price at which the [s]ecurities will be offered and sold may vary from purchaser to purchaser and during the period of distribution."**

to "enrich our patient and customer experience by connecting them to the best quality products, educational resources and service[s]."

738.    Defendant Eric Paul ("Paul") is CannTrust's co-founder and was the former CEO from the Company's inception in 2015 until October 1, 2018, when he stepped down to assume the role of Chairman of CannTrust's Board of Directors ("Board") and Special Advisor to CannTrust's management team.  Paul is, and was at the time of the Offering, a member of CannTrust's Board of Directors.  Paul signed the Registration Statement as well as the 2018 Financial Statements and Management Information Circular, which were incorporated by reference in the Offering Materials.

739.    Defendant Paul Aceto ("Aceto") was the former CEO of CannTrust from October 1, 2018 until July 25, 2019.  Aceto signed the Registration Statement as well as the 2018 Financial Statements, which was incorporated by reference in the Offering Materials.

740.    Defendant Greg Guyatt ("Guyatt") has been the CFO of CannTrust since February 13, 2019. Guyatt signed the Registration Statement.

741.    Defendant Mark I. Litwin ("Litwin") is, and was at the time of the Offering, a member of CannTrust's Board.  Litwin signed the Registration Statement as well as the 2018 Financial Statements, which were incorporated by reference in the Offering Materials.

742.    Defendant Mitchell J. Sanders ("Sanders") is, and was at the time of the Offering, a member of the CannTrust Board.  Sanders signed the Registration Statement.

743.    Defendant Robert F. Marcovitch ("Marcovitch") is, and was at the time of the Offering, a member of the CannTrust Board and a member of the audit committee. Marcovitch signed the Registration Statement.

744.    Defendant Mark E. Dawber ("Dawber") is, and was at the time of the Offering, a member of the CannTrust Board.  Dawber signed the Registration Statement.

745.    Defendant Shawna Page ("Page") is, and was at the time of the Offering, a member of the CannTrust Board.  Page signed the Registration Statement.

746.    Defendant John T. Kaden ("Kaden") is, and was at the time of the Offering, a member of the CannTrust Board.  As of February 14, 2019, Kaden was also a member of the audit committee of CannTrust's Board.  Kaden signed the Registration Statement.

747.    Defendant KPMG has been engaged as CannTrust's auditor since 2018.  KPMG purportedly provided audit services to CannTrust beginning in 2018.  CannTrust paid KMPG approximately $500,000 for professional audit services related to CannTrust's fiscal year 2018. KPMG is a Canadian member firm of KPMG International Cooperative.  KPMG International Cooperative is based in Switzerland and is a membership-based company with member and network accounting and advisory firms operating locally in countries around the world, including the United States and Canada.  All KPMG member firms are affiliated with KPMG International.

748.    KPMG consented to the use of its Audit Report and notes on CannTrust's consolidated financial statements for the year ended December 31, 2018 in the April 22, 2019 Preliminary Prospectus Supplement ("Preliminary Prospectus") and May 3, 2019 Prospectus Supplement ("Prospectus Supplement," collectively, with Preliminary Prospectus, "Prospectus").

749.    Defendant Cannamed is a holding company owned and controlled by Defendants Paul (through the Paul Family Trust, which he owns and/or controls) and Litwin (through companies he or his family own and/or control, including Mar-Risa Holdings, Inc. and York Capital Funding Inc.).  Cannamed sold 6 million shares in the Offering.

750.    Defendant Cajun is a holding company owned and controlled by Defendant Sanders.  Cajun sold 250,000 shares in the Offering.

751.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a financial services firm that acted as underwriter and co-lead book-running manager for the Offering and helped to draft and disseminate the Offering Materials.  Merrill Lynch agreed to purchase 13,051,300 shares of CannTrust common stock in the Offering, exclusive of any over-allotment options.  Merrill Lynch maintains executive offices in this district at One Bryant Park, New York, New York 10036.

752.    Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial services firm that acted as underwriter and co-lead book-running manager for the Offering and helped to draft and disseminate the Offering Materials.  Citigroup agreed to purchase 7,457,885 of CannTrust common stock in the Offering, exclusive of any over-allotment options.  Citigroup maintains executive offices in this district at 388 Greenwich St., New York, New York 10013.

753.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services firm that acted as underwriter and co-lead book-running manager for the Offering and helped to draft and disseminate the Offering Materials.  Credit Suisse agreed to purchase 7,457,885 of CannTrust common stock in the Offering, exclusive of any over-allotment options.  Credit Suisse maintains executive offices in this district at 11 Madison Avenue, New York, New York, 10010.

754.    Defendant Jefferies LLC ("Jefferies") is a financial services firm that acted as underwriter and book-running manager for the Offering and helped to draft and disseminate the Offering Materials.  Jefferies agreed to purchase 2,701,505 of CannTrust common stock in the

Offering, exclusive of any over-allotment options.  Jefferies maintains executive offices in this district at 520 Madison Ave, 10th Floor, New York, New York, 10022.

755.    Defendant RBC Dominion Securities Inc. ("RBC") is a financial services firm that acted as underwriter and co-lead book-running manager for the Offering and helped to draft and disseminate the Offering Materials.  RBC agreed to purchase 3,650,680 of CannTrust common stock in the Offering, exclusive of any over-allotment options.  RBC directed substantial activities toward the state of New York in connection with the Offering.

756.    Defendant Canaccord Genuity LLC ("Canaccord") is a financial services firm that acted as underwriter and book-running manager for the Offering and helped to draft and disseminate the Offering Materials.  Canaccord agreed to purchase 2,044,381 shares of CannTrust common stock in the Offering, exclusive of any over-allotment options.  Canaccord maintains a regional office in this district and/or directed substantial activities toward the state of New York in connection with the Offering.

757.    Defendants Paul, Aceto, Guyatt, Litwin, Sanders, Marcovitch, Dawber, Page, and Kaden are collectively referred to herein as the "Individual Securities Act Defendants."

758.    Cannamed and Cajun are collectively referred to herein as the "Selling Shareholder Defendants."

759.    Merrill Lynch, Citigroup, Credit Suisse, Jefferies, RBC, and Canaccord are collectively referred to herein as the "Underwriter Defendants."

760.    CannTrust, the Individual Securities Act Defendants, the Underwriter Defendants, KPMG, and the Selling Shareholder Defendants are collectively referred to as the "Securities Act Defendants."

C.    **Relevant Third Parties**

761.    **CW1** worked at CannTrust's Niagara Facility from August 2018 until May 2019 as a Document Coordinator.    CW1 was responsible for issuing paperwork for harvests, cleanliness of the facility, sanitation logs, and, as she explained, "everything that is required by Health Canada."    CW1 handled those documents internally, and then her boss, Quality Supervisor Jared Epp, communicated directly with Health Canada.    Epp reported directly to Graham Lee who in turn reported to Defendant Aceto.    During her tenure, CW1 attended Quality Control meetings where issues at the Niagara Facility were discussed.    Furthermore, CW1 knew at the time that CannTrust staff removed plants from the unlicensed rooms, hung up curtains, and took framed pictures to make it look like there were no cannabis growth activities occurring in those rooms.

762.    **CW3** worked at CannTrust's headquarters at its Vaughan Facility from October 2018 until August 2019.    In October 2018, when CW3 first joined CannTrust, she worked in operational quality assurance, which involved working on the floor and overseeing enforcement of procedures.    In January 2019, CW3 transitioned into a new role that involved deviation closures.    In April 2019, CW3 was promoted to the rank of QAP (Quality Assurance Professional) at CannTrust.    In that role, CW3 worked with the product quality team and was responsible for training that team in advance of its product releases.    In February 2019, CW3 started doing the pre-review for product batches before they were released.    CW3 initially reported to Steven Khemraj, then Laura Leung, then Victoria Malov.

763.    **CW4** worked at CannTrust's Niagara Facility from May 2018 until June 2019 as a Senior Grow Technician.    CW 4 was responsible for growth activities for CannTrust's cannabis plants.

## XVII.  THE MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING MATERIALS

764.    The Underwriting Agreement, attached as Exhibit 99.1 to the May 3, 2019 Form 6-K, incorrectly represented that the Registration Statement and Prospectus "comply in all material respects with all applicable provisions of the 1933 Act" and "did not and will not contain any untrue statement of a material fact or omitted, omits or will omit to state a material fact necessary in order to make the statements therein" not misleading.

765.    Contrary to this representation and, as set forth below, the Offering Materials contain untrue statements of material fact, omit to state material facts required to be stated therein, or omit to state material facts necessary to make the statements therein not misleading, concerning the licensing, regulatory compliance, production, and financial growth of CannTrust.

766.    Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303") requires the Offering Materials to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Item 303 also requires disclosure of: (i) whether those trends or uncertainties have had or are reasonably expected to have a material unfavorable impact on revenue; (ii) the extent of any such impact on revenue; and (iii) "events that will cause a material change in the relationship between costs and revenues (such as known . . . inventory adjustments)."

767.    The Offering Materials failed to disclose known trends or uncertainties, as alleged further below, including with respect to illicitly growing cannabis at the Niagara facility, illegally storing cannabis in the Vaughan facility, and using "black market" seeds to grow cannabis as well as the uncertainty of what would happen to CannTrust were Health Canada to discover the illicit growing and storing scheme and revoke or rescind their licenses.  As

discussed above, Defendant Paul and Aceto's knowledge of this trend or uncertainty is evidenced by numerous emails and CW allegations regarding the practices occurring at CannTrust.   For example, in November 2018—prior to the Offering— Graham Lee sent an email to Defendant Aceto that was forwarded to Defendant Paul which stated: "1) RG8 is not licenced but has plants in it; 2) RG9 is not licenced but we are intending to put plants in it on Monday; 3) PA2A-E are not licenced but we have moved the encapsulation equipment into them and will begin running it next week."

768.    The failure to disclose these facts violated Item 303 because the Securities Act Defendants were aware that these adverse, undisclosed facts could (and ultimately did) have an unfavorable impact on CannTrust's sales, revenues, and income from continuing operations. Item 303 required disclosure because these material, adverse facts were known events or uncertainties that, at the time of the Offering, had caused or were reasonably likely to cause CannTrust's disclosed financial information not to be indicative of its future operation results, and likely materially and adversely to affect CannTrust's future results and prospects.

   A.    **False and Misleading Statements Concerning CannTrust's Compliance with Applicable Regulations**[32]

769.    The Offering Materials unequivocally stated that "CannTrust is a . . . licensed producer and disitributor of medical and recreational cannabis" that the Compnay "***abide[s] by applicable federal, state and provincial laws***," when, in reality, CannTrust had been illicitly growing cannabis from black-market seeds and storing cannabis since June 2018 and growing cannabis in unlicensed rooms from at least October 2018 and was therefore operating outside the parameters of its licenses.  For example, the Prospectus stated:

---

[32] Bold and italicized statements are alleged to be false and misleading while other statements are provided for context.

(1)     [CannTrust is] a *licensed producer and distributor of medical and recreational cannabis pursuant to the provisions of the Cannabis Act (Canada) (the 'Cannabis Act') and its regulations* which came into force on October 17, 2018.

(2)     The following summary addresses the primary Canadian federal and provincial laws and regulations associated with the production and distribution of legal cannabis and related products. It does not address the laws and regulations of any other jurisdiction. *The Company believes that, as of the date of this Prospectus, it is in material compliance with all laws and regulations* summarized below.

(3)     *[CannTrust] believes that it currently holds* or has applied for *all necessary licenses and permits to carry on the activities which it is currently conducting under applicable laws and regulations and also believes that it is complying in all material respects with the terms of such licenses and permit*s.

770.    The 2018 Form 40-F made similar representations as ¶769 above, representing:

(1)     CannTrust Opco's Quality Assurance team is led by a group of experienced operators and scientists and *is focused on generating the highest quality and most consistent product that meets or exceeds Health Canada expectations*.

(2)     *The Company distributes its recreational cannabis products in accordance with the federal and provincial regulatory frameworks*.

(3)     *The Company adheres to prescribed packaging requirements under the Cannabis Act and the Cannabis Regulations*.

(4)     The Company is continuously reviewing and enhancing its operational procedures at the Vaughan Facility and the Niagara Facility both proactively and in response to routine inspections. *The Company follows all regulatory requirements in*

*response to inspections in a timely manner. As of the date hereof, there are no outstanding inspection issues with Health Canada* beyond day-to-day adjustments that may occur in order *to ensure ongoing compliance.*

        (5)    *The Company believes that it currently holds* or has applied for *all necessary licences and permits to carry on the activities which it is currently conducting under applicable laws and regulations, and also believes that it is complying in all material respects with the terms of such licences and permits*.

771.    The 2018 MD&A similarly stated that "*CannTrust is a Licensed Producer and distributor of medical and recreational cannabis pursuant to the provisions of the Cannabis Act (Canada) (the ''Cannabis Act') and its regulations which came into force on October 17, 2018*."

772.    Similarly, the Prospectus represented that "*Health Canada has issued licences to CannTrust Opco for each of our facilities* (the '**Cannabis Licences**' and each a '**Cannabis Licence**')."

773.    The statements above regarding CannTrust's compliance with federal, state and provincial laws, as well as CannTrust's representations that it was a licensed producer and distributor, were materially false and misleading when made because: (i) starting in October 2018, CannTrust began illegally growing cannabis in unlicensed rooms at the Niagara facility; (ii) since June 2018, CannTrust was illegally storing dried cannabis in unlicensed rooms in the Vaughan facility; (iii) by June 2018, CannTrust was using illegal "black market" seeds to grow over one thousand cannabis plants without approval from Health Canada; and (iv) CannTrust's product packaging mislabeled "black market" seed cannabis as one of the licensed strain names,

in violation of the Cannabis Act; Accordingly, CannTrust was not operating in compliance with regulations and did not have a license to produce, store, and sell certain of its products.

774.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

775.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

776.    The Offering Materials also contained certain risk factors that were false and misleading, including the following:

(1)    *Any delays or complications in obtaining regulatory approvals, as well as failure to obtain any regulatory approvals, may have a material adverse effect on the business of the Company and result in additional costs.*

> *Achievement of the Company's business objectives is contingent, in part, upon compliance with regulatory requirements enacted by governmental authorities and obtaining all regulatory approvals, where necessary for the sale of its product.*  The Company may not be able to accurately predict the impact of the compliance regime Health Canada is implementing for the Canadian medical and recreational cannabis industry.  Similarly, we may not be able to accurately predict the time required to secure all appropriate regulatory approvals for its product, or the extent of testing and documentation that may be required by governmental authorities.  *The impact of Health Canada's compliance regime, any delays in obtaining, or failure to obtain, regulatory approvals may significantly delay or impact the development of markets,*

*products and sales initiatives and could have a material adverse effect on the business, results of operations and financial condition of the Company.*

(2)   A significant failure of our site security measures and other facility requirements, including *any failure to comply with regulatory requirements, could have an impact on our ability to continue operating under the Cannabis Licenses or our prospects of renewing the Cannabis Licenses, and could also in a suspension or revocation of the Cannabis Licenses.*  As we currently produce our cannabis products only at the Niagara Facility *any event impacting our ability to continue production there, or requiring us to delay production, would prevent us from continuing to operate our business* until operations at the Niagara Facility could be resumed, or until we are able to commence production at another facility.

(3)   *We are required to obtain and maintain certain permits, licenses or other approvals from regulatory agencies* in countries and markets outside of Canada in which we operate, or to which we export, in order to produce or export to, and sell our medical products in, these countries, including, in the case of certain countries, the ability to demonstrate compliance with Good Manufacturing Practices ("GMP").  *There can be no assurance that we will be able to comply with these standards*.

777.   The above purported warnings were materially false and misleading when made because these risks warned of had already materialized and come to pass because CannTrust was not in compliance with regulations and was not licensed to produce or sell certain of its products, as described in paragraphs 773-775.

778.   In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.  Specifically, Defendants failed to disclose that they were growing

cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

### B. False and Misleading Statements Concerning CannTrust's Successful Increased Capacity and Expansion

779.    As a result of CannTrust's illegal use of black seeds and unlicensed rooms to grow cannabis, the Offering Materials contained false and misleading statements concerning the true amount and timing of CannTrust's legal cannabis production and expansion.

780.    For example, the Offering Materials touted CannTrust's production volume, yet failed to disclose this volume was the result of growing illegal and unlicensed cannabis. The 2018 MD&A and Prospectus stated:

(1)     *In the quarter ended March 31, 2019, we harvested approximately 9,424 kg of cannabis from our Niagara facility*, representing an increase of 96% from the fourth quarter of 2018.

(2)     *At December 31, 2018, it is expected that the Company's biological assets will yield, net of waste, approximately 13,926,974 grams (December 31, 2017- 1,911,972 grams)* of biological produce, with net selling prices ranging from $2.92 to $12.00 per gram.

(3)     *As at [sic] December 31, 2018, the Company held 4,471,032 grams of dry cannabis (December 31, 2017 – 626,935) and 6,887,849 grams of extracts (December 31, 2017 – 977,186)*.

(4)     *For the three months ended December 31, 2018, harvested production was 4,816 kg, a 712% increase from the 593 kg in the comparable 2017 period*.

(5)   *Our approximately 450,000 square foot perpetual harvest facility in Niagara (the 'Niagara Facility'), has an annual capacity of approximately 50,000 kilograms, as of April 2019 and, through our planned expansion, we are targeting annual capacity of 100,000 kilograms by 2020*.

(6)   2018 Full Year Highlights . . . *Sold 7,251 kg of dried Cannabis and dried Cannabis equivalent* at an average net price of $6.29 per gram.

(7)   2018 Fourth Quarter Highlights . . . *Sold 3,407 kg of dried Cannabis and dried Cannabis equivalent* at an average net price of $4.75 per gram.

(8)   *For the year ended December 31, 2018, harvested production was 16,212 kg, a 471% increase from the 2,839 kg in the prior year period.  For the three months ended December 31, 2018, harvested production was 4,816 kg, a 712% increase from the 593 kg in the comparable 2017 period*.  The increase in the fair value of biological assets recorded during the period was due to the ramp up of production at the Niagara Facility, partially offset by the impact of valuation assumptions such as the average revenue per gram and the stage of the plants as of the reporting date.  While the total number of plants in production increased significantly year over year, as at December 31, 2018 the average stage of the plants in the grow cycle combined with lower expected revenue per gram as a result of the recreational market resulted in the limited increase in the value of biological assets.

(9)   *As of December 31, 2018, the Company supplied more than 10,000 finished units of its products per day* for its medical and adult-use recreational market.

781.   Likewise, the 2018 MD&A and Prospectus represented CannTrust's revenue was increasing, and that the increase was due to organic customer growth and sales:

(1)     *Our rapidly growing patient base has increased organically at a rate we believe is faster than any other licensed producer, experiencing a 57% growth from 2017 to 2018.*  We believe that we have supported this growth through our commitment to patients' access to cannabis.

(2)     *Revenue for the quarter ended December 31, 2018 was $16,166 compared to $6,983 for the comparable 2017 period, an increase of 132%.  Revenue for the year ended December 31, 2018 was $45,645 compared to $20,698 in the comparable 2017 period, an increase of 121%.  The increase in revenue in the quarter and year ended December 31, 2018 was primarily attributable to increased sales volume due to the growth in the Company's medical patient base from approximately 37,000 at December 31, 2017 to 58,000 as at December 31, 2018*, as well as sales derived from the Company's new domestic and international wholesale revenue streams, which includes sales to the provinces related to the legalization of the adult-use recreational market.

(3)     *Net revenue is expected to be approximately $17 million, an increase of 116% as compared to $7.8 million for the quarter ended March 31, 2018.  The estimated increase in revenue is primarily due to a 68% increase in medical patients* combined with the contributions from the Canadian adult-use recreational market, which was legalized in October of 2018.  *This estimated revenue represents an increase of approximately 5% as compared to $16.2 million for the quarter ended December 31, 2018, primarily due to a 16% increase in medical patients*.

(4)     *Gross profit is expected to be between $27 million to $28 million as compared to $21 million for the quarter ended March 31, 2018*.

(5)     *The total quantity of medical cannabis sold to patients during the three months ended December 31, 2018 increased to 2,017 kg, a 166% from the comparable 2017 period.  For the full year 2018, the [C]ompany sold 5,372 kg of medical cannabis, an increase of 141% from the comparable 2017 period*.

(6)     *Cost of goods sold during the three and twelve months ended December 31, 2018 were $10,489 and $19,690, respectively, compared to $4,577 and $7,680 in the comparable prior year periods*.  Costs of goods sold includes pre-harvest production, post-harvest production and processing costs of cannabis, packaging, testing and inventory purchased from third parties.  *Costs of goods sold during the three and twelve months ended December 31, 2018 increased compared to the comparable 2017 periods due to increases in sales quantities and the associated increase in the scale of production activities.*

(7)     Gross profit/(loss) for the three and twelve months ended December 31, 2018 was a loss of $8,282 and profit of $36,493, respectively, compared to a gross profit of $11,036 and $23,980 in the comparable prior year periods . . . . *The increase in gross profit in 2018 compared to 2017 was principally due to the increase in sales.*

(8)     Excluding the impact of the change in the fair value of biological assets, gross profit for the three and twelve months ended December 31, 2018 was $5,677 and $25,955, respectively, compared to a gross profit of $2,406 and $13,018 in the comparable prior year periods.  *The increase in gross profit excluding the impact of the change in the fair value of biological assets was as a result of increased scale of operations.*

(9)     ***Net income before income taxes and Adjusted EBITDA are expected to be between $12 million and $14 million*** . . . .

(10)    [2018 Full Year Highlights:] ***Record annual revenues of $45,645, a 132% increase from 2017***. . . .2018 Fourth Quarter Highlights . . . ***Record quarterly revenues of $16,166***, a 28% increase from third quarter of 2018.

782.    Defendants' statements above were materially false and misleading for the same reasons set forth in paragraphs 773-775.   For example, the statements above regarding CannTrust's volume, capacity to grow and sell cannabis, and increased sales were materially false and misleading when made and omitted material information because they failed to disclose that the cannabis produced and sold: (a) was illegally grown in unlicensed rooms at the Niagara facility beginning in October 2018; (ii) was stored in unlicensed rooms in the Vaughan facility since June 2018; (iii) was grown from illegal "black market" seeds without approval from Health Canada, which ultimately grew over one thousand cannabis plants; and (iv) was distributed and sold to consumers without a proper permit. Accordingly, the touted production volume was based on illegal activities and did not represent CannTrust's legal production volume.

783.    Further, the statements above concerning the purported increase in production of cannabis in 2018 as compared to 2017 were false and misleading and omitted material information because CannTrust failed to disclose that its production rates after June 2018 were artificially inflated due the growth of illegal and unlicensed cannabis, as described in ¶782 above.

784.    The 2018 Form 40-F further represented that "CannTrust Opco has an extensive genetic strain bank and ***currently produces approximately eight core strains***. The strains have been optimized for greenhouse horticultural practices."  This statement was false and misleading

because, by June 2018, CannTrust was using illegal "black market" seeds to grow over one thousand cannabis plants without approval from Health Canada, and CannTrust's product packaging for these products mislabeled the "black market" seed cannabis as coming from one of the licensed strains. Accordingly, CannTrust was producing over eight core strains but mislabeling the additional unlicensed strains as one of the eight approved strains.

785.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

786.    The Prospectus further made materially false and misleading statements when comparing CannTrust's production rates to competitors, stating:

(1)    ***Our plant genetics and related expertise, production experience, and integrated supply chain allow us to grow and cultivate cannabis at what we believe is a higher efficiency and lower cost than many of our competitors, while maintaining the award-winning quality*** and standardization necessary to produce high-quality cannabis.

(2)    We believe that the efficiency of our operating model, ***including our production capacity*** and research and development, ***makes us one of the few licensed producers with a clear, identifiable path to growth and profitability.***

787.    Defendants' statements above were materially false and misleading for the same reasons set forth in paragraphs 773-775 and 782-784.  For example, these statements were false

and misleading and omitted material information because they failed to disclose that: (i) CannTrust's purported efficiency rates, awards, and production capacity were not the result of expertise, but were the result of its illegal cannabis operations; and (ii) CannTrust's cost of production was lower than competitors due to the fact it was obtaining less costly seeds from the unregulated black market, rather than the more expensive licensed seeds from the regulated market.

788.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

789.    To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

790.    In addition, the Prospectus discussed CannTrust's plans to expand and meet increased product demand, but failed to disclose that the Company was illegally growing, and would need to continue to illegally grow and sell cannabis in order to do so:

(1)    ***We plan to increase our presence in existing markets, drive growth by entering new regions***, and broaden consumer awareness and education of the benefits of cannabis globally.

(2)     *We are also making strategic investments into our capacity to prepare for expected increases in demand for our products.*

(3)     *With the completion of all phases of the Niagara expansion, we believe we have the ability to supply a substantial share of the increased demand* arising from international markets.

791.     Defendants' above statements were materially false and misleading for the same reasons set forth in paragraphs 773-775, 782-784, and 787.  For example, these statements were false and misleading and omitted material information because they failed to disclose that CannTrust was growing, and would continue to grow cannabis illegally in order to meet its current demand and expansion efforts.

792.     In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

793.     The Prospectus and Registration Statement further represented that CannTrust "expects [the] first harvest from the Phase II expansion by the end of the first quarter of 2019, subject to Health Canada approval." The Prospectus and 2018 MD&A similarly represented that CannTrust would increase its production and profitability once the Phase 2 expansion was complete, stating:

(1)      *Profitability is expected to improve following the full realization of the increased operational capacity of the Phase 2 expansion*.  As the Phase 2 expansion contributes to positive operating leverage, we are targeting a return to profitability.

(2)      *The Phase 2 expansion at the Niagara Facility was substantially completed during the first quarter of 2019* and Health Canada approved the amendment of our cultivation and processing permit to include the final 20% of the Phase 2 expansion on April 8, 2019.

(3)      *With the Phase 2 expansion, we expect full production to be achieved by the end of the second quarter of 2019 at an annualized rate of 50,000 kg per year*.

(4)      *The completed Phase 2 expansion of the Niagara Facility is expected to increase production capacity to 50,000 kg on an annualized basis.  With this increased production capability, we believe revenue will increase significantly in 2019 compared to the 2018 full year results*, with revenue growth accelerating throughout the year starting in the second quarter of 2019.  *We are positioned to receive all necessary regulatory approvals* to support this planned growth. In addition, having obtained all necessary permits from the Town of Pelham for the construction of its Phase 3 expansion, *we continue to expect our Niagara Facility capacity to reach 100,000 kg on an annualized basis in the second half of 2020*.

794.    The Registration Statement also represented the Phase 2 expansion remained "on course" to increase the Company's capacity, stating:

(1)      *The Phase II expansion remains on course to bring the Company's capacity to 50,000 kg per year.*

(2)     The build out of an additional 390,000 square feet of high-end greenhouse as part of *the Niagara Phase III expansion would provide an expected additional 50,000 kg of annual high-quality cannabis flower production capacity. Once constructed, this expansion facility would require licencing by Health Canada*.

795.     Defendants' above statements were materially false and misleading for the same reasons set forth in paragraphs 773-775, 782-784, and 787.   Furthermore, CannTrust's representation that the expansion facility "would require licencing by Health Canada" "[o]nce constructed" was false and misleading and omitted material information because it failed to disclose that CannTrust was already operating the Phase II facilities without having obtained the necessary licensing.   Accordingly, operations under the Phase 2 expansion were already underway with cannabis being grown, produced, stored, and sold without regulatory approval.

796.     In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.   Specifically, Defendants failed to disclose that they were growing cannabis in unlicensed rooms in their Niagara Facility, were storing cannabis in unlicensed rooms in their Vaughan Facility, were obtaining seeds from the black market, and in light of these direct violations of applicable regulations, risked Health Canada suspending CannTrust's growing and selling licenses.

797.     To the extent any of Defendants' statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statements regarding their ability to increase growing capacity to meet the high demand for cannabis.

**C.      False and Misleading Statements Concerning CannTrust's Financial Growth and Values of Inventory and Biological Assets**

798.      The Offering Materials contained materially false and misleading statements concerning the financial growth of CannTrust in 2018. The March 28, 2019 Consolidated Financial Statements also included a Report of Independent Registered Public Accounting Firm signed by KPMG.  Addressing the shareholders, the Audit Report explained that KPMG audited the March 28, 2019 Consolidated Financial Statements and stated that "the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018."

## CannTrust Holdings Inc.
Consolidated Statements of Financial Position
As at December 31
(in Canadian dollars)

| | Notes | 2018 | 2017 |
|---|---|---|---|
| **Assets** | | | |
| | | | |
| **Current** | | | |
| Cash | | $ 9,022,821 | $ 17,961,043 |
| Short term investments | 7 | 63,023,908 | 201,538 |
| Harmonized sales tax recoverable | | 1,492,110 | 2,636,710 |
| Inventory | 8 | 35,389,490 | 10,959,022 |
| Biological assets | 8 | 10,502,579 | 9,843,690 |
| Accounts receivable | | 6,151,604 | 160,383 |
| Prepaid expenses | | 2,859,039 | 2,465,506 |
| **Total current assets** | | 128,441,551 | 44,227,892 |
| | | | |
| Investments | 18 | 10,661,932 | 156,073 |
| Restricted cash | 7 | 100,000 | 100,765 |
| Property and equipment | 9 | 62,208,905 | 33,963,685 |
| Financial assets | 11 | 901,350 | - |
| **Total Assets** | | 202,313,738 | 78,448,415 |
| | | | |
| **Liabilities** | | | |
| | | | |
| **Current** | | | |
| Accounts payable and accrued liabilities | | 12,806,458 | 6,579,997 |
| Current portion of promissory note | 6 | 200,000 | 200,000 |
| Current portion of mortgage | 12 | 3,790,610 | - |
| **Total current liabilities** | | 16,797,068 | 6,779,997 |
| | | | |
| Promissory note | 6 | 600,000 | 800,000 |
| Mortgage | 12 | 9,457,876 | - |
| Deferred tax | 19 | 1,433,000 | - |
| **Total Liabilities** | | 28,287,944 | 7,579,997 |
| | | | |
| **Shareholders' Equity** | | | |
| Share capital | 13 | 207,061,423 | 104,824,215 |
| Share-based payment reserve | | 8,714,188 | 2,272,302 |
| Warrants reserve | 15 | 11,393,687 | 3,361,789 |
| Deficit | | (53,143,504) | (39,589,888) |
| **Total Shareholders' Equity** | | 174,025,794 | 70,868,418 |
| **Total Liabilities and Shareholders' Equity** | | $ 202,313,738 | $ 78,448,415 |

Commitments (Note 16)

The accompanying notes are an integral part of the consolidated financial statements.

_(signed) "Eric Paul"_____    Director        _(signed) "Mark Litwin"_____    Director

**CannTrust Holdings Inc.**
Consolidated Statements of Net (Loss) Income and Comprehensive (Loss) Income
For the Years Ended December 31
(in Canadian dollars)

| | Notes | | 2018 | 2017 |
|---|---|---|---|---|
| | | | | (Restated) |
| | | | | (Note 5) |
| Gross revenue | 22 | $ | 48,390,103 | $ 20,697,764 |
| Excise duty | | | (2,744,960) | - |
| **Net revenue** | | | 45,645,143 | 20,697,764 |
| Cost of goods sold | 5 | | 19,690,162 | 7,680,234 |
| **Gross profit, before changes in fair value of biological assets** | 5 | | 25,954,981 | 13,017,530 |
| Fair value changes in biological assets included in inventory sold | 5 | | 17,301,866 | 8,929,308 |
| Unrealized gain on changes in fair value of biological assets | 5,8 | | (27,840,156) | (19,891,851) |
| **Gross profit** | | | 36,493,271 | 23,980,073 |
| **Expenses** | | | | |
| Amortization | 9 | | 2,169,281 | 964,396 |
| General and administrative | 17 | | 9,014,467 | 3,636,808 |
| Marketing and promotion | | | 7,274,454 | 198,858 |
| Salaries and benefits | | | 9,823,942 | 3,853,314 |
| Selling and shipping costs | | | 8,971,434 | 3,803,056 |
| Share based compensation | 14 | | 8,056,451 | 2,310,678 |
| **Operating expenses** | | | 45,310,029 | 14,767,110 |
| **(Loss) income from operations** | | | (8,816,758) | 9,212,963 |
| Mortgage interest expense | | | (478,169) | (260,203) |
| Interest income | | | 790,123 | - |
| Accretion expense | 12 | | (208,842) | (233,716) |
| Transaction costs | 6 | | - | (204,282) |
| Other (loss) income | 18 | | (2,033,700) | 143,060 |
| (Loss) on equity accounted investment | 18 | | (385,110) | (147,056) |
| Impairment loss on assets | 10 | | (988,160) | - |
| Loss on revaluation of derivative liability | | | - | (1,625,336) |
| **(Loss) income before income taxes** | | | (12,120,616) | 6,885,430 |
| Deferred income tax expense | 19 | | 1,433,000 | - |
| **Net (loss) income and comprehensive (loss) income** | | $ | (13,553,616) | $ 6,885,430 |
| **Weighted average number of common shares - basic** | | | 99,282,045 | 76,876,971 |
| **Weighted average number of common shares - diluted** | | | 99,282,045 | 80,526,105 |
| **Earnings (loss) per share - basic** | 13 | | (0.14) | 0.09 |
| **Earnings (loss) per share - diluted** | 13 | | (0.14) | 0.09 |

799.    The above statements concerning CannTrust's revenue, inventory, and financial growth in fiscal year 2018 were materially false and misleading and omit material information because they failed to disclose that CannTrust's 2018 revenue and sales were derived from: (i) illegally grown cannabis in unlicensed rooms at the Niagara facility beginning in October 2018; (ii) illegally stored cannabis in unlicensed rooms in the Vaughan facility since June 2018;

(iii) illegally grown cannabis from "black market" seeds without approval from Health Canada beginning no later than June 2018, which ultimately grew over one thousand cannabis plants; and (iv) illegally distributed and sold cannabis that CannTrust did not obtain a proper permit to sell.  In fact, two of CannTrust's most popular strains of cannabis product were harvested from illegal "black market" seeds, further artificially increasing CannTrust's growth and earnings through inorganic means.

800.    Further, the statements concerning the purported increase of revenue and sales in 2018 as compared to 2017 were false and misleading and omitted material information because they failed to disclose that CannTrust's production rates in 2018 were artificially inflated due to the growth of illegal and unlicensed cannabis, as described in paragraphs 799, *supra*, and 801-821, *infra*.

### 1.    CannTrust Issued Financial Statements In Violation of International Accounting Standards

801.    International Financial Reporting Standards ("IFRS") represent the set of accounting principles that domestic public companies in Canada are required to employ for purposes of preparing financial statements.[33] IFRS are generally accepted around the globe and at least 100 countries have adopted IFRS.  *See* SEC Release No. 33-8879. For example, the SEC allows "foreign private issuers in their filings with the Commission [to prepare] financial statements…in accordance with International Financial Reporting Standards ("IFRS") as issued by the [IASB]." (*Id.*)   IFRS are comparable to U.S. generally accepted accounting principles ("GAAP") and the SEC has supported efforts to converge the standards. (*Id.*)

---

[33]https://www.ifrs.org/use-around-the-world/use-of-ifrs-standards-by-jurisdiction/canada/

802.    According to CannTrust's 2017 and 2018 annual reports, the Company purportedly reported and prepared its financial statements in accordance with the IFRS.[34]

### (a)    CannTrust's Illicit Growing and Storing Scheme Resulted in Overstated Biological Assets and Inventory

803.    During the Class Period, CannTrust consistently overstated its biological assets and inventory according to IFRS.  CannTrust's inventory and biological assets were critical assets on the Company's balance sheet and to investors because they represented approximately 40% of total current assets and more than 80% when excluding short-term investments.

| | Notes | 2018 | 2017 |
|---|---|---|---|
| **Assets** | | | |
| **Current** | | | |
| Cash | $ | 9,022,821 | $ 17,961,043 |
| Short term investments | 7 | 63,023,908 | 201,553 |
| Harmonized sales tax recoverable | | 1,492,110 | 2,636,710 |
| Inventory | 8 | 35,389,490 | 10,959,022 |
| Biological assets | 8 | 10,502,579 | 9,843,690 |
| Accounts receivable | | 6,151,604 | 160,383 |
| Prepaid expenses | | 2,859,039 | 2,465,506 |
| **Total current assets** | | **128,441,551** | 44,227,892 |

804.    According to CannTrust's SEC and SEDAR filings, biological assets represented pre-harvest seeds and plants and were reported at fair value less costs to sell at time of harvest. Biological assets were then transferred to inventory when the cannabis plants were harvested. Inventory included harvested finished goods, cannabis in process, extracts, accessories and packing supplies and was valued at the lower of cost and net realizable value.

805.    CannTrust claimed that they valued biological assets and inventory in accordance with IAS Rule 41, which covers "Agriculture that applied to Biological Assets," and IAS 2 and

---

[34] IFRS include International Accounting Standards ("IAS") that were issued by the Board of the International Accounting Standards Committee.

IAS 41.3, which apply to "Inventories that applied to post-harvest products."  However, as discussed above, CannTrust grew and stored cannabis in unlicensed facilities and from black-market seeds that were then improperly recorded as biological assets and inventory for multiple reasons.

806.    First, CannTrust did not have control, including legal ownership, of the biological assets, which is a required condition for asset measurement under IAS 41.10-11.  Under IAS 41, legal ownership requires that the asset is acquired or produced by legitimate means.  Here, CannTrust did not have legal ownership or control over the cannabis grown and stored in unlicensed rooms because it was not produced by legitimate means.  Likewise, the cannabis grown from black-market seeds was unquestionably not acquired by legitimate means.

807.    Second, CannTrust's valuation of biological assets is necessarily overstated because the Company could not and did not accurately account for the **fair market value** of unlicensed cannabis or cannabis grown from black-market seeds.    As mentioned above, CannTrust's biological assets represented "pre-harvest seeds and plants . . . [are] reported at fair value."

808.    However, CannTrust did not and could not demonstrate or report any evidence that a market participant would have been willing to pay the same price for an unlicensed product as a licensed product a**s is required to accurately assess fair market value under IAS 41.8**.[35]  For example, CannTrust could not have identified quoted market prices for unlicensed cannabis products as required by IAS 41.30 because no such market prices for unlicensed or

_____

[35] "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  *See* IFRS 13 Fair Value Measurement.

black-market products existed.  Consequently, CannTrust did not have the ability to reliably measure the fair value of those biological assets.

809.    Moreover, IFRS 13 – Fair Value Measurement, states that in determining fair value, a market participant would be expected to use the asset in its highest and best use, taking into account the use of the asset that is physically possible, ***legally permissible***, and financially feasible.  *See* IFRS 13.28.[36]  Yet, CannTrust still reported increased biological assets during the Class Period, even though it did not and could not accurately account for the fair value of illicitly grown cannabis.  Accordingly, CannTrust violated IFRS in reporting biological assets at the level that they did during the Class Period.

810.    Further, CannTrust did not and could not report inventory that was unlicensed (such as cannabis sold in violation of Health Canada regulations) under IAS 2.7 because the cannabis could not be sold in the ordinary course of business.  Under IAS 2.7, net realizable value is the net amount that an entity expects to realize from the sale of inventory in the ordinary course of business.  The net realizable value of inventory decreases when, for example, inventory is damaged or market prices decline.  Here, such products have a net realizable ***value of zero*** because illicitly grown products cannot be sold in the ordinary course of business, as they were grown in violation of Health Canada regulations.  Consequently, CannTrust vastly overstated the value of inventory during the Class Period.

811.    CannTrust overstated a material portion of the Company's biological assets and inventory during the Class Period.  As discussed above, following Health Canada's discovery of the illicit growing and storing scheme, CannTrust was forced to place the sale of impacted

---

[36] *See also*, IFRS 13.28(b), "A use that is legally permissible takes into account any legal restrictions on the use of the asset that market participants would take into account when pricing the asset."

inventory on hold (*i.e.*, it was unable to sell the inventory). Ultimately, CannTrust estimated that the reported value of the impacted inventory and biological assets was $51 million as of June 30, 2019. As described above, this inventory was later destroyed. As of March 31, 2019, the Company's total inventory and biological assets totaled approximately $77.6 million. Thus, the Company's fraudulent scheme imperiled at least 65% of the reported value of biological assets and inventory. Yet, CannTrust concealed this information from investors.

**(b)     Defendants Recognized Revenue in Violation of International Financial Reporting Standards**

812.    In addition to overstating inventory and biological assets, Defendants also overstated its revenue. Indeed, as discussed below, under relevant IFRS standards, CannTrust was permitted to recognize revenue only for products for which the Company ***held valid legal title***. And because CannTrust generated revenue from cannabis that it grew, stored and sold through illegitimate means, it improperly recognized revenue from any cannabis that was grown or stored in unlicensed rooms or were from black-market seeds.

813.    However, because CannTrust grew and stored cannabis in unlicensed, unregulated rooms and from black-market seeds, CannTrust did not possess legal title and control over the illicitly grown cannabis because it was non-conforming with Health Canada regulations. Nor could CannTrust transfer legal title and control to its customers because it did not have it to begin with. Accordingly, any illicitly grown cannabis that was transferred or sold to CannTrust's customers was subject to immediate return and refund.

814.    According to CannTrust's SEC and SEDAR filings, the Company "[r]evenue is recognized when **control of the goods has transferred to the purchaser** and the collectability is reasonably assured. **This is generally when goods have been delivered, which is also when the performance obligations have been fulfilled under the terms of the related sales**

**contract**."   Like all of its financial information, CannTrust represented to investors that its revenue recognition policy was consistent with IFRS—including the IFRS rules governing revenue recognition, IFRS rule15.31-32.

815.   However, because CannTrust did not have a valid license to produce all of its cannabis (and specifically the illicitly grown cannabis), CannTrust was unable to legitimately transfer ***control*** of the cannabis to its customers.   For accounting purposes (and according to CannTrust's auditor KPMG's IFRS Handbook), **control refers to the right to use, consume, and sell the asset**.   *See* KPMG Revenue – IFRS 15 Handbook, p.114 (hereafter the "KPMG Guide").   The following diagram summarizes the analysis of the transfer of control according to the KPMG Guide, p.149, IFRS 15.38.



816.   In addition to not having legal title to pass, CannTrust also could not establish a second, separate condition for revenue recognition—**that collectability was reasonably assured**, even if the customer had already paid for it—for the simple reason that CannTrust was faced with the very real prospect that customers would demand a refund if the unlicensed ***or*** black market nature of the product was revealed.   In other words, customers could demand a

refund because they were not buying the same product that CannTrust was representing and warranted that it was selling.[37]

817.    In such circumstances, where an entity cannot conclude that a **legally enforceable** contract exists (either because the entity does not have legal title or collectability cannot be reasonably assured), CannTrust was **required to defer the revenue on sales of such products because the customer payments received constitute a deposit liability**.  *See* IFRS 15.16 and 15.B20; KPMG Guide, pp.15, 241.[38]



**Revenue recognition may be deferred for a significant period**

If an entity cannot conclude that a legally enforceable contract exists, then it may be difficult to evaluate when all or substantially all of the promised consideration has been received and is non-refundable. In some cases, an entity may have a deposit liability recognised for a significant period of time before it can conclude that a contract exists in the model or that the criteria for recognising the consideration as revenue are met.

KPMG Guide, p.15

818.    Critically, however, CannTrust's financial statements did not reflect any accounting for deferred revenue as of either December 31, 2018 or March 31, 2019 or at any other time during the Class Period:

---

[37] To be sure, these exact events occurred after Health Canada discovered CannTrust's illicit growing and storing scheme. For example, on August 19, 2019, the Ontario Cannabis Store (OCS) determined that all of its inventory of CannTrust product constituted Non-Conforming Products and would be returned. The value of OCS's inventory at that time was C$2.9 million. This return was substantial despite the fact that it was from a single customer.   Indeed, CannTrust's total revenue for the quarter ended March 31, 2019 was C$16.9 million.  Thus, this customer return accounted for approximately 17% of CannTrust's total quarterly revenue.

[38] *See also*, KPMG Guide § 1.1, "A contract with a customer is in the scope of the standard when the contract is legally enforceable and certain criteria are met. If the criteria are not met, then the contract does not exist for the purpose of applying the general model of the standard, and any consideration received from the customer is generally recognised as a deposit (liability)."

CannTrust Holdings Inc.
Condensed Interim Consolidated Statements of Financial Position
(in Canadian dollars)

| | Notes | March 31, 2019 | December 31, 2018 |
|---|---|---|---|
| **Current** | | | |
| Accounts payable and accrued liabilities | | 11,327,922 | 12,806,458 |
| Current portion of promissory note | | 200,000 | 200,000 |
| Current portion of mortgage | 10 | 13,210,731 | 3,790,610 |
| **Total current liabilities** | | 24,738,653 | 16,797,068 |
| | | | |
| Promissory note | | 400,000 | 600,000 |
| Mortgage | 10 | - | 9,457,876 |
| Lease liability | 3 | 1,785,059 | - |
| Deferred tax | 17 | 7,430,000 | 1,433,000 |
| **Total Liabilities** | | 34,353,712 | 28,287,944 |

819.   Furthermore, under IFRS Rule 15.110, CannTrust was required to disclose sufficient information to enable investors who rely on its financial statements to understand the nature, amount, timing, **and uncertainty** of revenue and cash flows arising from contracts with customers.   During the Class Period, CannTrust failed to disclose the existence of any uncertainty surrounding the Company's revenues and cash flows despite knowing that—as discussed above—there was significant uncertainty surrounding revenue generated from illicitly grown and sold cannabis.

820.   That Defendants did not disclose any such uncertainty is not surprising. Defendants knew that if Health Canada were to discover the illicit growing and storing scheme and use of black market seeds, there was an extremely high probability that CannTrust's customers would return the non-conforming cannabis because, like CannTrust, the customer would no longer have or be able to pass legal title of an unregulated and non-conforming product.   However, CannTrust obviously did not disclose the existence of such regulatory uncertainty because in doing so they would have to simultaneously disclose that the reason for deferring such revenue was because of the uncertainty associated with CannTrust's illicit growing and storing scheme and use of black-market seeds.

821.    Accordingly, CannTrust overstated its revenue because it recognized revenue from illicitly grown and black-market cannabis that was not recognizable under the relevant IFRS and KPMG accounting standards set forth above.

### 2.    KPMG Issued A Clean Audit Report That Containd False and Misleading Statements

822.    In addition to the false and misleading revenue, biological assets, and inventory figures set forth in CannTrust's KPMG audited consolidated financial statements filed on March 27, 2019, KPMG made numerous false and misleading statements in its Audit Report.

823.    Specifically, KPMG's Audit Report misleadingly told investors that KPMG audited the March 27, 2019 Consolidated Financial Statements and that "***the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018***."

824.    KPMG's Audit Report claimed that the auditor had audited the 2018 Annual Financial Statements "***in accordance with the standards of the PCAOB.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud***."

825.    In addition the Audit Report misleadingly reassured investors that "***the audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements***."

826.    The Audit Report continued "***the audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the***

*overall presentation of the consolidated financial statements" and "[KPMG] believe[d] that the audit provide[d] a reasonable basis for [its] opinion*."

827.   Finally, the Audit Report stated "***the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018, and the financial performance and its cash flows for the year then ended, in conformity with IFRS***."

828.   KPMG prepared and consented to the filing of the Audit Report which contained materially false and misleading consolidated financial statements and were incorporated into the Offering Materials. Specifically, the consolidated financial statements contained overstated revenue, biological assets, and inventory amounts that were disseminated to investors in the Offering.  KPMG audited the consolidated financial statements and issued a clean Audit Report despite the fact that these financial figures were materially overstated.

829.   Moreover, KPMG's Audit Report contained the false and misleading statements set forth in paragraphs 823-827.  These statements were false and misleading because they falsely represented that KPMG performed a thorough audit in accordance with PCAOB Standards and relevant audit procedures, when in fact they had not, and that, as a result, CannTrust's consolidated financial statements were free of material misstatement, whether due to error or fraud, when in fact they contained overstated revenue, biological assets, and inventory figures.

### 3.    The Underwriter Defendants Failed to Perform Adequate Due Diligence

830.   Merrill Lynch, Citigroup, Credit Suisse, Jefferies, RBC, and Canaccord underwrote the Offering yet failed to perform satisfactory due diligence with respect to the offering and issuance of CannTrust shares in accordance with their responsibilities.

831.   Underwriters are intended to be gatekeepers and are supposed to serve as independent checks on management and to bring to light critical negative information and risks about the issuer to investors intending on purchasing shares in the offering.   During the due diligence process, the underwriter is charged with reviewing all pertinent documents and interviewing all relevant individuals to identify all aspects of the issuer's operations that need to be disclosed.   As the treatise "Due Diligence - Periodic Reports and Securities Offerings" describes it, "[t]he underwriter should look upon due diligence primarily as an attempt to find 'red flags' which indicate potential danger."

832.   This process provides comfort that investors receive full and fair disclosure of all material facts.   If, during their due diligence investigation, the underwriters learn of material negative information regarding the issuer, they must insist that such information be disclosed to the investing public or withdraw from the offering.   Complete and adequate disclosure is the very purpose of due diligence.   Thus, no amount of due diligence or investigation can serve as a defense or an excuse to an underwriter who possesses material negative information about an issuer and fails to disclose such information to the public.

833.   An underwriter needs to conduct substantial due diligence in connection with each public offering to ensure the timeliness and accuracy of the information as of the date of the offering.   Moreover, Underwriters must conduct their due diligence with the reasonable care "required of a prudent man in the management of his own property."   *See* 15 U.S.C. §77(k)(c).

834.   Likewise, according to well-regarded treatises covering due diligence "[m]aterial federal, state and local regulations affecting the target company should be understood and, where appropriate, reviewed with target company or special counsel."   *See* Due Diligence in Business Transactions, Lawrence, release 48, 2018, Law Journal Press, §1.05 [h].   Additionally, it may be

desirable for a member of the target company's management to assemble a list of material licenses and permits that it possesses in connection with the operation of its business or the ownership of its property." *See id.*

835.    For issuers that conduct business in regulated industries (such as cannabis ) the underwriters (or the underwriters' counsel) are obligated to review the  regulatory status of the issuer.   First, underwriters ask underwriters' counsel to undertake  an investigation of the applicable laws and regulations affecting the issuer; second, underwriters or their counsel review correspondence between the applicable regulatory agencies and the issuer; and third, underwriters interview the issuer's general counsel or other responsible parties concerning regulatory compliance.

836.    According to one well-regarded treatise, in such circumstances the Underwriter Defendants (or their counsel) were required to engage in a "comprehensive document review" of CannTrust's regulatory filings, permits, and licenses to ensure that the issuing company was in compliance with applicable regulations.   According to one leading treatise on due diligence, "comprehensive document review" should cover:

  i.    Notices to and from regulatory authorities including notices of violation.

  ii.    Correspondence with regulatory authorities, including requests and responses…

  iii.    Audit and inspection reports . . .

  iv.    Permits and permit applications (especially when pending), related memoranda and correspondence.

  v.    Management/review committee reports, memoranda, intracompany correspondence…

*See* Due Diligence – Periodic Reports and Securities Offerings 2014- 2015 Edition, Haft, Haft & Hudson, Thompson Reuters, § 2.23 (e).

837.    Critically, in conducting due diligence, an underwriter cannot simply rely on management statements and representations, and instead must conduct a reasonable investigation to independently verify management's statements.  Similarly, underwriters may not rely on an accountant's or auditor's report as adequate due diligence for financial statements.  Rather, underwriters have a duty to perform their own financial analysis of the issuer and identify for themselves any red flags, inconsistencies, or areas of concern that impact the issuer's business and financial condition, and follow up on any issues that they uncover in their investigation. Underwriters are uniquely positioned to investigate non-audited financial statements and protect investors.

838.    As discussed above, there were numerous red flags contained in CannTrust's consolidated financial statements and other documents included in the Offering Materials.  For example, in the fourth quarter of 2018, CannTrust's cannabis volume tripled as compared to the three earlier quarters in 2018.  As a result, total grams of cannabis sold by CannTrust in Q4 2018 constituted at least 50% of total grams sold during the entire fiscal year 2018.  A comprehensive document review of CannTrust's consolidated financial statements and the underlying materials should have included a review of this unprecedented increase in production capacity from the Niagara Facility as well as an inquiry into the source of the cannabis and confirmation that the appropriate regulatory licenses permits were in place.

839.    Here, the Underwriters failed to perform any such due diligence.  Had they done so, the Underwriter Defendants would have uncovered the fact that CannTrust was materially overstating its revenue, biological assets, and inventory as a result of growing and storing cannabis in unlicensed rooms and growing cannabis from black-market seeds in violation of Health Canada regulations.

## XVIII. CLASS ALLEGATIONS

840.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired CannTrust common stock pursuant and traceable to the Offering Materials issued in connection with the secondary public offering, completed on May 6, 2019 (the "Offering").  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of CannTrust during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (v) CannTrust's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

841.    The members of the Class are so numerous that joinder of all members is impracticable.  According to its quarterly and annual reports filed with the SEC, during the Class Period, CannTrust had approximately 136,563,951 shares of common stock outstanding and was actively traded on the NYSE under the ticker symbol "CTST," on the TSX under the ticker symbol "TRST," and, prior to February 25, 2019, on the OTC Market under the ticker symbol "CNTTF."  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by CannTrust and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

842. Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by the Security Act Defendants' allegedly wrongful conduct in violation of the Security Act as complained of herein.

843. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

844. Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a) Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b) Whether the Offering Documents were negligently prepared and contained inaccurate statements of material fact and/or omitted material information required to be stated therein;

(c) Whether, and to what extent, the market price of CannTrust common stock and exchange-traded options on such common stock was artificially inflated because of the material misstatements alleged herein;

(d) Whether the Securities Act Individual Defendants were controlling persons of CannTrust; and

(e) Whether the members of the Securities Act Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

845.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIX.   CAUSES OF ACTION

### COUNT III

**For Violations of Section 11 of the Securities Act**
**Against The Securities Act Defendants**

846.    Plaintiffs repeat and reallege the allegations contained in paragraphs 707-845 above as if fully set forth herein.

847.    This cause of action is predicated upon the Securities Act Defendants' strict liability for making false and materially misleading statements and omissions in the Registration Statement, which incorporated all Offering Materials.

848.    This Cause of Action does not sound in fraud.  Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Cause of Action.  Lead Plaintiffs do not allege for this cause of Action that the Securities Act Defendants had scienter or fraudulent intent, which are not elements of this claim.

849.    This cause of Action is brought pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. §77k, on behalf of all persons who purchased CannTrust common stock pursuant to and/or traceable to the Offering, in which shares registered under the Registration Statement were sold.

850.     CannTrust is the issuer of the securities purchased by Lead Plaintiffs and the Class.  As such, CannTrust is strictly liable for the materially untrue statements contained in the Offering Materials and the failure of the Offering Materials to be complete and accurate.

851.     The Individual Securities Act Defendants each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf.  As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Individual Securities Act Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document contained all facts required to be stated therein.  These Individual Securities Act Defendants failed to conduct a reasonable investigation and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misleading.  Accordingly, the Individual Securities Act Defendants are liable to Lead Plaintiffs and the Class.

852.     KPMG is strictly liable for the contents of the Registration Statement as the auditor of CannTrust's 2018 financial statements that consented to the inclusion of its expert report and opinion pursuant to Section 11(a)(4) of the Securities Act.

853.     The Underwriter Defendants each served as underwriters in connection with the Offering.  As such, each is strictly liable for the materially inaccurate statements contained in the Offering Materials and the failure of the Offering Materials to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  These

defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials. They had a duty to ensure that the Offering Materials were true and accurate, that there were no omissions of material facts that would make the Offering Materials misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Offering Materials and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Lead Plaintiffs and the Class.

854. By reason of the conduct herein alleged, each of the Securities Act Defendants named herein violated Section 11 of the Securities Act.

855. Lead Plaintiffs acquired CannTrust common stock pursuant or traceable to the Registration Statement used for the Offering and without knowledge of the material omissions or misrepresentations alleged herein.

856. Lead Plaintiffs and the Class have sustained damages, as the value of CannTrust common stock has declined substantially subsequent to and due to the Securities Act Defendants' violations.

857. This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

858. By virtue of the foregoing, Lead Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Securities Act Defendants, jointly and severally.

## COUNT IV

### For Violation of Section 12 (a)(2)  of the Securities Act of 1933
### Against The Securities Act Defendants

859.    Lead Plaintiffs repeat and reallege the allegations contained in paragraphs 707-845 above as if fully set forth herein.

860.    This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against the Securities Act Defendants.

861.    This cause of action does not sound in fraud.  Lead Plaintiffs do not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.  This Count is based solely on negligence and/or strict liability.  Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

862.    Each of the Defendants named in this Count were sellers, offerors, and/or solicitors of purchasers of the Company's common stock pursuant to the defective Offering Documents.  The actions of solicitation by the Defendants named in this Count included participating in the preparation of the false and misleading Offering Documents, roadshow, and marketing of CannTrust common stock to investors, such as Lead Plaintiffs and the other members of the Class.

863.    The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

864.     Each of Defendants named in this Count owed to the purchasers of CannTrust's common stock, including Lead Plaintiffs and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of these Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.

865.     Lead Plaintiffs did not know, nor in the exercise of reasonable diligence could Lead Plaintiffs have known, of the untruths and omissions contained in the Prospectus at the time Lead Plaintiffs purchased CannTrust shares.

866.     By reason of the conduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violation, Lead Plaintiffs and the other members of the Class who purchased CannTrust shares pursuant to the Registration Statement sustained substantial damages in connection with their share purchases. Accordingly, Lead Plaintiffs and the other members of the Class who hold the shares issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members who have sold their CannTrust shares seek damages to the extent permitted by law.

## COUNT V

### For Violation of Section 15 of the Securities Act of 1933
### Against CannTrust, the Individual Securities Act Defendants, Cannamed, and Cajun

867.   Lead Plaintiffs repeat and reallege the allegations contained in paragraphs 707-845 above as if fully set forth herein.

868.   This cause of action is brought pursuant to Section 15 of the Securities Act of 1933, 15 U.S.C. §77o, on behalf of all persons who purchased CannTrust common stock pursuant to and/or traceable to the Offering, against CannTrust, the Individual Securities Act Defendants, Cannamed and Cajun. This count is based solely on claims of strict liability and/or negligence under the Securities Act.

869.   At all relevant times, the Individual Securities Act Defendants each were control persons of CannTrust by virtue of their positions as directors and/or senior officers of the Company.  Each of the Individual Defendants had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major stockholders of CannTrust.

870.   At all relevant times, Cannamed and Cajun were control persons of CannTrust by virtue of their stockholdings in the Company and their affiliated Board members.  CannTrust controlled the Individual Securities Act Defendants and all of its employees.

871.   CannTrust, Cannamed, Cajun and the Individual Securities Act Defendants did not conduct a reasonable investigation or possess a reasonable basis for the belief that the statements contained in the Offering Materials were true, were without omission of material fact, and were not misleading.

872.   CannTrust, and the Individual Securities Act Defendants each were culpable participants in the violations of Section 11 of the Securities Act alleged in the First Cause of

Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

873.    As a direct result of the aforementioned conduct, these Class members suffered damages in connection with their purchase of CannTrust common stock. This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action is a proper class action, and certifying Lead Plaintiffs as the Securities Act Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel for the Securities Act Class;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Securities Act Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding Lead Plaintiffs and the Securities Act Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## **JURY DEMAND**

Plaintiffs demand a trial by jury as to both the Exchange Act Claims and the Securities Act Claims.

DATED:  June 26, 2020

Respectfully submitted,

*/s/ James W. Johnson*
James W. Johnson
Michael H. Rogers
David J. Schwartz
James T. Christie
Philip J. Leggio
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com
pleggio@labaton.com

*Counsel for Lead Plaintiffs Granite
Point Capital Master Fund, LP and
Granite Point Capital Scorpion
Focused Ideas Fund, and
Lead Counsel for the Class*

Shannon L. Hopkins (SH-1887)
Andrew W. Rocco (Pro Hac Vice
forthcoming)
Michael J. Keating (Pro Hac Vice
forthcoming)
LEVI & KORSINSKY, LLP
1111 Summer Street, Suite 403
Stamford, CT 06904
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
arocco@zlk.com
mkeating@zlk.com

*Counsel for Additional Plaintiff Dr.
Silva*